# EXHIBIT "C"

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - -x

JUSTIN T. MAHER,

              Plaintiff,

                                   14-CV3586

   -against-                       (VLB)

CAITLIN H. RAILO and QUALITY
BUS SERVICE, LLC,

              Defendants.

- - - - - - - - - - - - - - - - - - - - -x

                   Thursday,
                   March 26, 2015
                   10:05 a.m.

           EXAMINATION BEFORE TRIAL
   of the Defendant, CAITLIN H. RAILO, held pursuant
to Court Order, held at the Taconic Correctional
Facility, 250 Harris Road, Bedford Hills, New
York, before a Notary Public within and for the
State of New York.

**CSR**

**CLASSIC
SHORTHAND
REPORTING
LIMITED**

**LIMITED**

Ph: (845) 634-2022
Fax: (845) 634-2046

67 NORTH MAIN STREET
NEW CITY, NEW YORK 10956
classicreporters@aol.com

COPY

Received
Saugerties Office

APR 08 2015

Maynard, O'Connor, Smith &
Catalinotto, LLP

A P P E A R A N C E S:


COGNETTI & CIMINI, ESQS.
        Attorneys for Plaintiff
        Scranton Electric Building
        507 Linden Street
        Scranton, Pennsylvania  18503
BY:   VINCENT CIMINI, ESQ.,
         -and-
        SARAH LLOYD, ESQ.



FOULKE LAW OFFICES
        Attorneys for Plaintiff
        25 Main Street
        Third Floor
        Goshen, New York  10924
BY:   EVAN M. FOULKE, ESQ.



LaROSE & LaROSE, ESQS.
        Attorneys for Defendant
        Caitlin H. Railo
        510 Haight Avenue
        Poughkeepsie, New York  12603
BY:   KEITH V. LaROSE, ESQ.



MAYNARD, O'CONNOR, SMITH & CATALINOTTO, LLP.
        Attorneys for Defendant
        Quality Bus Service, LLC
        P.O. Box 180
        Saugerties, New York  12477
BY:   MICHAEL E. CATALINOTTO, JR., ESQ.



oOo

3

S T I P U L A T I O N S

       IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties hereto, that this examination may be signed and sworn to before any Notary Public of the State of New York.

       IT IS FURTHER STIPULATED AND AGREED that the filing and certification of the said examination shall be waived.

       IT IS FURTHER STIPULATED AND AGREED that all objections to questions, except as to form, shall be reserved for the trial of this action.

4

```
 1
 2        C A I T L I N    H.     R A I L O,     a
 3             Defendant herein, having been first duly
 4             sworn by Melissa Shelton, a Notary Public
 5             of the State of New York, was examined
 6             and testified as follows:
 7                  THE COURT REPORTER:  Please state
 8             your name and where you are currently
 9             housed and your DIN number for the
10             record.
11                  THE WITNESS:  Caitlin H. Railo, at
12             Taconic Correctional Facility, 14-G0401.
13   EXAMINATION BY
14   MR. CIMINI:
15        Q.    Good morning.
16        A.    Good morning.
17        Q.    Would you please state your full
18   name for the record?
19        A.    Caitlin Helen Railo.
20        Q.    Ms. Railo, my name is Vincent
21   Cimini.  We were just introduced a few minutes
22   ago.  I along with Sarah Lloyd and Evan Foulke
23   represent Justin Maher in the lawsuit that was
24   filed against you and against Quality Bus, and
25   we came here today to take your deposition.
```

5

1                              CAITLIN H. RAILO

2      It's basically a question and answer session.

3                  Before we begin, before I ask you

4      questions, I just want to lay a few ground rules

5      that I think will make this go a little

6      smoother.  Okay?

7                  You can see to my right there is a

8      court reporter here, and her job is to take down

9      my question and your answer, so it's important

10     that before you give your answer to a question,

11     that you wait until I fully finish my question.

12     Is that okay?

13          A.     Absolutely.

14          Q.     And just like you're doing now,

15     make your answers verbal as opposed to any kind

16     of shake of the head or nod of the head or any

17     kind of grunt other than a yes or a no.  Is that

18     fair?

19          A.     Absolutely, yes.

20          Q.     Okay.  Thank you.  If at any time

21     you do not hear or understand a question, please

22     let me know and I'll rephrase the question.

23     Okay?

24          A.     Okay.

25          Q.     If at any time you want to take a

6

                        CAITLIN H. RAILO

1

2    break, if at any time you want to discuss

3    something with your counsel, you need to use the

4    restroom, whatever, just let us know and we'll

5    be happy to accommodate you.  Okay?

6           A.    Yes.

7           Q.    Can I call you Caitlin?

8           A.    Yes.

9           Q.    Caitlin, can you tell me your date

10   of birth?

11          A.    August 12th, 1981.

12          Q.    And are you currently taking any

13   type of prescribed medications?

14          A.    Yes.

15          Q.    What are you taking currently?

16          A.    Clonidine, one milligram twice a

17   day.

18          Q.    Anything else?

19          A.    Tegretol, 200 milligrams, twice a

20   day.

21          Q.    How many times a day?

22          A.    Twice.  Neurontin, 200 milligrams

23   in the p.m.  Ibuprofen, 600 milligrams, twice a

24   day, and a cholesterol medication.  I don't

25   remember the name, to be honest with you.  I

7

```
 1                          CAITLIN H. RAILO
 2      could find out.  I just don't remember the name.
 3              Q.     Okay.  That's fine.  Anything else?
 4              A.     No.
 5              Q.     Do any of those medications affect
 6      your ability to hear or understand questions
 7      that I'm asking you today?
 8              A.     No.
 9              Q.     Do you believe that any of those
10      medications that you're on would impair your
11      ability to answer questions today?
12              A.     No.
13              Q.     What is the Tegretol?
14              A.     Seizure medication.
15              Q.     Seizure medication?
16              A.     Yes.
17              Q.     And the Neurontin, what are you
18      taking that for?
19              A.     Pain.
20              Q.     And the Clonidine?
21              A.     Blood pressure.
22              Q.     And the Ibuprofen?
23              A.     Pain.
24              Q.     Pain.  And you said you're also
25      taking a cholesterol med?
```

8

                    CAITLIN H. RAILO

1

2          A.     Yes.  Lopid, that's it.  L-O-P-I-D.

3          Q.     Do you currently suffer from

4   seizures?

5          A.     Yes.  Not with the medication.

6          Q.     Okay.  How long has that been the

7   case?

8          A.     Since I've had seizures?

9          Q.     Yes.

10         A.     I don't remember the first time I

11   had one.  It's been years.  I haven't had one

12   since last year, but it's been over five years.

13         Q.     How often were you getting the

14   seizures?

15         A.     It all depends on -- it depends on

16   everything, what I'm doing, my diet, medication

17   that I'm on.  It depends on everything.  Stress

18   levels.

19         Q.     Have you suffered from seizures

20   since you were a young child?

21         A.     No.

22         Q.     When did the seizures start?

23         A.     Car accident when I was a teenager.

24         Q.     When you were a teenager?

25         A.     Mid twenties.

CAITLIN H. RAILO

1

2      Q.    I'm sorry?

3      A.    Twenties.

4      Q.    In your twenties?

5      A.    Um-hum.

6            THE COURT REPORTER:  Yes?

7            THE WITNESS:  Yes.

8      Q.    Where was that car accident?

9      A.    Wallkill.

10     Q.    Were you driving?

11     A.    No.

12     Q.    You were a passenger.  Who was

13   driving the car?

14     A.    My ex.  I don't want to say his

15   name.

16     Q.    Was there a police report as a

17   result of the accident?

18     A.    Yes.

19     Q.    Did it involve another vehicle?

20     A.    No.

21     Q.    Did you strike your head as a

22   result of the accident?

23     A.    (Indicating affirmative response.)

24     Q.    You have to say yes.

25     A.    Yes.  Sorry.  Yes.

1                    CAITLIN H. RAILO

2          Q.    Since that time, up until last

3    year, I think you said you would have seizures?

4          A.    Um-hum, yes.

5          Q.    And you can't tell me how often per

6    year you would have seizures per month during

7    that time period?

8               MR. LaROSE:  I'm not sure I

9          understand the question.  She's already

10         said if she is on her medication she

11         doesn't have them.

12         Q.    When did you start taking the

13   medication for seizures?

14         A.    Years ago.  I was on a different

15   medication.  I was on Depakote.

16         Q.    Depakote?

17         A.    Um-hum.

18         Q.    The accident happened when you were

19   in your twenties you said?

20         A.    Yes.

21         Q.    Do you remember the year?

22         A.    No.

23         Q.    And did you say where it happened,

24   Wallkill?

25         A.    Yes.

11

CAITLIN H. RAILO

1

2      Q.    Wallkill, New York?

3      A.    Yes.

4      Q.    When did you suffer your first

5   seizure following that accident?

6      A.    About six months later.

7      Q.    When did you first start taking

8   medication as a result of the seizures?

9      A.    When I had a seizures.

10     Q.    How many seizures would you say

11  you've had?

12     A.    I don't know.

13     Q.    More than one?

14     A.    Yes.

15     Q.    More than ten?

16     A.    No.

17     Q.    More than five?

18     A.    I can't remember how many.

19     Q.    When was the last seizure that you

20  had?  You said a year ago?

21     A.    Yes.

22     Q.    Was that while you were in prison?

23     A.    County.

24     Q.    When you were in county prison?

25     A.    Yes, county jail.

12

CAITLIN H. RAILO

1

2      Q.      What doctor prescribed the

3   Depakote?

4      A.      I don't remember.  I've seen too

5   many doctors.  I think started in a rehab and

6   then just carried along when I left the rehab.

