161

1                       CAITLIN H. RAILO

2          Q.    Tell me what is not accurate then

3   as far as what boxes are checked off.

4          A.    Well, I'm on high blood pressure

5   medication and it looks like it's almost checked

6   for no for high blood pressure.

7          Q.    Well, it is.  There is a mark there

8   for no, so that's not --

9          A.    Why?  Yes, that doesn't make any

10  sense.

11        Q.    Okay.  What about --

12        A.    The head -- well, it's not really--

13  at that time it wasn't really brain, but the

14  head injury, disorder or illness would have to

15  go to yes.

16        Q.    And wouldn't the one underneath

17  that, seizures, epilepsy?

18        A.    Yeah, but the doctor then didn't

19  really -- I stopped taking my seizure

20  medication.  Like I said, the last couple of

21  seizures have only been from drug induced, so I

22  wouldn't check just seizures.

23        Q.    Do you recall telling any medical

24  health care provider that may have been hired by

25  Quality Bus that you had suffered from seizures

CAITLIN H. RAILO

1

2 in the past?

3       A.    No.  Before that I hadn't had

4 seizures for years.  Doctor took me off the

5 seizure medication and I haven't had any.

6       Q.    Is that why you believe that's

7 checked no?

8       A.    Absolutely.

9       Q.    And then "Any illness or injury in

10 the last five years" is checked yes; correct?

11       A.    Yes.

12       Q.    And what illness or injury in the

13 last five years is being referred to there, do

14 you know?

15       A.    Surgeries.

16       Q.    Would that be the surgeries related

17 to your cancer?

18       A.    Yes.

19       Q.    Anything else that that could be

20 referring to?

21       A.    No.

22       Q.    And what about the last box on the

23 third column to the right, "Narcotics or habit-

24 forming drug use"?  Do you see that?

25       A.    Um-hum.

1                       CAITLIN H. RAILO

2          Q.     Yes?

3          A.     Yes.  Sorry.

4          Q.     And that box is checked no?

5          A.     No.  Yes, I talked -- I talked

6     to -- I talked to her about it, with the lady

7     from Partners in Safety.  It's supposed to be

8     within the last five years.  Within the last

9     five years, I did not.

10         Q.     Who told you that they were

11    referring to narcotics or habit-forming drug use

12    only in the past five years?

13         A.     Apparently most of this stuff had

14    been within the past five years.

15         Q.     That wasn't my question.  Did

16    someone from Partners in Safety tell you that

17    they were only interested in obtaining

18    information related to your health history for

19    the past five years?

20         A.     Yes, the lady that gave me the

21    physical.

22         Q.     You recall her telling you that?

23         A.     Yes.

24         Q.     Do you remember the lady's name?

25         A.     No.

1                CAITLIN H. RAILO

2      Q.    Do you remember, if I were to say a

3 name, Patricia Ames, A-M-E-S, does that sound

4 familiar?

5      A.    That sounds familiar, yes.

6      Q.    Would that be the nurse that you

7 had this discussion with?

8      A.    Like I said, I don't remember, but

9 it sounds familiar.

10      Q.    There is some information that's

11 handwritten under that, "Health History"

12 section, Number 2, that is still a part of

13 Section 2, that says, starts "May 2012, had a

14 hysterectomy."  Do you see that?

15      A.    Yes.

16      Q.    Is that your handwriting?

17      A.    Yes.

18      Q.    And would you agree that it says

19 "May 2012, had a hysterectomy due to cervical

20 cancer"?

21      A.    Yes.

22      Q.    And it says, "Dr. Koehler,

23 currently on Clonidine for menopause and hot

24 flashes"?

25      A.    Yes.  See, that's not a menopause

165

1                       CAITLIN H. RAILO

2      medication, but Dr. Koehler currently -- and

3      then she said, Dr. Koehler also said that my

4      Clonidine could help for the hot flashes, so she

5      was asking me about that.  I don't know why I

6      wrote that, but...

7              Q.     And then you put "and Valium,"

8      correct, next to it?

9              A.     Yes.

10             Q.     There is no mention of Suboxone on

11     here, is there?

12             A.     No.  I don't know why, because I

13     told her.  She was the one writing all these and

14     I told her when she asked me.

15             Q.     We're going to get to that.  We

16     didn't get to that yet and I think I know what

17     you're referring to.

18                    But there is right underneath where

19     you wrote that comment that we just talked about

20     was a doctor's name.  Is that Dr. Koehler's name

21     and address?

22             A.     Yes.  She wanted the doctor who did

23     my surgery.

24             Q.     And is that your handwriting?

25             A.     Yes.

```
 1                    CAITLIN H. RAILO
 2          MR. LaROSE:  The name and the
 3     address here (indicating), this is what
 4     he is asking.
 5          MR. CIMINI:  Right.
 6          MR. LaROSE:  Is that you?
 7          THE WITNESS:  No, that's not my
 8     handwriting.
 9          MR. CIMINI:  Okay.  That was my
10     question.  That's not your handwriting?
11          THE WITNESS:  That's a different
12     doctor.
13          MR. CATALINOTTO:  Could we clarify
14     for the record now?
15          THE WITNESS:  Limitation, I don't
16     know what that is.
17          MR. CATALINOTTO:  Could we clarify
18     for the record now?  We have the
19     handwritten words that she's testified
20     that she wrote I believe in this box up
21     to the words Valium.  Could we clarify?
22          MR. CIMINI:  That's my under-
23     standing.
24          MR. CATALINOTTO:  Under where?
25          MR. LaROSE:  Yes, the name of the
```

1                      CAITLIN H. RAILO

2             doctor and the address that's there,

3             she's saying that's not her handwriting,

4             and where it says "no" --

5                  MR. CATALINOTTO:  What's not her

6             handwriting, where it says "doctor"?

7                  THE WITNESS:  That's not my

8             handwriting, I'm sorry, and it says "no

9             current limitations."

10                 MR. LaROSE:  That's not your

11            handwriting?

12                 THE WITNESS:  No.  I know why she

13            didn't put the Suboxone on there.  She

14            told me that she only wanted the

15            medications that were going to make me

16            tired on there, and that's the quantity

17            and the volume, yes.

18            Q.    That's what you recall her telling

19      you?

20            A.    That's exactly what she told me.  I

21      remember that.

22            Q.    Now, is that your signature

23      underneath where we're just talking about,

24      Caitlin Railo?

25                 MR. LaROSE:  You mean under Box 1

168

1                    CAITLIN H. RAILO

2          and 2?

3                    MR. CIMINI:   Correct.

4          A.     Yes.

5          Q.     Is that your signature?

6          A.     Yes.

7          Q.     And the date is October 16th, 2012?

8          A.     Yes.

9          Q.     That's your handwriting, as well?

10         A.     Yes.

11         Q.     Now, there is some more handwriting

12    underneath that; correct?

13         A.     Yes.

14         Q.     Was that your handwriting?

15         A.     No.

16         Q.     Do you know who wrote that

17    information?

18         A.     That was the nurse.

19         Q.     And the nurse writes "PMH," which

20    stands for past medical history?

21                 MR. LaROSE:   Do you know if that's

22          what that means?

23                 THE WITNESS:   I don't know.

24                 MR. LaROSE:   Okay.

25         Q.     And did you tell the nurse that you

1                      CAITLIN H. RAILO

2      had cancer of the cervix?

3              A.     That's what the medical records

4      say.  That's why he did the hysterectomy.

5              Q.     Do you see the letters right next

6      to that, it looks like T -- either TAH --

7              A.     TAH.

8              Q.     Do you see that?

9              A.     Yes.

10             Q.     And then it says, May '12 or --

11     excuse me, "May 2012"?

12                    MR. LaROSE:  May 2012.

13             Q.     Do you know what that's

14     referencing?

15             A.     No.

16             Q.     And then if you continue on to the

17     right, on that same line, it says "PCP Dr.

18     Galli" with a telephone number.  Do you know if

19     that's Dr. Galli's telephone number?

20             A.     Yes, it is.

21             Q.     And then underneath that, it looks

22     like the next line, it says, she writes, "PSH

23     2006 breast cancer."  Did you have breast cancer

24     in 2006?

25             A.     Yes.

170

CAITLIN H. RAILO

1          Q.     And a lumpectomy; is that correct?

2          A.     Yes.

3          Q.     And chemo pills?

4          A.     Yeah.  I didn't take pills for

5 chemo.  I don't know why that's on there.

6          Q.     And then underneath that, there is

7 the word "meds" that's circled.  Do you see

8 that?

9          A.     Yes.

10          Q.     And then there is Clonidine?

11          A.     Um-hum.

12          Q.     ".1 milligram," do you see that?

13          A.     Yes.

14          Q.     Did you tell the nurse that you

15 were taking Clonidine?

16          A.     Yes.

17          Q.     And did you tell her in that

18 dosage?

19          A.     Yes.

20          Q.     Was that the correct dosage?

21          A.     Yeah.  That's one milligram twice a

22 day.

23          Q.     Do you know what the letters are

24 that are after that?

1              CAITLIN H. RAILO

2          A.    PO Q -- it's PO, then QID.

3          Q.    Do you know what that stands for?

4          A.    QID is twice a day.

5          Q.    And then next to that "Diazepam";

6     correct?

7          A.    Yes.

8          Q.    And Diazepam is Valium; correct?

9          A.    Yes.

10         Q.    And then there is a dosage after

11    that?  Do you see that?

12         A.    Yes.

13         Q.    Is that the correct -- what is the

14    dosage that's written there?

15         A.    10 milligrams twice a day.

16         Q.    Was that accurate?  Is that what

17    you're taking at that time?

18         A.    Yes.

19         Q.    And, again, in this section there

20    is no reference to Suboxone, is there?

21         A.    No, because she didn't put it on

22    there.

23         Q.    Did you tell her that you were

24    taking Suboxone?

25         A.    Yes, I did.  She said she only

CAITLIN H. RAILO

1

2      writes down the medication that makes you tired.

3      That's what she said to me.

4              Q.    And did you tell her that Clonidine

5      makes you tired?

6              A.    That's why it's on there.  No, it

7      doesn't make me tired, but she -- because it

8      lowers your -- it lowers your blood pressure, so

9      most people, it would make you tired, and so

10     would Valium because it's a benzodiazapine that

11     would make you tired too.

12             Q.    But it's your testimony that

13     neither of those two drugs made you tired?

14             A.    No.

15             Q.    And the reason why she didn't write

16     Suboxone is because that's a drug that won't

17     make you tired?

18             A.    No, it doesn't.

19             Q.    Did she agree with that?  Who said

20     Suboxone is a drug that doesn't make you tired?

21     Did the nurse say that?

22             A.    The nurse that did that, did my --

23     whoever did this, that did my physical.

24             Q.    Did you agree with her that when

25     she said that the Suboxone doesn't make you

CAITLIN H. RAILO

1
2      tired?

3             A.     She said I just want the medication

4      on here that make you drowsy.

5             Q.     Then it says, "PMD Dr. Galli"

6      underneath that.  Do you see that?

7             A.     Okay, yes.

8             Q.     That's in the nurse's writing;

9      correct?

