

263

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - -x

JUSTIN T. MAHER,

                  Plaintiff,

          -against-

CAITLIN H. RAILO and QUALITY
BUS SERVICE, LLC,

               Defendants.

                                14-CV3586
                                 (VLB)

- - - - - - - - - - - - - - - - - - - - - -x

                        Monday,
                        April 13, 2015
                        9:00 a.m.

        CONTINUED EXAMINATION BEFORE TRIAL
of the Defendant, CAITLIN H. RAILO, held pursuant
to Court Order, held at the Taconic Correctional
Facility, 250 Harris Road, Bedford Hills, New
York, before a Notary Public within and for the
State of New York.



**CSR LIMITED**

**CLASSIC SHORTHAND REPORTING LIMITED**

67 NORTH MAIN STREET
NEW CITY, NEW YORK  10956
classicreporters@aol.com

Ph: (845) 634-2022
Fax: (845) 634-3846

A P P E A R A N C E S:


COGNETTI & CIMINI, ESQS.
        Attorneys for Plaintiff
        Scranton Electric Building
        507 Linden Street
        Scranton, Pennsylvania  18503
BY:   VINCENT CIMINI, ESQ.,
            -and-
        SARAH LLOYD, ESQ.



FOULKE LAW OFFICES
        Attorneys for Plaintiff
        25 Main Street
        Third Floor
        Goshen, New York  10924
BY:   EVAN M. FOULKE, ESQ.



LaROSE & LaROSE, ESQS.
        Attorneys for Defendant
        Caitlin H. Railo
        510 Haight Avenue
        Poughkeepsie, New York  12603
BY:   KEITH V. LaROSE, ESQ.



MAYNARD, O'CONNOR, SMITH & CATALINOTTO, LLP.
        Attorneys for Defendant
        Quality Bus Service, LLC
        P.O. Box 180
        Saugerties, New York  12477
BY:   MICHAEL E. CATALINOTTO, JR., ESQ.


oOo

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED, by and
between the attorneys for the respective parties
hereto, that this examination may be signed and
sworn to before any Notary Public of the State of
New York.

IT IS FURTHER STIPULATED AND AGREED that
the filing and certification of the said
examination shall be waived.

IT IS FURTHER STIPULATED AND AGREED that
all objections to questions, except as to form,
shall be reserved for the trial of this action.

1

2          C A I T L I N    H.    R A I L O,      a

3                   Defendant herein, having been first duly

4                   sworn by Melissa Shelton, a Notary Public

5                   of the State of New York, was examined

6                   and testified further as follows:

7                          THE COURT REPORTER:  Please state

8                   your name and where you are currently

9                   housed and your DIN number for the

10                  record.

11                         THE WITNESS:  Caitlin H. Railo, at

12                  Taconic Correctional Facility, 14-G0401.

13     EXAMINATION BY

14     MR. CATALINOTTO:

15          Q.     Good morning, Ms. Railo.

16          A.     Good morning.

17          Q.     My name is Mike Catalinotto and I

18     represent Quality Bus Company, and I'm going to

19     ask you some questions regarding your employment

20     with Quality Bus and the accident that you were

21     involved in.

22                  If at any time you don't understand

23     one of my questions, will you please tell me?

24          A.     Absolutely.

25          Q.     And if you give a response to a

```
 1                    CAITLIN H. RAILO

 2   question, I'll assume that you understood it.

 3   Okay?

 4         A.    Yes.

 5         Q.    And I know you went through a

 6   deposition once before.  Just keep in mind you

 7   have to give verbal responses, you can't shake

 8   your head or nod, so the court reporter can take

 9   down what you said.  Okay?

10         A.    Yes.

11         Q.    What is your full name?

12         A.    Caitlin Helen Railo.

13         Q.    And Caitlin is spelled how?

14         A.    C-A-I-T-L-I-N.

15         Q.    L-I-N.

16               Before February 14th, 2013, were

17   you known by any other names other than Caitlin

18   H. Railo?

19         A.    Metcalf, Caitlin Metcalf.

20         Q.    And at any time did you spell

21   Caitlin different?

22         A.    With a Y.

23         Q.    So, there is Caitlin with an I,

24   Caitlyn with a Y, and then Caitlin Metcalf?

25         A.    Yes.
```

CAITLIN H. RAILO

1

2      Q.    When you used Caitlyn with a Y, did

3    you use that for Metcalf, also, or just Railo?

4      A.    I don't remember.

5      Q.    Do you know during what time period

6    you were Caitlyn with a Y?

7      A.    No.

8      Q.    And do you know what time period

9    you were known as Caitlin Metcalf?

10      A.    Through my middle school and high

11    school.

12      Q.    Up until about what age?

13      A.    Sixteen.

14      Q.    And I think you told us last time

15    that was when you got your driver's license, you

16    changed to Caitlin Railo?

17      A.    I didn't change it.  That was my

18    original name.  I didn't know.

19      Q.    All right.  But you started going

20    by that name?

21      A.    Yes.

22      Q.    And when you got your driver's

23    license for the first time, it was Caitlin H.

24    Railo?

25      A.    Yes.

CAITLIN H. RAILO

1

2          Q.     Other than Caitlin with an I,

3     Caitlyn with a Y and Caitlin Metcalf, were you

4     known by any other names?

5          A.     No.

6          Q.     When you applied for employment at

7     Quality Bus, what name did you go by?

8          A.     Caitlin Railo.

9          Q.     And did you spell it with a Y or an

10    I?

11         A.     I don't remember.

12                (Whereupon, a photocopy of Caitlin

13         H. Railo's CDL Driver's License was

14         marked as Railo Exhibit L for Identifica-

15         tion as of this date.)

16         Q.     Ms. Railo, I'm showing you what's

17    been marked Exhibit L with today's date.  Do you

18    recognize that as your commercial driver's

19    license?

20                (Document submitted.)

21         A.     Yes.

22         Q.     And the spelling of your first name

23    is Caitlin with an I for that commercial

24    license?

25         A.     Yes.

1                        CAITLIN H. RAILO

2          Q.    And again it's Railo, R-A-I-L-O?

3          A.    Yes.

4          Q.    And it looks like this was issued

5     on October 24th, 2012?

6          A.    Yes.

7          Q.    And is that about the time you

8     applied for employment with Quality Bus?

9          A.    Around that time.   It was prior to

10    that, because then I got my license after I got

11    the job.

12         Q.    Actually, yes, you applied and then

13    you were actually hired and able to drive a bus

14    around that date, October 2000 --

15         A.    I couldn't drive a bus until I got

16    that, yes.

17         Q.    I'm going to show you some exhibits

18    from the last deposition.   This was Exhibit E

19    that we used last time.

20              Do you recognize that as your

21    application for employment with Quality Bus

22    Company?

23              (Document submitted.)

24         A.    Yes.

25         Q.    And what is the date when you

271

1                        CAITLIN H. RAILO

2      applied?

3             A.    July 31st.

4             Q.    2012?

5             A.    Yes.

6             Q.    If you could just hand that back to

7      me.

8                   (Document submitted.)

9             Q.    Did you fill out that application?

10            A.    Yes.

11            Q.    And on Page 3, is that your

12     signature at the bottom?

13            A.    Yes.

14            Q.    And it's Caitlin Railo?

15            A.    Yes.

16            Q.    And it's July 31st, 2012?

17            A.    Yes.

18            Q.    Now, at the top of that page, they

19     asked you to fill in any accidents that you were

20     involved in for the past three years; is that

21     correct?

22            A.    Yes.

23            Q.    And what did you fill in for that?

24            A.    The rear-end accident that happened

25     with my prior job.

1                         CAITLIN H. RAILO

2          Q.    And was that the rear-end accident

3     that you told us about where the lady didn't

4     have a steering wheel?

5          A.    Yes.

6          Q.    And there were no injuries in that

7     accident?

8          A.    No.

9          Q.    Is that correct?

10         A.    Yes.

11         Q.    And that vehicle that you struck,

12    as far as you know, was that vehicle already

13    significantly damaged before you hit it?

14         A.    It had a window busted out, back

15    window, side window, the steering wheel.

16         Q.    And do you know if that vehicle

17    sustained any damage as a result of the accident

18    when you hit it?

19         A.    No, it didn't.

20         Q.    It didn't?

21         A.    On the bumper.  It had a scratch on

22    the bumper.

23         Q.    Are you aware of any accident

24    report --

25         A.    No.

CAITLIN H. RAILO

1

2     Q.    -- stemming from that accident?

3     A.    No.

4     Q.    And then below that, it says,

5  "Traffic convictions and forfeitures for the

6  past three years."  Did you fill out those boxes

7  there?

8     A.    Yes.

9     Q.    And what did you indicate for

10  those?

11     A.    Speeding ticket and parking on

12  pavement.

13     Q.    And the speeding ticket was from?

14     A.    Pennsylvania.

15     Q.    And the parking on pavement was in

16  New York State?

17     A.    Yes.

18     Q.    All right.  Did you list any other

19  convictions when you applied for Quality Bus in

20  that application other than what's set forth

21  there?

22     A.    No.

23     Q.    When you signed this document, were

24  you aware that they were going to do a criminal

25  history check both with the federal and state

1                          CAITLIN H. RAILO

2       agencies?

