348

1                    CAITLIN H. RAILO

2    account?

3         A.    I don't remember.

4         Q.    Who did you speak to?

5         A.    One of the ladies in the office.

6         Q.    Do you know who it was?

7         A.    No, I don't remember her name.

8         Q.    What did you say and what did she

9    say?

10        A.    "I don't feel good.  I don't think

11   I should be in work today."  I said, "Is there

12   any way I could stay home?"

13        Q.    And what did she say?

14        A.    "No, there is absolutely no one to

15   do your run.  You have to come in."

16        Q.    What did you say?

17        A.    What could I say?  I went in.

18        Q.    When you went in, who was in the

19   office?  Do you recall?

20        A.    Same, same two ladies that are in

21   the office.

22        Q.    Both of them were in the office?

23        A.    I believe so.  I don't really

24   remember.

25        Q.    Were you ever told that day that

349

1                       CAITLIN H. RAILO

2       you would be fired if you didn't come in?

3              A.    I was told prior to that day.

4              Q.    The day of the accident, were you

5       told you would be fired if you didn't come in?

6              A.    No.  I hung up and went in.

7              Q.    Before that, were you ever told

8       that you would be fired if you didn't come into

9       work?

10             A.    Yes, I would lose my job.

11             Q.    And who told you that?

12             A.    I had to sign a paper, and then the

13      boss told me.  They both told me.

14             Q.    What paper did you have to sign?

15             A.    One of their papers saying that I

16      wouldn't be late or call out again.

17             Q.    What happened on that occasion --

18             A.    I don't remember.

19             Q.    -- that caused you to have to sign

20      something?

21             A.    Either I was late or called out.  I

22      don't remember the day.

23             Q.    And do you remember in relation to

24      the accident when it was?

25             A.    No.

1                    CAITLIN H. RAILO

2          Q.    Days?  Weeks?  Months?

3          A.    No.

4          Q.    Who did you speak to?

5          A.    I always speak to the same person.

6    It's one of them in the office, I don't remember

7    who, when I called out prior or that day.

8          Q.    Prior?

9          A.    I don't remember.

10         Q.    You don't remember?  Was it a

11   female or a male?

12         A.    It was female.  They're both

13   females in the office.

14         Q.    So, someone in the office that told

15   you you would lose your job if you came in late

16   or didn't come in to work again?

17         A.    They told me, and then my boss told

18   me.

19         Q.    So, was that over the phone, was it

20   in person where the female told you you would

21   lose your job?

22         A.    That person I had to sign a paper.

23         Q.    Do you know what the paper stated?

24         A.    That if I called out or was late

25   again, that I would be -- I don't remember what

1                        CAITLIN H. RAILO

2      it said on the paper, but basically I would lose

3      my job.

4              Q.    Did you sign it?

5              A.    Yes.

6              Q.    And was there another discussion

7      about this with someone at Quality Bus?

8              A.    My boss.

9              Q.    Okay.  Who was that?

10             A.    I don't know his name.  What's his

11     name?

12             Q.    Male?

13             A.    Yes.

14             Q.    And what did he say?  What did you

15     say?

16             A.    Same thing.

17             Q.    What did he say?

18             A.    That I cannot be late or call out

19     again.

20             Q.    And what did you say?

21             A.    I signed the paper.

22             Q.    Well, did he present the paper or

23     did the female?

24             A.    Both of them.

25             Q.    Two separate papers?

1                    CAITLIN H. RAILO
2          A.    I don't know.  I don't remember.
3     It was the same paper, but there is two
4     different copies.  They both had a copy.
5          Q.    Who handed it to you?
6          A.    I signed it with her, I believe.
7          Q.    And did your boss tell you anything
8     else --
9          A.    No.
10         Q.    -- about that?
11         A.    No.
12         Q.    Were you certified by the State of
13    New York to drive a school bus --
14         A.    Yes.
15         Q.    -- on the date of the accident?
16         A.    Yes.
17              MR. CATALINOTTO:  I don't have any
18         other questions.  Thanks.
19    FURTHER EXAMINATION
20    BY MR. CIMINI:
21         Q.    Caitlin, you remember me?
22         A.    Yes.
23         Q.    I'm Vince Cimini.  I represent
24    Justin Maher.  I just have some follow-up
25    questions based on some of the questioning that

353

1                    CAITLIN H. RAILO

2      Attorney Catalinotto asked you, and certainly

3      I'm not even going to be remotely close as to

4      how long I was last time we were here.

5                    Let me ask you this, Caitlin:  Did

6      you have a belief that if you missed going into

7      work on the date of the accident, February 14th,

8      2013, that you were going to lose your job?

9           A.    Yes.

10          Q.    And was that based on some prior

11     conversations that you had with your boss and

12     with some other female employees in the

13     office --

14          A.    Yes.

15          Q.    -- specifically told you that if

16     you miss work, you're going to be fired?

17          A.    Yes.

18          Q.    And you believed that?

19          A.    Yes.

20          Q.    And isn't it true that you also

21     believed that you should not have gone into work

22     on the day of February 14th, 2013?

23                    MR. CATALINOTTO:  Objection to the

24               form.  You can answer.

25          A.    Yes.

CAITLIN H. RAILO

1

2     Q.    Your answer was yes?

3     A.    Yes.

4     Q.    And isn't that because you knew

5  that you had taken some pills and that you were

6  really not feeling well, that you were in pain

7  and that you were very tired?

8          MR. CATALINOTTO:  Objection to the

9          form.

10    A.    It wasn't the fact so much that I

11 was tired, it was the fact that I was in pain

12 and that I shouldn't have to work like that.

13    Q.    Because that pain would affect your

14 ability to drive, wouldn't it?

15         MR. CATALINOTTO:  Objection to the

16         form.

17         MR. LaROSE:  Objection.

18         MR. CATALINOTTO:  I don't

19         believe -- go ahead, you can answer.

20         MR. CIMINI:  Go ahead, you can

21         answer.

22         MR. LaROSE:  Read it back for her

23         so she hears the whole thing without the

24         objections.

25              (Whereupon, the last question was

355

1          CAITLIN H. RAILO

2          read back by the reporter.)

3               MR. CATALINOTTO:  Objection.

4          A.   It's not the pain that would affect

5     my ability to drive, because -- you know what, I

6     really don't know how to answer that because --

7          Q.   Well, then why did you feel it was

8     necessary to call in and attempt to not go to

9     work that morning?

10          A.   Because of the pain.

11          Q.   And you knew that you had to drive

12     a bus that day; correct?

13          A.   Yes.

14          Q.   And you didn't want to go into work

15     and drive a bus, did you?

16               MR. CATALINOTTO:  Objection to the

17               form.  You can answer.

18          A.   No.

19          Q.   And that was because you're saying

20     you were in pain?

21          A.   Yes.

22          Q.   When you were shown the typed

23     statement that you gave as part of Exhibit J,

24     when you were interviewed by the police, were

25     you being truthful when you answered the police

1                       CAITLIN H. RAILO

2    officer's questions?

3          A.     Honestly, that day where they came

4    and got me, they didn't do that until after

5    about five hours and I don't really like that

6    whole typed -- I don't like any of the answers

7    to those questions, because they were -- I don't

8    know, they kind of rushed me on that.

9          Q.     Do you remember being asked the

10   following question on April 12th, 2013 by

11   Investigator Tim Diamond:   Question is --

12                 MR. LaROSE:   Off the record.

13                 (Discussion off the record.)

14         Q.     I'll ask the question again.

15                 Do you remember being asked the

16   following question on April 12th, 2013 in the

17   presence of a police investigator:   The question

18   is, "Did you feel like you should not have gone

19   to work and drive the school bus?"  And the

20   typed answer is, "I felt fine in the morning

21   run.  I just felt tired in the afternoon."  Is

22   that an accurate answer to the question?

23                 MR. LaROSE:   Is that what you said?

24                 MR. CIMINI:   Well, that's a

25         different way of saying is that an

357

1                     CAITLIN H. RAILO

2          accurate answer.