7   The seizures really only came most of the time

8   with drug use.

9      Q.      You said a couple of things are

10   going to prompt me to ask you some questions,

11   and let me just preface, you know, these

12   questions by saying it's not my intention to

13   embarrass you or to make you feel uncomfortable,

14   but I'm doing my job and I have to ask these

15   questions, so I apologize for the nature of the

16   questions that I have to ask, but please, I hope

17   you understand that I really have to do this.

18   Okay?  I appreciate your --

19      A.      Yes.

20      Q.      -- your cooperation.

21              You mentioned something about your

22   seizures happening with drug use?

23      A.      Yes.

24      Q.      What type of drug use are you

25   talking, illegal drug use?

13

1                          CAITLIN H. RAILO

2              A.    Pills.  I've done drugs when I was

3      younger.  I mean, through my whole teenage

4      years, early twenties, of course.

5              Q.    What kinds of drugs were you doing

6      in the early -- your teenage years and early

7      twenties?

8              A.    Drinking, pills.

9              Q.    What kind of pills?

10             A.    I don't remember.  Ecstasy.  I

11     mean, normal -- I don't know.  Just alcohol,

12     Ecstasy.

13             Q.    Marijuana?

14             A.    Every once in a while, yes.

15             Q.    Cocaine?

16             A.    Not really.

17             Q.    Ever?

18             A.    No, I have a few times.  I just

19     don't like it.

20             Q.    How about heroin?

21             A.    Um-hum, yes.

22             Q.    Yes.  How long did your drug use

23     last?

24             A.    Until five years ago when I went on

25     Suboxone.

14

1                    CAITLIN H. RAILO
2          Q.    You said "five years ago."  So,
3    that would have been -- it's 2015 -- so 2010?
4          A.    2010, yes.
5          Q.    Now, I named some drugs including
6    heroin, cocaine, marijuana, Ecstasy, alcohol.
7    Did you use any other drugs that I didn't
8    mention?
9          A.    That's basically all of them.
10         Q.    Who prescribed the Suboxone in 2009
11   or 2010?
12         A.    Dr. Galli.
13              THE COURT REPORTER:  How do you
14         spell that?
15              THE WITNESS:  G-A-L-L-I.
16         Q.    Who is Dr. Galli?
17         A.    Viviana Galli.  She works out of
18   Port Jervis.  She's actually out of the mental
19   clinic.
20              MR. CATALINOTTO:  I'm sorry, what
21         clinic?
22              THE WITNESS:  Mental.
23              MR. CATALINOTTO:  Okay.
24         Q.    What's the name of the clinic?
25         A.    Just Port Jervis Medical Center,

15

CAITLIN H. RAILO

1
2    Port Jervis Mental Health, one of them.

3        Q.    When did you first start seeing Dr.

4    Galli?

5        A.    Five, six years ago.

6        Q.    And you mentioned something about

7    being in rehab.  Were you ever in rehab for your

8    drug or alcohol use?

9        A.    Yes.

10        Q.    Can you tell me when and where?

11        A.    I don't remember.  Middletown.  I

12    don't actually remember the name of the place

13    right now.

14        Q.    Do you remember when?

15        A.    This was years and years ago.

16    Twenties.

17        Q.    When you were in your twenties?

18        A.    Um-hum.

19        Q.    Early twenties, mid-twenties or

20    late twenties?

21        A.    Early and mid-twenties.

22        Q.    When was the last time you were in

23    rehab -- let me just finish the question.

24        When was the last time you were in

25    rehab for drugs and/or alcohol?

16

1                        CAITLIN H. RAILO

2            A.    I don't remember.  It was years

3      ago.  I don't remember the year.

4            Q.    Okay.  Let's use the bus accident

5      as maybe a frame of reference.  That happened in

6      February of 2013.

7                  Using that as a frame of reference,

8      can you tell me when the last time you would

9      have been in rehab prior to that date?

10           A.    No, that doesn't help.  Before my

11     daughter was born.  My daughter is eight, so it

12     had to be nine, ten years ago.

13           Q.    That was the last time you were in

14     rehab?

15           A.    Yes.

16           Q.    Do you remember where that place

17     was?

18           A.    Daytop, actually.

19           Q.    What is it called?

20           A.    Daytop.

21           Q.    And where is that located?

22           A.    Rhinebeck.

23           Q.    Rhinebeck, New York?

24           A.    Yes.

25           Q.    Have you ever been deposed before

17

1                    CAITLIN H. RAILO

2      like this?

3           A.    No.

4           Q.    Did you review any documents in

5      order to prepare for today's deposition?

6           A.    No.

7           Q.    Did you talk to anyone other than

8      your attorney about today's deposition?

9           A.    No.

10          Q.    Now, of course you know why we're

11     here.  We're going to ask you questions about

12     your background, you know, leading up to the

13     date of the accident on February 14th, 2013.

14     That was the day of the bus accident.  Do you

15     remember that accident?

16          A.    Yes.

17          Q.    Why, in your own words right now,

18     just tell me what you remember about that

19     accident and then later on I'm going to get into

20     some more detail, but just for now, tell me what

21     you recall about that.

22          A.    There is not really much to say.  I

23     just remember I was making a turn and his car

24     came out of nowhere.  I mean, he was -- I mean,

25     not that he came out of nowhere, but he was

CAITLIN H. RAILO

1

2    quickly -- he came because I'm in a bus, so I'm

3    higher, and that turn is really sharp.  If I was

4    in my car, I wouldn't be able to see around that

5    turn at all, as I was higher, I could see more

6    around that turn, and I did not see him coming.

7    I would have had ample time to come if I saw him

8    coming.

9         Q.    Again, we'll get into some more

10   detail later on.  Can you tell me what road were

11   you traveling on when the accident happened?

12        A.    What was that?  42?  I don't

13   remember what the name of the road.  209?  208.

14        Q.    Again, this is another instruction

15   for you.  If you do not know an answer or you

16   don't remember an answer to a question, please

17   tell me that you don't know or you don't

18   remember.  I don't want you to guess.

19        A.    I don't remember.

20        Q.    Unless your guess is a pretty good

21   guess and you feel confident with that guess.

22             MR. LaROSE:  Don't worry about it.

23          They have the police report.  They can

24          identify the roads.

25        Q.    I'm just trying to get what you

19

CAITLIN H. RAILO

1

2    remember, that's all.  Okay?

3              What was your last home address

4    before you went into prison as a result of this

5    accident?

6         A.    White Street.  5 White Street.

7         Q.    In what town?

8         A.    Port Jervis.

9         Q.    And who were you living with at

10   that place?

11        A.    Myself, my daughter.

12        Q.    What is your daughter's name?

13        A.    Alexis.

14        Q.    And you said she's eight years old?

15        A.    Yes.

16        Q.    Who currently has custody of

17   Alexis?

18        A.    My mother.

19        Q.    What is your mother's name?

20        A.    Sheila Metcalf.

21        Q.    Do you know when you're going to be

22   released from prison?

23        A.    November.

24        Q.    Of what year?

25        A.    This year or March of 2016.

20

1                         CAITLIN H. RAILO

2              Q.     And where do you intend to reside

3        after you're released?

4              A.     My mother's probably.

5              Q.     Where is that address?

6              A.     807 Oakland Valley Road,

7        Cuddebackville, New York.

8              Q.     Have you ever been married?

9              A.     Yes.

10             Q.     What was your husband's name?

11                    THE WITNESS:   Do I have to say my

12             husband's name?

13                    MR. LaROSE:   Yes.

14             A.     Eric Baisley.

15             Q.     How do you spell the last name?

16             A.     B-A-I-S-L-E-Y.

17             Q.     When were you and Eric married?

18             A.     July of 2011.

19             Q.     Would it be fair to say that you

20        got divorced from Eric at some point?

21             A.     No.

22             Q.     You're still married?

23             A.     Yes.

24             Q.     Did you become separated from Eric?

25             A.     Yes.

21

1              CAITLIN H. RAILO

2          Q.     When did you and Eric separate?

3          A.     Three years ago.

4          Q.     Is Eric the father of your

5     daughter?

6          A.     No.

7     *     Q.     Who's the father of your daughter?

8          MR. LaROSE:   Is that really

9     necessary?

10          THE WITNESS:   No, it's not.

11          MR. CIMINI:   It could be.   I don't

12     know.

13          MR. LaROSE:   How does that relate

14     to this accident or anything that leads

15     up to it?

16          MR. CIMINI:   It relates to all of

17     her background, could potentially be

18     important.   At this point, I don't know.

19     It's a simple question.   I believe it's a

20     fair question.   If you're going to tell

21     her not to answer, tell her not to answer

22     and we'll bring it up with the judge.   I

23     don't want to delay this.

24          MR. LaROSE:   Do you mind telling

25     her who the father of your child is?

22

1                    CAITLIN H. RAILO

2              THE WITNESS:  Yes, I do mind.

3              MR. LaROSE:  She doesn't want to

4         answer.

5         Q.    Were you married to anyone else

6    other than Eric Baisley?

7         A.    No.

8         Q.    Do you have any other children

9    other than your eight-year-old daughter?

10        A.    No.

11        Q.    Have you ever gone by any name

12   other than Caitlin Railo?

13        A.    Or Metcalf Railo.  That's my mom's

14   name, but that's not my legal name.

15        Q.    All right.  Just before we get to a

16   document that I want to show you, how do you

17   spell Caitlin?

18        A.    C-A-I-T-L-I-N.

19        Q.    Did you ever spell it C-A-I-T-

20   L-Y-N?

21        A.    Yes.

22        Q.    Is there any reason why you

23   would -- Did you use both a Y and an I?