10            A.     Yes.

11            Q.     Were there any other drugs that you

12     were taking at the -- prescription drugs that

13     you were taking at the time when this medical

14     examination report was filled out?

15            A.     No.

16            Q.     Do you recall whether or not the

17     nurse who you provided this information ever

18     discussed with you any potential hazards of

19     taking the medications that you were on while

20     driving or operating a motor vehicle?

21            A.     No.

22            Q.     Did the nurse that you gave this

23     information to at that time ever request that

24     you provide her or Quality Bus with a written

25     prescription clearance form or opinion stating

CAITLIN H. RAILO

1

2      that you were fit to operate a school bus even

3      though you were taking the drugs that you

4      reported to them?

5              MR. CATALINOTTO:   Objection to the

6          form.

7              MR. LaROSE:   I'll join.

8          A.    No.

9          Q.    Did any representative of Quality

10     Bus ever tell you that you needed to obtain

11     written clearance from your physician saying

12     that you were fit to operate a school bus?

13         A.    No.

14             MR. CIMINI:   Railo G.

15             (Whereupon, an Article 19-A Bus

16         Driver Application was marked as Railo

17         Exhibit G for Identification as of this

18         date.)

19             (Document submitted.)

20         Q.    Railo G that you've just been

21     handed is a one-page Article 19-A Bus Driver

22     Application and there is some typed information

23     on this particular form.  My first question to

24     you is, did you type any of the information

25     that's contained on this form?

CAITLIN H. RAILO

1

2          A.     No.

3          Q.     Does your signature appear on the

4     bottom of this form anywhere?

5          A.     Yes.

6          Q.     Is that signature next to the date

7     October 26th, 2012?

8          A.     Yes.

9          Q.     Do you remember signing this form?

10          A.     Yes.

11          Q.     Do you remember, when you signed

12     this form, was the information that was typed

13     that you see on it now on the form when you

14     signed it --

15               MR. LaROSE:   In other words, you're

16          asking her --

17          Q.     -- or was it blank when you signed

18     it?

19          A.     To tell you the truth, I really --

20     I don't know, because, I mean, I'm sure it was

21     typed, but now I don't remember.

22          Q.     And underneath there is a signature

23     of employer/agent, and it looks like it's

24     Michael R. Martucci --

25          A.     Yes.

176

CAITLIN H. RAILO

1

2      Q.    -- October 26th, 2012.  Do you see

3  that?

4      A.    Yes.

5      Q.    Do you know if when you signed this

6  form, if his signature was already on it at the

7  time?

8      A.    No.

9      Q.    Under the accident section of this

10  form, it says "Accident" -- "Start with your

11  most recent accident and include accident within

12  the past three years," and there is no mention

13  of any accident in there, is there?

14      A.    No.

15      Q.    We can go back to your application

16  which was Exhibit E, Page 3.  The very top, it

17  says, "Accident review for past three years,"

18  and you wrote in this information; correct?  We

19  went over that before?  This was all in your

20  handwriting?

21      A.    Yes.

22      Q.    You referenced a 2010 rear-end

23  accident?

24      A.    Yes.

25      Q.    "Person trying to pull into

CAITLIN H. RAILO

1

2      dealership, driving without steering wheel"?

3          A.    Yes.

4          Q.    This is the accident that you

5      mentioned earlier?

6          A.    That's within the past three years.

7          Q.    It was within the past three years?

8          A.    Yes.

9          Q.    That's why you listed it; correct?

10         A.    Yes.

11         Q.    And, in fact, I believe that

12     accident actually occurred 2011, but you

13     inadvertently may have written 2010?

14         A.    I don't remember dates, but, yes,

15     probably.

16         Q.    I just want to make sure that there

17     was no other rear-end accident and that we're

18     only talking about one rear-end accident --

19         A.    Yes.

20         Q.    -- that you recall being involved

21     in and that's the one by the dealership.

22         A.    Yes.

23         Q.    And then if we go back to the

24     accident section of Railo G, you would agree

25     that there is no mention of that rear-end

1                    CAITLIN H. RAILO

2       accident in this particular form, is there?

3            A.    No.

4            Q.    Do you know why there is no

5       reference there?

6            A.    No, I don't.  I mean, I put it on

7       that paper (indicating).

8                 MR. LaROSE:  Referring to her

9            application.

10           A.    I don't know.  They also say I'm a

11      male in this application, so I don't know.

12           Q.    That's right.  Did you check off

13      that --

14           A.    No.

15           Q.    -- box?

16                You didn't type in any of that

17      information that's contained in there; correct?

18           A.    No.

19           Q.    You don't know who typed that, do

20      you?

21           A.    No.

22           Q.    And then on that same form, Railo

23      G, under "Convictions:  Start with your most

24      recent conviction and include all criminal

25      convictions," and you would agree that there is

179

CAITLIN H. RAILO

1
2       nothing listed in any of those boxes, is there?

3       A.    No.

4       Q.    And when we go back to your

5       application --

6       A.    It only asked if I have been

7       convicted of a felony.

8       Q.    Well, let's go back to your

9       application, Page 3, under the traffic, under

10      the second section under the "Accident review

11      for past three years," there is another section

12      that says "Traffic convictions and forfeitures

13      for the past three years," and then you wrote

14      "Deer Park, May 2012, parking on pavement"?

15      A.    That's what they gave me.

16      Q.    What was that for?

17      A.    After -- it was the one ticket that

18      I had, after you plead not guilty, that's what I

19      got in court and had to pay a fine.

20      Q.    And you wrote that in there?

21      A.    Yes.

22      Q.    And then underneath that, you made

23      a reference to "conviction in Pennsylvania in

24      March of 2012 for speeding"; correct?

25      A.    Yes.

1               CAITLIN H. RAILO

2          Q.    And when you go back to Railo G,

3     under that "Conviction" section that we were

4     talking about, there is no mention of any

5     convictions in there at all; is there?

6               MR. LaROSE:  That's what he wants

7          to know.  Is this section blank?  That's

8          all he is asking you.

9          Q.    This section is blank; right?

10          A.    (Indicating affirmative page.)

11          Q.    You have to say yes.

12          A.    Yes.

13          Q.    Do you remember having a discussion

14     with Mr. Martucci or anyone from Quality Bus

15     about filling out that particular section

16     regarding convictions on Railo G at the time

17     that you signed this document?

18          A.    No.

19          Q.    Under that section of

20     "Convictions," it says, "Start with your most

21     recent conviction and include all criminal

22     convictions"; right?

23          A.    Yes.

24          Q.    Do you see that?  And there is no

25     limitations there with respect to how many

181

```
1                      CAITLIN H. RAILO

2       years, is there?

3            A.    No.

4            Q.    And you would agree that you did

5       have criminal convictions as of October 26th,

6       2012 when this document was signed; correct?

7            A.    Yes.

8                 MR. CIMINI:  I'm going to show you

9            what we will mark as Railo H.

10                (Whereupon, a document entitled

11           "Carrier's Annual Review of Employee's

12           Driver Record Under Article 19-A" was

13           marked as Railo Exhibit H for

14           Identification as of this date.)

15           Q.    Railo H is entitled, "Carrier's

16      Annual Review of Employee's Driver Record Under

17      Article 19-A," and again, there is some

18      information that's typed there and then there is

19      some information that's handwritten on the

20      entire form; correct?

21                (Document submitted.)

22           A.    Yes.

23           Q.    Did you type in any of the

24      information that's contained there?

25           A.    No.
```

1                      CAITLIN H. RAILO

2            Q.    Is there any handwriting on this

3      particular form that is yours?

4                 MR. LaROSE:   Other than her

5            signature?

6            A.    No.

7            Q.    Is the signature yours?

8            A.    Yes.

9            Q.    And the date, October 26th, 2012,

10     is that your handwriting, as well?

11           A.    Yes.

12           Q.    Is that the only handwriting that

13     is yours on this form?

14           A.    Yes.

15           Q.    And under the "Accident"

16     information section, that's all blank; correct?

17           A.    Yes.

18           Q.    There is no reference to any

19     rear-end accident that occurred?

20           A.    In the past twelve months.

21           Q.    It's just blank; correct?

22           A.    Yes, it's blank.

23           Q.    And then under the next section

24     regarding "Record of Convictions," there is

25     something written in there for July 10th, 2012

183

1                     CAITLIN H. RAILO

2      and that's a disobeying of the traffic control

3      device that we went over earlier; correct?

4             A.    Yes.

5             Q.    And that was in Deer Park.

6                   Now, again by looking at this, does

7      this now maybe refresh your recollection as to

8      what that offense involved, the disobeying of

9      the traffic signal?

10                  MR. LaROSE:  You mean what she was

11             originally charged with first versus what

12             she pled to?

13                  MR. CIMINI:  Yeah, because she

14             didn't remember.

15            A.    No.

16            Q.    There is no reference to the

17     speeding conviction that we went over earlier

18     that happened in March of 2012 in Pennsylvania,

19     is there?

20                  MR. LaROSE:  It's not here, is it?

21                  THE WITNESS:  No.

22            Q.    Do you know why it's not there?

23            A.    I have no idea.

24            Q.    Do you remember having a discussion

25     with Mr. Martucci at the time that this form was

                    CAITLIN H. RAILO

1

2      filled out about your record of convictions?

3          A.     No.

4          Q.     We went over your job application,

5      and you would agree that you did disclose your

6      speeding citation in March of 2012 on your

7      application; correct?

8          A.     Yes.

9          Q.     And you don't have an explanation

10     as to why it's not contained on the Carrier's

11     Annual Review of Employees Driving Record which

12     is marked as Railo H?

13         A.     No.

14         Q.     Do you remember if Quality Bus ever

15     provided you with an employee handbook?

16         A.     No.

17         Q.     Do you remember if you were ever

18     subjected to a random drug test by Quality Bus

19     after you were hired but before the February

20     14th, 2013 bus accident?

21             MR. LaROSE:   She's already

22         discussed with you the drug test and she

23         told you you don't know in advance when

24         it's given, so that's the random drug

25         test.  Are you referring to something

```
 1                    CAITLIN H. RAILO
 2         else now?
 3                  MR. FOULKE:  I don't know that we
 4         established that.
 5                  MR. CIMINI:  I don't know that was
 6         a random we never discussed.
 7                  MR. LaROSE:  She said to you
 8         specifically --
 9                  MR. CIMINI:  Calm down.
10                  MR. LaROSE:  -- okay, that you
11         don't know in advance when it's being
12         given to you because you were asking
13         about masking and everything, and she
14         said you don't know when the test is
15         going to be given.
16                  MR. CIMINI:  We talked about a drug
17         test that she was required to give --
18                  MR. LaROSE:  Right.
19                  MR. CIMINI:  -- prior to her being
20         hired, that's what we talked about, and I
21         asked her, and she said it was a
22         urinalysis and then we went through that
23         stuff.
24                  MR. LaROSE:  Okay, right.
25                  MR. CIMINI:  That was the one test
```

```
1                    CAITLIN H. RAILO
2              that I know that she was given before she
3              was hired.  It was mandated as part of
4              the hiring process.  That was my under-
5              standing.
6                    MR. LaROSE:  Okay.  So, what's your
7              question then?  It's coming out
8              different.
9              Q.    My question is, were you subjected
10     to any random drug test by Quality Bus after you
11     were hired but before the February 14th, 2013
12     bus accident?
13             A.    I only had the one drug test.
14             Q.    And that was?
15             A.    That was right before I started
16     driving.
17             Q.    And then you had another one after
18     the accident; correct?
19             A.    Yes.
20             Q.    Are you right-handed or left-
21     handed?
22             A.    Right.
23             Q.    And would it be fair to say that
24     you actually first started to drive a bus for
25     Quality Bus transporting students in October of
```

CAITLIN H. RAILO

1
2      2013?  Does that sound right?