3               A.    I would hope so, yes.

4               Q.    Now, before February 14, 2013, what

5       criminal convictions did you have?

6               A.    I don't remember them.   No

7       felonies.   I had petit larceny, possession of a

8       controlled substance, possession in the seventh.

9       I don't remember which one possession in the

10      seventh, driving without a license.

11              Q.    Was that driving with a suspended

12      license?

13              A.    Yes.   It was years ago.

14              Q.    How many years prior was that?

15              A.    I don't remember.

16              Q.    More than three?

17              A.    Yes.

18              Q.    And the criminal possession of a

19      controlled substance seventh, do you know what

20      year that conviction was?

21              A.    No.

22              Q.    Was it within five years of when

23      you applied for employment at Quality Bus?

24              A.    Probably right around five years.

25      I don't remember.

CAITLIN H. RAILO

1

2          Q.    Did you go on probation for that

3    charge?

4          A.    I was never on probation.

5          Q.    Your whole life?

6          A.    No.

7          Q.    Never on probation?

8          A.    No.

9          Q.    Do you know when the petit larceny

10   conviction was?

11         A.    No, I don't remember the years.

12         Q.    But you think the criminal

13   possession of a controlled substance was about

14   five years prior to getting employment with

15   Quality Bus?

16         A.    Yes.

17         Q.    Any other criminal convictions that

18   you had before being employed by Quality Bus

19   Company besides what you've mentioned?

20         A.    Like I said, I don't remember what

21   they are because they were a long time ago.

22         Q.    Could there have been others or you

23   don't recall?

24         A.    Yeah, there probably is others.  I

25   don't remember what they are.  I mean, this has

                          CAITLIN H. RAILO

1

2    been since I was thirteen years old.  I don't

3    remember what they are.

4         Q.    Were you ever convicted of driving

5    while intoxicated or driving while impaired?

6         A.    DWAI, Driving While Ability

7    Impaired, yes, once.

8         Q.    Is that DWAI alcohol or drugs?

9         A.    No, never alcohol.  It was drugs.

10        Q.    Do you know if you pled to a

11   misdemeanor or a violation?

12        A.    To be honest, I don't remember.

13   It's the only DWAI was before -- I think it was

14   before my daughter was born.

15        Q.    All right.  How long ago would that

16   have been?

17        A.    More than seven years, seven years

18   ago.

19        Q.    Before you drove your first bus

20   route by yourself, did you have training?

21        A.    Yes.

22        Q.    And that was through Quality Bus

23   Company?

24        A.    Yes.

25        Q.    Do you remember when you first

1                          CAITLIN H. RAILO

2        drove a bus route by yourself, what month that

3        would have been?

4               A.    It was the exact day I got my

5        license.

6               Q.    So, October 24th, 2012?

7               A.    Yes.  They told me I had my

8        license, I went to DMV that day, picked it up

9        and I got a bus route.

10              Q.    As part of your training, did you

11       have to have a School Bus Driver's Physical

12       Performance Test?

13              A.    Yes.

14              Q.    And do you remember how often you

15       had the School Bus Driver Physical Performance

16       Test?

17              A.    I only had one.

18              Q.    Do you remember having it on

19       February 13th, 2013?

20              A.    I don't remember what day it was.

21                    MR. CATALINOTTO:  Can you mark

22              that?

23                    (Whereupon, a "School Bus Driver

24              Physical Performance Test" was marked as

25              Railo's Exhibit M for Identification as

1                    CAITLIN H. RAILO

2          of this date.)

3          Q.    Ms. Railo, I'm showing you what's

4    been marked as Railo's Exhibit M.

5                    (Document submitted.)

6          Q.    Do you recognize this -- do you

7    recognize that document?

8          A.    No.

9          Q.    Do you remember doing that test?

10         A.    Yes.

11         Q.    And, in fact, that test was given

12   the day before the accident?

13         A.    Okay.

14         Q.    Do you remember what you had to do

15   during that test?

16         A.    Yeah.  I remember having to run up

17   and down the stairs, pull a weight from the

18   front to the back of the bus, and then do --

19   yeah, brake to gas, brake to gas.  It was just

20   controls and running and pulling the weight.

21         Q.    Do you also have a recollection of

22   another test, the Defensive Driving Performance

23   Test?

24         A.    What do you mean?

25                    MR. CATALINOTTO:  Can you mark

CAITLIN H. RAILO

1

2      that?

3              (Whereupon, a "Report of Annual

4      Defensive Driving Performance for Driver

5      Under Article 19-A" was marked as Railo's

6      Exhibit N for Identification as of this

7      date.)

8      Q.    I'm showing you what's been marked

9  Defendant's Exhibit N.  It's entitled, "Report

10 of Annual Defensive Driving Performance for

11 Driver Under Article 19-A."  Do you recognize

12 that document?

13             (Document submitted.)

14     A.    No.

15     Q.    But do you recognize or do you

16 remember doing that test?

17             MR. LaROSE:  Take your time and

18     look it over.

19     A.    No.

20     Q.    You don't have a recollection of

21 performing that?

22             MR. LaROSE:  That's fine.

23     Q.    Is your name on the top of that?

24     A.    Yes.

25     Q.    Okay.  And what is the date on

1              CAITLIN H. RAILO

2      that?

3              A.    December 3rd.

4              Q.    What year?

5              A.    2012.

6              Q.    Do you remember a Biennial Behind

7      The Wheel Road Test that you took?

8              A.    Like I said, I had one test of

9      everything.  It was all in the same couple

10     months, so...

11             Q.    You had a number of tests?

12             A.    Um-hum.

13                   MR. LaROSE:  Yes?  That's a yes?

14                   THE WITNESS:  Sorry.  Yes.

15             Q.    And do you remember who conducted

16     those tests?

17             A.    Oh, the lady that works in the

18     office.

19             Q.    Is it Mary?

20             A.    I think so.  I don't remember her

21     name.

22                   MR. CATALINOTTO:  Mark that.

23                   (Whereupon, an "Article 9-A

24             Biennial Behind The Wheel Road Test" was

25             marked as Railo's Exhibit O for

281

```
1                    CAITLIN H. RAILO
2           Identification as of this date.)
3           A.     I think that was when she rode with
4      me.
5           Q.     I just want to go back to Exhibit
6      M.
7                  MR. LaROSE:   N?
8                  MR. CATALINOTTO:   M.
9           Q.     You said Mary is probably the one
10     that drove with you on that?
11          A.     Yes.
12          Q.     Okay.  I'm showing you what's been
13     marked Exhibit O with today's date.
14                 (Document submitted.)
15          Q.     Do you recognize your name on the
16     top of that document?
17          A.     Yes.
18          Q.     And is that entitled at the top
19     "Article 19-A Biennial Behind The Wheel Road
20     Test"?
21          A.     Yes.
22          Q.     And do you recall taking that test?
23          A.     Like I said, no, I don't remember
24     exactly which ones.  I had a couple tests all in
25     the same couple months.
```

282

1            CAITLIN H. RAILO

2          Q.    But do you remember having a test

3    when you were behind the wheel?

4          A.    Yes, but I don't remember which one

5    was which.

6          Q.    And do you remember if Mary, her

7    name is at the bottom left, if she --

8          A.    Yes.

9          Q.    -- attended that test and conducted

10   it with you?

11         A.    I don't remember this exact test,

12   but I assume she was the one that did them.

13         Q.    Do you remember taking the School

14   Bus Driver Pre Service Course that resulted in a

15   final exam?

16         A.    I don't, no.

17         Q.    And that test, if I told you it was

18   conducted on November 6th of 2012, do you have

19   any recollection --

20         A.    Date doesn't help.

21         Q.    Okay.

22              MR. CATALINOTTO:  Could we mark

23         this?  It's four pages.

24              (Whereupon, a "Pre Service Course

25         Quality Bus Service, LLC," four pages,

283

1                    CAITLIN H. RAILO

2          was marked as Railo's Exhibit P for

3          Identification as of this date.)

4              (Document submitted.)

5      A.    Yes.

6      Q.    You recall taking that test?

7      A.    Well, I mean, not really, but, yes.

8  I don't remember what day it was.

9      Q.    But you recall taking it even

10 though you don't recall what day it was?

11     A.    Yes.

12     Q.    Can you flip to the first page of

13 Exhibit P?  Is your name printed and also signed

14 on the Pre Service Course check-in list?

15     A.    Yes.

16     Q.    That's for Tuesday, November 6th,

17 2012?

18     A.    Yes.

19     Q.    Okay.  And the course instructor is

20 Mary --

21     A.    I can't say.

22     Q.    -- Koselnak, K-O-S-E-L-N-A-K; is

23 that correct?

24     A.    Yes.

25     Q.    Do you remember Mary?

284

1                    CAITLIN H. RAILO

2          A.    Vaguely.

3          Q.    Underneath Page 1, is that a test?

4          A.    Oh, yes.

5          Q.    The page after that, are there

6    thirty-five questions?

7          A.    Yes.

8          Q.    And did you take that test?

9          A.    To be honest with you, I don't

10   really remember taking this test.

11         Q.    Does your name appear at the top of

12   the page?