3          Q.    But do you recall if that's what

4     you said and that's how you answered the

5     question?

6          A.    That might have been what I said to

7     him, yes, but that's only probably one of the

8     sentences with the answer.

9          Q.    And you're right.  The following

10    sentence says, "The pill combined with lack of

11    sleep from the night before caused me to be more

12    tired than normal."

13         A.    No, I didn't say that.

14         Q.    You didn't say that?

15         A.    Because I would have been more

16    tired in the morning run than the afternoon run.

17         Q.    Do you have any idea as to why the

18    investigator who took the statement would type

19    the answer that way if that's not what you said?

20         A.    That's why I'm saying, I don't like

21    that whole statement because we were just having

22    conversations about all kinds of drugs and pills

23    and we started going off on this.  He was going

24    off on this other tangent about drug dealers and

25    pills, and it was that whole statement is

358

                          CAITLIN H. RAILO

1    just -- I don't know, typed by the police, but,

2    I mean, I was -- I was tired.  I mean, my body

3    was tired and I tried calling out that morning

4    and they just -- I don't know.  I mean, yeah, I

5    was a little tired, but not too tired not to

6    drive, but the majority of it was the pain.  It

7    was very uncomfortable, very uncomfortable.

8         Q.    And because of that uncomfortable-

9    ness that you were feeling due to the pain, you

10   didn't want to go into work and drive a bus that

11   day, did you?

12                   MR. CATALINOTTO:  Objection to the

13           form.  You can answer.

14        A.    No.

15        Q.    Now, you were shown by Attorney

16   Catalinotto two exhibits, G and H.  I'll show

17   you from the original exhibit book.

18                   (Documents submitted.)

19        Q.    Do you remember these two forms, G

20   and H?

21        A.    Yes.

22        Q.    They contain information that's

23   typed on there that you did not type?

24        A.    No.

359

1                    CAITLIN H. RAILO

2        Q.    At least on Exhibit G there is

3    typed information; correct?

4        A.    Yes.

5        Q.    You didn't type any of that

6    information, did you?

7        A.    No.

8        Q.    But your signature appears on the

9    bottom; correct?

10       A.    Yes.

11       Q.    Is it possible, Caitlin, that you

12   signed that form without there being any

13   information on the form when you signed it?

14       A.    It's possible.

15            MR. CATALINOTTO:  Objection to the

16       form.

17       A.    I don't remember any of that,

18   because I would have noticed because this is all

19   blank, the convictions are on here, they're

20   blank and accident information and conviction

21   information are not right.

22            MR. LaROSE:  That's now on H you're

23       looking at?

24            THE WITNESS:  No.  Both of them,

25       convictions on the bottom of that one and

360

CAITLIN H. RAILO

1      accidents, they're on both of them.

2      Q.    In your application you

3  acknowledged some convictions and some

4  accidents; correct?

5      A.    Absolutely.

6      Q.    And on these forms they don't

7  appear, do they?

8      A.    No.

9      Q.    You didn't fill out the information

10  on those forms, G and H, did you?

11      A.    No.

12      Q.    And that's my question.  Do you

13  believe it's possible that someone from Quality

14  Bus handed you these forms and said, here, would

15  you just sign these --

16      MR. CATALINOTTO:  Objection.

17      Q.    -- with them being blank?

18      MR. LaROSE:  He means completely

19  blank.

20      THE WITNESS:  Yes.

21      Q.    Do you believe that's possibly what

22  happened?

23      A.    Yes.

24      MR. CATALINOTTO:  Objection to the

361

1                      CAITLIN H. RAILO

2           form.

3           A.    Anything is possible.  I don't

4    understand it.

5           Q.    Now, you were also asked some

6    questions about prior drug rehabilitation.  I

7    think you said that prior to the accident it was

8    six or seven years before that you had any drug

9    or alcohol rehabilitation; is that correct?

10          A.    Yes.

11          Q.    And just so I'm clear, was the

12   rehabilitation that you had for drugs and

13   alcohol or just drugs?

14          A.    Just drugs.

15          Q.    What kind of drugs?

16          A.    The time before, I think it was --

17   it was heroin.

18          Q.    Anything else?

19          A.    No.

20          Q.    Was that rehabilitation for heroin,

21   that type of treatment, was that inpatient

22   treatment or were you home and just attending

23   counseling?

24          A.    Inpatient.

25          Q.    Do you know for how long?

1                          CAITLIN H. RAILO
2          A.     Actually, I think the last time was
3     Daytop.  That was a year.  Eight months, almost
4     a year.
5          Q.     A year of rehab inpatient?
6          A.     Yes.
7          Q.     Where is Daytop?
8          A.     Rhinebeck.
9          Q.     You believe that that was six or
10    seven years before the accident?
11         A.     Yes.
12         Q.     And that was for heroin?
13         A.     Yes.
14         Q.     How about any inpatient rehab prior
15    to Daytop, do you recall undergoing any
16    inpatient treatment?
17         A.     Recovery center in Monticello and
18    Catskill Regional Center.
19         Q.     Is that one place or two places?
20         A.     That's two separate places.
21         Q.     Okay.  And they were both inpatient
22    treatment?
23         A.     Yes.
24         Q.     And for drugs and alcohol or just
25    drugs?

1                          CAITLIN H. RAILO

2          A.     And/or alcohol.  They're all for me

3    drugs.

4                 MR. LaROSE:  For you, not what the

5                 program allows.

6          Q.     For you, yeah, just drugs?

7          A.     Yes.

8          Q.     And do you remember what drugs

9    caused you to be in those two facilities?

10         A.     Heroin.

11         Q.     Was it always heroin?

12         A.     Yes.

13         Q.     When were you in those two other

14   facilities, roughly?

15                MR. LaROSE:  Either by your age or

16                anything else you can tell us.

17         A.     I know that Monticello was right

18   before Daytop, so it was about the same year.

19   And Catskill, I don't remember.  Probably within

20   a year before that.

21         Q.     How long was the Monticello rehab?

22         A.     I was in there for a month and then

23   went to Daytop.

24         Q.     You already said you were in Daytop

25   for eight months?

364

1                    CAITLIN H. RAILO

2          A.     Yeah, for around a year, so, yeah,

3     I think it was around eight months.

4          Q.     How long were you in Catskill?

5          A.     A couple weeks.   That's more of

6     a -- it's a hospital, so it's more of a detox.

7     You do your outpatient when you leave.

8          Q.     You were also asked some questions

9     about what you pled guilty to as a result of the

10    February 14th, 2013 accident?

11         A.     Yes.

12         Q.     Do you -- as you sit here today, do

13    you have a specific recollection as to exactly

14    what you pled guilty to?

15         A.     No.

16         Q.     When you were arrested as a result

17    of this accident, do you remember being charged

18    with fourteen different counts?

19         A.     Fourteen?   No, but I know there was

20    a lot.

21         Q.     You don't remember the specific

22    number?

23         A.     No.

24         Q.     But you do remember pleading guilty

25    to two separate counts; correct?

365

1               CAITLIN H. RAILO

2          A.    Yes.

3          Q.    And I think you said one was

4     assault?

5          A.    Yes.

6          Q.    Would it be correct that you pled

7     guilty to Vehicular Assault in the Second

8     Degree?

9          A.    Yes.

10          Q.    When you pled guilty to that

11     charge, did you have to appear before a judge in

12     court?

13          A.    Yes.

14          Q.    And do you remember, when you

15     appeared before that judge in court, do you

16     remember the judge asking you questions about

17     whether you know what you're doing and whether

18     you did, in fact, commit the crime of Vehicular

19     Assault in the Second Degree?

20          A.    I -- mostly it was my lawyer

21     talking and then I just pled guilty to the

22     charges, because, I mean, I knew it was -- I was

23     going to get charged, so I just took the first

24     plea because it was that whole accident just

25     kind of freaked me out, so I just took the first

366

CAITLIN H. RAILO

1  charge.