24        A.    I used it when I was a teenager

25   which it just kind of stuck.

23

CAITLIN H. RAILO

1

2     Q.    We've seen documents where it

3     appears that your name is spelled with at one

4     time an I-N, and then another time a Y-N, and I

5     was just trying to understand why there was a

6     difference.

7          A.    Probably -- I don't think about it

8     because I used to spell it with a Y.

9          Q.    And you said you've gone by the

10    name Caitlin Metcalf, as well?

11         A.    Yes.

12         Q.    Have you ever used the name Kate

13    Railo or Kate Metcalf?

14         A.    No.  Kate was my original name on

15    my birth certificate.

16              MR. CIMINI:  And actually that's

17         what we're going to mark as the first

18         exhibit, and I want to show you Railo A.

19              (Whereupon, a copy of an original

20         birth certificate was marked as Railo

21         Exhibit A for Identification as of this

22         date.)

23              (Document submitted.)

24         Q.    Caitlin, I just handed you what we

25    just marked as Railo Exhibit A, and it's a copy

24

1                        CAITLIN H. RAILO

2        of your original birth certificate and it has

3        the name of Kate Helen Railo.  Do you see that?

4               A.    Yes.

5               Q.    And is that your date of birth,

6        8/12/81?

7               A.    Yes.

8               Q.    And then there appears to have been

9        an amendment to your birth certificate; correct?

10              A.    Yes.

11              Q.    And that amendment occurred on

12       March 17th, 2009, and that indicates that you've

13       changed your --

14              A.    2009.  That was when I was one.

15              Q.    2009?

16              A.    Nothing happened in my birth

17       certificate in 2009.

18              Q.    I'm just looking at the date

19       issued.  There is a date issued.

20              A.    I had to get a new one in Bergen

21       County, that was in 2009.  I didn't have an

22       original birth certificate.

23              Q.    Okay.  So -- but at some point your

24       name was changed from -- legally changed from

25       Kate to Caitlin; correct?

1                    CAITLIN H. RAILO

2        A.    Yes, my mom did it when I was one

3   years old or two.

4        Q.    Well, that's what I wanted to ask.

5   When did that occur?

6        A.    I was a baby when she did that, one

7   or two years old.

8        Q.    Okay.  Because looking at this

9   document, I just thought that that occurred

10  maybe in 2009.

11       A.    No.  Date issued.  That's when I

12  got a copy.

13       Q.    Okay.  And would you confirm what

14  your Social Security number is?

15            MR. CIMINI:  And I would ask that

16        the court reporter only put the last four

17        digits in the record.

18       A.    Are you saying it's on this paper?

19            MR. LaROSE:  He is asking, from

20        memory.

21       A.    XXX-XX-5139.

22       Q.    And do you know what name is listed

23  on your Social Security card?

24       A.    Caitlin Helen Railo.

25       Q.    Have you ever been issued more than

1              CAITLIN H. RAILO

2    one Social Security card?

3         A.    I think I got a copy of one before.

4         Q.    Would it have the same name on it

5    as far as you know?

6         A.    Yes.

7              MR. LaROSE:  Off the record.

8              (Discussion off the record.)

9         Q.    Do you know how your name is

10   spelled on your Social Security card?

11        A.    The same way, I would assume.

12        Q.    The same way as what?

13        A.    My birth certificate.

14        Q.    Okay.  C-A-I-T-L-I-N?

15        A.    Yes.

16        Q.    It appears that at times you may

17   have used the last name Metcalf; is that

18   correct?

19        A.    Yes.  My mom had me use that name

20   when I was younger until I went and got a birth

21   certificate and it said Railo is my father's

22   name, Metcalf is my mom's name.  My mom didn't

23   want me to have anything to do with my father

24   when I was younger, so she had me use Metcalf

25   without me knowing that Railo was my real name,

CAITLIN H. RAILO

1

2      so through all of school I used Metcalf.

3            Q.    When did you start using Railo?

4            A.    When I went for my driver's license

5      and needed my birth certificate.

6            Q.    That was the first time that you

7      transitioned from Metcalf to Railo?

8            A.    Yes.

9            Q.    Where were you born, Caitlin?

10           A.    Westwood, New Jersey.

11           Q.    And where did you grow up?

12           A.    I moved from Jersey when I was six

13     and then New York.

14           Q.    Where in New York?

15           A.    Middletown, Bloomingburg, Walker

16     Valley, Cuddebackville.

17           Q.    Were you raised by your mother?

18           A.    Yes.

19           Q.    Did you ever know your father

20     growing up?

21           A.    Not until I was, I want to say,

22     eighteen, nineteen.

23           Q.    What is your father's name?  We

24     know his last name is Railo.

25           A.    Craig.

CAITLIN H. RAILO

1

2          Q.     Craig?

3          A.     Um-hum.  He is not alive anymore.

4          Q.     When did he pass?

5          A.     My honeymoon.

6          Q.     Which was what year?

7                 MR. LaROSE:  2011.

8          Q.     Do you have any brothers or

9    sisters?

10         A.     Not by the same mother, same

11   father.

12         Q.     Do you have any half-brothers and

13   sisters?

14         A.     I have two that I talk to, yes.

15   Megan Hanath, H-A-N-A-T-H, Josh.  Megan and

16   Josh.

17         Q.     Do they live in New York?

18         A.     Yes.

19         Q.     And you say you still talk to them?

20         A.     I haven't talked to them in

21   probably two years, though.

22         Q.     And you have other half-brothers

23   and sisters that you don't talk to; is that

24   correct?

25         A.     Yes.

29

1                              CAITLIN H. RAILO

2              Q.     What are their names?

3              A.     Jenny, Kyle -- I think Kyle, Kelly,

4       Craig.   That's it.

5              Q.     Caitlin, can you just try to give

6       me a sense of what your educational background

7       is starting from grade school forward?  Tell me

8       about what schools you went to.

9              A.     I got my GED, and then I went to

10      OCC, Orange County Community College, I went to

11      Dutchess Community College and I went to MTI.

12             Q.     Where did you go to grade school?

13             A.     Elementary?

14             Q.     Yeah.

15             A.     Jersey, in Westwood.

16             Q.     What's the name of the school?

17             A.     I don't know.  I don't remember.

18             Q.     Did you attend high school

19      anywhere?

20             A.     Pine Bush.

21             Q.     Where is that?

22             A.     In Pine Bush.  It's just called

23      Pine Bush High School.  It's in New York.

24             Q.     How far did you get through high

25      school?

1                    CAITLIN H. RAILO

2          A.    Tenth grade.

3          Q.    And then you said you got your GED?

4          A.    Yes.

5          Q.    When did you get your GED?

6          A.    I don't remember the exact year.

7    As soon as I dropped out.

8          Q.    I'm sorry, as soon as you dropped

9    out?

10         A.    Yes.

11         Q.    And then you went to, you said,

12   Orange County?

13              MR. LaROSE:  Orange Community

14         County College, Dutchess Community County

15         and MCI.

16              THE WITNESS:  MTI.

17              MR. LaROSE:  Oh, MTI.

18         Q.    Did you obtain a degree in Orange

19   Community County?

20         A.    Degree, no.

21         Q.    What kind of classes did you take

22   there?

23         A.    Criminal justice, math and English.

24         Q.    How many years did you attend

25   Orange Community County?

CAITLIN H. RAILO

1

2          A.    One.

3          Q.    I think you also said you went to

4     Dutchess?

5          A.    Yes.

6          Q.    And how long did you go there?

7          A.    Just the one, just one year to

8     finish women's health.

9          Q.    I'm sorry, what was that?

10         A.    Just the one year and I finished.

11         Q.    Did you obtain a degree?

12         A.    In women's health?

13         Q.    In women's health.

14         A.    Yes.

15         Q.    Do you remember what year that was?

16         A.    No.

17         Q.    And then you said you went to MTI?

18         A.    Yes.

19         Q.    What is MTI?

20         A.    It's a -- it's like a college, but

21    it's fast track.

22         Q.    Where is that located?

23         A.    Poughkeepsie.

24         Q.    How long were you at MTI?

25         A.    Just the one year.

32

1                          CAITLIN H. RAILO

2              Q.    Did you obtain any type of degree

3     or certificate?

4              A.    Yes.

5              Q.    What was that in?

6              A.    Phlebotomy and medical assistant.

7              Q.    Do you remember what year that was?

8              A.    No.  It was right before my

9     daughter was born, so eight years ago, nine

10    years ago.

11             Q.    Did you ever go to or obtain any

12    educational training at Kingston Benedictine

13    Hospital?

14             A.    That's where I did my internship,

15    yes.

16             Q.    An internship in what?

17             A.    Phlebotomy.

18             Q.    What is phlebotomy?

19             A.    Take blood.

20             Q.    How long did your internship last

21    at Kingston Benedictine Hospital?

22             A.    I don't remember the exact.  Couple

23    months.  I don't remember exactly how long.

24             Q.    Did you finish the internship?

25             A.    Yes, um-hum.

33

1          CAITLIN H. RAILO

2          Q.    Did you obtain any type of

3    certification to dispense medication?

4          A.    Yes.

5          Q.    And can you tell me about that,

6    where you obtained that certificate from?

7          A.    At my job.  They do it there at

8    Riverside Support Center.  I worked in rehab.

9          Q.    I'll get to that in just a minute.

10         What kind of medications were you

11   authorized to dispense based on obtaining that

12   certificate from Riverside?

13         A.    Any and all medication.

14         Q.    Would that just be for dispensing

15   medications to the patients at Riverside?