3             A.    September, October, yes.

4                   MR. CATALINOTTO:  Objection to the

5             form.  I think we got the years wrong.

6             October 2012.

7                   MR. CIMINI:  2012, you're right.

8             I'm sorry.

9             A.    Oh, yes.

10            Q.    October of 2012?

11            A.    Yes.

12            Q.    As part of your employment with

13     Quality Bus, at any time did they ever provide

14     any defensive driving courses?

15            A.    Well, what do you mean as

16     "defensive driving courses"?

17            Q.    Well, I don't know.  I'm asking the

18     question.  Do you recall there being anything

19     where you were instructed by Quality Bus on how

20     to be a defensive driver, that topic or that

21     term?

22            A.    Yeah, of course, because we had to

23     do driving for a little over a month.

24            Q.    Do you remember Quality Bus ever

25     giving you any rules or regulations about

188

                    CAITLIN H. RAILO

1  driving while impaired?

3       A.     Yes, but I don't remember the

4  exact.  It's the same stuff that's in the book

5  to get your -- get your CDL.  You know,

6  obviously if you're too tired, you can't keep

7  your eyes open, you are supposed to pull over

8  and call somebody, have them relieve you.  If

9  you don't, you have to radio in.  If something

10 is -- I mean, it's all the same.  It's

11 standardized rules.

12      Q.     What school district were you

13 driving for when you were driving for Quality

14 Bus?

15      A.     Port Jervis.

16      Q.     Did you have the same route every

17 day?

18      A.     Yes.

19      Q.     And can you tell me what that route

20 was?

21      A.     Route, the first was the -- hold

22 on, I got to think about this, because I went to

23 a school in PA in the morning.  The first route

24 was to Port Jervis Elementary and the second

25 route was to the PA school.

189

```
                         CAITLIN H. RAILO
 1
 2          Q.     Tell me about the first route,
 3    where it started and kind of where it ended.
 4    Where would you start from?
 5          A.     Okay.  Wait.  I'm sorry.  I'm
 6    backwards.  The first route was to the PA school
 7    and the second route was to the elementary
 8    school for which one there is two different
 9    routes that I did.
10          Q.     Tell me about the first, the route
11    that you would take that you would do in the
12    morning.  Where did that route start?
13                 MR. LaROSE:  Okay.  Let's get
14             something clear.  You do two routes in
15             the morning or one route in the morning?
16                 THE WITNESS:  Two in the morning,
17             two in the afternoon.
18                 MR. LaROSE:  Okay.
19          Q.     Tell me about the two routes in the
20    morning.
21                 MR. LaROSE:  She has Port Jervis
22             and then the PA route.  Now you want to
23             ask something specific?
24          Q.     Where do those routes start?
25          A.     I start in Sparrow Bush at the bus
```

CAITLIN H. RAILO

1

2       station, and I have to go through Port Jervis

3       and I have to go into Deer Park, and I don't

4       remember the road names now, make a left onto

5       the road that I was trying to make a left on.  I

6       go up there, and then I have to come back out,

7       go through Port Jervis again and go to PA.  Then

8       I have to pick up the elementary.  After that

9       route was done, it was elementary.

10             Q.    How long does that route take?

11             MR. LaROSE:  Which route?

12             MR. CIMINI:  The first route that

13       you described in the morning.

14             MR. LaROSE:  First Pennsylvania

15       route in the morning, how long average?

16             THE WITNESS:  About a half hour.

17             Q.    And then the second route?

18             A.    Second route is about the same, a

19       little shorter, because there are so many stops.

20             Q.    And so then there is a break in the

21       day, correct --

22             A.    Yes.

23             Q.    -- before you do the afternoon

24       route or routes?

25             A.    Yes.

1                        CAITLIN H. RAILO

2              Q.      How long is that break?

3              A.      About four hours.

4              Q.      What do you do during the four

5      hours?

6              A.      Eat, go home, make lunch, use the

7      phone, clean the house.

8              Q.      What do you do with the school bus?

9      Do you take the bus home with you?

10             A.      No.   It parks at the bus station

11     and then I drive my car home.

12             Q.      And then you go back to the --

13             A.      Bus station.

14             Q.      -- bus station --

15             A.      Yes.

16             Q.      -- for the afternoon?

17             A.      Yes.

18             Q.      And how many routes in the

19     afternoon, two?

20             A.      Yes.

21             Q.      And tell me about what routes they

22     are.

23             A.      It's the same, same routes, just

24     backwards.

25             Q.      Just reversed?

192

1                    CAITLIN H. RAILO

2          A.     Yes.

3          Q.     Are you required to do any type of

4    office work, paperwork, during the morning and

5    afternoon routes?

6          A.     No, not unless I have a writeup or

7    I just have to do a checkoff of the bus.  I have

8    to check the tires, check the outside, check the

9    mirrors, check the glass, the inside, the seat

10   belts, the floors --

11         Q.     Who --

12         A.     -- the gauges.

13         Q.     When do you do that?

14         A.     Before every route and before you

15   drive and after you drive.

16         Q.     Both in the morning and in the

17   afternoon?

18         A.     Absolutely, yes.

19         Q.     So, every morning when you would

20   start your job at Quality Bus, you would drive

21   to the bus facility, correct, to pick up your

22   bus?

23         A.     Yes.

24         Q.     Would you have to report to any

25   Quality Bus manager or employee to tell them

193

1                    CAITLIN H. RAILO

2      that you're here and that they can look at you

3      and observe you?

4           A.    Yes, I have to go in and get the

5      key for the bus, so I go in and I say good

6      morning.  I use, you know, the ladies' room and

7      then get the key and then go to the bus.

8           Q.    Who do you report to when you go in

9      in the morning?

10          A.    The secretary.  There is two.

11     There is one main lady that stays in the office

12     all day, but the other one is usually in there

13     with her too, so sometimes there is two ladies

14     in there.

15          Q.    Other than the two secretaries,

16     were you required to report to any manager or

17     supervisor?

18          A.    No.

19          Q.    Who was your supervisor or your

20     manager at the time that you were employed by

21     Quality Bus?

22          A.    It was Michael, I believe.

23          Q.    Michael Martucci?

24          A.    Yes.

25          Q.    Did you ever have to report to him

1                    CAITLIN H. RAILO

2      in the morning for any reason?

3            A.    If he needed, he told the

4      secretary, then he would.  She would call him

5      when I was there and then I would go and talk to

6      him.  Kids get taken off the bus or a new one

7      comes on, I have to know about it.  They'll give

8      me a different stop on my run or let me know if

9      somebody is taken off.

10           Q.    Do you know if anybody from Quality

11     Bus was required to make a personal observation

12     of your overall general appearance before you

13     were allowed to leave with the keys to a bus for

14     that day?

15           A.    No, but I'm sure they did.

16           Q.    Why do you say that?

17           A.    Because I had to go in there and

18     talk to him every morning, everybody does, to

19     get the keys, so I'm sure they do their own, you

20     know, personal inventory on you.

21           Q.    You're talking about those two

22     secretaries?

23           A.    Yes and yes.

24           Q.    Do you know if they had any special

25     training on how to observe bus drivers?

```
 1                    CAITLIN H. RAILO
 2          A.    I don't know.
 3                MR. CATALINOTTO:  Objection to the
 4          form.
 5          Q.    Were you free to go anywhere you
 6     wanted during the morning and afternoon routes?
 7                MR. LaROSE:  Wait a minute.  You're
 8          asking while she is driving the route,
 9          can she go anywhere she wants or, are you
10          talking about in the four-hour break?
11                MR. CIMINI:   In the four-hour
12          break.
13                MR. LaROSE:  That's not what you
14          said.
15          A.    Yes.  On break, yes.
16          Q.    You were free to go anywhere?
17          A.    Yes.
18          Q.    Were you free to go anywhere during
19     that break with the bus?
20          A.    No.
21          Q.    Did you drive the same bus every
22     day?
23          A.    Yes.
24          Q.    Was that Bus Number 71?
25          A.    Yes.
```

                         CAITLIN H. RAILO

1

2          Q.    Does that sound right?

3          A.    Um-hum.

4          Q.    From the time that you were hired

5    up to the time of the accident, were you ever

6    reprimanded by your employer for any reason?

7          A.    I was late, so yes.

8          Q.    Was that the only reason you were

9    reprimanded?

10         A.    Yes.

11         Q.    And how many times were you late?

12         A.    Twice.

13         Q.    Who reprimanded you, Mr. Martucci?

14         A.    Yes.

15         Q.    Were you given any kind of written

16   warning or a verbal warning?

17         A.    I was told if I was late or

18   anything, I was going to lose my job.

19         Q.    Do you recall when that occurred?

20         A.    No.

21         Q.    The accident happened on February

22   14, 2013.  Does that refresh your recollection

23   as to when you may have been reprimanded by Mr.

24   Martucci for being late?

25         A.    January.  I can't tell you when,

197

1                        CAITLIN H. RAILO

2        though.  I don't know.

3                  Q.    January of 2014?

4                  MR. LaROSE:  No.

5                  MR. CIMINI:  Excuse me.  2013.

6        A.    Yes.

7                  MR. CIMINI:  Off the record.

8                  (Discussion off the record.)

9            Q.    Do you recall whether you were ever

10       called off from work when you were driving for

11       Quality Bus?

12                 MR. LaROSE:  I'm sorry, what was

13           the question?

14                 MR. CIMINI:  Did you ever call off?

15                 MR. LaROSE:  What do you mean "call

16           off"?

17           Q.    Call and say I'm taking a day off,

18       I can't come in today.

19           A.    I think I did, but I don't remember

20       when.

21           Q.    Okay.  Do you know how many times

22       you would have called off?

23           A.    Once.

24           Q.    Do you remember what the reason

25       was?

                        CAITLIN H. RAILO

1

2          A.    It had to have been medical.

3          Q.    Well, again, I don't want you to

4    assume.  If you actually know the reason, I'll

5    take that, but if you don't know, just say I

6    don't know.

7          A.    Yeah.  Yes, it was from surgery.

8    That's the only reason I called out.

9          Q.    You didn't have surgery while you

10   were working for Quality Bus, did you?

11         A.    Yes.

12         Q.    What surgery did you have while you

13   were working for Quality Bus?

14         A.    Well, it was the same-day surgery.

15         Q.    What was that?

16         A.    I had a lump removed.

17         Q.    That was the lumpectomy that we

18   talked about, or was that something else?