13         A.    Yes.  I didn't even see that.

14         Q.    Did you score a 100?

15         A.    Yes.

16         Q.    Thirty-five out of thirty-five?

17         A.    (Indicating affirmative response.)

18         Q.    You have to say yes.

19         A.    Yes.

20               MR. CATALINOTTO:  Please mark this.

21               (Whereupon, a "Pre Service Course

22         Trainee Manual" was marked as Railo's

23         Exhibit Q for Identification as of this

24         date.)

25         Q.    I'm showing you what's been marked

285

1               CAITLIN H. RAILO

2     Exhibit Q which is the School Bus Driver Pre

3     Service Course Trainee Manual.  This is a copy

4     of it.

5                (Document submitted.)

6          Q.    Do you recognize that as the manual

7     that you received as part of your training at

8     Quality Bus Company?

9               MR. LaROSE:  Go to the table of

10              contents, maybe that will help you.

11         A.    I don't remember what it looked

12    like.

13         Q.    If you flip through that toward the

14    back, you'll see some little yellow sticky

15    things in the back.  Do you recognize the

16    handwriting in there as your notes?  Are those

17    your notes?

18         A.    It says where it is, where the bus

19    company is, yes.

20         Q.    That's your handwriting --

21         A.    Yes.

22         Q.    -- in the manual?  Okay.

23              Can you flip to Page 11?  Do you

24    remember reviewing this course book at one time?

25         A.    I mean, like I said, I really don't

286

1                        CAITLIN H. RAILO

2      remember what it looks like.  My memory is

3      horrible.  I really don't remember.

4              Q.    That's fine.  Do you also recognize

5      that page as containing your notes?

6              A.    Yes.  Those are people I work with.

7                    MR. CIMINI:  Was that Page 11?

8                    MR. LaROSE:  No.

9              Q.    On the back there are blank pages,

10     several blank pages.  Do you also recognize this

11     other page that you wrote on as your handwriting

12     that you took as part of your review of the

13     course materials?

14             A.    That's not my handwriting, no.

15             Q.    None of that is your handwriting?

16             A.    I didn't look at the bottom yet,

17     but the top is not.

18             Q.    What about the bottom part?

19             A.    That's not my handwriting

20     (indicating).

21                    MR. LaROSE:  Indicating the top

22             half.

23             A.    The top half is not mine.

24             Q.    What about down here at the bottom

25     (indicating)?

1                    CAITLIN H. RAILO

2          A.    It looks like mine, but like I

3     said, I don't remember writing it, but I know

4     that's not my handwriting.

5          Q.    But the other pages I showed you

6     did contain your handwriting?

7          A.    It was just notes about where the

8     bus company was, where it was located.

9          Q.    What about this page here?  There

10    is another blank white page that contains a list

11    of 1 through 6.  Is that your handwriting?

12         A.    Yes.

13         Q.    Okay.  Now going to Page 11, on the

14    bottom it says Page 11.

15         A.    Yes.

16         Q.    And what does that state there next

17    to the highlighted mark?

18         A.    "No matter how much you want to

19    drive a school bus, withholding information

20    about your medical history to pass the physical

21    exam is not worth it."

22         Q.    Is that in the School Bus Driver

23    Pre Service Course materials?

24         A.    Yes.

25         Q.    On Page 13, that's 13 at the

288

CAITLIN H. RAILO

1

2      bottom, do you recognize Paragraph 1.3.4 that

3      addresses personal medications?

4              A.    Yes.

5              Q.    And it says not to drive if you

6      have those medications that affects your ability

7      to drive?

8              A.    Yes.  Well, any medication affects

9      your ability and they knew about my medication.

10             Q.    So, do you agree that that's in the

11     course handbook?

12             A.    Yes, absolutely.

13                   MR. CATALINOTTO:  Please mark this

14             as Railo R.

15                   (Whereupon, the Quality Bus Company

16             Employee Handbook was marked as Railo's

17             Exhibit R for Identification as of this

18             date.)

19             Q.    Ms. Railo, I'm showing you what's

20     been marked Exhibit R.  It's the Quality Bus

21     Company Employee Handbook.  Do you recognize

22     that?

23                   (Handbook submitted.)

24             A.    No.

25             Q.    Do you recognize that as something

289

1                         CAITLIN H. RAILO

2        that you had in your locker while you were

3        employed at the bus company?

4                A.      Locker?  I didn't have a locker.

5                Q.      You didn't have it on the premises?

6                A.      This (indicating)?

7                Q.      Yeah.

8                A.      I don't recognize it.  I don't keep

9        stuff there.  There is no lockers.

10               Q.      Did you get an employee handbook?

11               A.      I don't recognize this.

12               Q.      Okay.  Do you remember receiving

13       any type of book that you could keep from

14       Quality Bus Company in addition to the documents

15       I've already showed you?

16               A.      I don't remember.

17                       MR. CIMINI:  Just so the record is

18               clear, I'm going to object to the last

19               question because I don't know that she

20               ever said that she received any of those

21               documents that you showed her.  Your

22               question implied that she received all of

23               the documents that you showed her today

24               at the deposition, and I don't know that

25               she said she received or kept or had

1                    CAITLIN H. RAILO

2         possession of any of them.

3              THE WITNESS:  Like the performance

4         test, I remember taking it, but I didn't

5         get that paper.

6              MR. CATALINOTTO:  I wasn't asking

7         her.  I was connecting materials, the

8         course book.

9              MR. CIMINI:  That's why I thought

10        the question was kind of vague.

11             MR. LaROSE:  Go back and rephrase

12        it.

13        Q.    Ms. Railo, the Exhibit R which is

14   the employee handbook, you don't have a

15   recollection of having that in your possession?

16        A.    That, no.

17        Q.    Okay.  But you do recall the course

18   book that you identified having your handwriting

19   in that; correct?

20        A.    Yes.

21             MR. CIMINI:  Object, because she

22        said she recognized the handwriting.  I

23        don't think she said that she kept the

24        book or had possession of the book or

25        remembers having that book.  She just

291

CAITLIN H. RAILO

1

2      acknowledged her handwriting.

3          Q.    You acknowledge your handwriting in

4      that Pre Service Course Book Training Manual;

5      correct?

6          A.    Yes.

7          Q.    Do you recall having that book,

8      keeping that book, reviewing that book?

9          A.    I can't tell because it's copy

10     papers.  I don't know what it looked like, so

11     it's not -- I can't tell by looking at that.

12         Q.    All right.  But, again, your notes

13     are contained within that manual; correct?

14         A.    Well, there is some notes that are

15     not mine, but yes.

16         Q.    But there were notes that were

17     yours?

18         A.    Yes.

19             MR. CATALINOTTO:  Mark this.

20             (Whereupon, a sign-in log for the

21         New York State Laws and Regs for School

22         Bus Drivers was marked as Railo's Exhibit

23         S for Identification as of this date.)

24         Q.    I'm showing you what's been marked

25     Exhibit S, and it's a sign-in log for the New

CAITLIN H. RAILO

1

2   York State Laws and Regs for School Bus Drivers,

3   and it's attached to the book.  On the last

4   page, does that contain your printed and signed

5   signature?

6                    (Document submitted.)

7          A.    Yes.

8          Q.    And the Laws and Regs for School

9   Bus Drivers, do you recall receiving that book?

10         A.    Yes.

11         Q.    And did you review that book?

12         A.    Yes.

13         Q.    And flipping to the inside cover,

14  on the first page, does that contain your

15  handwriting?

16         A.    Yes.

17         Q.    In the back of that book, does that

18  also contain your handwriting --

19         A.    Yes.

20         Q.    -- with highlight in green?

21         A.    Yes.

22         Q.    I made a photocopy of this.  I

23  believe this was in the other materials.  This

24  is the front page of another employee handbook.

25                   (Document submitted.)

293

1                         CAITLIN H. RAILO

2              Q.    Do you recall receiving that?

3              A.    I don't remember that, no.

4              Q.    This one is entitled "Quality Bus

5        Service Employee Handbook."  It's an additional

6        handbook?

7              A.    No.

8              Q.    No, okay.

9                    MR. CIMINI:  Did you mark that?

10                   MR. CATALINOTTO:  I didn't mark

11             that.  Maybe we'll mark that.

12                   (Whereupon, a photocopy of the

13             front page of the "Quality Bus Service

14             Employee Handbook" was marked as Railo's

15             Exhibit T for Identification as of this

16             date.)

17                   MR. CIMINI:  Just so when we're

18             looking at the record, we know that that

19             last document was T that she didn't

20             recognize.

21                   MR. CATALINOTTO:  Yeah.

22                   MR. CIMINI:  Just so we're on the

23             same page.

24             Q.    The page that I just handed you,

25       it's the cover sheet which is now marked Exhibit

294

CAITLIN H. RAILO

1

2      T.   It says "Quality Bus Service Employee

3      Handbook."   Again, do you recognize that as a

4      handbook that you received?

5                A.    No.

6                MR. CATALINOTTO:  Mark this.

7                     (Whereupon, a photocopy of a form

8                entitled "Article 19-A Oral/Written

9                Examination Results" was marked as

10               Railo's Exhibit U for Identification as

11               of this date.)

12               Q.    Okay.  Ms. Railo, as part of your

13     training at Quality Bus Company, do you recall

14     also doing some additional oral and written

15     examinations beyond the test that I showed you

16     before?

17               A.    Like I said, there was a lot of

18     tests.  I don't remember which one was which.