2

3       Q.    That's really not my question, I'm

4  sorry, and I'll try to be clear with the

5  question.

6             When you pled guilty to the

7  Vehicular Assault in the Second Degree, you were

8  standing before a judge; correct?

9       A.    Yes.

10      Q.    And you had your lawyer with you;

11  correct?

12      A.    Yes.

13      Q.    And do you remember your lawyer

14  asking you a series of questions at that time as

15  to whether or not you understand what you're

16  doing in court there that day?  Do you remember

17  him asking you questions like that?

18      A.    No.

19      Q.    You don't, okay.

20            But you did agree to plead guilty

21  to Vehicular Assault in the Second Degree?

22      A.    Yes.

23      Q.    And do you remember what the facts

24  were that supported that actual offense that you

25  pled guilty to?

367

CAITLIN H. RAILO

1

2          A.     No.

3          Q.     Do you remember if the judge asked

4    you, "Do you agree that you caused serious

5    physical injury to Justin Maher and that you did

6    operate a motor vehicle in violation of

7    Subdivision 4 of Section 1192 of the Vehicle and

8    Traffic Law in that you operated a motor vehicle

9    while your ability was so impaired by the use of

10   a drug as defined in the Vehicle and Traffic Law

11   of the State of New York, to wit, Diazepam and

12   morphine, and as a result of such impairment by

13   the use of such drug you did operate such motor

14   vehicle in a manner that caused serious physical

15   injury to such other person"?

16         A.     In court, no, I don't remember

17   that.

18         Q.     You don't remember that?

19         A.     No.

20                MR. CATALINOTTO:  Can you just tell

21         us what you're referring to?

22                MR. CIMINI:  Sure.  It's Page 136

23         of Exhibit --

24                MR. CATALINOTTO:  I think it's the

25         indictment.

368

1                     CAITLIN H. RAILO

2              MR. CIMINI:  It's the indictment

3         that lists --

4              MR. CATALINOTTO:  But it's not an

5         on-the-record discussion.  I just want to

6         make sure.

7              MR. CIMINI:  No, you're right.  I

8         don't have that either, no.

9              MR. CATALINOTTO:  Okay, thanks.

10             MR. CIMINI:  You're right.

11        Q.    The other charge that you pled

12   guilty to you said was a DWI involving a minor

13   or a child.  Do you recall that?

14        A.    I know it was endangering --

15   endangering the welfare of a minor, I think.

16        Q.    There is three charges altogether,

17   aggravated operating a motor vehicle while under

18   the influence of drugs while a child who was

19   fifteen years of age or less was a passenger in

20   such motor vehicle.  Does that sound right?

21        A.    For the exact charge?

22        Q.    Yes, that you pled guilty to.

23        A.    That doesn't sound like it -- yes.

24   I mean, yes, okay.

25        Q.    Do you remember the judge asking

369

CAITLIN H. RAILO

1

2  you any questions about whether you did, in

3  fact, commit that crime and that you were

4  pleading guilty to that specific offense?

5      A.    All I remember him asking me was if

6  I was pleading guilty to those charges.

7      Q.    And what did you say in response to

8  that, if you recall?

9      A.    I said, "Yes, I'm pleading guilty.'

10     Q.    To both charges?

11     A.    Yes.

12     Q.    And you had a lawyer with you at

13  that time; right?

14     A.    Yes.

15     Q.    Who was the lawyer, do you recall?

16     A.    I don't remember her name, no.

17     Q.    It was a female?

18     A.    Yes.

19     Q.    You didn't hire her personally, did

20  you?

21     A.    No.

22     Q.    She was a Public Defender?

23     A.    Yes.

24     Q.    Was that the only lawyer that you

25  ever had represent you for this accident, for

370

1                          CAITLIN H. RAILO

2          the charges --

3                    A.    Yes.

4                    Q.    -- that were related to the

5          accident?

6                    A.    I hired one when I got arrested

7          that I got bailed out on, and then he said that

8          it was going to trial and he couldn't be a

9          lawyer for trial, but, yes, she was the only one

10         at Goshen.

11                   Q.    And the last time I showed you Page

12         110 of one of our exhibits, part of C?

13                         (Document submitted.)

14                   MR. FOULKE:   Page 110.

15                   MR. LaROSE:   Just let him ask the

16              question.

17                   A.    I don't know what this is.

18                   Q.    You're looking at Page 110 of

19         Exhibit C; right?

20                   A.    Yes.

21                   Q.    Is there any writing on this

22         particular page that is yours ?

23                   A.    No.

24                   Q.    Nothing at all?

25                   A.    No.

371

CAITLIN H. RAILO

1

2        Q.    And this was in response to your

3     arrest on April 12th, 2013?

4         MR. LaROSE:  Do you know that?

5        A.    Oh, I see it on the date, but...

6        Q.    That's the day you were arrested;

7     correct?

8        A.    Yes.

9        Q.    And then there is defense counsel

10    listed as Greenwald Law with the telephone

11    number next to it; right?

12       A.    Yes.

13       Q.    Do you see that?

14       A.    I don't know who that is.

15       Q.    Do you know an attorney Erno Poll?

16         MR. FOULKE:  P-O-L-L, Erno,

17    E-R-N-O.

18       A.    No.

19       Q.    Does that name sound at all --

20    familiar at all to you?

21       A.    No.

22       Q.    You were never represented by

23    anybody that sounded close to that?

24       A.    No.

25       Q.    You said that you had an attorney

372

```
 1                    CAITLIN H. RAILO

 2    with you when you were first arrested?

 3          A.    No, I didn't have one, not when I

 4    was getting questioned in the police, no.

 5          Q.    You remember when I asked you

 6    before, did you have an attorney representing

 7    you for those charges other than the female

 8    Public Defender, you said yes?

 9                MR. LaROSE:  She said yes when she

10          got bail.

11                MR. CATALINOTTO:  She was

12          arraigned.

13          Q.    Do you know who that lawyer was?

14          A.    No.  After I got bail?

15                MR. LaROSE:  After we got bail.

16          A.    We called Wolfe out of Walden, but

17    that was the only one that would ever -- I don't

18    know who that is.

19                MR. LaROSE:  Off the record.

20                (Discussion off the record.)

21          Q.    Now, you had a DWAI in the past

22    some -- perhaps in 2005 that you were asked

23    about; correct?

24          A.    Yes.

25          Q.    And you said that you were not
```

373

1                          CAITLIN H. RAILO

2       driving the car at that arrest?

3               A.      No.

4               Q.      Correct, that you were in the car?

5               A.      Yes.

6               Q.      Where were you seated in the car?

7       In the driver's seat?

8               A.      Yes.

9               Q.      And the keys were in the ignition?

10              A.      Yes.

11              Q.      Was the car running or was the car

12      off?

13              A.      The car was off.  I had overdosed

14      in the car.

15              Q.      On heroin?

16              A.      Yes.

17              Q.      Did this overdose prompt you to go

18      into one of those rehabs that you mentioned

19      earlier?

20              A.      I think I did jail time.

21              Q.      How about after, immediately after

22      the jail time, did you go into rehab as a result

23      of that arrest and that jail time?

24              A.      I don't remember.

25              Q.      At the time you applied for

374

1                         CAITLIN H. RAILO

2       employment with Quality Bus, your primary care

3       physician was a Dr. Galli; correct?

4              A.     Yes.

5              Q.     Did you ever have Dr. Galli sign

6       any kind of letter or form that indicated that

7       you were okay and fit to drive a bus?

8              A.     Yes.

9              Q.     You did give Dr. Galli an actual

10      form?

11             A.     They faxed it to her and then she

12      faxed it back after she signed it.

13             Q.     Did you ever see that form?

14             A.     No.

15             Q.     Do you know what that form said?

16             A.     No.  Just the medications that I

17      was on and that she signed off on it for me to

18      drive.

19             Q.     How do you know that Dr. Galli

20      signed off on the particular form that was

21      submitted to her?