16         A.    Yes.

17         Q.    You couldn't dispense them to

18   anybody outside of that facility, could you?

19         A.    No.

20         Q.    I think maybe I asked you this.  I

21   apologize.  Were you allowed to prescribe

22   medications?

23         A.    No.

24         MR. CIMINI:  I'm just going to show

25         you quickly what we'll mark as Railo B.

34

1              CAITLIN H. RAILO

2              (Whereupon, a resume and a letter

3         dated July 30th, 2012 were marked as

4         Railo Exhibit B for Identification as of

5         this date.)

6         Q.    Just hand you what we've marked as

7    Railo B, and that looks like it's your resume.

8              (Document submitted.)

9         Q.    Would you agree with that?

10        A.    Yes.

11        Q.    Did you prepare this resume?

12        A.    With help, yes.

13        Q.    It's actually the resume is one

14   page and the second page of this exhibit is a

15   July 30th, 2012 letter; correct?

16        A.    Yes.

17        Q.    Is everything that's contained on

18   the first page of the resume correct and

19   accurate as far as you know?

20        A.    Yes.

21        Q.    And then if you flip over, the

22   second page is your July 30th, 2012 letter.  Do

23   you see that?

24        A.    Yes.

25        Q.    What was the purpose of writing

                          CAITLIN H. RAILO

1

2       this particular letter?

3               A.      I don't know.

4               Q.      Who was it intended to be viewed

5       by?

6               A.      Anybody that I handed my resume to.

7               Q.      But potential employers?

8               A.      Yes.

9               Q.      And in the first sentence, you

10      indicated that you were employed at Riverside

11      Rehabilitation Treatment Facility; correct?

12              A.      Yes.

13              Q.      Can you tell me what type of

14      facility is Riverside Rehabilitation Treatment

15      Facility?

16              A.      It's a rehab.

17              Q.      Rehab for what kind of patients?

18              A.      Drug, for drug use.

19              Q.      Were you ever a patient at

20      Riverside?

21              A.      No.

22              Q.      While you were at Riverside, did

23      you dispense medications to patients?

24              A.      Yes.

25              Q.      Do you know what kinds of

CAITLIN H. RAILO

1
2    medications you dispensed?  Do you have any

3    recollection?

4         A.    They had psych meds, sleeping

5    medications, medications for blood pressure,

6    for, I mean, anything.

7         Q.    How long did you work at Riverside?

8         A.    About two years.

9         Q.    And why did you leave Riverside?

10        A.    Riverside closed.

11        Q.    Do you know when it closed?

12        A.    2000 -- I don't remember when, no.

13        Q.    Was that the last job that you had

14   before obtaining employment with Quality Bus?

15        A.    No.  I worked at Kaltec for a

16   little while.

17        Q.    Do you remember the years that you

18   worked at Riverside Rehab?

19        A.    2010 to 2012.

20        Q.    And I'm just going to read another

21   sentence from your letter, July 30th, 2012.  You

22   wrote, "My duties at Riverside included handling

23   all calls, client intake, appointment

24   scheduling, transportation, administering

25   medications, payroll, billing, maintaining

37

1                    CAITLIN H. RAILO

2    medical records and whatever else is needed by

3    my employer."  When you wrote "transportation,"

4    what did you mean by that?

5          A.    Either they have to take a bus to

6    get home from there or they have to be scheduled

7    for a ride when they get discharged from the

8    rehab.

9          Q.    And I guess --

10         A.    Some of them take the train.

11   Sorry.

12         Q.    The question that I have, I was a

13   little bit unsure on reading that, did you

14   actually provide the driving for those patients

15   to get wherever they needed to go or did you

16   just make arrangements?

17         A.    No, I had to make arrangements.

18   Sometimes he would pay for their bus or pay for

19   their train, but that was the extent of it.

20         Q.    In other words, you never did any

21   of the actual driving to bring those patients

22   anywhere?

23         A.    Not home, no.  You're not supposed

24   to see their home.

25         Q.    Well, did you drive patients

38

1                    CAITLIN H. RAILO

2      anywhere?

3             A.    Maybe to the doctors, yes.  It's

4      right in Port Jervis.

5             Q.    So, that was part of your duties,

6      is to drive patients maybe to the doctor's

7      appointments?

8             A.    Yes.  Rarely, though.  I had to

9      stay in the office.

10            Q.    When you would do that driving,

11     what type of vehicle did you use, do you recall?

12            A.    They have a company vehicle.

13            Q.    Was it a bus?  Is it a van?  Is it

14     a car, regular car?  Do you remember?

15            A.    It's a Jeep.

16            Q.    Just a regular Jeep?

17            A.    Yes.

18            Q.    Did you ever use any other vehicle

19     for Riverside other than the Jeep?

20            A.    No.

21            Q.    Did you ever drive a bus for

22     Riverside?

23            A.    No.

24            Q.    Did you ever drive a truck for

25     Riverside?

1            CAITLIN H. RAILO

2        A.    No.

3        Q.    Do you have any criminal record

4    other than for the charges that you're in prison

5    for here as we sit here today?

6        A.    Yes.

7        Q.    Tell me about what your under-

8    standing of your criminal record is other than

9    the charges that relate to this bus accident?

10        A.    I don't know every single one of

11    them, but...

12        Q.    What you can recall for now would

13    be fine.

14        A.    Petit larceny, DWAI, possession in

15    the seventh.  I think that's all I remember.  I

16    don't remember any other ones.

17        Q.    You mentioned -- I got three things

18    when you answered that.  Petit larceny?

19        A.    Yes.

20        Q.    Can you tell me about that?

21        A.    I don't know what to say.  I was

22    younger.  I was using drugs.  I haven't gotten

23    arrested in years.

24        Q.    What were you arrested for

25    specifically with respect to that charge?

40

1                      CAITLIN H. RAILO

2          A.    I don't remember.

3          Q.    And then I think you also said DWI?

4          A.    No.

5                MR. LaROSE:   AI.

6          A.    DWAI.

7          Q.    Tell me what that is.

8          A.    Driving while ability impaired.

9          Q.    When was that?

10         A.    Like I said, it's been over ten

11    years.  Twelve years, I think.

12         Q.    Where was that?

13         A.    I don't remember.  I believe in

14    Newburgh.

15         Q.    Did that offense, criminal offense

16    involve drugs or alcohol or both?

17         A.    Drugs.

18         Q.    Do you remember what type of drugs?

19         A.    No.

20         Q.    And I believe the last thing that

21    you said was possession?

22         A.    In the seventh.

23         Q.    In the seventh.  Can you explain

24    what that means?

25         A.    It's -- when you get possession in

41

1                         CAITLIN H. RAILO

2      the seventh, it's something minuscule.  It's not

3      even worth going to jail for.  I don't even

4      remember what it was.  It was an empty bag of

5      weed.  I don't remember what it was.

6                Q.    You don't remember?

7                A.    No.

8                Q.    Would it be fair to say, correct me

9      if I'm wrong, that you have other items in your

10     criminal history, but you just can't recall them

11     or --

12               A.    Yes.

13               Q.    Is that everything that you listed?

14               A.    That's not everything.  I don't

15     remember all of them.

16               Q.    You just can't remember?

17               A.    No.

18               Q.    Were you ever involved in any motor

19     vehicle accident before February 14th, 2013?

20               A.    Yes.

21               Q.    Can you tell me the circumstances

22     surrounding those accident or accidents?

23               A.    While I was driving.

24               Q.    We'll start with while you were

25     driving, yes.

42

CAITLIN H. RAILO

1

2   A.  I was in an accident in Newburgh.

3   Q.  Do you remember when that was?

4   A.  I'm trying to remember.  Ten years

5 ago, before my daughter was born.

6   Q.  What were the circumstances

7 involving that accident?

8   A.  Somebody had hit my driver's side

9 door and flipped over me in an intersection.

10   Q.  Were you cited at all as a result

11 of that accident for any type of traffic or

12 moving violation?

13   A.  Yes.

14   Q.  What were you cited for?

15   A.  I don't remember.

16   Q.  Were you criminally charged or

17 convicted of any criminal offenses as a result

18 of that accident in Newburgh?

19     MR. LaROSE:  Let me ask for a

20    clarification.  By that you don't mean

21    like pleading to a Vehicle and Traffic

22    charge, something higher than that?

23     MR. CIMINI:  Correct.

24     MR. LaROSE:  Okay.  Meaning some

25    type of criminal charge, not a traffic

43

1           CAITLIN H. RAILO

2           ticket or something else, was there any

3           criminal charges that you pled to or were

4           convicted of for that accident?

5                THE WITNESS:  Leaving the scene of

6           a personal injury accident.

7                MR. LaROSE:  Okay.

8           Q.    Any other criminal charge related

9     to that accident other than leaving the scene?

10          A.    No.

11          Q.    Can you tell me why you left the

12    scene?  Do you recall that?

13          A.    Actually, I was told to -- yes, I

14    do recall it.  I ran to his vehicle and stayed

15    with him until the ambulance and fire department

16    came, and believe it or not, the cops didn't

17    show up for I think they said two hours, an hour

18    after the accident.  The car was still there and

19    they told me to go.

20          Q.    Who told you?

21          A.    The fire department said "We don't

22    need you anymore, go. " They're going to close

23    down the road, and the police never got there.

24          Q.    So, it was the -- as far as you

25    recall, was the emergency personnel, fire

44

1                          CAITLIN H. RAILO

2      department, that told you to leave?

3              A.     Um-hum.

4              Q.     Almost two hours after the

5      accident?

6              A.     No.  The police didn't get there

7      for two hours after the accident.