19         A.    No, it was a different one.

20         Q.    Was that also in your breast?

21         A.    No.

22         Q.    How many days did you miss as a

23   result of this lumpectomy --

24              .          MR. LaROSE:  It wasn't a

25              lumpectomy.

1                     CAITLIN H. RAILO

2          Q.     -- or the lump being removed?

3          A.     I don't know.

4          Q.     You don't remember when it was?

5          A.     It was in January, but I think I

6    only had -- or I just left early, I think, to go

7    get it done.  I don't think I had any days off.

8    I really don't remember.

9          Q.     Do you remember, if you did have to

10   call off, whether you were required to find a

11   replacement driver?

12         A.     No.

13         Q.     Do you know how Quality Bus would

14   get a driver to fill in for you or for any bus

15   driver for that matter if they had to call off

16   for any reason?

17         A.     You give another driver an extra

18   route.

19         Q.     Let's go to the day of the

20   accident.  You said earlier that you kind of,

21   you know, remembered the accident.  It was on

22   February 14th, 2013.  Do you remember what day

23   of the week it was?

24         A.     No.

25         Q.     In the area of the accident, were

1                    CAITLIN H. RAILO

2     you familiar with where that accident occurred?

3          A.    Yes.

4          Q.    Was that part of your daily bus

5     route?

6          A.    Yes.

7          Q.    Would that have been one of the

8     morning routes?

9          A.    That was the afternoon route.

10         Q.    The afternoon?

11         A.    Yes.

12         Q.    And do you remember what time of

13    day the accident happened?

14         A.    It was around 2:00, a little after

15    2 it had to have been.

16         Q.    Where were you with respect to the

17    afternoon route?  Was it the beginning of the

18    route?  Was it toward the end of the route?

19         A.    It was the end.

20         Q.    Do you remember where you were

21    coming from, where you were headed?

22         A.    I was -- I can't remember the name

23    of that road.  I was making a left onto the

24    road.  That was last stop I had.

25         Q.    Does Peenpack -- I'm not sure of

```
                        CAITLIN H. RAILO
```
1
2          the spelling.

3                  A.     Yes, Peenpack Trail.

4                  Q.     It was light out at the time of the

5          accident?

6                  A.     Yes.

7                  Q.     Was there anything about the

8          weather that was a problem that day?

9                  A.     No.

10                 Q.     What about the traffic conditions?

11         Was there anything unusual about the traffic

12         conditions?

13                 A.     No.

14                 Q.     What about the shape or curve of

15         the roadway at or near where the accident

16         happened, can you give me a sense as to what

17         that roadway was like?

18                 A.     There was a sharp -- there was a

19         sharp turn and I know the speed limit went down

20         with the turn, I believe.

21                 Q.     Sharp turn going -- coming from

22         what you were headed in a certain direction on,

23         I believe it was Route 209?

24                 A.     209.

25                 Q.     Okay.

1                    CAITLIN H. RAILO

2          A.    The way I was coming from Port

3     Jervis, it was a sharp left, sharp turn to the

4     left, so for him it would have been a right

5     turn.

6          Q.    Okay.

7          A.    Curve, not a turn.

8          Q.    So, you're saying the roadway,

9     there is a curve in the roadway at or near the

10    intersection of 209 and Peenpack Trail?

11         A.    Yes.

12         Q.    Do you know what the posted speed

13    limit is at that area of --

14         A.    45.

15         Q.    Just so the record is clear, do you

16    know what the posted speed limit is at the

17    intersection at or near the intersection of

18    Peenpack Trail and Route 209?

19         A.    45.  I believe the curve went down

20    to 35.  I'm not too sure.

21         Q.    Was there anything mechanically

22    wrong with the bus that day as far as you know?

23         A.    No.

24         Q.    Were the brakes working properly?

25         A.    Yes.

1                    CAITLIN H. RAILO

2          Q.    Were you having any difficulties

3     with the steering mechanism?

4          A.    No.

5          Q.    Do you know if you had headlights

6     on?

7          A.    No.  Well, headlights are always

8     on.

9          Q.    They're always on?

10         A.    They're always on.

11         Q.    Is that some type of requirement

12    from Quality Bus as far as you know?

13         A.    Yes.

14         Q.    Did you consume any alcoholic

15    beverages during the twenty-four-hour period

16    before the accident?

17         A.    No.

18         Q.    What medications or drugs did you

19    take during the twenty-four-hour period before

20    the accident on February 14th, 2013?

21         A.    Clonidine, Valium and two Percocets

22    the night before.

23         Q.    The Clonidine and the Valium, were

24    they the same dosages that you had described

25    earlier that you told the nurse when you were

CAITLIN H. RAILO

1
2      hired that you were taking?
3             A.    Yes.
4             Q.    And Percocet is something that we
5      haven't discussed before.  You're telling me
6      that the night before February 13th, 2013 you
7      took two Percocets?
8             A.    Yes.
9             Q.    Who prescribed those Percocets?
10            A.    Dr. Koehler, Crystal Run Health
11     Care.
12                  Oh, wait, no, it wasn't Dr.
13     Koehler.  I'm sorry.  It was a female doctor.  I
14     don't know what her name is, but it was --
15                  MR. LaROSE:   Somebody at Crystal
16            Run?
17                  THE WITNESS:  Crystal Run Health
18            Care, yes.
19            Q.    Someone at Crystal Run prescribed
20     Percocet for you?
21            A.    Yes.
22            Q.    When were they prescribed?
23            A.    Couple weeks before that.
24            Q.    Couple weeks before the accident?
25            A.    Yes.

205

CAITLIN H. RAILO

1

2      Q.      Did you notify Quality Bus that you

3  were prescribed Percocet?

4      A.      I don't remember, but I know I told

5  them what I had done, so I can't -- I really

6  can't remember.

7      Q.      Well, let me ask you this.  Maybe I

8  should have prefaced that question by this

9  question.

10             A couple weeks before someone from

11 Crystal Run prescribed Percocet for you;

12 correct?

13     A.      Yes.

14     Q.      Was that for pain?

15     A.      Yes.

16     Q.      And was that as a result of the

17 operation or the procedure that you described

18 earlier?

19     A.      Yes.

20     Q.      Were you taking those Percocets on

21 a daily basis from the time they were prescribed

22 up until the night before the accident?

23     A.      Yes, only when needed.

24     Q.      But did you take them every day?

25     A.      No.

206

CAITLIN H. RAILO

1

2      Q.   But you do recall taking them the

3   night before the accident?

4      A.   Yes.

5      Q.   And what effect did the Percocet

6   have on you, if any?

7      A.   None really.  They were like a

8   strong Motrin.

9      Q.   Did it relieve the pain?

10      A.   A little bit.  Yeah, it makes it

11   bearable.

12      Q.   What time did you take the

13   Percocet?  I know you said the night before, but

14   can you give me a sense as to what time you

15   would have taken the Percocet?

16      A.   Between 8:00 and 9:00 at night.

17      Q.   And do you remember the dosage?

18      A.   No, I don't.

19      Q.   So, the medications that you were

20   taking within the twenty-four-hour period were

21   the Clonidine, the Valium and the two Percocets?

22      A.   Yes.

23      Q.   Anything else?

24      A.   No.

25      Q.   Did you have a cell phone with you

207

CAITLIN H. RAILO

1

2      at the time the accident happened?

3              A.      Yes.   I always do, yes.

4              Q.      Was that your own personal cell

5      phone or was that a cell phone that Quality Bus

6      provided to you?

7              A.      Own personal cell phone.

8              Q.      Did Quality Bus provide you with a

9      cell phone?

10             A.      No.

11             Q.      Do you know if you were talking to

12     someone on your cell phone when the accident

13     happened?

14             A.      No, I was not.

15             Q.      Who was your cell phone carrier or

16     who was your cell phone carrier at the time of

17     the accident?

18             A.      Verizon, I believe.

19             Q.      Do you know if you were using your

20     cell phone at any time just before the accident

21     happened while you were driving the bus?

22             A.      I don't ever use the cell phone

23     while driving.

24             Q.      Who else was with you in the bus at

25     the time of the accident?

1                    CAITLIN H. RAILO
2          A.     One student.  I don't remember her
3     name.
4          Q.     Was there anyone else in the bus
5     with you other than the one student?
6          A.     No.
7          Q.     Do you remember where that one
8     student was seated at the time the accident
9     happened?
10         A.     Third, fourth seat from the front.
11    I know she was in the front, but I don't know
12    exactly which seat.
13         Q.     Do you know if she was directly
14    behind you or was she on the other side, I'll
15    call it, the passenger side?
16         A.     Passenger side.
17         Q.     She was on the passenger side?
18         A.     Yes.
19                MS. LLOYD:  Off the record.
20                (Discussion off the record.)
21         Q.     Did you attempt to call off work on
22    the morning of February 14th, 2013, the day of
23    the accident?
24         A.     I believe I did.
25         Q.     Tell me what happens as far as that

CAITLIN H. RAILO

1

2    goes, as far as you can remember.

3         A.    If I don't come in, I was fired.

4         Q.    Who did you speak to that morning?

5         A.    Secretary.

6         Q.    Do you remember her name?

7         A.    No.

8         Q.    Do you remember what time you

9    called?

10        A.    It would have to be between 4:00

11   and 5:00 in the morning.

12        Q.    Is there someone at the facility

13   that you can call that early?

14        A.    Yes.

15        Q.    Do you recall what you told that

16   secretary?

17        A.    No.

18        Q.    Do you recall generally what you

19   said about not coming in?

20        A.    I didn't feel good.

21        Q.    Did you say why you didn't feel

22   good?

23        A.    Just said my body was sore and I

24   was in pain and I had trouble sleeping the night

25   before.

1                         CAITLIN H. RAILO

2           Q.    And what did that person tell you

3     when you made the request to stay home that day?

4           A.    There was no other drivers.

5           Q.    Did she say anything else other

6     than there is no other drivers?

7                 MR. LaROSE:  What she already told

8           you.

9                 MR. CIMINI:  I'm going to get to

10          that.

11          A.    There was nobody else to do the

12    route.

13          Q.    You mentioned earlier that you were

14    told that you would be fired if you didn't come

15    in.  Is that what you were told by the

16    secretary?

17                MR. LaROSE:  Were you told that

18          that morning or is that something you had

19          been told to you earlier he wants to

20          know.

21          A.    I was told earlier.  I don't know

22    if she told me that morning.

23                MR. CATALINOTTO:  Hold it.  I can't

24          hear you.

25          Q.    I want to try to understand your

CAITLIN H. RAILO

1
2      testimony here because it's important.
3              At some point somebody from Quality
4      Bus told you that if you miss work, you're going
5      to be fired; is that fair?
6              A.    Yes.
7              Q.    When was that statement made to
8      you?
9              A.    The last time I was late.
10             Q.    Okay.  Who made that statement to
11     you?
12             A.    The secretary.
13             Q.    Was that the same secretary that
14     you called and spoke to on the morning of
15     February 14th, 2013?
16             A.    Yes.
17             Q.    And so when you called off that
18     morning of February 14th, 2013, you told her
19     that you didn't feel well and that you didn't
20     want to come in, and her response generally was,
21     well, there is no one else to take the route?
22             A.    Yes.
23             Q.    Do you recall her saying anything
24     else to you other than that?
25             A.    No.  I just said, "There is nobody

212

CAITLIN H. RAILO

1

2       else that can do it?"  And she said, "No, there

3       is not."