19               Q.    Before you were able to drive a bus

20     route by yourself, did you have to be certified

21     by the State of New York?

22               A.    Yes, as part of that CDL.

23               Q.    As part of that process, did you

24     have to be fingerprinted?

25               A.    I'm sure I did.  I don't know if I

1                        CAITLIN H. RAILO

2      had to or they already had them.

3                     MR. CATALINOTTO:  Mark this.

4                     (Whereupon, a photocopy of form

5            entitled "Request for NYS Fingerprinting

6            Services Information Form" was marked as

7            Railo's Exhibit V for Identification as

8            of this date.)

9            Q.    I'm showing you what's been marked

10     Exhibit V with today's date.  It's the

11     fingerprint form for your employment with

12     Quality Bus.

13                     (Document submitted.)

14           Q.    Do you recognize that document?

15           A.    Was this from DMV?

16           Q.    Do you recognize that document?

17           A.    This is a DMV form.

18           Q.    Is your signature, your writing, on

19     that document?

20           A.    Yes, only right here (indicating).

21           Q.    You filled out the bottom part?

22                     MR. LaROSE:  From where it says

23            "Caucasian" on down?

24                     THE WITNESS:  No, not even there.

25           Q.    What parts did you fill out on Page

1                         CAITLIN H. RAILO

2       1 of Exhibit V?

3                         MR. LaROSE:   Read the words that

4               you filled in.

5               A.     "Caucasian, white, brown, brown,

6       United States" and "New Jersey."

7               Q.     Okay.  And what does the top of

8       that document state?

9               A.     "New York State Fingerprinting

10      Services."

11              Q.     Do you recall going to an agency to

12      have your fingerprints done?

13              A.     I don't remember.  I don't remember

14      where I went.

15              Q.     But you do recall going to get your

16      fingerprints done for certification?

17              A.     No, I can't remember, unless it was

18      just the DMV.

19              Q.     But your handwriting does appear on

20      some of the boxes on the first page of Exhibit V

21      which is the fingerprint form?

22              A.     Yes.

23              Q.     As part of your employment, did you

24      have to have a drug screening done?

25              A.     Yes.

CAITLIN H. RAILO

1

2      Q.    And did you take that test?

3      A.    Yes, took urine.

4      Q.    Did you pass that test?

5      A.    Yes.

6      Q.    And that test showed no opiates, no

7  narcotics; is that correct?

8      A.    Yes.

9      Q.    When you applied for employment at

10  Quality Bus, did you ever tell them about any

11  past illicit drug use that you did?

12      A.    No.

13      Q.    Did you ever tell anyone at Quality

14  Bus that you had brain damage?

15      A.    No.  It's not really anybody's

16  business.

17             MR. CIMINI:  I didn't get that.

18             THE WITNESS:  I said it's not

19         really of anybody's business.

20             MR. CATALINOTTO:  Before that she

21         said no, it's not anybody's business.

22      A.    And drug use is not --

23      Q.    And when you were hired for

24  employment at Quality Bus, you were taking

25  Valium?

                              CAITLIN H. RAILO

1

2       A.    Yes.

3       Q.    Diazepam?

4       A.    Yes.

5       Q.    Was that for anxiety?

6       A.    Yes.

7       Q.    Any other reason that you know of?

8       A.    No.

9       Q.    And I believe you also testified

10   you were taking Clonidine?

11      A.    Yes.

12      Q.    Was that for high blood pressure?

13      A.    Yes.

14      Q.    Did you ever tell anyone at Quality

15   Bus that you were taking Percocet?

16      A.    No, because I wasn't taking them at

17   that time.  I was on Suboxone.

18      Q.    Did you ever tell anyone at Quality

19   Bus that you were taking Suboxone?

20      A.    Yes.  I told when I went for the

21   physical, when I got drug tested, I had to tell

22   the nurse what medications I was on.

23      Q.    The nurse, you told her about

24   Suboxone?

25      A.    Absolutely.

CAITLIN H. RAILO

1

2      Q.    We'll get to that document, but I'm

3   talking about Quality Bus.  Anyone at Quality

4   Bus that you told about taking Suboxone?

5      A.    No, because they got the paper from

6   the nurse with all the medication.

7      Q.    But then you never told anyone at

8   Quality Bus that you were taking Suboxone?

9      A.    No.  They never asked.

10     Q.    And you never told them?

11     A.    No.  I tell their nurse.  I didn't

12   have to tell them specifically.

13     Q.    When you were taking Percocet, for

14   what reason were you taking it?

15     A.    Because I had a lump removed.

16     Q.    And was that for pain relief?

17     A.    Yes.

18     Q.    And how often were you taking that?

19     A.    I wasn't really taking it.  Only

20   every once in a while.  I think twice I took it.

21     Q.    Did you ever tell anyone at Quality

22   Bus that you were taking Ambien?

23     A.    No.  Like I said, their nurse knew.

24     Q.    But I mean Quality Bus Company.

25     A.    No.

1          CAITLIN H. RAILO

2          Q.    Did you ever tell them that you

3    were taking Ambien?

4          A.    No.   The Ambien I wasn't taking

5    when I was driving a bus.

6          Q.    And you were aware while you were

7    employed with Quality Bus that you had to notify

8    them of any medications that would affect your

9    ability to drive; is that fair to say?

10         A.    Yes, I did.

11         Q.    You did?

12         A.    Yes.

13         Q.    What medications did you notify

14   Quality Bus that you were taking?

15         A.    I told the nurse all of them that I

16   was on.

17         Q.    I mean Quality Bus Company.

18         A.    I just told you, I don't tell them.

19   If I tell their nurse, that's like telling them.

20         Q.    We're going to get to the nurse.

21   Right now I'm talking about Quality Bus Company.

22              MR. LaROSE:   Off the record.

23              (Discussion off the record.)

24         Q.    As far as Quality Bus, did you ever

25   tell anyone at Quality Bus Company that you were

301

1                          CAITLIN H. RAILO

2      taking any medications that affected your

3      ability to drive?

4            A.    No.

5            Q.    Now, before you started the

6      afternoon run on the date of the accident, did

7      you ever tell anyone at Quality Bus that you

8      weren't feeling well?

9            A.    Yes.

10           Q.    Who did you tell?

11           A.    I told the lady in the office that

12     morning and I called before I came in.

13           Q.    I'm going to get to that.  Right

14     now I'm kind of moving ahead to the afternoon.

15                 MR. CATALINOTTO:  Let me strike

16           that.

17           Q.    In between the morning and

18     afternoon runs, there is a break?

19           A.    Yes, but you go home.

20           Q.    How long is the break?

21           A.    About four hours.

22           Q.    All right.  During that break,

23     where is the bus?

24           A.    At the bus company.

25           Q.    And do you turn in the keys?

1                    CAITLIN H. RAILO

2          A.    Yes.

3          Q.    And then you basically can do what

4     you want to do during that time period?

5          A.    Yes.

6          Q.    When you returned back to the bus

7     garage, you have to retrieve the keys?

8          A.    Yes.

9          Q.    Who do you retrieve the keys from?

10         A.    The lady in the office.

11         Q.    All right.  Before you got into a

12    bus and started your afternoon route, did you

13    tell anyone at Quality Bus Company that you

14    didn't feel well?

15         A.    No.  I had taken a nap during

16    break.

17         Q.    Okay.  And did you tell anyone that

18    you didn't want to drive the afternoon route?

19         A.    I told two of the workers.

20         Q.    Who did you tell?

21         A.    The two that also do the PA run

22    with me.  I complained to them about it, having

23    to work.

24         Q.    They were bus drivers?

25         A.    Yes.

1                    CAITLIN H. RAILO

2          Q.     What are their names?

3          A.     Now I can't remember.  There was

4    only three of us that did that route.

5          Q.     So, there were two other drivers

6    that also went to PA?

7          A.     Yes.

8          Q.     That's Pennsylvania?

9          A.     Yes.

10         Q.     What did you say to them, what did

11   they say to you?

12         A.     I told them that I told Quality in

13   the morning and tried to call out and they

14   wouldn't let me, that I was in pain, and they

15   said, "Well, why are you working?"

16         Q.     What did you say?

17         A.     "I had to come in."

18         Q.     But you don't remember their names?

19         A.     No, I can't remember their names.

20         Q.     Male or female?

21         A.     One male, one female.

22         Q.     Did you ever tell anyone in the

23   position of authority before that -- after the

24   break but before you started your route in the

25   afternoon that you didn't feel well and didn't

CAITLIN H. RAILO

1

2      want to drive?

3              A.    I was saying it all day.  I don't

4      remember if I said it before I went on the

5      afternoon run, because I was just uncomfortable.

6      I was in pain, I was uncomfortable.

7              Q.    But did you tell anyone in

8      authority there?

9              A.    That morning, yes.  Not in the

10     afternoon.  I don't remember.

11             Q.    Do you remember when you last

12     refilled or filled any prescription for Percocet

13     before the motor vehicle accident?

14             A.    No, I don't remember the date.

15             Q.    Do you remember how many pills you

16     were prescribed?

17             A.    Thirty.

18             Q.    And what was the prescription for,

19     how many could you take a day, for how long?

20             A.    I don't know.  A normal -- it's

21     usually one every four to six hours, but I

22     didn't recall -- I didn't take them.  I had

23     almost the whole bottle when we got into the

24     accident.