22             A.     I didn't physically see her see it,

23      but she said that my job had called her or

24      Partners in Safety had called her and they

25      couldn't give me -- I couldn't drive unless she

375

CAITLIN H. RAILO

1

2    signed off on it.

3         Q.    And that was my next question.   My

4    question was, do you know who it was that

5    contacted Dr. Galli's office?

6         A.    It was either Partners in Safety or

7    the job itself.   I think it was Partners in

8    Safety.

9         Q.    When you say "the job itself," do

10   you mean Quality Bus?

11        A.    Yes.

12        Q.    As you sit here today, do you know,

13   in fact, who it was --

14        A.    No.

15        Q.    -- for sure?   Okay.

16        A.    No.

17        Q.    Did you have a discussion with Dr.

18   Galli about the form that was submitted to her?

19        A.    She told me that they had requested

20   it and she was going to do it that day after I

21   saw her in her office.

22        Q.    Did she tell you what she was going

23   to write on the form?

24        A.    She just said that she had to sign

25   off on my medications, that I could drive with

376

1                        CAITLIN H. RAILO

2       the medication that I was on.

3              Q.    And do you remember when you had

4       this discussion with Dr. Galli?

5              A.    I don't remember the day, no, but

6       it might have been a day or two after I went to

7       Partners in Safety.  I'm not sure.

8              Q.    Did she tell you what medications

9       she signed off on specifically?

10             A.    She prescribes me all of them.

11             Q.    Which ones does she prescribe?

12             A.    Suboxone, the Valium and Clonidine.

13      All my medications come from her.

14             Q.    Percocet?

15             A.    No, no.  That one is Middletown

16      Crystal Run.

17             Q.    Does Dr. Galli prescribe you any

18      other medications than the ones you just

19      described?

20             A.    No.

21             Q.    You mentioned a woman by the name

22      of Mary who participated in some of your road

23      testing, correct --

24             A.    Yes.

25             Q.    -- for the bus company?

377

CAITLIN H. RAILO

1

2      A.    Yes.

3      Q.    Did Mary work directly for Quality

4  Bus as far as you know?

5      A.    Yes.

6      Q.    What was Mary's last name?

7      A.    I don't know.

8      Q.    Was that the woman that was

9  mentioned, Mary Koselnak?

10      A.    Yes.

11      Q.    That's the same Mary?

12      A.    Yes.

13      Q.    There is only one Mary?

14      A.    Um-hum, yes.

15      Q.    Okay.  Do you know what her title

16  is?

17      A.    No.

18      Q.    Do you know if she was a manager?

19      A.    No, I don't know.

20      Q.    Do you know if she was -- you don't

21  know if she was an owner?

22      A.    No.

23      Q.    I think you said that you started

24  driving a bus on the first day that your

25  commercial driver's license was issued to you on

378

1                    CAITLIN H. RAILO

2     October 24th, 2012; is that accurate?

3              A.     Yes.

4              Q.     So, that very day you got the keys

5     to a bus?

6              A.     Yes.

7              Q.     And did you actually do a route

8     that day?

9              A.     Yes.

10             Q.     You picked up school children?

11             A.     Yes.

12             Q.     Did anybody from Quality Bus ride

13    with you on that first day?

14             A.     No.

15             Q.     How about any day that you were

16    driving school students for Quality Bus, did

17    Quality Bus employ, supervise or manage your --

18    or even another bus driver, ride with you at any

19    point in time?

20             A.     No.

21                 MR. CIMINI:   I think that's all I

22             have.

23                 MR. CATALINOTTO:   I just have a few

24             follow-up questions.

25    FURTHER EXAMINATION

379

1              CAITLIN H. RAILO

2     BY MR. CATALINOTTO:

3          Q.    When you went home after the

4     morning run on the day of the accident, what did

5     you do?

6          A.    Took a nap, watched TV, took a nap,

7     ate.

8          Q.    How long did you nap for?

9          A.    About two and a half hours.

10         Q.    When you drove that bus at the time

11    of the accident, did you feel your ability was

12    impaired to operate a bus?

13         A.    No.

14         Q.    I just wanted to go back to this

15    form, the medical examination report, Exhibit F.

16         A.    Yes.

17         Q.    Was it your understanding that the

18    nurse took Dr. Galli's name and number and was

19    going to request clearance for you from Dr.

20    Galli for the medications you were on?

21         A.    She gave me a card that day.

22         Q.    What did the card say?

23         A.    That I was cleared to drive with

24    the medication.

25         Q.    Dr. Galli did?

380

CAITLIN H. RAILO

1

2      A.    No.  She did.

3           Q.    The nurse had it from Dr. Galli?

4           A.    No.  The nurse gave me a card that

5      day to leave with.  It was a little white card

6      that you carry in your wallet.  So maybe she did

7      fax her that day, I'm not sure.

8           Q.    On the right side over here, is

9      that the nurse's handwriting (indicating)?

10          A.    Yes.  All of that is.

11          Q.    And the name, "Dr. Galli," it says

12     "PCP," that would be primary care physician --

13          A.    Yes.

14          Q.    -- is that the nurse's handwriting?

15          A.    Yes.

16          Q.    And the phone number underneath?

17          A.    Yes.

18          Q.    All right.  So, the nurse could

19     have gotten in contact with Dr. Galli that day

20     to get the clearance that day while you were

21     still there?

22          A.    Yes.

23          Q.    And you left with that card?

24          A.    Yes.

25          Q.    So, is it fair to say that the

381

1                     CAITLIN H. RAILO

2    request came from the Article 19-A medical

3    examiner --

4          A.    Yes.

5          Q.    -- for the clearance on the

6    medication?

7          A.    Yes.

8          Q.    Just so I'm clear, did Dr. Galli

9    prescribe all those meds for you or was there

10   another doctor in the mix?  The meds I'm talking

11   about are the Diazepam and the Clonidine.

12         A.    And the Suboxone and the Ambien all

13   came from Dr. Galli.

14         Q.    From Dr. Galli?

15         A.    Yes.

16         Q.    You were asked about someone being

17   on the bus with you when you drove the route,

18   Quality Bus.

19         A.    Yes.

20         Q.    Were you aware that they also, in

21   addition to the training that you got, once you

22   were driving the route, that Mary would follow

23   you sometimes while you were in the bus?

24         A.    Yes.  I heard about that two or

25   three times, she told me.

382

1                    CAITLIN H. RAILO

2          Q.    And that was when you were picking

3     up children, dropping off children, going to

4     schools; correct?

5          A.    Yes.

6          Q.    The DWI or DWAI what we were

7     talking about in 2005, is it fair to say that

8     you never wrote that down on any application for

9     employment on Quality Bus?

10          A.    They only asked for the past three

11     years.

12          Q.    So, you didn't put that down?

13          A.    No.   More than three years ago.

14          MR. CATALINOTTO:   All right.   I

15          don't have any other questions.   Thanks.

16     FURTHER EXAMINATION

17     BY MR. CIMINI:

18          Q.    Did you know Mary was following you

19     on the occasion she was following you?

20          A.    No.   I'm sorry.   No.

21          MR. CIMINI:   Okay.

22          MR. FOULKE:   Do you mind if I ask a

23          few questions?

24          Can we mark this?

25          MR. CATALINOTTO:   You're going to

383

1                          CAITLIN H. RAILO

2          mark the indictment?

3                    MR. FOULKE:   Part of it, Page 110.

4                    MR. LaROSE:   You're beating a dead

5          horse.

6                    MR. CATALINOTTO:   She didn't

7          prepare it.

8                    MR. LaROSE:   She doesn't know

9          exactly what language she pled to, Evan.

10         I mean, what do you think you're going to

11         accomplish?

12                   MR. CATALINOTTO:   Off the record.

13                   (Discussion off the record.)

14    EXAMINATION BY

15    MR. FOULKE:

16              Q.   Ms. Railo, I represent Justin

17    Maher.  Just a few questions for you.

18                   I'm handing you what was Page 136

19    of what was a part of Exhibit C which was a

20    multi-packet from the Criminal Court, and was

21    your testimony earlier that you recall that you

22    pled guilty to two separate charges; is that

23    correct?