8              Q.     I understand that.  But it was the

9      fire department that told you to leave after two

10     hours because the police hadn't arrived yet?

11             A.     After two hours.

12             Q.     Okay.  After two hours?

13             MR. LaROSE:  No.  You keep saying

14             "after two hours."  She is saying no.

15             Q.     When did you leave?

16             A.     About forty-five minutes later.

17             Q.     Forty-five minutes after the

18     accident occurred?

19             A.     Yes.

20             Q.     And you're saying -- I just want to

21     understand what your testimony is -- that you

22     left because the fire department told you you

23     could leave?

24             A.     He told me they didn't need my

25     assistance.  They were closing down the road.

45

CAITLIN H. RAILO

1

2      My car was drivable.

3            Q.    And they said you could leave?

4            A.    Um-hum.

5            Q.    Is that a yes?

6            A.    Yes.

7            Q.    And that's one accident.  Are there

8      any other accidents that you recall being

9      involved in other than the February 14th, 2013

10     accident when you were driving or while you were

11     driving?

12           A.    No.

13           Q.    Do you recall ever being cited or

14     charged for speeding while operating a motor

15     vehicle?

16           A.    No.

17           Q.    And just so I understand your

18     answer, is your answer no, you've never been

19     charged with speeding in a motor vehicle, or no,

20     you don't recall ever being charged?

21           A.    I don't ever remember getting a

22     speeding ticket, no.

23           Q.    How old were you -- the accident

24     that involved when you were charged with leaving

25     the scene, do you know if there was a civil

46

CAITLIN H. RAILO

1

2      lawsuit filed against you by anyone that was

3      involved in that accident?

4              A.    No.

5              Q.    There was not?

6              A.    No.

7              Q.    How old were you when you obtained

8      your driver's license?

9              A.    Sixteen.

10             Q.    And in what state was that?

11             A.    New York.

12             Q.    Are there any restrictions on your

13     driver's license?

14             A.    No.

15             Q.    Did you ever obtain a driver's

16     license from any other state other than the

17     State of New York?

18             A.    No.

19             Q.    Has your driver's license ever been

20     suspended or revoked for any reason?

21             A.    Yes.

22             Q.    Can you tell me about that?

23             A.    It was suspended for fines, I

24     believe.

25             Q.    For unpaid fines?

1                     CAITLIN H. RAILO

2          A.     Yes.

3          Q.     Do you remember when that was?

4          A.     No.

5          Q.     Do you remember how long your

6     license was suspended?

7          A.     No.  I think it wasn't long.  I

8     know that.  I don't remember, though.  No.  This

9     was -- we're talking over ten years ago, so I

10    don't remember.

11         Q.     Was that the only time that your

12    driver's license, your New York State driver's

13    license was suspended?

14         A.     Yes, except for now.

15         Q.     Except for now.  And how long is

16    your driver's license suspended now?

17         A.     A year.

18         Q.     And that's as a direct result of

19    the February 14, 2013 accident?

20         A.     Yes.

21         Q.     Now I'm going to show you another

22    document.

23              MR. CIMINI:  We'll mark this as

24         Railo D.  Actually, let's mark that Railo

25         D.  I know it's out of sequence.  There

48

1               CAITLIN H. RAILO

2          is a reason for that.

3               MR. LaROSE:  Off the record.

4               (Discussion off the record.)

5               (Whereupon, a Record Expansion was

6          marked as Railo Exhibit D for Identifica-

7          tion as of this date.)

8               (Document submitted.)

9          Q.    Do you have in front of you what

10    we've marked as Railo D?

11          A.    Yes.

12          Q.    This I'll represent to you, that

13    this was obtained from the State of New York and

14    it has your essentially what is identified as a

15    Record Expansion for Caitlin H. Railo.  Do you

16    see that at the top?

17          A.    Barely, but yes.

18               MR. LaROSE:  Can you read it?  It's

19          very small print.

20               THE WITNESS:  It's very small.

21          Q.    There is, on the upper left-hand

22    corner is "Railo, Caitlin H." --

23          A.    Yes.

24          Q.    -- "5 White Street, Apartment 2,

25    Port Jervis, New York 12771," and then to the

49

1               CAITLIN H. RAILO

2    right of that, "date of birth, 8/12/1981."

3         A.    Yes.

4         Q.    Would you agree that that's you?

5         A.    Yes.

6         Q.    Do you ever recall being charged

7    with driving a motor vehicle without having

8    insurance and that charge being on July 30th,

9    2009?

10              MR. LaROSE:  Where on the document

11              are we looking to make it easier?  Again,

12              this type is very small.

13         A.    No.

14              MR. CIMINI:  On the bottom section.

15              MR. LaROSE:  Okay.

16         A.    Oh, I do.  Yes, I do remember.  I

17    didn't pay on time.  I was on 84.  I remember

18    that.

19         Q.    I'm just going to ask you some

20    questions about what this document says relating

21    to that, and I just want to know, if you can, if

22    you have any recollection.  It says that, with

23    respect to your license, that it was revoked on

24    September 4th, 2009 and it says "operating

25    without insurance" and then underneath that

1              CAITLIN H. RAILO

2     "cleared on September 13th, 2010.  Requirements

3     met."

4          A.    No.  My license was never taken

5     away in 2009.

6          Q.    Okay.  So, you don't believe your

7     license was suspended or revoked at any point in

8     time for operating?

9          A.    No, because I would have gotten

10    arrested.  I was operating without insurance.

11    If I was operating -- driving without an --

12    operating without a license, I would have gotten

13    arrested.  That's a ticket.

14         Q.    That's why I'm asking you, because

15    they identified -- they use the word

16    "revocation."  I didn't know if your license was

17    revoked because of that.

18              MR. LaROSE:  To the best of your

19         memory.

20         A.    No, I wasn't.  I don't remember,

21    no, but when I got driving with no insurance, I

22    didn't have no license suspended.

23         Q.    If you go back to the top of that

24    form, the first section under your name and your

25    address, it says "probation start" and then

51

1                     CAITLIN H. RAILO

2       "September 13th, 2010," and then it says "end,

3       March 13th, 2011."  Do you see that it's sort of

4       at the very top?

5                     MR. LaROSE:  First box?  Second

6             box?  Where are you looking?

7                     MR. CIMINI:  It's the first box

8             under her identifying information.

9             Second line, "probation start."

10                    MR. LaROSE:  That's "License Class

11            B"?

12                    MR. CIMINI:  Right.

13                    THE WITNESS:  Isn't that for the --

14            that's a different license?

15                    MR. LaROSE:  Right.

16                    THE WITNESS:  That's why it was

17            surrendered.  That's a different license.

18       Q.     Tell me what this.

19       A.     CDL.

20       Q.     I'm unclear.

21       A.     When you get a CDL, you have to

22       hand in your New York State license and get a

23       different class license.  They give you the same

24       picture, but it's just, there is Class B, Class

25       C, Class D.  You have to hand in that one and

52

1                    CAITLIN H. RAILO

2    get another one.

3           Q.    Okay.  So, that's what this is

4    referencing?

5           A.    It's got to be, because it --

6    that's what it says on here.

7                 MR. LaROSE:  Right.

8           Q.    It says "probation."  Do you know

9    what they mean when they say "probation start"?

10          A.    No, I have no idea.

11                MR. LaROSE:  Off the record.

12                (Discussion off the record.)

13          A.    Yeah, it says new CDL is B.  I had

14   a Class D and it changed to CDL B.  It says "old

15   Class D."  That's on the middle one on the

16   bottom right, in the middle box.

17          Q.    Okay.  Well, let's get to that one

18   now since you've --

19          A.    You see where it says up on the

20   top, "probation start 9/13/2010""  In the middle

21   box it says, "class change 9/13/2010 to a new

22   Class D license.  Old" -- the CDL is Class B so

23   it's class change.

24          Q.    I see that.

25          A.    Okay.

53

1          CAITLIN H. RAILO

2          Q.    Let's talk a little about what's

3   directly above that that you just mentioned,

4   because it looks like the way I read this, that

5   there was a surrendering of your license on

6   March 4th, 2002.

7          A.    That would be the Class D.

8          Q.    March 4th, 2002?

9          A.    Oh, 2002.  I don't remember 2002.

10  Where is that?

11          MR. LaROSE:  Maybe that's the date

12          of the license.

13          Q.    It says "document surrendered on

14  March 4th, 2002 to New York" and then right

15  underneath that, "returned to New York on July

16  8th, 2002."

17          A.    I don't remember 2002.

18          Q.    You don't remember surrendering

19  your license in 2002?

20          A.    I don't remember 2002.

21          Q.    Why is it that you don't remember

22  2002?

23          A.    I have trouble remembering

24  yesterday.  I don't remember 2002.

25          Q.    Is that because of your medical

54

1                         CAITLIN H. RAILO

2      condition or because of your past drug use or a

3      combination of?

4              A.     I have brain damage, and mixed with

5      that and drug use, I have short-term memory

6      loss.

7              Q.     When did you sustain brain damage?

8              A.     I'm -- I don't know.  A year?  I

9      don't know.

10             MR. LaROSE:  Is that the car

11      accident?

12             THE WITNESS:  It was, yeah.  It was

13      a mix between that and then just through-

14      out the years too.

15             Q.     Throughout the years what, the drug

16      use?  Do you believe the drug use caused brain

17      damage?

18             A.     It's helping.  It was helping, yes.

19             Q.     Did anybody ever tell you that you

20      suffered brain damage?