4              Q.     Was it your understanding that if

5       you did not show up for work that morning, that

6       you would be fired based on the statement that

7       that secretary made to you earlier?

8              A.     Yes.

9              MR. CATALINOTTO:   Objection to the

10             form.

11             Q.     At the time that this accident

12      happened, you were in your afternoon route;

13      correct?

14             A.     Yes.

15             Q.     The second route of the afternoon;

16      correct?

17             A.     Yes.

18             Q.     So, prior to that time, you had

19      done the two morning routes; correct?

20             A.     Yes.

21             Q.     What did you do that day in

22      between, for the four-hour break in between the

23      morning routes and the afternoon routes, if you

24      recall?

25             A.     I went home, ate lunch and sat and

213

1                       CAITLIN H. RAILO

2      watched TV.

3              Q.    Did you take any more medications?

4              A.    No, I don't take my other meds

5      until nighttime.  That would only be the blood

6      pressure medication at night.

7              Q.    When do you take your -- let's see,

8      you said that you were taking in the twenty-

9      four-hour period Clonidine, Valium and two

10     Percocets?

11             A.    Yes.

12             Q.    At what time did you take the

13     Clonidine?

14             A.    I don't know.  Before work

15     sometime.

16             Q.    It would have been in the morning

17     hours of February 14th?

18             A.    I take it early, probably about

19     4:00 in the morning.

20             Q.    What about the Valium?

21             A.    Same time.  I don't start driving

22     until 7:30.

23             Q.    Do you know if at the time of the

24     accident, whether you were on schedule or were

25     you running late for any reason?

214

1                           CAITLIN H. RAILO
2               A.     I was on schedule.
3               Q.     How many students were in the bus
4      when that particular route started, if you
5      recall?
6               A.     Five.
7                      MR. LaROSE:   Okay.   Never mind.
8           Which route?
9                      MR. CIMINI:   The last route.
10                     MR. LaROSE:   The one she was on at
11          the time of the accident?
12                     MR. CIMINI:   Yep.
13                     MR. LaROSE:   When you start that
14          route.
15              A.     Yeah, it was about five.  I don't
16     remember exactly how many that day, though,
17     because I think one was missing.
18              Q.     Do you remember at the exact point
19     of the impact with Justin Maher what you were
20     doing?
21              A.     What I was doing?
22              Q.     Yeah.
23              A.     I was about to make a turn.  I was
24     making a turn.
25              Q.     You were about to make -- you were

CAITLIN H. RAILO

1

2    attempting to make a left turn onto Peenpack;

3    correct?

4         A.    Yes.

5         Q.    Do you remember at that time if you

6    were talking to anyone?

7         A.    No, I don't remember -- no, I

8    wasn't.  Sorry.

9         Q.    You were not talking to anyone?

10        A.    Not when I was turning, I don't

11   believe.

12        Q.    Do you know if Quality Bus had any

13   policy that prohibited you from talking to the

14   students while they're on the bus?

15        A.    No.

16        Q.    Do you know if you were ever

17   reprimanded for talking too much to the students

18   on the bus by Quality Bus?

19        A.    No.

20        Q.    No, you were not?

21        A.    No.

22        Q.    Did you ever see the video

23   surveillance from inside the bus of the

24   accident?

25        A.    No.

1              CAITLIN H. RAILO

2         Q.    If the video shows that you were

3    talking to someone at the time of the impact,

4    would the only person that you could have been

5    talking to been the person that was on the bus,

6    the student?

7         A.    Yes.

8         Q.    You were not on your cell phone?

9         A.    No.

10        Q.    And if you were talking to the

11   student at the time of the impact, that would

12   not have been a violation of any Quality Bus

13   policy?

14             MR. CATALINOTTO:  Objection to the

15        form.

16             MR. LaROSE:  Object to the form.

17        When you say "time of impact," I think

18        you really mean in the moments before the

19        impact.

20             MR. CIMINI:  Right before the

21        impact.

22             MR. CATALINOTTO:  Objection to the

23        form.  You can answer.

24        A.    No.

25        Q.    In the moments right before the

217

CAITLIN H. RAILO

1

2        impact, if you were talking to someone, would

3        that have been a violation of Quality Bus

4        policy?

5               A.    No.

6               Q.    How fast were you traveling at the

7        point of impact?

8               A.    I don't know.

9               Q.    Do you recall seeing my client's

10       vehicle at any time before the impact?

11              A.    No.

12                    MR. LaROSE:  Even for moments.  He

13                    wants to know if you ever saw it before

14                    you hit it.

15              A.    Two seconds, that was it, no.  That

16       was it.

17              Q.    Well, the question was, did you

18       ever see Mr. Maher's vehicle before, at any time

19       before the impact?

20                    MR. LaROSE:  Yes.

21              A.    Right before he hit me.  As he was

22       hitting me, no, I didn't even see him coming

23       around the turn.

24              Q.    You didn't even see him coming

25       around the turn?

218

CAITLIN H. RAILO

1       A.    No.

2       Q.    Would you be able to describe the

3 color of his vehicle?

4       A.    Dark.  I don't know exactly what

5 color, but I know it was dark.

6       Q.    Was that based upon your

7 observation of his vehicle before the impact or

8 was that based on your observations after the

9 crash occurred?

10      A.    No, that was after.

11      Q.    Is there any way you would be able

12 to give an estimate as to how fast he was

13 traveling prior to the impact?

14      A.    I would say he was definitely

15 speeding.

16      Q.    But can you give me an estimate as

17 to how fast he was traveling?

18      A.    No.  Above, he was going faster

19 than 60 or 65.  I know that.

20      Q.    Well, how do you know that?

21      A.    Because I can tell by how many

22 seconds it took him to hit me from that turn.

23      Q.    Well, how many seconds did it take?

24 Because I asked you earlier whether you saw his

218

CAITLIN H. RAILO

1        A.    No.

2        Q.    Would you be able to describe the

3    color of his vehicle?

4        A.    Dark.  I don't know exactly what

5    color, but I know it was dark.

6        Q.    Was that based upon your

7    observation of his vehicle before the impact or

8    was that based on your observations after the

9    crash occurred?

10        A.    No, that was after.

11        Q.    Is there any way you would be able

12    to give an estimate as to how fast he was

13    traveling prior to the impact?

14        A.    I would say he was definitely

15    speeding.

16        Q.    But can you give me an estimate as

17    to how fast he was traveling?

18        A.    No.  Above, he was going faster

19    than 60 or 65.  I know that.

20        Q.    Well, how do you know that?

21        A.    Because I can tell by how many

22    seconds it took him to hit me from that turn.

23        Q.    Well, how many seconds did it take?

24    Because I asked you earlier whether you saw his

219

CAITLIN H. RAILO

1

2    vehicle at any time before and you gave me the

3    sense that you barely saw his vehicle.

4          A.     If he was going 45, I would have

5    saw him.  Somebody that's going more than 55,

6    60, you would see that person before they hit

7    you.  I didn't even see him.

8          Q.     Were you able to take any actions

9    to avoid a collision with Justin Maher's

10   vehicle?

11         A.     No.

12         Q.     Does the bus have a horn?

13         A.     Yes.

14         Q.     Were you able to apply the horn?

15         A.     No.

16         Q.     Do you know if you were able to hit

17   your brakes just before the impact?

18         A.     I hit him as he was hitting me.  I

19   didn't even see him coming.  I had one-second

20   reaction time, one- or two-second reaction time,

21   which is nothing.

22         Q.     Do you know whether or not the bus

23   left any skid marks as a result of you applying

24   your brakes?

25         A.     No.

220

1          CAITLIN H. RAILO

2          Q.    The bus did not leave skid marks or

3    you don't know?

4          A.    No, I don't know.

5          Q.    Do you know if you were able to

6    turn your wheel in any direction in an attempt

7    to avoid contact with Mr. Maher's vehicle?

8          A.    No.

9          Q.    What part of the bus came into

10   contact with what part of Mr. Maher's vehicle,

11   if you recall?

12         A.    It was his front of his car with

13   the front right side of the bus.

14         Q.    What did you do right after you

15   learned that there was an accident?

16         A.    Got out and checked on him and used

17   the phone -- well, radioed my phone.

18         Q.    Did the bus have a radio in it?

19         A.    Yes.  I radioed the depot.

20         Q.    Was that before you got out of the

21   bus or did you go out of the bus first and then

22   come back in and radio depot?

23         A.    I don't remember.

24         Q.    Did you use your cell phone at all

25   to contact anyone right after the accident?

CAITLIN H. RAILO

1

2      A.     The only person I contacted was

3   the -- well, afterwards, after they took him and

4   they were taking me to the hospital, I mean,

5   afterward.

6      Q.     I mean while you were at the scene,

7   in the moments right after the accident, while

8   you were at the scene, did you use your cell

9   phone to contact anyone?

10           MR. LaROSE:   Just in the first

11       minute or two is what he is asking you.

12           THE WITNESS:   No.

13      Q.     Did you take any photographs at the

14   scene?

15      A.     No.

16      Q.     Did you have a camera with you?

17      A.     No.

18      Q.     Would it be fair to say that you

19   were upset at that time?

20      A.     Yes.

21      Q.     Were you in any kind of pain?

22      A.     Yes.

23      Q.     Were you in pain as a result of the

24   accident that you were just in or were you in

25   pain as a result of the surgery that you had

CAITLIN H. RAILO

1

2     recently for which you were taking Percocet?

3           A.    I don't think the accident really

4     did anything to me.  I was just -- I was sore

5     the next day.  I don't know why.  At that time I

6     was just in shock.

7           Q.    You were in shock at the scene;

8     would that be fair to say?

9           A.    Yes.

10          Q.    Do you remember who you spoke to at

11    the scene of the accident right afterwards?

12          A.    The lady that works for the Deer

13    Park courthouse.  I don't remember her name.

14          Q.    Do you remember the substance of

15    that conversation?

16          A.    No.  She was asking me if we were

17    okay, brought us into the building and called

18    the kid's parents, the father, to come pick her

19    up and told me to not move, and that was about

20    it.

21          Q.    Do you know if that person that you

22    spoke to saw the accident?

23          A.    I think she saw some of it or heard

24    it.  I don't remember what she said.

25          Q.    You don't remember her name?

1                          CAITLIN H. RAILO

2          A.     No.

3          Q.     Do you recall anyone asking you for

4    a fire extinguisher?

5          A.     No, nobody did.

6          Q.     Other than that woman that you

7    described having that conversation with, did you

8    have a discussion or conversation with anyone

9    else at the scene?

10         A.     No.

11         Q.     How about my client, Justin Maher?

12         A.     No.

13         Q.     Did you talk to him at all?

14         A.     No.

15         Q.     Did you see him?

16         A.     Yes.

17         Q.     Did you see him in his vehicle?

18         A.     Yes.

19         Q.     Can you tell me what condition he

20   was in?

21         A.     He was leaning against the steering

22   wheel.