25             Q.    When did you last take a Percocet

1                    CAITLIN H. RAILO

2      before the accident?

3            A.    The night before, before I went to

4      sleep.

5            Q.    What time was that?

6            A.    I don't exactly remember.  It was

7      8:00 or 9:00.

8            Q.    8:00 or 9:00 p.m.?

9            A.    Yes.

10           Q.    What time do you report to the bus

11     garage in the morning?

12           A.    6:00.

13           Q.    Did you tell anyone when you

14     reported that you had taken Percocet?

15           A.    I don't remember.  Like I said, I

16     talked to them that morning.

17           Q.    Did you tell anyone that you took

18     Percocet?

19           A.    I don't remember.

20           Q.    Did anyone ever give you

21     restrictions, that being a doctor or a nurse, in

22     terms of your ability to drive a bus while you

23     were employed by Quality Bus Company?

24           A.    No.  My doctor signed off on it.

25           Q.    What doctor was that?

306

1                           CAITLIN H. RAILO

2              A.    Galli, Dr. Galli, the one that

3      prescribes me my medication.

4              Q.    Who prescribed the Percocet?

5              A.    Koehler, Crystal Run, Crystal Run

6      Health Care.

7              Q.    Did anyone there restrict your

8      ability to drive a school bus or tell you not to

9      drive a school bus when they prescribed the

10     Percocet?

11             A.    No.

12             Q.    Before this motor vehicle accident

13     of February 14th, 2013, did you ever call in

14     sick to work at Quality Bus Company?

15             A.    I don't remember.  I think I did.

16             Q.    And how did you do that?  Did you

17     stop in?  Did you call?

18             A.    Called, I believe.  I don't

19     remember.

20             Q.    Do you remember how many times?

21             A.    No.

22             Q.    Was it more than one time?

23             A.    I don't remember.

24             Q.    Did you call yourself or did

25     someone call for you?

CAITLIN H. RAILO

1

2      A.    I called.

3      Q.    Do you know who you spoke to?

4      A.    No.

5      Q.    So, if I asked you was it more than

6  five or more than ten, you wouldn't be able to

7  give me an estimate as to how many times you may

8  have taken off for sickness prior to the day of

9  the accident?

10     A.    I know it wasn't more than five or

11 ten.

12     Q.    When you called in sick, do you

13 know where you were living at the time?

14     A.    White Street.  I was living there

15 the whole time.

16     Q.    Were you living there throughout

17 your employment with Quality Bus Company?

18     A.    Yes.

19     Q.    When you called, would that have

20 been from a cell phone, a landline?

21     A.    My cell phone.

22     Q.    What's the cell phone number back

23 then?

24     A.    I don't remember.

25     Q.    Was it in your name?

CAITLIN H. RAILO

1

2          A.     Yes.

3          Q.     Do you know what cell service it

4     was; Verizon, Sprint?

5          A.     No, Cell One.  To tell you the

6     truth, I don't remember.  I really don't

7     remember.

8          Q.     When --

9          A.     Oh, I had a phone in my husband's

10    name too.  We both had on his phone from Cell

11    One.

12         Q.     What was his name?

13         A.     And then after that I had a

14    throwaway phone.

15         Q.     What's your husband's name?

16         A.     Eric Baisley.

17         Q.     How do you spell the last name?

18         A.     B-A-I-S-L-E-Y.

19         Q.     So, you had a cell phone, you used

20    your husband's phone and you had a throwaway

21    phone?

22         A.     No.  My husband bought me a phone

23    under his contract.  It was cheaper for two

24    phones, so I had one under his name.

25         Q.     So, the phone --

1                    CAITLIN H. RAILO

2          A.     But then after he moved out, I had

3     a different phone.  They have the phone number.

4     It should be on file.

5          Q.     When you called in sick before on

6     the occasions, other than your attempt to call

7     in on the date of the accident, was it your

8     understanding that there was a backup driver

9     that did your route that day?

10         A.     Yes.

11         Q.     So, on all occasions where you

12    didn't go to work, someone drove your route; is

13    that correct?

14         A.     Yes.  I think the lady in the

15    office drove it the one time.  That's why I got

16    in trouble.  It wasn't Mary.  It was the other

17    one, the one with the black hair.  I don't

18    remember her name.

19         Q.     Do you remember the last time you

20    called in sick before the date of the accident?

21         A.     No.

22         Q.     So, it was a lady in the office

23    that drove the route?

24         A.     Yes.

25         Q.     But it wasn't Mary?

1                    CAITLIN H. RAILO

2          A.     No.

3          Q.     Did Mary drive also?

4          A.     Yes.

5          Q.     So, Mary was a backup driver too;

6    correct?

7          A.     Well, somebody had to be in the

8    office, so she usually -- but on emergencies she

9    had to stay in the office.  One of them had to.

10         Q.     How many individuals worked in the

11   office?

12         A.     Two as far as I knew.

13         Q.     Were you aware of other backup

14   drivers at Quality Bus?

15         A.     No.  I know they would take another

16   route in addition to their route.  That's what I

17   had to do that day.  That's what the other

18   drivers do.

19         Q.     So, there are other people that

20   could take additional routes as you did?

21         A.     I guess, but there was still other

22   drivers.  They already had a route.

23         Q.     So, you had ladies in the office

24   that could drive buses; correct?

25         A.     One of them could go out on the

311

CAITLIN H. RAILO

1

2      run, because there had to be somebody in the

3      office, yes.

4           Q.    But they both drove buses; correct?

5           A.    Yes.

6           Q.    And the drivers that drove routes

7      that could take additional routes; right?

8           A.    Yes.

9           Q.    And as part of your employment as a

10     bus driver with Quality Bus, you were aware that

11     if you had any medications that you were taking

12     that affected your ability to drive, you needed

13     clearance from a doctor; right?

14          A.    Yes.

15          Q.    Did you ever get clearance for

16     Percocet?

17          A.    No, I didn't take it that day.

18          Q.    But when you were prescribed

19     Percocet, did you ever get clearance for that

20     and hand that in, present it, furnish it to

21     Quality Bus?

22          A.    No.

23          Q.    Do you know how many times Mary

24     drove with you for training purposes before you

25     drove your first route by yourself?

1                    CAITLIN H. RAILO

2          A.    No.

3          Q.    Would it be fair to say that over

4    the course of a month she drove with you on

5    numerous days each week?

6          A.    Yes.

7          Q.    At the time of the accident, can

8    you give an estimate as to the speed of the

9    vehicle that came into contact with the bus?

10         A.    I can't do that.

11         Q.    You've given some statements to the

12   police about the speed of the vehicle?

13         A.    Yes.

14         Q.    And in that statement I believe you

15   estimate to be 65 to 70?

16         A.    He was going fast.

17         Q.    Is that an accurate estimate?

18         A.    No.

19         Q.    Do you have an accurate estimate as

20   to the speed of that vehicle?

21         A.    I just said I can't give that.

22         Q.    But you gave an estimate to the

23   police?

24         A.    That's not an estimate, that's what

25   I thought it was at that time.

313

1                        CAITLIN H. RAILO

2              Q.    And has anything changed that would

3      change that estimate?

4              A.    I can't give that.   I don't -- I

5      don't know what he was going.

6              Q.    Do you know what the speed limit

7      was?

8              A.    There was a 25-mile-an-hour turn.

9              Q.    And then when you come out of the

10     turn, what's the speed limit?

11             A.    That road should be 55, but there I

12     think it was 45.

13             Q.    Was he traveling in your estimation

14     in excess of 45 miles per hour?

15                   MR. FOULKE:  Objection.  She said

16             she can't say.

17             Q.    Well, can you answer that question?

18             A.    No, I can't.

19                   MR. FOULKE:  Objection.

20                   MR. CATALINOTTO:  You can object to

21             the form.

22                   MR. FOULKE:  That's what I'm doing.

23                   MR. LaROSE:  You can still answer.

24             Q.    Can you give an estimate as to

25     whether the vehicle was traveling in excess of

314

1                           CAITLIN H. RAILO

2      45 miles per hour with the bus in that stretch?

3                 MR. FOULKE:  Objection.

4                 MR. LaROSE:  You can answer.

5            A.    I told you I can't give an

6      estimate.  It was 25 miles per hour where he

7      was.

8            Q.    Was he traveling in excess of 25

9      miles per hour?

10                 MR. FOULKE:  Objection.

11           A.    I can't answer that, but to me it

12     looked, yes, but I can't say how fast.

13           Q.    That's what I'm asking you.

14           A.    Well, I can't give you an estimate.

15                 MR. LaROSE:  Why don't you ask her

16           if it's her belief?

17           Q.    What do you believe the speed of

18     the vehicle was as it was approaching your

19     vehicle right before impact?

20                 MR. FOULKE:  Object to the form.

21           There is no foundation.

22           A.    Like I said, I don't know what the

23     speed was, but personally it didn't look 25.

24           Q.    What did it look like?

25                 MR. FOULKE:  Objection.

315

CAITLIN H. RAILO

1
2     A.    I don't know.  Just it was fast,

3     but it was more than 25 miles an hour, I know

4     that.

5     Q.    Was the driver of the vehicle that

6     came into contact with the bus wearing a seat

7     belt?