24              A.   Yes.

25              Q.   And one of those charges you

1                    CAITLIN H. RAILO

2    testified was Vehicular Assault in the Second

3    Degree; is that right?

4          A.    Yes.

5          Q.    Now, prior to pleading to those

6    charges, did you have an opportunity to review

7    the indictment with your attorney?

8          A.    No.

9          Q.    Did you have an opportunity to

10   discuss those charges with your attorney?

11         A.    Vaguely, very quickly, not in

12   length, in detail.

13         Q.    Did you have an opportunity to meet

14   with your attorney prior to appearing before

15   Judge DeRosa?

16         A.    Yes.

17         Q.    Do you recall the date you appeared

18   before Judge DeRosa?

19         A.    The last time, it was March 17th.

20         Q.    And do you recall -- that's March

21   17, 2014?

22         A.    Yes.

23         Q.    Now, do you recall the date you

24   appeared before Judge DeRosa with your attorney

25   when you entered your guilty plea?

1                     CAITLIN H. RAILO

2          A.    No.

3          Q.    Was it the same attorney that

4     represented you on March 17th, 2014 that

5     appeared with you at the time when you entered

6     your guilty plea?

7          A.    Yes.

8          Q.    When you entered your guilty plea,

9     was that 2014 or 2013?

10         A.    '14.

11         Q.    Approximately how much time elapsed

12    from the time you entered your guilty plea until

13    March 17th of 2014?

14         A.    About a year.

15         Q.    Now, at the time you appeared and

16    entered your guilty plea to Vehicular Assault in

17    the Second Degree, you had an understanding of

18    what the charges were, did you not?

19              MR. CATALINOTTO:  Objection to the

20         form.

21         A.    Yes.

22         Q.    You understood, did you not, that

23    at the time you entered that plea, that you were

24    admitting responsibility for causing serious

25    physical injury to Justin Maher; is that

386

1                          CAITLIN H. RAILO

2       correct?

3                    MR. CATALINOTTO:   Objection to the

4              form.

5              A.    Yes.

6              Q.    And you were admitting responsi-

7       bility that you operated a motor vehicle while

8       your ability to do so was impaired; is that

9       correct?

10                   MR. CATALINOTTO:   Objection to the

11             form.

12             A.    Yes.

13                   MR. LaROSE:   Objection.

14             Q.    And you're admitting at that time

15      when you entered that guilty plea that you

16      operated a motor vehicle while your ability to

17      do so was impaired and that caused physical

18      injury to Justin Maher?

19                   MR. CATALINOTTO:   Objection to the

20             form.

21                   MR. LaROSE:   Objection.

22             A.    Yes.

23                   MR. FOULKE:   Thank you.   Nothing

24             else.

25      FURTHER EXAMINATION

1                          CAITLIN H. RAILO

2       BY MR. CATALINOTTO:

3            Q.   Ms. Railo, I'm going to ask you

4       again, was your ability to operate a motor

5       vehicle of any sort impaired at the time of this

6       accident?

7            A.   No.

8                 MR. CATALINOTTO:  Thank you.

9                 MR. LaROSE:  We're done.

10                (Time noted - 11:22 a.m.)

11                     oOo

12

13       _____

14                 Caitlin H. Railo

15

16

17       Sworn to before me this

18

19       _____ day of _____, 2015.

20

21       _____

22            Notary Public

23

24

25

388

## INDEX TO TESTIMONY

EXAMINATION BY                          PAGE

MR. CATALINOTTO                         266, 378, 386

MR. CIMINI                              352, 382

MR. FOULKE                              383

oOo

## RAILO EXHIBITS
## MARKED FOR IDENTIFICATION

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| L | Photocopy of Caitlin H. Railo's CDL Driver License | 269 |
| M | School Bus Driver Physical Performance Test | 277 |
| N | Report of Annual Defensive Driving Performance for Driver Under Article 19-A | 279 |
| O | Article 19-A Biennial Behind The Wheel Road Test | 280 |
| P | Pre Service Course Quality Bus Service, LLC, four pages | 282 |

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| Q | School Bus Driver Pre Service Course Trainee Manual CORE Units | 284 |
| R | Quality Bus Company Employee Handbook | 288 |
| S | Sign-In log for the New York State Laws and Regs for School Bus Drivers | 291 |
| T | Photocopy of front page of Quality Bus Service Employee Handbook | 293 |
| U | Photocopy of "Article 19-A Oral/Written Examination Results" | 294 |
| V | Photocopy of "Request for New York State Fingerprinting Services Information Form" | 295 |

oOo

390

# C E R T I F I C A T I O N

I,   MELISSA SHELTON,   a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth, was either first duly sworn or affirmed through me, and that the transcript of said examination is a true record of the testimony given by the said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and am in no way interested in the outcome of this matter.

_____
MELISSA SHELTON

Dated:   April 15, 2015

391

## ERRATA SHEET

RE:   MAHER VS. RAILO & QUALITY
      BUS SERVICE, LLC.


        The following corrections, additions
or deletions were noted on the transcript of the
testimony which I gave in the above-captioned
matter.

PAGE(S)   LINE(S)    SHOULD READ          REASON FOR CHANGE

*_____  *_____  *_____   *_____

*_____  *_____  *_____   *_____

*_____  *_____  *_____   *_____

*_____  *_____  *_____   *_____

*_____  *_____  *_____   *_____

*_____  *_____  *_____   *_____

*_____  *_____  *_____   *_____

*_____  *_____  *_____   *_____


                          _____
                          Caitlin H. Railo
Sworn to before me this
_____ day of _____, 2015.
_____
      Notary Public





# SCHOOL BUS DRIVER PHYSICAL PERFORMANCE TEST

| DRIVER'S LAST NAME | FIRST NAME | MI | DRIVER'S SIGNATURE |
|---|---|---|---|
| Railo | Caitlin | H | Caitlin Railo |

| STREET ADDRESS | VEHICLE TYPE | SCHOOL TYPE | |
|---|---|---|---|
| 5 White Street, Apartment 2 | Large Bus | ☑ PUBLIC | ☐ NON-PUBLIC |

| CITY | STATE | COUNTY | ZIP CODE | 19-A CARRIER |
|---|---|---|---|---|
| Port Jervis | NY | Orange | 12771 | Quality Bus Service, LLC |

| MOTORIST ID NUMBER | LICENSE CLASS/ENDORSEMENTS/RESTRICTIONS | TEST LOCATION |
|---|---|---|
| 491879925 | B  PS  NONE | 504 Route 42, Sparrowbush, NY 12780 |

TESTER:  SEE PT 901 FOR COMPLETE GUIDELINES FOR THIS TEST. CIRCLE "PASS" OR "FAIL" FOR EACH STANDARD.  STOP THE TEST IMMEDIATELY IF ANY ITEM IS FAILED.  ENTER TIME FOR TIMED STANDARDS.  IF A TIMED TEST IS NOT COMPLETED, ENTER "DNC" (DID NOT COMPLETE).