21             A.     Yes.

22             Q.     Who told you that?

23             A.     I had MRI.  I had a CAT scan.

24             Q.     Do you remember what year?

25             A.     I don't remember the doctor's name.

55

1                          CAITLIN H. RAILO

2      It was in a hospital.  I don't remember.  I

3      can't even tell you the year.  I don't know.  I

4      could find out.

5              Q.    Okay.  Would those tests that

6      showed that you had brain damage, would they

7      have been performed prior to your employment

8      with Quality Bus?

9              A.    Absolutely.

10             Q.    And you don't remember what doctor

11     ordered those tests?

12             A.    No.  I could find out, because I

13     have been to so many doctors within the past

14     couple years, I don't remember.

15             Q.    Do you remember what hospital you

16     had the MRI or the CAT scans done at?

17             A.    Middletown.

18             Q.    Middletown hospital?

19             A.    Yes.

20             Q.    And that would be obviously in

21     Middletown, New York?

22             A.    Yes.

23             Q.    Is that the name of the hospital,

24     Middletown hospital?

25             A.    It's changed hospitals.

56

1                    CAITLIN H. RAILO
2              MR. FOULKE:  Orange Regional
3         Medical Center?
4              THE WITNESS:  Yes, and it moved, so
5         I'm sure they still have records, though.
6              MR. FOULKE:  Moved to Crystal Run
7         Road?
8              THE WITNESS:  Yes.  I haven't been
9         there.  No, I had surgery there, but I
10        haven't been there to see a doctor.
11             Q.    Continuing on with looking at Railo
12   Exhibit D, right underneath where we were
13   talking about, it looks like there was another
14   surrendering of your license, and I'll read it.
15   It says, "Document surrendered on 12/5/2008 to
16   New York.  Returned to New York on 8/12/2009."
17   Do you remember anything about surrendering your
18   driver's license in December of 2008 and getting
19   it back in August of 2009?
20             A.    I vaguely do, yes.
21             Q.    Tell me what you remember about
22   that.
23             A.    I remember I had to pay a fine to
24   get it back.
25             Q.    Do you know why it was surrendered

57

1                    CAITLIN H. RAILO

2       in the first place?

3            A.    No.  I had it taken away until I

4       paid a fine.  It was for -- I think it was, to

5       tell you -- I can't remember.  I don't remember

6       what it was for.

7            Q.    Do you remember at that time being

8       legally represented by someone from Scofflaw?

9       Does that ring a bell?

10           A.    No.

11           Q.    We may come back to this, but for

12      now we're going to move on.

13                 Caitlin, our office was able to

14      obtain a number of police records that involved

15      incidents in which you were involved in from

16      Port Jervis, Town of Deer Park, Pike County,

17      Pennsylvania, Orange County, Dingsman Township

18      in Pennsylvania, Middletown, Newburgh and the

19      Town of Wallkill, and what I want to show you

20      initially is a document that our office just

21      created for purposes of this deposition that I

22      would hope help facilitate and make this go a

23      lot quicker.

24                 MR. CIMINI:  We'll mark --

25                 actually, it's the whole entire packet as

58

```
1                        CAITLIN H. RAILO

2          Railo C.

3                    (Whereupon, packet of arrest

4              records was marked as Railo Exhibit C for

5              Identification as of this date.)

6                    (Documents submitted.)

7              Q.    And what you're looking at is a

8     pretty thick packet of documents, Caitlin.  The

9     first three pages of Railo C are really like a

10    summary of what is contained thereafter and --

11                   MR. LaROSE:  I'm going to ask,

12             counsel, that if you have the documents

13             here as part of the package that this was

14             created out of, that we be able to show

15             her, question and ask her about a

16             specific --

17                   MR. CIMINI:  Keith, I will.  If you

18             look at this, you'll see this is a

19             reference on the right-hand column.

20                   MR. LaROSE:  Okay.

21                   MR. CIMINI:  That references the

22             page number that information is obtained

23             from, so we can easily just flip through.

24                   For example, for the first one

25             that's identified there, you can go to
```

59

CAITLIN H. RAILO

1
2     PAge 9 and 10 of Railo C and we can find
3     that document, but I don't necessarily
4     want to go through -- I just want to ask
5     some general questions.  But if you feel
6     like you want to look at something and
7     have her --
8              THE WITNESS:  What page am I going
9     to?
10             MR. LaROSE:  Doesn't matter.  Let's
11     just wait until the next question and
12     then we'll see if there is something you
13     want to look at before you answer a
14     question, okay, for any reason.  You can
15     always -- we can always try to find any
16     documents that he's referring to.
17             MR. CIMINI:  Right.
18             MR. LaROSE:  Okay.
19        Q.    And I will represent to you that
20     these documents contain information from various
21     police departments that do not include
22     information related to the February 13th,
23     2000 -- excuse me, February 14th, 2013 accident.
24        A.    What the hell is that?
25        Q.    You may have some questions about

60

CAITLIN H. RAILO

1

2      some of these things and we can go through them

3      and we're going to go through them and hopefully

4      it's going to be quick, but let's start with the

5      first one that's identified there on February

6      17th, 2014, the City of Port Jervis.  That

7      references an incident involving an Ann Horsham

8      from Empowerment where --

9              MR. LaROSE:  These are dispatch

10         reports.

11         Q.    Let me ask you.  I will ask you

12     this question and maybe this will help.  Do you

13     remember, Caitlin, being asked to leave a

14     facility by the name of Empowerment by an Ann

15     Horsham and where you refused to leave and the

16     cops were called?

17         A.    No.

18         Q.    You don't recall that?

19         A.    No.

20         Q.    I can show you that document, but

21     if you don't remember it, that's fine.  I don't

22     need to show it to you to refresh your

23     recollection unless you really want me to.  I

24     rather not.

25              I'm just going to ask questions, if

1        CAITLIN H. RAILO

2 you recall certain things, that's fine.  If you

3 don't recall, you can just say I don't know.

4 That's why I don't want to ask any -- if I want

5 to ask any follow-ups on those incidents, I

6 will.

7    A. I don't remember.  I don't know

8 anybody named Ann Horsham.

9    Q. How about a place called

10 Empowerment?  Do you know what that is?  Did you

11 ever hear of a place called Empowerment?

12    A. No.

13    Q. Do you remember on June 12th, 2014

14 being kicked out of a house that you were living

15 in with a gentleman by the name of Curt Van

16 Riper?

17    MR. LaROSE:  Where is that on this

18    sheet?

19    MR. CIMINI:  That's the second,

20    February 12th, 2014.

21    MR. LaROSE:  You said June.

22    MR. CIMINI:  Oh, I apologize, I'm

23    sorry.

24    A. I remember that he was drunk.  His

25 mom kicked him out.

62

CAITLIN H. RAILO

1

2      Q.     Okay.  You remember you were with

3   this Curt Van Riper?

4      A.     Yes.

5      Q.     Was that somebody that you were

6   living with at that time?

7      A.     No.

8      Q.     Was he a friend, boyfriend?

9      A.     He was a friend.

10      Q.     June 11th, 2013, do you recall

11   being pulled over from someone, a police

12   officer, from the Town of Deer Park, for erratic

13   driving?

14      A.     No.

15           MR. CATALINOTTO:  I just want to

16        put something on the record, just to

17        clarify, that to the extent that these

18        are not criminal convictions and they're

19        just --

20           MR. CIMINI:  I'm not representing

21        they are.

22           MR. CATALINOTTO:  To the extent

23        that any of these questions pertain to

24        things that are not criminal convictions,

25        then I object to the admissibility of

63

1                          CAITLIN H. RAILO
2              this should this case go to trial and
3              this testimony today, other than
4              questions and answers relative to
5              criminal convictions, so...
6                   MR. CIMINI:  Okay.  I'll give you a
7              continuing objection.
8                   MR. LaROSE:  Same for me, right.  I
9              wasn't going to raise it because we are
10             not at trial, but okay.
11                  MR. CIMINI:  That's fine.  You both
12             can have a continuing objection based on
13             that.
14             Q.    Caitlin, the next one is, I'm going
15    to ask you about is on May 16th, 2011 in the
16    Town of Deer Park, do you remember being with a
17    female who had chest pains and the police being
18    called as a result of that?
19             A.    Which one are we on?
20                  MR. LaROSE:  Down here.  5/16/11,
21             right here (indicating).
22             A.    No.
23             Q.    Okay.  And I'm just asking if you
24    recall any incident that sounds familiar.
25             A.    No.

64

1                        CAITLIN H. RAILO

2           Q.    Do you recall being in Pike County

3     on December 21st, 2013 when the police were

4     called and found an unconscious female on the

5     bathroom floor?

6                 MR. LaROSE:   First page.

7                 MR. CIMINI:   Strike that.  We may

8           come back to that.

9           Q.    December 16th, 2013, do you

10    recall --

11                MR. LaROSE:   Also, let's also just

12          note another continuing objection also to

13          the fact that you're asking about a lot

14          of stuff that postdates the accident

15          here.

16                MR. CIMINI:   I understand that.

17                MR. LaROSE:   All right.

18                MR. CIMINI:   And, actually, there

19          is not much that postdates it.

20                MR. LaROSE:   Well --

21                MR. CIMINI:   Strike that last

22          question.

23          Q.    December 16th, 2013, because those

24    are the charges that related to our accident to

25    the bus accident, so we're not going to go over

1                      CAITLIN H. RAILO

2      that at this point, but do you remember on July

3      24th, 2013 having the police come to somewhere

4      in Port Jervis where you were camping in an area

5      behind a middle school where you weren't

6      supposed to be?

7              A.     No.

8              Q.     You don't have any recollection of

9      that?