23         Q.     Was he conscious?

24         A.     I don't think so.

25         Q.     Was he making any noise?

224

CAITLIN H. RAILO

1
2      A.     No.

3      Q.     Was he moving at all?

4      A.     No.

5      Q.     Was he bleeding?

6      A.     A little bit on his nose, coming
7  from his nose.

8      Q.     Did he appear to have any injuries
9  to his arms or his legs as far as you could
10 tell?

11     A.     No.

12     Q.     Can you tell me what he was
13 wearing?

14     A.     No.  I wasn't paying attention to
15 that.

16     Q.     Do you know if the passenger that
17 was in your bus, the little girl, whether she
18 was injured?

19     A.     No.  She was fine.

20     Q.     She was not.  How long did you stay
21 at the accident scene?

22          MR. LaROSE:  Define what you mean
23          by "the accident scene."

24          MR. CIMINI:  Well, the intersection
25          where the accident happened I refer to as

225

1                       CAITLIN H. RAILO

2              the accident scene.

3              A.     A couple minutes.

4              Q.     Let me finish the question.  I'm

5       trying to establish the question.

6                     How long did you remain at or near

7       that area following the accident?

8                     MR. LaROSE:  You mean by the bus

9                and by the car?  Is that what you're

10               referring to?

11                    MR. CIMINI:  Yeah, in that general

12               area.

13                    MR. LaROSE:  Because you know that

14               later she went across to that other

15               place.  She mentioned that briefly;

16               right?

17                    MR. CIMINI:  Right.

18                    MR. LaROSE:  Okay.  How long did

19               you remain by the bus and car?

20              A.     I don't know.  Only a couple

21       minutes, went over and then we went into that

22       building.

23              Q.     How long did you remain in that

24       building?

25              A.     Until the cops got there.  Maybe

CAITLIN H. RAILO

1

2      half hour, forty-five minutes, not even.

3            Q.    And did the cops interview you

4      while you were in that building, if you recall?

5            A.    No, because I had to be taken to

6      the hospital.

7            Q.    Did the cops interview you while

8      you were at the hospital?

9            A.    Yes.

10            Q.    Do you recall what you told the

11      police about the accident?

12            A.    Same thing I just said here.  I

13      mean, there is nothing really he is to say about

14      it.  It was quick.  I mean, it happened so fast.

15            Q.    Well, I just want to know if you

16      recall specifically what you may have said to

17      the police as you sit here today.  Do you have a

18      recollection of what you told them?

19            A.    Nothing that we haven't already

20      said.

21            Q.    Did you tell the police officer

22      about any drugs that you were taking, that you

23      had taken that day or within the twenty-four

24      hours?

25            A.    Yep.  Yes.

227

1                    CAITLIN H. RAILO

2                MR. CIMINI:  Railo J.

3                (Recess taken.)

4                (Whereupon, a thirty-five-page

5          police report was marked as Railo Exhibit

6          J for Identification as of this date.)

7                (Document submitted.)

8          Q.    You've just been handed Railo J,

9     and I think just so the record is clear, I think

10    we may have skipped a letter, but that's

11    intentional even though it may not flow.  This

12    should be Railo J because it's consistent with

13    what everybody else has.  It's the police report

14    and it's a total thirty-five pages.

15                MR. CATALINOTTO:  Is that in here?

16                MR. CIMINI:  That's in there, Railo

17    J.

18          Q.    And we're not going to go through

19    the entire report.  We are going to look at some

20    statements, Caitlin, that were made that are

21    attributable to you, that were made by you.

22                And the first page I want you to

23    turn to Page 23.  Do you see the handwritten

24    statement that's contained on Page 23?

25          A.    Yes.

228

1                         CAITLIN H. RAILO

2                Q.     Is the handwritten statement in

3       your handwriting?

4                A.     No.

5                Q.     Is your signature on the bottom of

6       that page?

7                A.     Yes.

8                Q.     Yes?

9                A.     Yes.

10               Q.     But that's not your handwriting

11      above it; correct?

12               A.     No.

13               Q.     Do you know who wrote that

14      statement?

15               A.     No.

16               Q.     There are two witnesses underneath

17      your name.  Do you see those witnesses' names?

18               A.     I can't read them.

19               Q.     But --

20               A.     Yes.

21               Q.     Can you identify who they are?

22               A.     No.

23               Q.     Looks like Investigator MJ Skunks.

24               A.     That's what it looks like.

25               Q.     Do you know who that person is?

1                      CAITLIN H. RAILO

2              A.    No.

3              Q.    Underneath that, it looks like

4      another person, but maybe it's the same person,

5      and their initials MJS.

6                   MR. LaROSE:  She doesn't know.

7              Q.    I'm going to read the statement

8      into the record and I'll ask you some questions

9      real quick.

10                  MR. LaROSE:  Off the record.

11                  (Discussion off the record.)

12             Q.    Did you have an opportunity to read

13     that statement?

14             A.    Yes.

15             Q.    You did?

16                  MR. LaROSE:  She glanced at it,

17          yes.  Go ahead.

18             Q.    After you glanced at it, do you

19     think there is anything in that that's

20     inaccurate?

21                  MR. LaROSE:  As to what she said at

22          the time?

23                  MR. CIMINI:  Yes.

24                  MR. LaROSE:  He wants to know if

25          everything in here is accurate as far as

230

CAITLIN H. RAILO

1      either what you described or said, so go

2      through it and tell us on any line if

3      there is anything you don't recognize

4      there as being something that you said.

5            THE WITNESS:  Yes.

6            MR. LaROSE:  Okay.  So, start with

7      wherever the first thing is and tell him

8      all the things you don't recall telling

9      him specifically, that way --

10           THE WITNESS:  Tell him things I

11     don't remember saying?

12           MR. LaROSE:  Yeah, or that are

13     inaccurate, you believe are inaccurate,

14     not things you said.

15           THE WITNESS:  It's pretty accurate.

16           MR. LaROSE:  Okay.

17     Q.     And let me just address one thing

18     that's part of the statement.  It says, "In the

19     midst of making the turn, I saw a dark-colored,

20     two-door car traveling southbound on Route 209";

21     right?

22           MR. LaROSE:  Do you see that?

23           MR. CIMINI:  You see that?

24           THE WITNESS:  Yes.

```
                           CAITLIN H. RAILO
 1
 2        Q.    You see that?  I just wanted to
 3   make sure you see.
 4        A.    That's not my wording.
 5             MR. LaROSE:  But that's what's
 6        there, okay.
 7        A.    That doesn't make any sense
 8   because --
 9             MR. CATALINOTTO:  Well --
10        A.    Yes, I see it.
11        Q.    This is a statement that you signed
12   as being an accurate and true statement at the
13   time; correct?
14        A.    Yes.
15        Q.    And do you believe that not to be
16   true now as you read that statement?
17             MR. LaROSE:  Which, "In the midst
18        of making the turn"?
19             MR. CIMINI:  Yes.  The statement
20        that I just read, yes.
21        A.    That can go either way, but all
22   right.
23        Q.    I don't understand that answer.
24   You made that statement on February 14th, 2013
25   at 4:55 p.m.?
```

232

```
 1                    CAITLIN H. RAILO
 2              MR. LaROSE:  Off the record.
 3              (Discussion off the record.)
 4    A.    I didn't make that statement.
 5              MR. LaROSE:  She may have not used
 6         the words "In the midst of making the
 7         turn."
 8              THE WITNESS:  No, I didn't.
 9              MR. LaROSE:  But you were making
10         the turn when you saw the dark-colored
11         car?
12              THE WITNESS:  Well, yeah, I saw
13         when he hit me.
14              MR. LaROSE:  Right.
15    Q.    And then it says after that, "I
16   estimate this vehicle to be traveling 65 to 70
17   miles per hour."
18    A.    Yes.
19    Q.    Is that an accurate statement as
20   far as you know when you gave that statement
21   back in February of 2013?
22    A.    Yes.
23    Q.    "The driver of the other car was a
24   younger white male not wearing a seat belt and
25   wearing some type of a sweatshirt," do you
```

1              CAITLIN H. RAILO

2     believe that to be an accurate statement?

3            A.    Like I said, now I don't really

4     remember, but I guess at that time, yes.

5            Q.    When did you make your

6     determination that the driver of the other

7     vehicle was a younger white male not wearing a

8     seat belt and wearing some type of sweatshirt,

9     was that after the accident or did you make that

10    observation just before the impact when you

11    first saw his car?

12           A.    After.

13           Q.    And if you turn over Page 2 of the

14    written statement, even though the first page,

15    it says "1 of 1."

16                 MR. CIMINI:   Page 24.

17           Q.    Does that contain your signature on

18    the bottom of Page 24 just like it did on Page

19    23?

20           A.    Yes.

21           Q.    In the middle of this statement on

22    this page, there is some discussion about

23    medications and we can read it together, or are

24    you reading it now?

25           A.    Yes, I am.

234

```
1                    CAITLIN H. RAILO
2              MR. LaROSE:  All right.  This you
3          might as well read out loud.  I know what
4          you want to do.  Okay.
5          Q.    All right.  It states, I quote "The
6     medications I took today are Clonidine, .01
7     milligrams, one tablet, at 9:45 a.m.; Valium, 5
8     milligrams, one tablet at 9:45 a.m.  Yesterday I·
9     took Percocet, 7.5 milligrams, two tablets, at
10    about 8:00 p.m. and a half of Ambien, 10
11    milligrams, one-half tablet, at 8:00 p.m.  I
12    also take Suboxone, 8 milligrams in the morning
13    and 2 milligrams before bed, but I haven't taken
14    it since last week."  Okay.  Did I miss
15    anything?
16             MR. LaROSE:  No, okay.  So, you're
17          done reading what's written here.  Now
18          you have a question?
19             MR. CIMINI:  Yes.
20             MR. LaROSE:  Go ahead.
21          Q.    Is that statement accurate?
22          A.    I really couldn't tell you.  I
23    would assume so.  I normally don't take the meds
24    at 9:45, though, but all right.
25          Q.    Earlier you told me that you took
```

235

1                    CAITLIN H. RAILO

2       those meds --

3            A.    In the morning.

4            Q.    -- much earlier in the morning;

5       correct?

6            A.    Yes.

7            Q.    But as you read this statement --

8            A.    That's what I just said.  I never

9       take my meds at 9:45 because I'm usually still

10      driving at that time.  I take them before I

11      leave.

12                 MR. CATALINOTTO:  Can we just

13            clarify real quick, she didn't write this

14            either, this page?

15                 MR. CIMINI:  No.

16                 MR. CATALINOTTO:  Okay.

17           Q.    On the record, is that handwriting

18      regarding the statement of your medications in

19      your handwriting?

20           A.    No.

21           Q.    Did you recall as you sit here

22      today telling the investigator that you took

23      those medications in those dosage at those

24      times?

25           A.    I don't remember what I told him.

236

CAITLIN H. RAILO

1    I remember telling him what I was on and how

2    often I take them.

3                MR. LaROSE:  But not the time?

4                THE WITNESS:  No.

5         Q.    What about the Ambien?  We haven't

6    discussed Ambien before.  That hasn't been

7    mentioned at all.