8     A.    I can't remember now.  I think -- I

9     don't believe he was, but I can't remember.

10    Q.    Did you tell the police that he

11    wasn't wearing a seat belt?

12    A.    I think I did.  That's why I'm

13    saying I don't think he was.

14    Q.    Would you agree that your memory in

15    terms of recalling speed and whether he was

16    wearing a seat belt was better right after the

17    accident when you talked to the police than it

18    is now?

19    A.    Yes.

20    Q.    Did you ever tell anyone at Quality

21    Bus Company that you ever had seizures?

22    A.    No.

23    Q.    Did you ever tell the nurse that

24    examined you as part of your Article 19-A

25    certification that you ever had seizures?

1                    CAITLIN H. RAILO

2          A.    No.  Because before that, I only

3     had one or two since I was eighteen.

4          Q.    And that's my next question.  When

5     was your last seizure before this motor vehicle

6     accident?

7          A.    I don't even remember.  Years prior

8     to that.

9          Q.    Age?

10         A.    Twenty-five.

11         Q.    And how old were you at the time of

12    this accident?

13         A.    Thirty-two -- thirty-one.  I'm

14    sorry.

15         Q.    Thirty-one?

16         A.    Yes.

17         Q.    Did you ever tell the nurse who

18    examined you as part of the Article 19-A

19    certification that you had brain damage?

20         A.    No, because the doctor said I

21    didn't have to, it didn't affect motor skills or

22    reaction skills.

23         Q.    Again, did you tell her?

24         A.    No.

25         Q.    Do you know if your license to

317

1                              CAITLIN H. RAILO

2        drive in the State of New York was ever revoked

3        prior to your employment with Quality Bus

4        Company?

5              A.     Yes.

6              Q.     It was revoked?

7              A.     It was suspended, I know that.

8              Q.     How long before you applied there

9        was it suspended?

10             A.     More than three years.

11             Q.     Now, when we were here last time,

12       Mr. Cimini asked you a lot of questions about

13       police entries, calls to the police.  You

14       remember all that?

15             A.     Yes.

16             Q.     All right.  And is it fair to say

17       that what was documented according to you was

18       not accurate in terms of those police calls?

19             A.     Yes.

20             Q.     And would you also agree that those

21       police calls that were discussed with you were

22       not evidence of any criminal convictions that

23       you had as a result of those police calls?

24             A.     That's correct.

25             Q.     When were you up for parole?

1                    CAITLIN H. RAILO

2          A.    November.

3          Q.    This year?

4          A.    Yes.

5          Q.    I just want to clarify.  That

6    offense when you were driving while impaired,

7    was that in 2005?

8          A.    I don't remember the year.

9          Q.    Does that sound anywhere close to

10   when it may have been, about ten years ago?

11         A.    Probably.  I wasn't driving.  I was

12   found inside a parked car.

13         Q.    You know the distinction between

14   driving while impaired by drugs and driving

15   while impaired by alcohol in terms of the

16   charges that can be lodged against you?

17         A.    Yes.

18         Q.    Do you remember if you were

19   arrested for an alcohol offense or drug offense?

20         A.    No, I never was arrested for

21   driving while intoxicated by alcohol, never.

22         Q.    Do you remember if that conviction

23   was for a lesser offense reduced down to an

24   ability impaired that was not a criminal

25   offense?

319

1                      CAITLIN H. RAILO

2           A.    No.

3           Q.    Do you remember how much your fine

4      was for that?

5           A.    No.

6           Q.    You didn't get jail time or

7      probation?

8           A.    I was never on probation.

9           Q.    Did you get jail time for that?

10          A.    I think --

11                MR. LaROSE:  Off the record.

12                (Discussion off the record.)

13          Q.    Do you have a recollection of what

14     your sentence may have been?

15          A.    No.  I mean, I vaguely remember

16     that because the DWAI, like I said, I was found

17     in a car, but I think I did fifteen or thirty

18     days.  Like I said, I don't remember.

19          Q.    Were you represented by an

20     attorney?

21          A.    Always.

22          Q.    Do you remember if you had a

23     hearing about the operation of the vehicle, to

24     fight it?

25          A.    About the operation of the vehicle?

CAITLIN H. RAILO

1

2          Q.    Was there an issue where they had a

3     hearing and arguing that you weren't operating

4     the car and the case should run out?

5          A.    Because the car wasn't running, the

6     keys were in the ignition, but the car wasn't

7     running.

8          Q.    Did you have a hearing?

9          A.    I think so.  I don't remember.

10         Q.    Do you remember as part of that if

11    they reduced the charge down to a non-criminal

12    offense?

13         A.    I don't know.  I think it was still

14    a DWAI.  I'm not sure.

15         Q.    You told us last time that you were

16    employed as a phlebotomist?

17         A.    Yes.

18         Q.    Did you receive training as part of

19    that position?

20         A.    Yes.

21         Q.    Did you actually take blood from

22    patients?

23         A.    I worked with before I started

24    there?

25         Q.    Yeah, for the company where you

1                    CAITLIN H. RAILO

2    were a phlebotomist before you worked for

3    Quality Bus Company.

4            A.    Riverside?

5            Q.    Yeah.

6            A.    Yes.

7            Q.    What did you do there?

8            A.    I got hired as a phlebotomist, but

9    then they stopped with the laboratory, something

10   with the money, and then I ended up working in

11   the office.  I was the administrative assistant.

12           Q.    But did you actually --

13           A.    Take blood?

14           Q.    Yeah.

15           A.    Yes.

16           Q.    And did do you that from patients

17   of all ages?

18           A.    Yes.

19           Q.    Little children?

20           A.    I didn't do children.

21           Q.    What age group?

22           A.    Mostly adults.

23           Q.    Okay.  How long did you work doing

24   that?

25           A.    I don't remember.

1          CAITLIN H. RAILO
2          MR. LaROSE:  Break it down.  Worked
3     there or doing that?
4          MR. CATALINOTTO:  Let me break it
5     down.
6          Q.    As a phlebotomist, how long did you
7     do that?
8          A.    At Riverside?
9          Q.    Yeah, where you actually took blood
10    from patients.
11         A.    The first couple months.
12         Q.    And then after that you did office
13    work?
14         A.    Yes, everything.
15         Q.    As part of that, as part of your
16    employment there, you had various training and
17    took tests before you were able to draw blood
18    from a patient?
19         A.    No.  I already had that.
20         Q.    Where did you get that training?
21         A.    MCI in Poughkeepsie, and then I
22    worked at Benedictine Hospital.
23         Q.    As part of those jobs, did you get
24    training for drawing blood?
25         A.    Yes.

CAITLIN H. RAILO

1

2          Q.    Did you take tests?

3          A.    Yes.

4          Q.    Now, obviously you had to pass

5    those tests before you could draw blood from a

6    patient?

7          A.    Yes.

8          Q.    Do you remember the type of

9    training you received?

10         A.    What do you mean, "the type"?  I

11   went to --

12         Q.    Did you go to seminars?  Did you

13   have to read books?

14         A.    I went to school for it.

15         Q.    How long did you go to school for

16   that?

17         A.    Almost a year.  It was a faster

18   pace class, so it was condensed into a shorter

19   time.

20         Q.    Was it just one long class or

21   several different types of topics, you know,

22   separate classes?

23         A.    I don't understand what you're

24   saying.  I mean, it was one class I went to in

25   school.

324

1                    CAITLIN H. RAILO

2          Q.    Did you have a book?

3          A.    Yes.

4          Q.    Was there a book?  Did you read the

5    book?

6          A.    Yes.

7          Q.    You understood everything?

8          A.    Yes.

9          Q.    And you passed?  Was it a written

10   test?

11         A.    Yes.  After months of class, yeah.

12         Q.    And you also worked at Benedictine

13   Hospital?

14         A.    Yes.

15         Q.    Did you receive training there?

16         A.    That was training, yes, hands-on

17   training.

18         Q.    Did you need any type of assistance

19   to help you take those tests or read the book?

20         A.    Yes.

21         Q.    Who assisted you?

22         A.    The teacher and another worker.

23         Q.    What did they do to help you?

24         A.    Showed me how to do it.  We had to

25   work on dummies.

1                        CAITLIN H. RAILO

2            Q.    I mean in terms of taking the

3      written test, did you have to have assistance or

4      did you do it on your own?

5            A.    Yes.

6            Q.    What type of assistance?

7            A.    Well, we had to take tests over and

8      over again and I would have to write things down

9      over and over again, but it was months of class

10     every day.

11           Q.    And you successfully completed all

12     those --

13           A.    Yes.

14           Q.    -- programs?

15                 The license I showed you before,

16     was that the first CDL license you ever had?

17           A.    Yes.

18           Q.    How long ago was the last time you

19     had any type of drug or alcohol rehabilitation?

20                 MR. LaROSE:   Prior to the accident

21           are you asking?

22                 MR. CATALINOTTO:   Let me strike

23           that.

24           Q.    Before the accident, when was the

25     last time you had any type of drug or alcohol

326

1                          CAITLIN H. RAILO

2     rehabilitation?

3              A.    I don't know.  Six, seven years.

4              Q.    Six, seven years before?

5              A.    Yes.

6              Q.    Now, you were arrested as a result

7     of this accident that we're here about today;

8     right?