| STANDARD #1 | BUS STEPS | TIME: 10.61 | (3 TRIPS UP & DOWN IN 30 SECONDS) | ☑ PASS | ☐ FAIL |
|---|---|---|---|---|---|
| STANDARD #2 | THROTTLE TO BRAKE | TIME: 6.03 | (10 THROTTLE TO BRAKE CYCLES IN 10 SECONDS) | ☑ PASS | ☐ FAIL |
| STANDARD #3 | BRAKE / CLUTCH | (HOLD BRAKE 3 SECONDS 5 TIMES / HOLD CLUTCH THROUGHOUT) | | ☑ PASS | ☐ FAIL |
| STANDARD #4 | DOOR | (MANUALLY OPEN AND CLOSE ENTRANCE DOOR THREE TIMES) | | ☑ PASS | ☐ FAIL |
| STANDARD #5 | HAND CONTROLS | (ENTER NAME OF CONTROL FOR EACH SEGMENT OF THIS STANDARD) | | | |

| RIGHT SIDE CONTROL #1 CONTROL NAME: Shift | TIME: 4.98 | (WHEEL TO CONTROL TO WHEEL IN 8 SECONDS) | ☑ PASS | ☐ FAIL |
|---|---|---|---|---|
| RIGHT SIDE CONTROL #2 CONTROL NAME: Horn | TIME: 1.18 | (WHEEL TO CONTROL TO WHEEL IN 8 SECONDS) | ☑ PASS | ☐ FAIL |
| LEFT SIDE CONTROL #1 CONTROL NAME: Hazards | TIME: .98 | (WHEEL TO CONTROL TO WHEEL IN 8 SECONDS) | ☑ PASS | ☐ FAIL |
| LEFT SIDE CONTROL #2 CONTROL NAME: Left Defroster | TIME: 2.51 | (WHEEL TO CONTROL TO WHEEL IN 8 SECONDS) | ☑ PASS | ☐ FAIL |

| STANDARD #6 | EMERGENCY EXIT | TIME: 8.30 | (FROM DRIVER SEAT AND OUT EXIT IN 20 SECONDS) | ☑ PASS | ☐ FAIL |
|---|---|---|---|---|---|
| STANDARD #7 | WEIGHT DRAG | TIME: 7.42 | (125 LBS 30 FEET IN 30 SECONDS) | ☐ PASS | ☐ FAIL |

IN ACCORDANCE WITH THE COMMISSIONER'S REGULATION 156.3, AND GUIDELINE PT901, AND WITH KNOWLEDGE OF HIS/ HER DUTIES, I CERTIFY THAT THE ABOVE NAMED DRIVER (CHECK ONE):

☑ HAS PASSED ALL 7 STANDARDS AND IS QUALIFIED BY THE PHYSICAL PERFORMANCE STANDARDS.

☐ IS NOT QUALIFIED BY THE PHYSICAL PERFORMANCE STANDARDS.

*SBDI INFORMATION AND SIGNATURE*

| SBDI NAME (PRINTED) | SBDI SIGNATURE | SBDI # | DATE |
|---|---|---|---|
| Koselnak, Mary B. | Mary B Koselnak | 98056 | 2-13-13 |

COPY #1 SHOULD BE PLACED IN DRIVER'S FILE. COPY #2 FOR NYSED—ATTN: JAMES DUNDON, 876 EBA, 89 WASHINGTON ST, ALBANY, NY 12234. COPY #3 GIVEN TO TESTED DRIVER.  COPY #4 FOR TESTER'S RECORDS.  IF A WAIVER HAS BEEN APPROVED BY NYSED, THE TESTING 19-A CERTIFIED EXAMINER MUST COMPLETE AND SIGN INFORMATION BELOW—IN ADDITION TO SUPERVISING SBDI.

| 19-A CE PRINT NAME | 19-A CE SIGNATURE | 19-A CE # | DATE |
|---|---|---|---|
| | | | |

PLAINTIFF'S EXHIBIT Railo M GVD-009-139-6899

REPORT ON ANNUAL DEFENSIVE DRIVING
**PERFORMANCE FOR DRIVER UNDER ARTICLE 19-A**
Case 7:14-cv-03586-JCM   Document 54-4 Filed 10/01/15   Page 47 of 57
www.dmv.ny.gov

**INSTRUCTIONS TO CERTIFIED EXAMINER:**
- Regular observation of a driver's defensive driving performance must be conducted while the driver is operating the vehicle with passengers.
- **This observation shall NOT be conducted on the same day as the biennial behind-the-wheel road test.**
- Discuss performance with driver, complete rating, driver acknowledgement, and examiner certification.

## SECTION 1 - DRIVER INFORMATION

| Driver's Last Name | First | M.I. | Date of Birth (Month/Day/Year) |
|---|---|---|---|
| Rallo | Caitlin | H | 8/12/1981 |

| Street Address | City | State | Zip Code |
|---|---|---|---|
| 5 White Street, Apartment 2 | Port Jervis | NY | 12771 |

| Client/License ID Number (from Driver License) | State | Class of Driver's License | Endorsements | Restrictions | Expiration Date |
|---|---|---|---|---|---|
| 491879925 | NY | B | PS | NONE | 8/12/2015 |

## SECTION 2 - CARRIER INFORMATION

| Carrier/DBA Name | Legal Name (if different) | Federal ID Number | 19-A Business ID Number |
|---|---|---|---|
| Quality Bus Service, LLC | | 260833353 | 22855 |

| Street Address | City | State | Zip Code |
|---|---|---|---|
| PO Box 600 | Sparrowbush | New York | 12780 |

## SECTION 3 - VEHICLE INFORMATION

| Type of Vehicle | Adult Seating Capacity | GVWR | Vehicle Plate Number | State |
|---|---|---|---|---|
| School Bus | 44 | 29000 | 55171-BA | NY |

## SECTION 4 - OBSERVATION  (may be conducted inside or outside the vehicle)   Observation Conducted: ☑ Inside  ☐ Outside

| | Satisfactory | Unsatisfactory | | | Satisfactory | Unsatisfactory |
|---|---|---|---|---|---|---|
| 1. Observation | ☐ | ☑ | 7. Obeys Traffic Signs, Signals and Road Hazard Signs | | ☑ | ☐ |
| 2. Traffic Lane Use (include center line violation) | ☑ | ☐ | 8. Observes Proper Following Distance | | ☑ | ☐ |
| 3. Speed | ☑ | ☐ | 9. Procedures for Receiving and Discharging Passengers | | ☐ | ☑ |
| 4. Properly Signals Intention | ☑ | ☐ | | | | |
| 5. Turning | ☑ | ☐ | 10. Traffic Interaction | | ☐ | ☑ |
| 6. Vehicle Control | ☑ | ☐ | | | | |

Comments: (required if Unsatisfactory checked above)   to much unnecessary conversation w/students
1. Be more observant when people getting in + out of cars on side streets
9. Remind students of listen unloading procedures + crossing
10. When car is letting pedestrians cross yield @ stop sign wait - car has right of (way)

## SECTION 5 - DRIVER ACKNOWLEDGEMENT

I acknowledge discussion of my defensive driving performance with the examiner who observed and rated my performance.

*Caitlin Rallo*
(Driver Signature)

12/3/12
(Date)

## SECTION 6 - EXAMINER'S CERTIFICATION

| Certified Examiner's Name | Client/License ID Number (from Driver License) |
|---|---|
| Mary Koselnak | 681891588 |

| Certificate Number | Certification Class | Endorsements | Restrictions | Expiration Date |
|---|---|---|---|---|
| 070197 | B | PS | B | 8/20/2020 |

I certify that the above report is, to the best of my knowledge, true and correct, and that I personally observed the above driver's defensive driving performance, and that I currently hold a valid examiner certification as required in accordance with Article 19-A of the New York State Vehicle and Traffic Law.

Certified Examiner's Signature
*Mary Koselnak*

Date of Observation
12-3-12





PLAINTIFF'S
EXHIBIT
R4.10 N
4/13/15 ms
PENGAD 800-631-6989

# ARTICLE 19-A BIENNIAL BEHIND THE WHEEL ROAD TEST

## INSTRUCTIONS TO CERTIFIED EXAMINER
- This test shall not be conducted on the same day as the annual defensive driving performance observation. The test should be taken without passengers in the vehicle.
- If the driver fails the test, he/she is disqualified from driving under Article 19-A. He/she may make a request to the carrier for a reexamination.
- Examiner will circle the point value of those items not properly performed. Driver is disqualified if 40 or more points are circled, or if a DISQUALIFICATION (DQ) item is circled, or if any two 10-point items are circled.