10             A.     No.  There was a homeless guy back

11     there and we went swimming in the river, but I

12     don't know why it says that.  Maybe that was the

13     call that they got because this is going to

14     be -- this is the calls and what they got, this

15     isn't what really happened.  I don't even want

16     to go through this.

17             Q.     Well, I'm just asking what you

18     recall.

19             A.     Okay.  But I'm just saying that I

20     don't even want to go through this.

21             Q.     Well, I'm going --

22             A.     Because I'm going to tell you I

23     don't remember any of it because that's not what

24     happened.

25             Q.     That's a perfectly acceptable --

66

1                    CAITLIN H. RAILO

2     I'll accept that as an answer if that's the

3     truth and you don't remember, that's fine.  You

4     can just tell me I don't remember or that's not

5     what happened.  This is what happened.

6              MR. LaROSE:  It's not what

7         happened.  It's what she's saying.  Okay?

8         Q.    I'm going to skip down to November

9     14th, 2011.  Do you recall being in a dispute

10    with a neighbor regarding some items that may

11    have been blocking an alleyway?

12         A.    No.

13         Q.    You don't remember that?

14         A.    No, not at all.

15         Q.    Down to the last one, Caitlin, on

16    that page, there is an October 26th, 2008 --

17             MR. LaROSE:  Can you just hold on a

18         second?  Let me finish reading something

19         here.

20             MR. CIMINI:  Sure.

21             MR. LaROSE:  You know, I'm allowing

22         you a lot of leeway here, and I just want

23         to point out for the record that, you

24         know, asking her about some police

25         dispatch on 11/14/11 where there was an

1               CAITLIN H. RAILO

2          argument reportedly according to the

3          dispatch between two neighbors, what the

4          hell this has to do with this lawsuit,

5          and why you're invading my client's --

6               THE WITNESS:  Exactly.

7               MR. LaROSE:  -- privacy in areas

8          that I don't think are in any way

9          relevant or could lead to relevant

10         material in this litigation, just for the

11         record.  Go ahead, counselor.

12              MR. CIMINI:  Thank you.

13         Q.    Caitlin, on the very bottom of that

14    page, October 26th, 2008, there is an incident

15    in Middletown where you claimed that you had

16    been robbed.  Do you recall anything related --

17              MR. LaROSE:  Hold on a second.  Let

18         me see what you're referring to here.

19              MR. CIMINI:  That's Page 61.

20              MR. LaROSE:  What is the relevance

21         of this, counselor?  I mean, come on,

22         really!

23              MR. CIMINI:  This is a discovery

24         deposition.  I'm entitled.

25              MR. LaROSE:  I understand that.

1          CAITLIN H. RAILO

2          How is this going to lead to anything

3          that's relevant?

4               MR. CIMINI:  It could.

5               MR. LaROSE:  It could?

6               MR. CIMINI:  That's the purpose of

7          a discovery deposition.  We're not on

8          trial right now.

9               MR. LaROSE:  I understand that.

10              MR. CIMINI:  You guys asked Justin

11         Maher the same types of questions, so...

12              MR. LaROSE:  I don't think we went

13         to anything even closely resembling this,

14         counselor, quite frankly.

15              MR. CIMINI:  Well, I'm going to ask

16         the questions.

17              MR. LaROSE:  Go ahead.

18              MR. CIMINI:  Here's what we do.  If

19         you don't want her to answer, you can

20         just instruct her not to answer, I'll

21         accept that and we can move on, and then

22         we'll have Judge McCarthy rule on these.

23         We can do this, you know, the easy way or

24         the hard way.  I'm willing to go ahead

25         and ask my questions.  If you don't want

69

1                    CAITLIN H. RAILO

2           her to answer, tell her not to answer.

3                MR. LaROSE:  Do you have a specific

4           question?  Go ahead and ask.  Let's hear

5           what your specific question is.

6           Q.    Do you remember complaining to the

7      police on October 26th, 2008 that you had been

8      robbed?

9           A.    No.

10          Q.    You don't recall that?

11          A.    No.

12          Q.    Involving a cell phone and a ring,

13     does that ring a bell?

14          A.    No.

15                MR. LaROSE:  I don't think you're

16          reading the right one.

17                THE WITNESS:  I don't know any of

18          this.

19                MR. LaROSE:  That's all right.

20          That's fine.  If you don't recall, you

21          don't recall.

22                MR. CATALINOTTO:  Off the record.

23                (Discussion off the record.)

24          Q.    Caitlin, do you remember on July

25     30th, 2008 being arrested for any reason in the

70

1                        CAITLIN H. RAILO

2       City of Middletown, New York?

3                       MR. LaROSE:  Hold on.  So, where on

4            your C is this and then we'll find it?

5                       MR. CIMINI:  Page 58.

6                       MR. LaROSE:  No.  Where on C are we

7            looking?

8                       MR. FOULKE:  It says D-1.

9                       MR. CIMINI:  It's on Page 2.

10                      MR. LaROSE:  What is the date?

11                      MR. CIMINI:  July 30th, 2008, and

12           then if you go to --

13                      MR. LaROSE:  Arrest redacted.

14                      MR. CIMINI:  If you go to Page 58.

15                      THE WITNESS:  What does that mean?

16                      MR. LaROSE:  Well, let's see.

17           A.     What the hell is that?  I mean,

18      it's kind of funny.

19           Q.     And quite frankly, this document I

20      mention your name and an arrest, and I don't

21      know what it's about and that's why I'm asking

22      you if you can, if you recall anything regarding

23      this at that time --

24           A.     No.

25           Q.     -- on July 30th, 2008 in

1                    CAITLIN H. RAILO

2      Middletown.

3            A.     Doesn't have anything on there, no.

4            Q.     No.  And that's why I'm asking.  I

5      don't know anything about it either.

6                  MR. LaROSE:  Counselor, have you

7            obtained these under a subpoena or

8            something?  You should have provided them

9            to us.

10                 MR. CIMINI:  I didn't obtain those

11           pursuant to a subpoena.  They were

12           absolutely not obtained pursuant to a

13           subpoena.

14                 MR. LaROSE:  Then how did you

15           obtain them?

16                 MR. CIMINI:  Through FOIL.

17                 MR. LaROSE:  Okay.  I would have

18           appreciated the courtesy of being

19           provided these documents ahead of time.

20                 MR. CIMINI:  I will tell you that

21           we just received these documents within

22           probably the last couple of days, as late

23           as yesterday, so they just came in for

24           the most part.

25                 MR. CATALINOTTO:  I just want to

CAITLIN H. RAILO

1
2    put one thing on the record.  I'm not

3    trying to impede the questioning, but at

4    Justin Maher's deposition, certain

5    entries in the police documents we

6    questioned him on as it pertained to his

7    mental state for purposes of anger and

8    his driving ability after the accident.

9    Right now we're getting into dispatch

10   calls, calls she didn't make and asking

11   her to interpret those and understand why

12   those people made the calls, and again,

13   it's discovery, but I really think we

14   should go over -- we should be asking

15   questions based on her criminal

16   convictions and a rap sheet, not calls

17   from dispatch, but...

18        MR. LaROSE:  Or at least something

19   that has some tentative relationship to

20   any direct relevance to her driving a bus

21   on the day of this accident.  I don't see

22   how any of this does --

23        MR. CIMINI:  Well, I think it can

24   be fairly argued that all of these

25   incidents could relate -- may relate to

CAITLIN H. RAILO

1
2      her ability, her mental ability to drive

3      a bus, you know, being involved in

4      various incidents when the police are

5      called.

6           MR. LaROSE:  And how does that

7      relate to the liability in this lawsuit?

8           MR. CIMINI:  We'll leave that up to

9      the experts at the appropriate time to

10      pull it all together, but I believe that

11      it is very relevant.

12           THE WITNESS:  A lot of people

13      wouldn't be able to drive a bus.  I don't

14      want to answer any more questions about

15      this.  It's really just -- I told you I

16      don't remember stuff.

17           MR. CIMINI:  And that's fine.

18           THE WITNESS:  Stuff from 2007,

19      2006, 2008.

20           MR. LaROSE:  Okay.

21           MR. CIMINI:  Off the record.

22           (Discussion off the record.)

23      Q.   Caitlin, do you remember being

24      involved in any type of domestic dispute on

25      October 2nd, 2006 in Middletown, New York?

74

1                    CAITLIN H. RAILO

2          A.     2006, no.

3          Q.     Independent of what those records

4     say or anything like that, I'm asking you, do

5     you remember anything related to a domestic

6     dispute at that time?

7          A.     No.

8                 MR. LaROSE:   Just for the record,

9          she is only looking at your summary.

10         She's not looking at any supporting

11         documents.

12         Q.     Do you remember being involved in a

13    domestic dispute in Middletown on June 7th,

14    2004?  Does that ring a bell?

15                MR. LaROSE:   Okay.  Again, she is

16         just looking at your attorney's summary,

17         not any supporting documents.

18                MR. CIMINI:   I understand that.

19         A.     No.

20         Q.     You remember on March 21st, 2001 in

21    Newburgh being a witness to a robbery or a

22    felony?

23         A.     No.

24         Q.     Now, if you can, on Railo Exhibit

25    C, can you please turn to Page 70?

75

1       CAITLIN H. RAILO

2     MR. LaROSE:  Is it possible?

3     MR. CIMINI:  Do you have Page 70 in

4  front of you?

5     MR. LaROSE:  Hang on a second,

6  because 70 looks like a continuation of

7  something.

8     MR. CIMINI:  There is -- just let

9  me know when you're ready.  It's a simple

10  question.

11     MR. LaROSE:  All right.  Why don't

12  you ask the question, give me a chance to

13  look at this document, then I'll have her

14  answer so I know what we're doing here?