8         A.    No, because I was taken off of it.

9         Q.    First of all, who prescribed you

10   Ambien in the first place?

11        A.    Dr. Galli.  I wasn't taking it at

12   that time, though.

13        Q.    When did Dr. Galli prescribe Ambien

14   for you?

15        A.    What do you mean "when"?  When did

16   she start me on it?

17        Q.    When?

18        A.    Or when was I supposed to take it?

19        Q.    When did Dr. Galli first prescribe

20   you Ambien?

21        A.    About five, six years ago.

22        Q.    For what reason?

23        A.    For sleep.

24        Q.    And how long did you take Ambien?

CAITLIN H. RAILO

1

2      A.     Maybe two, three years, when

3   needed, when I needed it.

4      Q.     Is there any reason to believe that

5   what you told the investigator with respect to

6   you taking Ambien is not true at that time?

7      A.     I don't know.   It probably wasn't

8   because I wasn't on them at that time.

9      Q.     Do you know why he would have put

10   that there then?

11      A.     Probably because I had all my

12   medications on me because I think I had just

13   picked them up, picked one of them up in that

14   afternoon.

15      Q.     Well, then you would have had to

16   have picked up an Ambien prescription, as well?

17      A.     I'm not sure, I don't know, or if

18   he was just asking me which ones I was on, which

19   ones I've taken, I don't know.   I'm not sure.

20      Q.     Do you know for sure whether you

21   had taken Ambien as indicated by this statement

22   at that time?

23      A.     No.

24      Q.     You don't know for sure?

25      A.     No.

238

1                     CAITLIN H. RAILO

2          Q.     Is it possible that you did take

3     it?

4          A.     Possible, yeah.

5          Q.     Is it possible that you had taken

6     it because you were in pain from the operation

7     and you were having difficulty sleeping because

8     of the pain?

9                 MR. CATALINOTTO:   Objection to the

10                form.   You can answer.

11         A.     It's possible, but not likely.

12         Q.     Do you remember earlier when I

13    asked you whether you called in the bus company

14    that morning to ask if you could have the day

15    off?

16         A.     Yes.

17         Q.     Do you remember that line of

18    questioning?

19         A.     Yes.

20         Q.     And I think that you told me that

21    you told the girl, the secretary, that you

22    wanted to take the day off because you were in

23    pain and because you were having trouble

24    sleeping?

25         A.     Yeah.

239

1               CAITLIN H. RAILO
2        Q.    You had trouble sleeping that
3    night?
4               MR. CATALINOTTO:   Objection to the
5         form.   You can answer.
6        A.    But Ambien doesn't take pain away.
7    I would stay up because the pain and then just
8    be drowsy.   There would be no sense in taking
9    it.   I have to get up at 4:00.
10       Q.    You indicate something about having
11   difficulty sleeping and you had trouble sleeping
12   that night before you wanted to take the day
13   off?
14       A.    Yes.
15       Q.    Okay.   And do you know if you had
16   taken Ambien that day at any point to help you
17   sleep because you were --
18       A.    Oh, no.
19       Q.    -- having difficulty sleeping?
20       A.    No.
21       Q.    If you turn to Page 25, this is
22   another statement that is typed.   This time Page
23   25 and 26, two-page statement.   Second page, on
24   Page 26 is your signature.   Do you see that?
25       A.    Yes.

```
1                          CAITLIN H. RAILO
2              Q.    And it looks like this statement
3      was given on April 12th, 2013; right?
4              A.    Yes.
5              Q.    Do you remember giving a statement,
6      this particular statement to the New York State
7      police?
8              A.    I don't, no.
9              Q.    Why don't you take a second to look
10     at it?
11             A.    Yeah.  See, this was a detective in
12     Middletown.  I don't -- okay, yes, I do.
13             Q.    Okay.  This looks like this was
14     questions by an Investigator Tim Diamond.
15                  MR. LaROSE:  That's what it says,
16         yes.
17             Q.    You remember being questioned by an
18     investigator named Timothy Diamond?
19             A.    Yep.
20             Q.    And did you read the questions and
21     the answers?
22                  Did you say yes?
23             A.    Yes.
24             Q.    Do you recall giving the answers
25     that are indicated in this statement?
```

1          CAITLIN H. RAILO

2          A.     No.

3          Q.     I'll go through it.

4                 The third question says, "Do you

5    know why you are here today?"  And the answer

6    that's typed there is, "Unfortunately, yes, for

7    the bus accident.  I had dirty blood."

8          A.     That was kind of a -- that's what

9    he called it.  I was kind of saying that back to

10   him.  That's what he told me.

11         Q.     That's not a term that you used?

12         A.     I have never said that before in my

13   life, no.

14         Q.     And the next question is, "Why was

15   your blood test positive for morphine and

16   Diazepam?"

17         A.     Yeah.  That's not the answer I gave

18   to him.

19         Q.     The answer that's here is, "I am

20   prescribed Valium by Dr. Galli so that is why

21   Diazepam came up."  Is that an accurate

22   statement?

23         A.     Yes.

24         Q.     Then the next sentence reads, "I

25   ran out of Suboxone the two days before the

242

                    CAITLIN H. RAILO

1

2    accident."  Is that an accurate statement?

3          A.    No.

4          Q.    Did you run out of Suboxone at any

5    point in time before the accident?

6          A.    No.  I stopped taking it.

7          Q.    Okay.  When did you stop taking

8    Suboxone?

9          A.    You can't take a couple of days

10   before that because you can't take a Percocet

11   and a Suboxone together at all.  It would make

12   you sick.  It can kill you.

13         Q.    So, a couple of days before the

14   accident you stopped taking Suboxone because you

15   were taking Percocet for the pain that you were

16   in from your surgery?

17         A.    Yes.

18         Q.    Is that the only reason why you

19   stopped taking Suboxone?

20         A.    Yes.

21         Q.    The next sentence says, "I did not

22   go to my doctor and get a refill and I was not

23   allowed to call out of work."  Is any part of

24   that sentence accurate?

25               MR. LaROSE:  Accurate or

243

```
 1                    CAITLIN H. RAILO

 2           inaccurate?

 3                    MR. CIMINI:  Either way.

 4                    MR. LaROSE:  You said accurate.

 5           Q.    Is any part of that sentence

 6      inaccurate?

 7                    MR. CATALINOTTO:  Can we just read

 8           that back?

 9                    MR. CIMINI:  Sure.  The sentence?

10                    MR. CATALINOTTO:  The question,

11           whatever the question was.

12                    MR. CIMINI:  Go ahead.  I will read

13           the statement again.

14                    MR. CATALINOTTO:  Okay.

15           Q.    "I did not go to my doctor and get

16      a refill and I was not allowed to call out of

17      work.  I had to work."

18           A.    It doesn't make any sense to me.

19           Q.    What part of those statements are

20      not accurate?

21           A.    I didn't go to my doctor for what,

22      a refill, about a refill for what?

23           Q.    Well, the previous sentence said

24      that you ran out of Suboxone.

25                    MR. LaROSE:  She's already told you
```

1                    CAITLIN H. RAILO

2              that that's inaccurate.  Okay?  So, it's

3              inaccurate that you did not go back to

4              the doctor to get a refill, that's not

5              correct, you didn't say that?

6                    THE WITNESS:  No.

7                    MR. LaROSE:  Okay.

8         A.    I get them all at the same time.

9    If I run out of one, I run out of all of them.

10        Q.    And the reason why you didn't run

11   out of Suboxone is because you didn't run out of

12   Suboxone, you had Suboxone?

13        A.    Yes.

14        Q.    You weren't taking it because you

15   were taking Percocet; is that right?

16        A.    Yes.  You can't take them both at

17   the same time.

18        Q.    What about the statement that says,

19   "I was not allowed to call out of work.  I had

20   to work," is that an inaccurate statement?

21        A.    I said I had to go to work.  See,

22   he messed all this up and the 200-milligram

23   morphine pills.

24        Q.    I didn't get there yet.  We didn't

25   get there yet.

245

1            CAITLIN H. RAILO

2          A.    Okay.

3          Q.    The answer that's typed here says,

4    part of it, anyway, says, "I was not allowed to

5    call out of work.  I had to work."  My question

6    to you,  is that an accurate, truthful statement

7    that's attributable to you that you gave on

8    April 12th, 2013?

9          A.    At that time, probably close to it,

10   yes.

11         Q.    And isn't that consistent with what

12   you said earlier about you trying to call off

13   from work that morning and you were told that

14   there were no other drivers?

15         A.    Yes.

16                MR. CATALINOTTO:  Objection to the

17         form.  You can answer.

18         Q.    And when you said that you had to

19   work in that statement, why did you say that?

20         A.    That's what I'm saying, I don't

21   know.

22         Q.    Well, did you say you had to work

23   because there were no other drivers available

24   and that if you didn't go to work that it was

25   your understanding that you would be fired?

246

```
1                    CAITLIN H. RAILO
2              MR. CATALINOTTO:   Objection to the
3         form.
4         A.    Yes.
5         Q.    The next sentence says, "I took a
6    200-milligram morphine pill."  It is -- can't
7    read that word.
8         A.    Me either.
9         Q.    But something -- it says
10   something --
11             MR. LaROSE:  Word we can't read.
12        Q.    -- a word we can't read and oblong
13   says "200" on one side.  The pill is time
14   released." Is that an accurate statement?
15        A.    No, that was the conversation that
16   he was having.  I said that the reason -- that
17   the reason that there was morphine in my blood
18   test, in my test, I was talking to him.  I said
19   morphine doesn't mean a pill.  Morphine is a
20   derivative that's what's in the Percocet.  It's
21   an opiate.  That's what shows up when you take
22   any kind of opiate.  It's morphine that shows
23   up.
24        Q.    Okay.
25        A.    So, I said it doesn't mean I took a
```

                              CAITLIN H. RAILO

1  Morphine pill.  It means that that's the

2  Percocet in my system.  That's just what it says

3  in the blood test, Morphine.  That's why I don't

4  understand where this morphine pill came into

5  play.

6          Q.    After the accident that involved

7  Justin Maher, they drew blood from you; correct?

8          A.    Yes.

9          Q.    And the blood test came back

10 positive for Valium?

11         A.    Yes.

12         Q.    Correct.  And for what else?

13         A.    That's the two.

14         Q.    What's the other one?

15         A.    The Benzodiazapine which is the

16 Valium and the morphine which is narcotics which

17 is the Percocet.

18         Q.    So, it's your understanding that

19 the Morphine that was found in your blood after

20 the accident is a direct result of the Percocet

21 pills that you had taken?

22         A.    Yes, that's what it is.

23         Q.    Then the next question says, "When

24 did you take the pill on February 13th, 2013?"