9              A.    Yes.

10             Q.    The charges came from an indict-

11    ment; is that your understanding?  Do you know

12    what that means?

13             A.    No.

14             Q.    Do you know if your case went to

15    Orange County Grand Jury?

16             A.    No, I don't.

17             Q.    Do you know what you pled guilty

18    to?

19             A.    Yes.  I have child endangerment

20    charge.

21             Q.    Did you plead guilty to Aggravated

22    DWI with a child?

23             A.    DWI?  Actually, no.

24             Q.    Do you know what you pled guilty

25    to?

                    CAITLIN H. RAILO

1

2          A.    I don't really know the exact

3   charge.  It just says assault and child

4   endangerment.

5          Q.    You don't remember?

6          A.    I didn't think it was DWI because

7   it doesn't say that on my papers.

8          Q.    What does it say in your papers, do

9   you know?

10         A.    It's just -- it's condensed into

11  two charges.  It says child endangerment and

12  then they call it assault.  Because it's a

13  vehicle, it's vehicular assault, I think.  I

14  don't know, but it says assault because it was a

15  vehicle.

16         Q.    You were represented by an

17  attorney?

18                MR. LaROSE:  Public Defender;

19         right?

20                THE WITNESS:  Yeah.

21         Q.    When you went to County Court, you

22  have a recollection of who the judge was?

23         A.    I don't remember the judge's name.

24  It's in Goshen.  I don't remember his name.

25         Q.    When you entered that plea, do you

1                      CAITLIN H. RAILO

2      know what an allocution is?

3             A.    No.

4             Q.    Did the judge ask you, do you

5      understand you're waiving your right to a trial?

6             A.    Yes.

7             Q.    And you're entering this plea of

8      guilty --

9             A.    Um-hum.

10            Q.    -- waiving your right to a jury

11     trial?  You're satisfied with the representa-

12     tion; right?  Do you remember questions like

13     that?

14            A.    Yes.

15            Q.    Did the judge ask you to state on

16     the record what it is you were guilty of?

17            A.    No.

18            Q.    They didn't ask you to state, you

19     know, anything about what drugs you were on that

20     day or whether you were impaired when you were

21     driving?

22            A.    In court, no.

23            Q.    Were there any hearings in that

24     case, any type of hearings where you testified?

25            A.    Where I testified?

1                      CAITLIN H. RAILO

2          Q.    Yeah.

3          A.    No.

4          Q.    Okay.  When you gave the statements

5     to the police about the accident, where did you

6     do that?  Were you at the police station?

7          A.    Yes.

8                MR. LaROSE:  Off the record.

9                (Discussion off the record.)

10         Q.    Ms. Railo, do you remember giving

11    more than one statement to the police about this

12    accident?

13         A.    Yes.

14         Q.    You gave one the date of the

15    accident that was handwritten.  You talked about

16    that last time?

17         A.    Yes.

18         Q.    And then we also talked about,

19    again these are in Exhibit J, there is also a

20    typed one that's in front of you that was part

21    of Exhibit J?

22                (Document submitted.)

23         A.    Yes.

24         Q.    That one, if you look at the top,

25    was taken in April 2013; is that correct?

1                    CAITLIN H. RAILO

2          A.    Yes.

3          Q.    And that's approximately two months

4     after the accident?

5          A.    Yes.

6          Q.    Were you represented by counsel at

7     that time?

8          A.    No.

9          Q.    When did you first get assigned

10    counsel?

11         A.    Court.

12         Q.    When were you charged, do you

13    remember, for any criminal charges as a result

14    of this accident?

15         A.    I don't remember when.  It was this

16    day apparently.

17         Q.    So that when you went in that day,

18    was that the day you went to the police station

19    you were being charged?

20         A.    Yes.

21         Q.    And in that statement for the first

22    time you're talking about calling in so you

23    didn't have to try to not work that day?

24              MR. LaROSE:  I would have to

25         object.  You have to let her look at both

1                          CAITLIN H. RAILO

2              statements.

3                    MR. CATALINOTTO:   That's fine.

4              Q.    If you could take a look at them

5       and tell me if it's in the April statement that

6       you mention for the first time --

7                    MR. LaROSE:   He wants to know if

8              it's in here or just in here

9              (indicating).

10             Q.    -- about calling.

11             A.    This one (indicating), I don't

12      recall.   This was right after the accident.

13                   MR. LaROSE:   Right.

14             A.    They did this at the hospital while

15      I was laying in the hospital bed.

16             Q.    Okay.   But I'm just asking you

17      if --

18                   MR. LaROSE:   He just wants to know

19             if it's in here or just in here.   That's

20             all you have to tell him.   Mention

21             anything about trying to call.

22             A.    No.   This was only the accident

23      report.

24             Q.    Okay.   So, the handwritten

25      statement to the police the day of the accident,

CAITLIN H. RAILO

1

2      there is no mention of calling in to try not to

3      work on the day of the accident; is that

4      correct?

5             A.    Yes, that is correct.

6             Q.    Okay.  And in the typed statement

7      which was the day you were getting arrested,

8      that's the first time that you are reporting to

9      the police that you tried to call in and you

10     didn't want to work that day; is that correct?

11            A.    Yes.  They didn't ask me, and then

12     this one (indicating) --

13            Q.    Before you were sentenced on the

14     charges stemming from this accident, were you

15     re-arrested?

16            A.    No.

17            Q.    Let me backtrack for a minute.

18                  When you were arraigned on the

19     charges, were you out on bail?

20            A.    From this charge.

21            Q.    Okay.  While you were out on bail

22     but before you were sentenced, did you get

23     arrested for a drug possession?

24            A.    No.

25            Q.    Did anything happen in between your

333

CAITLIN H. RAILO

1

2   plea of guilty and your sentence where you had

3   police contact?

4           A.      Yeah.   They came to the house,

5   brought me to the hospital.

6           Q.      For what?

7           A.      Overdose.

8           Q.      And did they charge you for

9   possession of a controlled substance?

10          A.      No.

11          Q.      Did anything happen that affected

12  the sentence that you were to get?

13          A.      No.

14          Q.      Now, last time we went over -- Mr.

15  Cimini went over with you Exhibit F.

16                  MR. CATALINOTTO:   You have that

17          with you, Keith?

18                  MR. LaROSE:   It's marked there.

19                  (Document submitted.)

20          Q.      Do you have Exhibit F in front of

21  you?

22          A.      Yes.

23          Q.      What is Exhibit F?

24          A.      Medical exam.

25          Q.      And is that the exam where you went

334

CAITLIN H. RAILO

1

2      to see a nurse for purposes of certification for

3      your employment at the bus company?

4              A.     And drug test, yes.

5              Q.     Now, the first box is "Driver's

6      Information" at the top, and it says, "Driver,

7      complete this section"; is that correct?

8              A.     Yes.

9              Q.     Did you complete that section?

10             A.     Yes.

11             Q.     And you wrote down your name,

12     Social Security number?

13             A.     (Indicating affirmative response.)

14             Q.     You have to say yes or no.

15             A.     Yes.

16             Q.     On the first two top lines, did you

17     write down all that information?

18             A.     Yes.

19             Q.     Below that, Number 2, it says

20     "Health History."  You see that?

21             A.     Yes.

22             Q.     And then it says, "Driver, complete

23     this section, but medical examiner is encouraged

24     to discuss with driver."  Do you see that?

25             A.     Yes.

335

1                              CAITLIN H. RAILO

2                  Q.    The second box down under the yes

3        and no category where it says "head/brain

4        injuries, disorders or illness," you checked off

5        "No"; correct?

6                  A.    Yes, and I kind of --

7                  Q.    Below that it says "Seizures"?

8                  A.    Yes.

9                  Q.    And you checked "No"; correct?

10                 A.    Yes.

11                 Q.    The middle category for the yes and

12       no questions at the very bottom, it says

13       "Nervous or psychiatric disorders," and you

14       checked "No"; correct?

15                 A.    Yes.

16                 Q.    And then the third box -- I mean

17       the third column category --

18                 MR. LaROSE:   Okay.

19                 Q.    -- under yes or no, the third one

20       down, "Sleep disorders," you checked "No";

21       correct?

22                 A.    Yes.

23                 Q.    All the way down to the bottom of

24       that category, "Narcotics or habit-forming drug

25       use," you checked off "No"; correct?

336

1              CAITLIN H. RAILO

2        A.    Yes.

3        Q.    Below that, the second sentence

4    says, "List all medications including over-the-

5    counter medications used regularly or recently,"

6    and tell me what you wrote there.

7              MR. LaROSE:  This is your hand-

8         writing?

9              THE WITNESS:  Yes.

10             MR. LaROSE:  Go ahead, read it.

11       A.    "2012, hysterectomy."

12       Q.    It says "May 2012"; correct?

13       A.    Yes.

14       Q.    Go ahead.

15       A.    "Due to cervical cancer, Dr.

16   Koehler.  Currently on Clonidine for menopause,

17   hot flashes, and Valium."  That's all I wrote.

18       Q.    That's all your handwriting?

19       A.    Yes.

20       Q.    Below that, where it says "Doctor,"

21   it looks like, Rhenler, R-H-E-N-L-E-R?

22       A.    Yes.  I didn't write that.  That

23   was the doctor that prescribed me the other

24   medication and she wrote "No current

25   limitations."