## DRIVER INFORMATION

| Driver's Last Name | First | M.I. | Date of Birth (Month/Day/Year) |
|---|---|---|---|
| Railo | Caitlin | H | 8/12/1981 |

| Street Address | City | State | Zip Code |
|---|---|---|---|
| 5 White Street, Apartment 2 | Port Jervis | NY | 12771 |

| Client/License ID Number (from Driver License) 491879925 | State NY | Class of Driver's License B | Endorsements PS | Restrictions NONE | Expiration Date 8/12/2015 |
|---|---|---|---|---|---|

Driver Signature: *Caitlin Railo*

## CARRIER INFORMATION

| Carrier/DBA Name | Legal Name (if different) | Federal ID Number | 19-A Business ID Number |
|---|---|---|---|
| Quality Bus Service, LLC | | 260833353 | 22855 |

| Street Address | City | State | Zip Code |
|---|---|---|---|
| PO Box 600 | Sparrowbush | New York | 12780 |

## VEHICLE INFORMATION

| Type of Vehicle | Adult Seating Capacity | GVWR | Vehicle Plate Number | State |
|---|---|---|---|---|
| School Bus | 44 | 29000 | 55171-BA | NY |

| | Point Value | | Point Value |
|---|---|---|---|
| **1. PRE-TRIP TEST** | | **EN-ROUTE (Continued)** | |
| A. Failed to check wheels, tires | 5 | J. Failed to use proper speed - impedes traffic | 5 |
| B. Failed to check validation of required vehicle stickers | 5 | K. Failed to use proper steering control | 5 |
| C. Failed to check lights *Back up / Brake* | (5) | L. Failed to use proper braking | 5 |
| D. Failed to check windshield, wipers, horn, and steering | (5) | M. Failed to use proper acceleration | 5 |
| E. Failed to check emergency equipment: fire extinguisher, and emergency reflectors | (5) | N. Failed to use proper speed for conditions | DQ |
| | | O. Failed to anticipate and/or identify hazards | 5 |
| F. Failed to check seats and restraints when equipped. | (5) | P. Failed to yield right-of-way | DQ |
| G. Failed to check passenger entry and emergency exits | 5 | Q. Failed to use proper lane/s | (10) |
| H. Failed to check all gauges, heater, and defroster | 5 | R. Failed to properly use transmission | 5 |
| I. Failed to check all mirrors and adjust as needed | 5 | S. Failed to observe traffic control devices | DQ |
| J. Failed to perform static brake check | 5 | **4. PARKING AND BACKING** | |
| K. Failed to properly use seat belt | 5 | A. Failed to leave the vehicle to check rear before backing (no observer) | 10 |
| L. Failed to perform 50 ft. brake test | 10 | B. Failed to observe (backing) | DQ |
| **2. DEPARTING** | | C. Unable to park | DQ |
| A. Failed to signal | 5 | D. Failed to properly position the vehicle | 5 |
| B. Failed to observe | 10 | E. Stopped too far away from, or hit, curb | 5 |
| C. Failed to use caution | 10 | F. Excessive maneuvers in parking | 5 |
| **3. EN-ROUTE** | | **5. SIMULATED PROCEDURES FOR RECEIVING/ DISCHARGING PASSENGERS** | |
| A. Failed to properly signal | 5 | A. Failed to use caution at approaching/departing, receiving/discharging points | DQ |
| B. Failed to observe | 10 | | |
| C. Failed to demonstrate proper judgment approaching/at intersection; speed, turning, stopping, observing, etc. | 10 | B. Failed to properly activate warning lights/devices (where applicable) | DQ |
| D. Failed to make proper lane changes; signals ___, observes ___, procedure ___ | 5 | C. Lacked knowledge of proper crossing procedures as required by NYS Education Department (where applicable) | DQ |
| E. Failed to regularly check mirrors while driving | 5 | | |
| F. Failed to stop properly at RR crossing | DQ | | |
| G. Failed to use proper clutch/engine control | 5 | D. Failed to observe pedestrians/passengers or other hazards at receiving and discharge points | DQ |
| H. Failed to use proper judgment in traffic | 10 | | |
| I. Failed to demonstrate proper following distance | DQ | | |

## EXAMINER'S CERTIFICATION

SCORING: Total Points Circled Above **30**   Disqualification (DQ) Circled Above ☐ YES ☑ NO   Two 10-point items Circled Above ☐ YES ☑ NO

RESULTS: ☑ QUALIFIED ☐ DISQUALIFIED

## CERTIFIED EXAMINER'S COMMENTS: (write or type on reverse side)

| Certified Examiner's Name | Client/License ID Number (from Driver License) |
|---|---|
| Mary Koselnak | 681891588 |

| Certificate Number | Certification Class | Endorsements | Restrictions | Expiration Date |
|---|---|---|---|---|
| 97 | B | PS | B | 8/20/2020 |

Certified Examiner's Signature: *Mary Koselnak*

Date of Test: 12-18-12

PLAINTIFF'S EXHIBIT
Railo D
4/3/15 ms
PENGAD 800-631-6989

# PRE SERVICE COURSE

# QUALITY BUS SERVICE, LLC

# 504 Route 42

# Sparrowbush, NY 12780



PLAINTIFF'S
EXHIBIT
Railo P
4/13/15 mr

**Tuesday, 11/6/12**

**Course Instructor:  Mary Koselnak**

**SBDI #:  98-056**

*NYSED Pre Service Course 2010 Curriculum*

**Sign in sheet**

| | |
|---|---|
| Christina Roth | Christina Roth |
| Caitlin Raio | Caitlin Raio |
| Dana Keefer | Dana Keefer |

Trainee Name (print): _Cathi Vano_

Trainee Signature: _____

Employer: _Quality Bus_

Date of Exam: _11/11/12_

## New York State Education Department
## SCHOOL BUS DRIVER PRE-SERVICE COURSE
## MANDATED UNITS 1-6
## FINAL EXAM

*Instructions: Circle the best answer to each question. Use a pen. Complete both sides. Turn the completed test in to your Pre-Service Course instructor.*

* * *

**1. Complete the following sentence: *Your main priority as a school bus driver is...***

a. *staying on schedule*
b. *keeping parents happy*
c. *protecting the students*
d. *keeping peace with the students*

**2. Complete the following sentence: *To be treated as a professional, you must act like a...***

a. *buddy to your students*
b. *macho man*
c. *professional*
d. *authority*

**3. Which statement about fatigue is not true?**

a. *It is against the law to drive school bus more than ten hours in a single day.*
b. *You can legally drive school bus at six a.m. if you returned from a sports trip at midnight the night before.*
c. *It is against the law to be on duty for more than fifteen hours in a single day.*
d. *Trying to drive a school bus when you're tired is a recipe for disaster.*

**4. Which of the following actions are unacceptable for a school bus driver?**

a. *Hitting the brakes hard so students sit down.*
b. *Making fun of a student's family or house.*
c. *Pushing a misbehaving student into his seat.*
d. *All of the above actions are unacceptable.*

**5. TRUE or FALSE?** *"School bus drivers in New*

*York State are subject to random drug and alcohol testing while on duty, as well as continuous monitoring of their driving and criminal record both on and off the job."*

**6. Which of the following statements are true?**
a. *Children don't like an out-of-control bus any more than adults do.*
b. *All children deserve a safe bus ride.*
c. *Positive relationships with students are the key to safe behavior.*
d. *All of the above.*

**7. TRUE or FALSE?** *"Squabbles over where to sit are a common cause of behavior problems."*

**8. TRUE or FALSE?** *"Like adults, children need to understand the 'why's' behind rules."*

**9. TRUE or FALSE?** *"Use referrals sparingly, for violations of key safety rules."*

**10. TRUE or FALSE?** *"Even if a child misbehaves, never put the child off the bus during the route."*

Page 1 of 4

NYSED 2010

equipment on your bus"?

a. Fire extinguisher.
b. *Internal mirror above the driver.* (circled)
c. Bumpers.
d. Fuel tank.