15  Q. Do you remember being cited,

16 receiving a citation for any motor vehicle

17 violation on October 17th, 2000?

18     MR. LaROSE:  The one that's here

19  blank?

20     MR. CIMINI:  Yes.  Do you have any

21  recollection?

22     MR. LaROSE:  Is there any reason

23  that that date rings a bell of any type

24  of vehicle citations?

25     THE WITNESS:  Fifteen years ago,

76

1                        CAITLIN H. RAILO

2              no.

3              Q.     That's the question, yep.

4              A.     No.

5              Q.     Page 69, on May 25th, 2001 in the

6       Town of Deer Park, the police records reference

7       a traffic stop on Plank Road in Newburgh.  Do

8       you have any recollection of that particular

9       traffic stop at that time?

10             A.     No.

11             Q.     That doesn't ring a bell at all?

12      Yes or no?

13             A.     No.

14             Q.     Page 72, this report references a

15      charge of disorderly conduct that would have

16      occurred on April 25th, 2003.  Do you recall?

17                    MR. LaROSE:  You're showing us the

18             wrong document then.  What page?

19                    MR. CIMINI:  Page 72.

20             Q.     There is a reference that at the

21      police station it was discovered that the

22      defendant had a bench warrant issued by

23      Honorable Werner on April 25th, 2003 for failure

24      to pay a $315 fine for the charge of disorderly

25      conduct.  Do you have any recollection of that?

77

1                          CAITLIN H. RAILO

2              A.    Of what?  Getting disorderly

3      conduct?

4              Q.    Yes, at that time.

5              A.    Do you also realize that when you

6      get a charge, they lower it to disorderly

7      conduct?

8              Q.    That's not the question.

9              A.    I got a couple times because it got

10     lowered to that.

11                   MR. LaROSE:  But this was a charge,

12             this wasn't a reduction even.

13             A.    They charged me with disorderly

14     conduct, so it becomes a charge.

15             Q.    Do you recall that happening?

16             A.    No, I don't remember getting

17     disorderly conduct.

18             Q.    That's the question.

19             A.    Not in 2003.

20                   MR. LaROSE:  Well, that's the

21             failure to pay fine.  It doesn't tell you

22             when the charge was.

23             A.    I don't remember.

24             Q.    You don't remember?

25             A.    No.

1                CAITLIN H. RAILO

2        Q.     There is a reference to you on May

3  1st, 2003 taking some items worth about $708 in

4  clothing, bracelets and fragrance from a

5  Bon-Ton.  Do you recall that?

6        A.     Vaguely.  I don't -- I mean, this

7  is twelve years ago.

8        Q.     I understand that, but my question

9  is, do you recall being arrested for larceny,

10  petit larceny, for that event?

11        A.     Probably was.  I remember it

12  vaguely.

13        MR. LaROSE:  She told you earlier

14        that she recalls generally a petit

15        larceny charge, but didn't recall the

16        details.

17        Q.     After looking at this, does that

18  refresh your recollection about that charge?

19        A.     A little bit.  I said I vaguely

20  remember.

21        Q.     Okay.  What do you remember about

22  it?

23        A.     Stealing and getting arrested.  I

24  don't remember exactly what store it was or

25  exactly what date it was.

1                    CAITLIN H. RAILO

2          Q.    Do you remember how that charge was

3    resolved?

4          A.    I don't know.  Probably got bailed

5    out.

6          Q.    Do you remember who your lawyer

7    would have been?

8          A.    All right.  Now you're just going

9    too far.  I don't remember.

10         Q.    You could just say yes or no, I

11   don't remember.  That's fine.

12         A.    I did.  I said I don't remember.

13         Q.    Okay.  If you turn to Page 146,

14   this is an Information and an Indictment,

15   Criminal Number is 2013-43, People of the State

16   of New York against Caitlin H. Railo a/k/a

17   Caitlin Railo.  This is a document that's signed

18   by the acting Orange County District Attorney,

19   and in that he references a January 5th, 2014,

20   Driving While Ability Impaired.

21              MR. LaROSE:  No, 2004.

22              MR. CIMINI:  What did I say?

23              MR. LaROSE:  '14.

24         Q.    January 5th, 2004, Driving While

25   Ability Impaired conviction.  Do you recall that

1                           CAITLIN H. RAILO

2      conviction?

3                     MR. LaROSE:  Well --

4                     THE WITNESS:  I know I got one.

5                     MR. LaROSE:  She already testified

6            that she recalls a DWAI.  She couldn't

7            recall the date, so you're asking her --

8            Q.    Is this the conviction that you're

9      referring to that you referred to earlier?

10           A.    I'm assuming.

11           Q.    Was there more than one?

12           A.    I don't remember details of it.  I

13     don't remember exact.

14                   MR. LaROSE:  This doesn't tell

15           details anyway.

16           Q.    And I just want to know, was this

17     the only Driving While Ability Impaired

18     conviction --

19           A.    Yes.

20           Q.    -- that you had prior to our bus

21     accident?

22           A.    Yes.

23           Q.    Were there any others --

24           A.    No.

25           Q.    -- as far as you know?

81

1                         CAITLIN H. RAILO

2         A.     No.

3         Q.     Okay.  And you can't tell me

4   anything about the facts surrounding that

5   conviction?

6         A.     No.

7         Q.     Do you remember how the case was

8   disposed of?

9              MR. LaROSE:  Well, it just says she

10         was --

11             MR. CIMINI:  I know it says that

12        you were convicted.  Let me ask you this.

13             MR. LaROSE:  -- convicted.

14         Q.     Did you go to prison as a result of

15   that?

16         A.     No.

17         Q.     Were you ever in prison other than

18   for this accident?

19         A.     No.

20         Q.     Do you have Railo D in front of

21   you?

22             MR. LaROSE:  He is going to ask you

23        to look at something apparently.

24         Q.     The second page of Railo D.  I'll

25   read it so everyone can understand what it says.

82

1          CAITLIN H. RAILO

2               It says, "Conviction" on the very

3     top.  "Conviction Driving While Impaired.

4     Violation 12/22/2003.  Convicted on January 5th,

5     2004.  Location Orange County, Town of Newburgh.

6     Penalty days 15."  Do you recall being sentenced

7     to fifteen days in prison?

8               A.    I don't remember.

9               Q.    Okay.

10              A.    That's the same one, but that's not

11    prison.  You said have I been to prison before.

12              Q.    Right.  That's not prison.  Were

13    you sentenced to fifteen days in any

14    institution?

15              A.    In jail, in county.  Probably, yes,

16    I did.

17              Q.    So, you're making a distinction

18    between --

19              A.    There is a very big --

20              Q.    I just want to understand so we're

21    on the same page.

22              A.    I'm letting you know so if you ask

23    me again, this is prison, those are counties.

24    Those are totally different jails.

25              Q.    I appreciate that.

83

1                    CAITLIN H. RAILO

2          A.    Okay.

3          Q.    So, you did serve fifteen days in

4    county jail --

5          A.    Yes.

6          Q.    -- for that Driving While Ability

7    Impaired conviction?

8          A.    I don't remember when it was.  I

9    probably did.  It says 15, so probably, yes.

10         Q.    Okay.  If you can turn to Page 76.

11               MR. LaROSE:  We're back to D again?

12               MR. CIMINI:  C.

13               MR. LaROSE:  Back to C, I mean.

14         Q.    Do you remember earlier when you

15   talked about leaving the scene of an accident?

16         A.    Yes, that's that one.

17         Q.    Is this what we're talking about

18   now on Page 76?

19         A.    Um-hum.

20         Q.    You were -- according to this

21   particular report, it looks like you were

22   charged with leaving the scene of an accident,

23   and that's what you told me about earlier;

24   correct?

25         A.    Yes.

84

CAITLIN H. RAILO

1

2      Q.    And it also indicates that you

3   failed to stop at a stop sign and that you were

4   also charged with reckless driving in connection

5   with this particular accident.  Does that sound

6   accurate?

7      A.    I've never been charged with

8   reckless driving.

9      Q.    Do you see at the very top of Page

10   76 there are numbers listed, 1, 2, 3 on the

11   left-hand column and the first charge is leaving

12   the scene of an auto accident?  Do you see that?

13      A.    Yes.

14      Q.    And underneath that "fail to stop

15   at a stop sign"?

16      A.    Um-hum.

17      Q.    And underneath that "reckless

18   driving"?

19      A.    Yes.  Those might have been the

20   tickets that the cops wrote, but when I went to

21   court, all I got was leaving the scene of a

22   personal injury accident.

23      Q.    Okay.  Do you remember what type of

24   vehicle you were driving --

25      A.    A van.

1                    CAITLIN H. RAILO

2          Q.     -- in that accident?  And that was

3   a 1999 Dodge van?

4          A.     I don't know the year, but yes.

5          Q.     Who owned that van?

6          A.     My boyfriend at the time.  It was

7   his boss'.  It was his work van.

8          Q.     Would that have been Robert Sava

9   (phonetic)?  Does that sound familiar?

10         A.     Yes.

11         Q.     And were you operating that van

12  with your boyfriend's boss' permission?

13         A.     No.  My boyfriend asked me.

14  Actually, I was reading this which actually it's

15  pretty funny.  This is the same one that I had.

16  Yeah, I was going somewhere for him.  He knew I

17  was driving it.

18         Q.     Who knew?  Your boyfriend?  Your

19  boyfriend knew?

20         A.     Um-hum.

21                THE COURT REPORTER:  Yes?

22                MR. CIMINI:  That's a yes?

23                THE WITNESS:  Yes.  Sorry.

24         Q.     Do you recall exactly how that

25  accident happened?