248

                    CAITLIN H. RAILO

1
2     And then the answer is "12:00 a.m., on the
3     14th," actually?
4            A.     See, I didn't say that either.
5            Q.     You didn't say that?
6            A.     No.
7            Q.     The next question is, did you feel
8     you should not have gone to work and drive the
9     school bus and the typed answer to that question
10    is, "I felt fine in the morning run and I just
11    felt tired in the afternoon run.  The pill
12    combined with lack of sleep from the night
13    before caused" -- something I can't read -- "to
14    be more tired than normal."
15           A.     That's the beginning of what I
16    said.
17           Q.     Is that --
18           A.     I mean...
19           Q.     Do you believe that you said that
20    to Trooper Diamond or Investigator Diamond?
21           A.     I didn't say anything about the
22    bill combined with the sleep.  I just say, yeah,
23    I felt tired and as I got progressively tired
24    during the day, but that doesn't mean that I
25    can't work or be alert just because I'm a little

249

1                    CAITLIN H. RAILO

2      tired.

3              Q.     The next question says, "Do you

4      regret driving the school bus that day?"  And

5      the answer is, "Yes."  Do you remember him

6      asking you that question and do you remember

7      saying yes to that question?

8              A.     Yes.

9              Q.     And do you believe that to be a

10     true statement?

11             A.     Not because I couldn't drive, just

12     because of what happened that day, yes,

13     absolutely.

14             Q.     The next question Trooper Diamond

15     asked you, "If you could go back to the day of

16     the accident, would you have taken the day off?"

17     And the answer there is, "If I could, I would

18     have.  Under no circumstances can I call out

19     because no one else can do my run."  Did you

20     give that answer to Trooper Diamond in response

21     to that question?

22             A.     I don't know.  I don't really

23     remember.

24             Q.     Next question is, "Do you have a

25     drug problem?"  Your answer was, "No."  Is that

250

1                    CAITLIN H. RAILO

2       right?  Do you see the next question?  "Do you

3       have a drug problem?"

4              A.    Yes.

5              Q.    And the answer is no?

6              A.    Yes.

7              Q.    Do you believe that to be an

8       accurate answer to that question?

9              A.    To an extent.  I mean, he just puts

10      my one answer.  I said more than that.

11             Q.    Do you remember what you said --

12             A.    Yes.

13             Q.    -- more than that?

14             A.    Yes.

15             Q.    Tell me what you said.

16             A.    I said, no, I don't currently have

17      a drug problem, but I guess technically

18      throughout my life I will always have a drug

19      problem, but the Suboxone does keep me from

20      doing drugs, it does.  It's been six years.

21             Q.    The next question is a general

22      question, "Is there anything you would like to

23      add?"  And then I just want to go to the last

24      two sentences of that answer, and it says, "I

25      was tired and I wished they would have let me

251

1                            CAITLIN H. RAILO

2       call out.  My boss told me I could not call out

3       under any circumstances."  Did you say those

4       statements to Investigator Diamond on April

5       12th, 2013?

6               A.    Yes.

7               Q.    And do you believe those to be true

8       statements?

9               A.    At the time, yes.

10              Q.    And when you say your boss told me

11      I could not call out under any circumstances,

12      who were you referring to specifically?

13              A.    Yes, see, that's not my boss, that

14      would have been the secretary, so I don't know

15      why they keep saying my boss, why they keep

16      saying that.

17              Q.    Earlier didn't you say that Mr.

18      Martucci who was your supervisor told you that

19      you couldn't be late anymore, and if you were

20      late, you were going to be fired?

21              MR. LaROSE:  No.  She said --

22              A.    Yeah, but I don't know why they say

23      that.  It's like -- it almost makes it sound

24      like if I call, I'm talking to him.

25              MR. CATALINOTTO:  That's a

252

CAITLIN H. RAILO

1
2      different question.  Just note my
3      objection.  I mean, calling in late and
4      what we're talking about here --
5          Q.    You agree that the statement says,
6      "My boss told me that I could not call out under
7      any circumstances""  And you said that you
8      believe that was a true statement; correct?
9              MR. CATALINOTTO:  Objection to the
10      form.  I don't believe she said that.
11              MR. LaROSE:  She already said that
12      the boss meant the secretary.
13          Q.    So, it's your position --
14          A.    They both did.
15              MR. LaROSE:  Okay.
16              MR. CIMINI:  Well, thank you for
17      that clarification.
18          Q.    So, both your boss or your
19      supervisor, Mr. Martucci and the secretary, told
20      you that you could not call out under any
21      circumstances; is that accurate?
22          A.    Yes.  I could not be late.
23              MR. CATALINOTTO:  Just go ahead.
24      Could you define what we mean by "call
25      out," because that's where we're getting

253

1                        CAITLIN H. RAILO

2         lost in translation.  I think she

3         believes can't come in late and we're

4         talking about if you don't come in at

5         all.  Please clarify that.

6               MR. CIMINI:  I mean, it's pretty

7         obvious --

8               MR. CATALINOTTO:  She keeps saying

9         I can't call out.

10              THE WITNESS:  It's either/or.

11              MR. FOULKE:  If you're going to get

12         fired --

13              MR. CATALINOTTO:  I want to make

14         sure I clarify when I get my opportunity

15         to question, so...

16              MR. CIMINI:  We'll go back to get

17         some clarification.

18         Q.    The sentence that I was referring

19  to reads as follows:  "I was tired and I wished

20  they would have let me call out."  What did you

21  mean when you said, "I wished they would have

22  let me call out"?  Did that mean take the day

23  off --

24         A.    Yes.

25         Q.    -- or come in late?

254

1                           CAITLIN H. RAILO

2              A.     Take the day off.

3              Q.     Next sentence, "My boss told me

4       that I could not call out under any

5       circumstances."  Did you mean that your boss

6       told you that you could not take the day off

7       under any circumstances?

8              A.     Yes.

9              Q.     And when you say boss, you're

10      referring to both Mr. Martucci and the

11      secretary; correct?

12             A.     Yes.

13             Q.     Yes?

14             A.     Yes.

15             Q.     The next statement, and it's the

16      last statement.

17                    MR. CIMINI:  Railo K.

18                    (Whereupon, a Quality Bus incident/

19             accident report was marked as Railo

20             Exhibit K for Identification as of this

21             date.)

22                    (Document submitted.)

23             Q.     Are you reading Railo K?

24             A.     Yes.

25             Q.     Okay, good.

255

CAITLIN H. RAILO

1

2          A.     Okay.

3          Q.     This is a Quality Bus incident/

4    accident report regarding the February 14th,

5    2013 accident.  Would you agree with that?

6          A.     Yes.

7          Q.     It's a two-page statement.  Is the

8    entire statement in your handwriting?

9          A.     Yes.

10         Q.     Is there anything on this statement

11   that is not in your handwriting?

12         A.     No.

13         Q.     I can't tell when this statement

14   was made.  I don't see any date on it.  Can you

15   give me any indication as to when you made this

16   statement?

17         A.     I have no idea.  It only says the

18   date of the incident.  I don't know when.  I

19   don't know what date I wrote it.

20         Q.     Okay.  Do you know where you would

21   have made the statement?

22         A.     I was at Quality Bus.

23         Q.     Was it on the day of the accident?

24         A.     No.

25         Q.     Do you know how much longer after

1                       CAITLIN H. RAILO

2      the accident it was?

3              A.     I don't.

4              Q.     Was anyone with you when you made

5      the statement?

6              A.     No.

7              Q.     Did anyone help you make this

8      statement?

9              A.     No.

10             Q.     Did anyone tell you what to write

11     in this statement?

12             A.     No.

13             Q.     Did anyone coach you on what you

14     should say or shouldn't say in this Quality Bus

15     incident/accident report?

16             A.     No, just said write as much as you

17     can or as detailed as much as you can.

18             Q.     Is there anything in the statement

19     that you wrote, this two-page statement, that

20     you believe is inaccurate?

21             A.     Just little stuff.  I mean, it

22     keeps saying, a lot of them keep saying that I

23     saw him when he was coming around that turn,

24     which I didn't.  I couldn't tell who he was or

25     the kind of car it was until I got out.  I don't

257

CAITLIN H. RAILO

1

2      remember hitting the brakes when he hit me.

3      Believe it or not, I really don't.  I mean, I

4      remember hitting the brake when he hit me, not

5      before.  I don't remember him saying anything to

6      me, and that's about it.

7              Q.    Okay.  At the time you made the

8      statement, you gave the statement, were you

9      still employed by Quality Bus?

10             A.    I don't know.

11             Q.    Is it possible that you could have

12     been terminated when this statement was given?

13             A.    It's possible.

14             Q.    You don't have any specific

15     recollection?

16             A.    No.

17             Q.    Do you recall ever having any

18     conversations with Justin Maher or his wife,

19     Angel Maher, after the accident?

20             A.    No.

21             Q.    Do you recall ever having any

22     exchanges with Justin Maher or Angel Maher via

23     Facebook?

24             A.    Those two, no.

25             Q.    You never had any conversation with

1                          CAITLIN H. RAILO

2      them through any form of social media --

3              A.     No.

4              Q.     -- as far as you know?

5              A.     No.

6              Q.     Okay.  And you never had any

7      discussions with them in person?

8              A.     No.

9              Q.     Over the telephone?

10             A.     Never met them.  Never talked to

11     them.

12                    MR. CIMINI:  I think that's all I

13             have.

14                    (Time noted - 3:30 p.m.)

15                         oOo

16

17             _____

18                         Caitlin H. Railo

19

20     Sworn to before me this

21     _____ day of _____, 2015.

22     _____

23             Notary Public

24

25

259

RAILO EXHIBITS
<u>MARKED FOR IDENTIFICATION</u>

| <u>EXHIBIT</u> | <u>DESCRIPTION</u> | <u>PAGE</u> |
|---|---|---|
| A | Copy of original birth certificate | 23 |
| B | Resume and letter dated July 30, 2012 | 34 |
| C | Packet of arrest records | 58 |
| D | Record Expansion | 48 |
| E | Employment application | 154 |
| F | Medical examination report | 159 |
| G | Article 19-A Bus Driver Application | 174 |
| H | Carrier's Annual Review of Employee's Driver Record under Article 19-A | 181 |
| J | Thirty-five-page police report | 227 |
| K | Quality Bus Incident/ Accident Report | 254 |

C E R T I F I C A T I O N

     I,   MELISSA SHELTON,   a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

     That the witness whose examination is hereinbefore set forth, was either first duly sworn or affirmed through me, and that the transcript of said examination is a true record of the testimony given by the said witness.

     I further certify that I am not related to any of the parties to this action by blood or marriage, and am in no way interested in the outcome of this matter.

_____
MELISSA SHELTON

Dated:   March 6, 2015

261

<u>ERRATA SHEET</u>

RE:    MAHER VS. RAILO & QUALITY
       BUS SERVICE, LLC.


           The following corrections, additions
or deletions were noted on the transcript of the
testimony which I gave in the above-captioned
matter.

<u>PAGE(S)</u>   <u>LINE(S)</u>      <u>SHOULD READ</u>           <u>REASON FOR CHANGE</u>

*_____    *_____    *_____   *_____

*_____    *_____    *_____   *_____

*_____    *_____    *_____   *_____

*_____    *_____    *_____   *_____

*_____    *_____    *_____   *_____

*_____    *_____    *_____   *_____

*_____    *_____    *_____   *_____

*_____    *_____    *_____   *_____

                                   _____
                                          Caitlin H. Railo
Sworn to before me this
_____ day of _____, 2015.
_____
         Notary Public