337

CAITLIN H. RAILO

1

2          Q.     What's the other medication?

3          A.     There is other medications that I

4    think -- that's the doctor that also prescribed

5    me the pain medication.

6          Q.     It says "No current limitations"?

7          A.     Yes.   That was the doctor I was

8    seeing.

9          Q.     Now, you never listed Suboxone on

10   Exhibit F; is that correct?

11         A.     She wrote these.   I told her and

12   she said she only wanted the medications that

13   would cause me to be drowsy.

14         Q.     We'll get to that.   Did you write

15   Suboxone anywhere on Exhibit F?

16         A.     No.

17         Q.     You knew at the time what Suboxone

18   was for; right?

19         A.     Yes.

20         Q.     And when you testified last time,

21   you said everyone knows what Suboxone is for;

22   right?

23         A.     The nurses, yes.

24         Q.     And you knew if you told anyone

25   about Suboxone, it would be relative to some

338

1                          CAITLIN H. RAILO

2       type of narcotic use; correct?

3              A.     Yeah.  I told the nurse.

4              Q.     But you didn't write it down;

5       correct?

6              A.     No.

7              Q.     Have you reviewed what the nurse

8       wrote down?

9              A.     Yes.

10             Q.     What is Suboxone for?

11             A.     It's for prior opiate use, and I

12      was also using it for pain.

13             Q.     Do you see the nurse's writing?

14             A.     Yes.

15             Q.     Are you able to read that?

16             A.     Yes.

17             Q.     Okay.  Do you see anywhere where

18      the nurse wrote down Suboxone?

19             A.     That's not my fault.

20             Q.     But you didn't write it either;

21      correct?

22             A.     No.

23             Q.     And it's your testimony that you

24      told the nurse --

25             A.     Yes.

339

CAITLIN H. RAILO

1

2        Q.      -- that you were on Suboxone?

3        A.      Absolutely.

4        Q.      She told you to do that?

5        A.      That she was only writing down the

6   medicine that made me tired because it's driving

7   and it doesn't affect my driving.

8        Q.      But you didn't write it down

9   either; correct?

10       A.      No.

11       Q.      And the only way she would have

12  known is if you told her; correct?

13       A.      Yes.

14       Q.      Did you tell the nurse that you

15  were on Ambien?

16       A.      Yes.  I don't take it, though.  I

17  was prescribed it, but I wasn't taking it.

18       Q.      But you didn't write it down;

19  correct?

20       A.      No.  I don't take it.

21       Q.      Were you taking Ambien?

22       A.      No.  I can't take Ambien and get up

23  at 4:00 in the morning.

24       Q.      Did you, underneath your signature

25  and the date, did you write anything else on

340

1          CAITLIN H. RAILO

2     Exhibit F?

3          A.     No.

4          Q.     And it looks like the date is

5     October 16th, 2012?

6          A.     Yes.

7          Q.     And you signed that; correct?

8          A.     Yes.

9          Q.     And by signing that, above your

10    signature, it says, "I certify that the above

11    information is complete and true."

12         A.     Yes.

13         Q.     And it says, "I understand that

14    inaccurate, false or missing information may

15    invalidate the examination and medical examiner

16    certificate."

17         A.     Yes, but she knew, that's why I had

18    to check off an illness or injury less -- more

19    than five years.

20         Q.     She knew what?

21         A.     She told me to check off an illness

22    or injury less than five years -- more than five

23    years.  It's the first one is checked off.

24         Q.     That's one category.  But would you

25    agree that underneath that are many different

341

1                          CAITLIN H. RAILO

2     questions where you check off yes or no?

3          A.    Yes.

4          Q.    You knew as part of that

5     examination you had to pass that in order to get

6     certified to drive a bus; correct?

7          A.    Yes.  The only thing I would have

8     to put yes on --

9          Q.    My question is, you knew that you

10    had to pass this examination in order to drive a

11    bus to get that employment; correct?

12               MR. LaROSE:  Just answer his

13          question.

14         A.    Yes.

15         Q.    Okay.  I'm showing you what's been

16    marked --

17               MR. LaROSE:  Off the record.

18               (Discussion off the record.)

19         Q.    I'm showing you what's been marked

20    Exhibit G.

21               (Document submitted.)

22         Q.    You saw that last time?

23         A.    Yes.

24         Q.    Did you fill out any portion of

25    Exhibit G?

342

1                    CAITLIN H. RAILO

2          A.    No.

3          Q.    Did you sign it?

4          A.    Yes.

5          Q.    Did you indicate any accident on

6    that document?

7          A.    I don't remember this.

8          Q.    Is that your signature on there?

9          A.    This is the one that they did in

10   the office.

11         Q.    Does your signature appear on

12   Exhibit G?

13         A.    Yes.

14         Q.    Okay.  Can I have that back,

15   please?

16               (Document submitted.)

17         A.    I didn't put --

18         Q.    On this document, did you list any

19   criminal convictions?

20         A.    I never -- I don't remember this

21   document.

22         Q.    I'm just saying, did you fill

23   out --

24         A.    This was theirs.  This is a typed

25   one.

343

CAITLIN H. RAILO

1

2          MR. LaROSE:  Okay.  That's what he

3      wants to know.  Did you?

4          THE WITNESS:  No.

5      Q.    When you signed this, you signed a

6  document that lists no accidents and no

7  convictions of any sort; correct?

8      A.    Yes, but I don't know why I would.

9      Q.    But that's your signature on there;

10  correct?

11      A.    Yes.

12      Q.    Now I'm going to show you Exhibit

13  H.

14          (Document submitted.)

15      Q.    I believe you saw this last time

16  also?

17      A.    Yeah.  I don't know what this is

18  either.

19      Q.    Does your signature appear on that?

20      A.    Yes.  See, I don't like this,

21  though, because I filled this out on the

22  application.  I don't like that they didn't put

23  it on there.  That's not my fault.

24      Q.    When you signed that, was there any

25  accident information on that document?

344

CAITLIN H. RAILO

1

2          A.     No.

3          Q.     And when you signed that, did you

4     list any convictions other than a failure to

5     disobey traffic --

6          A.     That's not my handwriting.

7          Q.     I'm saying, when you signed that,

8     was there anything listed other than the failure

9     to obey a traffic device?

10         A.     No.

11         Q.     That's for convictions; correct?

12    That's under the heading for convictions?

13         A.     Yes.

14         Q.     And by signing that, you certify

15    that the information above is true and accurate,

16    is true and complete?

17         A.     Yes.

18         Q.     You see that?

19                Do you remember the name of the

20    lady that was in the office right before you did

21    the afternoon run?  Do you remember her name?

22         A.     No.

23         Q.     The medications that you were on

24    such as Diazepam, does Diazepam affect your

25    ability to drive?

1                        CAITLIN H. RAILO

2            A.     No.

3            Q.     Does Clonidine affect your ability

4       to drive?

5            A.     No.

6            Q.     Do you feel that you had any

7       medications in your system at the time of the

8       accident that affected your ability to drive?

9            A.     No.

10           Q.     Do you remember answering questions

11      last time --

12           A.     I'm sorry.  Go ahead.

13           Q.     -- about that typed statement that

14      we went over?

15                  MR. LaROSE:  Exhibit J; right?

16                  MR. CATALINOTTO:   Exhibit J.

17           Q.     In that statement they asked you,

18      "Do you regret driving the school bus that day,

19      and you said "Yes."  And I believe you testified

20      last time that you regretted that the accident

21      happened, but you were able to drive that day?

22           A.     I regret that whole day.

23           Q.     I want to make sure I clarified it.

24                  When you testified last time, you

25      said you regret that the accident happened, but

346

1                          CAITLIN H. RAILO

2      when you said I regret it, it didn't mean that

3      you weren't able to drive that day; is that a

4      fair categorization?

5                     MR. CIMINI:  Objection.

6                     MR. CATALINOTTO:  You can answer.

7                     MR. LaROSE:  Do you understand what

8           he is asking?

9                     THE WITNESS:  No.

10                    MR. LaROSE:  He wants to know what

11          you meant when you said in this statement

12          that you regret driving the bus.  He

13          wants to know if -- so, say your question

14          again?

15                    MR. CATALINOTTO:  Yeah.

16          Q.    Last time when you testified --

17     well, explain to me what you meant.

18          A.    I regret the accident, but...

19          Q.    Correct.

20          A.    I also regret that whole day, I

21     mean, honestly.

22          Q.    Of course.

23          A.    They should have let me call out.

24     I'm sorry.

25          Q.    Do you feel you were able to drive

1                          CAITLIN H. RAILO

2      a bus that day?

3              A.    Mentally, yes, yes.  I was

4      uncomfortable.

5              Q.    Were you able to drive a bus that

6      day?

7              A.    Yes.

8              Q.    When you called in the date of the

9      accident, what time was it?

10             A.    About 5:30.

11             Q.    In the morning?

12             A.    (Indicating affirmative response.)

13             Q.    You have to say yes or no.

14             A.    Yes.

15             Q.    What phone did you call from?

16             A.    My cell phone.

17             Q.    What was the cell number?

18             A.    I don't remember.

19             Q.    And do you know what the provider

20     was at that time?

21             A.    No.

22             Q.    And were you at home when you

23     called?

24             A.    Yes.

25             Q.    Whose name was on that cell phone