**12. TRUE or FALSE?** *"Making fun of a child in front of others usually improves behavior."* (FALSE circled)

**13. Which statement about bullying is not true?**

a. Most bullying is verbal.
b. *Bullying is "just kids being kids."* (circled)
c. Sexual harassment is a form of bullying.
d. Bullies are usually clever at what they do. (marked)

**14. TRUE or FALSE?** *"Subs should drive even more cautiously than other drivers in the fleet."* (TRUE circled)

**15. Why is the student loading/unloading process considered "the moment of truth"?**

a. Three of four fatalities occur at the bus stop.
b. Children are impulsive and unpredictable.
c. All school buses have blind spots where a child could be hidden from direct view.
d. *All of the above.* (circled)

**16. Statistically, when are children most at risk?**

a. Getting on a bus in the morning.
b. *Getting off a bus in the afternoon.* (circled)
c. Riding on the bus in a residential neighborhood.
d. Riding on the bus on the highway.

**17. TRUE or FALSE?** *"Secure your bus at every bus stop."* (circled)

what does it mean?

a. Flash lights - child should freeze in the road.
b. Honk horn - child should freeze in the roadway.
c. Wave your hands and yell - child should run.
d. *Honk horn - child should immediately return to the side of the road he/she started from.* (circled)

**19. What's the most important purpose of crossover mirrors?**

a. To locate a child you know you've lost track of.
b. *To check for children you didn't know you'd lost track of.* (circled)
c. To check for cars pulling next to you on the road.
d. To check your flashers during the pre-trip.

**20. What should you do if you feel a bus stop is unusually hazardous, or you come up with an idea for improving safety on your route?**

a. Make the change on your own.
b. *Discuss it with your supervisor.* (circled)
c. Routes cannot be changed during the year.
d. None of the above.

**21. What's the most important reason students should stay out of the rear seats when possible?**

a. You can't hear what they're saying.
b. Takes longer to get off the bus at their bus stops.
c. *More exposed to injury in certain accidents.* (circled)
d. Rear seats are just as safe as any other seats.

**22. Which statement below is not true?**

a. Most disabled children ride regular school buses.
b. Most bus drivers transport disabled children.
c. *Transporting children with disabilities has grown simpler in recent years.* (circled)
d. A generation ago, children with disabilities seldom had a chance to go to school. (marked)

**23. Which statement(s) below are true?**

   a. *A child with a disability is a child, not a disability.*

   b. *Every child, disabled or not, is an individual with a unique personality.*

   c. *Within every disability category, individual children display a wide spectrum of characteristics and behaviors.*

   **d.** *All statements are true.*

**24. An inability to communicate and interact with others and repetitive movements such as rocking or waving is characteristic of what type of disability?**

   a. *Emotional disturbance.*

   b. *Mental retardation.*

   c. *ADHD.*

   **d.** *Autism.*

**25. Which statement is not a typical characteristic of children with emotional disturbance?**

   **a.** *Behaves normally in normal circumstances.*

   b. *Trouble maintaining friendships with peers.*

   c. *Pervasive unhappiness or depression.*

   d. *Physical symptoms due to personal problems.*

**26. TRUE or FALSE?** *"Unnecessarily revealing personal information about students or their families is a violation of state and federal law."*

**27. Which statement(s) below are true?**

   a. *A thoughtless comment about a child can leave a lasting scar.*

   b. *Sensitivity towards children with disabilities begins with an examination of how we speak.*

   c. *Our society has a long history of savage verbal abuse aimed at the "handicapped."*

   **d.** *All the above statements are true.*

**28. TRUE or FALSE?** *"School buses cannot catch fire."*

**29. TRUE or FALSE?** *"Always evacuate students in a school bus emergency."*

**30. What's the safest way to go out a rear emergency door?**

   **a.** *Sit and slide.*

   b. *Jump directly to the ground.*

   c. *Jump into someone's arms.*

   d. *Never go out a rear emergency door.*

**31. PJ's Law focuses on _____ in addition to technical skills.**

   a. *Background checks*

   b. *Seniority*

   **c.** *Sensitivity*

   d. *Crisis intervention*

**32. Which of the following is an appropriate way to communicate with a student with a disability?**

   a. *Storyboards*

   b. *Sign language*

   c. *Touch screens*

   **d.** *All of the above*

**33. When communicating with a student with a disability is recommended to:**

   a. *Joke about it to lighten the mood*

   b. *Focus on the disability and talk about it openly and often*

   **c.** *Use language of respect*

   d. *All of the above*

34. **Person – first language focuses on:**

    a. *Always allowing a person with a disability to go ahead of you*
    b. *Speaking of the person first and the disability second*
    c. *Using the exact name of the disability out of respect*
    d. *All of the above*

35. **PJ's Law requires school bus staff to:**

    a. *Be trained annually regarding sensitivity toward the characteristics of student's disabilities*
    b. *Embrace differences in the students they transport*
    c. *Welcome students with disabilities into the broad diversity of students they transport*
    d. *All of the above*

**Final Exam Score:** _35_

_100_ **% of 35**

School Bus Driver

PRE-

SERVICE

COURSE

Trainee Manual

COPE Units

© NYSED 2010

PLAINTIFF'S
EXHIBIT
Railo Q
4/13/15-ms

PENGAD 800-631-6989

This page intentionally left blank.

# Acknowledgements

*We could not have prepared this curriculum without the ideas, enthusiasm, and guidance of the following people:*

Marion Edick, *2010 State Director of Pupil Transportation*

NYSED SBDI Advisory Committee: *Jim Brown, Robert Brown, Jason Burrick, Jorge DeJesus, Lorraine Misciagno, Susan Soudant, Faye Stevens,    Peter Brockmann, Betty Hughes, Patricia Martell, Paul Mori, Chuck Paquette, Joseph Van Aken, Patricia Bailey, Lenny Bernstein (chair), Ted Finlayson-Schueler, Kathy Furneaux, Pete r Lawrence, Peter Montalvo, James Rogan, and Maureen Ryan*

*Safety Rules!* Curriculum Advisory Committee: *Lance Frieberger, Cliff Berchtold, Joe Van Aken, Paul Mori, Mike Dello Ioio, Faye Waxman, Robin Parks, Teena Fitzroy, Deanna Adams, Peter Lawrence, Deb Stevens, Greg Jenne, and Judy Clarke*

Moravia CSD School Bus Drivers, Attendants, and Mechanics

Attendees at Syracuse focus group: *Tyronne Worrell, Luther Everson, Cindy Raulli, Deb Lilley, Deb Stevens, Tammy Payne, Chuck Paquette, Barb Biddlecome, Terri Kuss, Shelly O'Riley, and Pat Bailey*

Attendees at Rochester focus group: *Peter Lawrence, Michael Proukou, and Kitty Rhow*

Lee Comeau, *retired, author of the original (1989) Pre-Service Course*

*JE & TFS, June, 2010*

Title: School Bus Driver Pre-Service Course – Trainee Manual

Authors: Jim Ellis and Ted Finlayson-Schueler

Copyright June 30, 2010
The University of the State of New York
The New York State Education Department
Office of Pupil Transportation Unit
EBA, Room 876
Albany, NY 12234-0001
Phone: (518) 474-6541 • Fax: (518) 474-1983

# INTRODUCTION

Welcome, new New York State school bus driver!

The *School Bus Driver Pre-Service Course* has one goal: to prepare you to safely transport children on a school bus.

You are entering a proud profession. New York State's school bus drivers have established an admirable safety record over the past generation. Statistically, New York's school buses represent the safest form of ground transportation ever devised. Children riding in school buses are approximately 24 times safer than when they're riding in the family car!

However, student safety is never assured. Your responsibility for safety will be serious from the first day you drive a bus with children on board. What you learn in this course can save a child's life.

This *Trainee Manual* will prepare you for the course. Read it carefully before the course begins. Complete the review questions at the end of each Unit before you come to class. Write down any questions you have for your instructor. If you don't understand something, say so. Asking questions is one sign of a professional.

Again, welcome to our New York State school bus safety community!

Marion Edick
New York State Education Department
2010 State Director of Pupil Transportation