IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUSTIN T. MAHER | **Docket No. 12 CV 3586 (JCM)** |
| Plaintiff | **MEMORANDUM OF LAW IN OPPOSITION TO QUALITY BUS SERVICE, LLC'S MOTIONS FOR SUMMARY JUDGMENT & JUDGMENT ON THE PLEADINGS** |
| v. | |
| CAITLIN H. RAILO and QUALITY BUS SERVICE, LLC | **Jury Trial Demanded** |
| Defendants | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT QUALITY BUS SERVICE, LLC'S MOTIONS FOR SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS

AND NOW comes the Plaintiff, Justin T. Maher, by and through his attorneys,

COGNETTI & CIMINI, and hereby submits the instant Memorandum of Law in Opposition to

Defendant Quality Bus Service, LLC's Motions for Summary Judgment and Judgment on the

Pleadings.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………… ii.

I.   INTRODUCTION……………………………………………………………….. 1

II.  ISSUES PRESENTED………………………………………………………….... 4

III. STANDARD OF REVIEW………………………………………………………… 4

    A.  Federal Rule of Civil Procedure 12(c)…………………………………….... 5

    B.  Federal Rule of Civil Procedure 56………………………………………… 7

IV.  ARGUMENT…………………………………………………………………….. 14

        *i.*    *Defendant Quality Bus's actions and inactions throughout the course of its hiring process evidence a patently desperate, nearly fraudulent, scheme to fill bus driver positions; regardless of the applicant's qualifications, true eligibility, or ability to safely operate a school bus*…………………………………………………………… 16

        *ii.*    *Defendant Quality Bus's procedures, actions, and inactions during the course of training Railo demonstrate a careless and reckless disregard for the safety of the public in general, and school aged children in particular*…………………………………………………… 33

        *iii.*    *Defendant Quality Bus's supervision and retention of Railo further establishes that the need for drivers outweighed the rights and safety of the general public, school aged children, and Plaintiff Mr. Maher.* 36

        *iv.*    *Defendant Quality Bus's complicity in the February 14, 2014 motor vehicle accident further evidences its needless disregard for the safety and rights of others, including Railo, school aged-children, and the general public as well as Mr. Maher*…………………………… 42

V.   CONCLUSION…………………………………………………………………… 49

# TABLE OF AUTHORITIES

**Procedural Rules**

F.R.C.P. 12(c)………………………………………………………………………….3, 5

F.R.C.P. 12(d) …………………………………………………………………………7

F.R.C.P. 56(a) …………………………………………………………………………8

**United States Courts of Appeals Cases**

Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994) ………………...11

Graziano v. Pataki, 689 F.3d 110, 114 (2d Cir. 2012) ………………………………………….6

Friedl v. City of N.Y., 210 F.3d 79, 83 (2d Cir. 2000) …………………………………………7

Peter F. Gaito Architecture, LLC v. Simon Dev. Corp., 602 F.3d 57, 62 (2d Cir. 2010) ……….6

**Southern District of New York Cases**

Allen v. Antal, et. al., 2015 WL 5474080, *3 (S.D.N.Y. 2015) ………………………………..5, 11

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ………………………………….. 8, 9

Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2553 (U.S. 1986) ……………………………….5, 7, 10

Greenbaum v. Handeksbanken, 979 F.Supp. 973, 988 (1997)…………………………………12

Holmberg v. Williamson, 135 F.Supp. 493, 494 (S.D.N.Y. 1955) ……………………………..5

Junker v. Midterra Assoc., Inc., 49 F.R.D. 310, 311 (S.D.N.Y. 1970) ………………………..10

Streit v. Bushnell, 424 F.Supp.2d 633, 640 (S.D.N.Y. 2006)…………………………………..6

Sheppard v. Beerman, 18 F.3d 147, 150 (S.D.N.Y. 1994) ……………………………………..6

Townes ex. rel. Estate of Townes v. Cove Haven, Inc., 2004 WL 2403467, *3
     (S.D.N.Y. 2004) ………………………………………………………………… 8, 11

Ventre v. Hilton Hotels Corp., et. al., 2000 WL 1011050, *2 (S.D.N.Y. 2000) ……………… 11

**New York State Cases**

Bumpus v. New York City Tr. Auth., 851 N.Y.S.2d 591, 591 (App. Div. 2d Dep't. 2008). . . . .12

Fabiano v. Philip Morris Inc., 862 N.Y.S.2d 487, 491 (App. Div. 1st Dep't 2008)……………. 14

Falcaro v. Kressman, 627 N.Y.S.2d 562 (App. Div. 2d Dep't. 1995) ……………………. ……16

Fordham-Coleman v. Nat'l Fuel Gas Dist. Corp., 834 N.Y.S.2d 422, 428-9
     (App. Div. 4th Dep't 2007) …………………………………………………………14, 15

ii

Ghaffari v. North Rockland Center School Dist., 804 N.Y.S.2d 752, 752

    (App. Div. 2d Dep't. 2005)…………………………………………………………15

Guzman v. Strab Construction Corp., 228 A.D.2d 645 (App. Div. 2d Dep't. 1996)………….10

Home Ins. Co. v. Am. Home Products Corp., 551 N.Y.S.2d 481, 550

    (App. Div. 3d Dep't 1967) ………………………………………………………………14

In re John D. Baker a/k/a David Baker, Debtor, 18 B.R. 243, 245 (E.D.N.Y. 2012) …………14

James, et. al. v. Eber Bros. Wine & Liquor Corp., 153 A.D.2d 329

(N.Y.S. App. Div. 4th Dep't. 1990). …………………………………………………….…45

Karoon v. New YorkCity Tr. Auth., 659 N.Y.S.2d 27 (App. Div. 1st Dep't. 1997) …………12

Kennedy v. Vault Leasing, 15 Misc.3d 1139(A) (Sup. Ct., Richmond County 2007). ………16

Linsalata v. Berry, 39 Misc.3d 1207(A) (Sup. Ct., Westchester County 2013) ………  ….10, 13

Prozeralik v. Capitol Cities Communications, Inc., 82 N.Y.2d 466, 479 (N.Y. 1993) ……….15

Sweeney v. McCormick, 159 A.D.2d 832, 834  (App. Div. 3d Dep't. 1990) …………………15

Talavera v. Arbit, 795 N.Y.S.2d 708, 708 (App. Div. 2d Dep't. 2005)  ………………………12

Watson v. Strack, 773 N.Y.S.2d 676 (App. Div. 4th Dep't. 2004) …………………………  …12

## I.      INTRODUCTION

The present litigation arises following a near fatal motor vehicle accident which occurred at the intersection of State Route 209 and Peenpack Trail (hereinafter "intersection") in the Town of Deerpark, Orange County, New York on February 14, 2013.  Exhibit "1;" Exhibit "2."

On the afternoon of February 14, 2013, at approximately 2:36 p.m., Defendant Caitlin Railo (hereinafter "Railo") was operating a yellow 2003 Freightliner School Bus in a northerly direction on State Route 209 approaching the intersection.  Exhibit "1," 1-3; Exhibit "2," 9-14. The 2003 Freightliner school bus was owned by and registered to Defendant Quality Bus Service, LLC (hereinafter "Quality Bus").  Exhibit "2," 9.  At the time, Railo was transporting a student, Kiera, home from school during the course and scope of Railo's employment as a bus driver for Quality Bus.  Exhibit "3," 7.

At the same time, Plaintiff Justin T. Maher (hereinafter "Mr. Maher"), was operating his blue-green 1995 Honda Civic Del Sol in a southerly direction on State Route 209, approaching the intersection.  Exhibit "1," 3.  As Mr. Maher was proceeding straight through the intersection on Route 209 southbound, Railo began negotiating a left turn onto Peenpack Trail without first bringing the approximately 35.3 foot long, 17,680 pound school bus to a stop at the intersection. Exhibit "2," 11, 17 ("it is obvious Caitlin [Railo] does not stop prior to making her turn onto Peenpack Trail as she stated she did during our interview with her at the hospital");  Exhibit "6."

Railo thereafter failed to yield the right of way to oncoming traffic, namely Mr. Maher, and proceeded to navigate the school bus through the oncoming (southbound) traffic lane of State Route 209.  Exhibit "2," 13.  By turning into the oncoming southbound lane of State Route 209, Railo caused the school bus to violently strike the front left (driver's side) of Mr. Maher's vehicle.  Exhibit "1," 1.

Following the accident, Railo was transported to Bon Secours Community Hospital for treatment of neck injuries.  Exhibit "2," 11.  During an interview conducted by Officer Timothy Dymond at Bon Secours Hospital, Officer Dymond noticed that Defendant Railo had "constricted pupils and droopy eye lids."  Exhibit "2," 17.  Officer Dymond then performed Standardized Field Sobriety Testing, which Railo failed.  Exhibit "2," 17.  Defendant Railo was then evaluated by Trooper Jason Vidocavich of the New York State Police Drug Recognition Experts and was found to be positive for "CNS [Central Nervous System] depressants."  Exhibit "2," 17.  With Railo's consent, a blood sample was also obtained by the New York State Police.  Exhibit "2," 17.  Toxicology testing by Susan B. Gillies, a forensic scientist with the New York State Police Mid Hudson Regional Crime Laboratory, revealed opiate drugs in Railo's blood; namely, prescription drugs Diazepam and Morphine.  Exhibit "2," 30.  New York State DOT Controlled Substance Testing of Railo's blood was similarly positive for opiate drug concentrations.  Exhibit "2," 29.

In her handwritten statement prepared at 4:15 p.m. on the date of the accident, Railo stated "the medications I took today are: Clonodine .01mg, one tablet at 9:45 am. Valium 5mg 1 tablet at 9:45 am. Yesterday I took Percocet 7.5mg 2 tablets at about 8 pm and a half an Ambien 10 mg ½ tablet at 8 pm.  I also take Suboxone 8mg in the morning and 2 mg before bed but I haven't taken it since last week."  Exhibit "2," 23.  During an April 12, 2013 statement obtained by Officer Dymond following receipt of Defendant Railo's toxicology results, Railo acknowledged that she "had dirty blood" at the time of the subject accident, further explaining:

> I am prescribed Valium by Dr. Galli so that is why Diazepam came up.  I ran out of Suboxone two days before the accident.  I did not go to my doctor and get a refill and I was not allowed to call out of work.  I had to work.  I took a 200 mg Morphine pill.  It is . . . oblong says 200 on one side.  The pill is time released.

Exhibit "2," 24.

In connection with the February 14, 2013 motor vehicle accident, Railo was indicted by the State of New York and charged with Assault in the Second Degree (Class D Felony), three counts of Vehicular Assault in the First Degree (Class D Felonies), two counts of Vehicular Assault in the Second Degree (Class E Felonies), three counts of Operating a Motor Vehicle While Under the Influence of Drugs (Class E Felonies), three counts of Aggravated Operating a Motor Vehicle While Under the Influence of Drugs (Class E Felonies), and Endangering the Welfare of a Child (Class A Misdemeanor).  Exhibit "5," 4, 16.  Railo ultimately pled guilty to Assault in the Second Degree and Aggravated Operation of a Motor Vehicle While Under the Influence of Drugs, and was sentenced to two years in state prison, and three years post release. Exhibit "5," 3; Exhibit "6," 4-5.  Her driver's license was revoked for one year as part of her sentence.  Exhibit "5," 2.

As a result of the February 14, 2013 motor vehicle accident, Mr. Maher sustained serious and permanent bodily injuries, including but not limited to, numerous facial fractures[1], left proximal humerous fracture, right mid shaft humerous fracture, left distal radius fracture, bicondylar left tibial plateau fractures, right posterior rib fracture, right-sided pneumothorax, groundglass opacifications in the upper lung, transection of the right and left cranial nerves, right abducens nerve palsy, ventilator associated pneumonia, deep vein thrombosis, traumatic brain

---

[1]   [1] to the anteromedial and posterolateral walls of the right maxillary sinus, [2] minimally displaced fracture of the floor of the right orbit, which was within the extra coronal orbit, displaced fractures of the [3] medial left orbital wall, [4] left orbit floor, and [5] left lateral orbital wall, displaced fractures of the [6] anterior, [7] medial, and [8] posterior lateral walls of the left maxillary sinus, displaced comminuted fractures of the [9] left zygomatic arch, displaced fracture at the [10] base of the bilateral pterygoids, [11] step off of the right nasal bone fractured through [12] bilateral sphenoid sinuses with [13] extension into the right carotid canal with focus of the airways in the right carotid canal, and a displaced fracture of the [14] left mandibular condyle and [15] left mandibular angle, and a comminuted displaced fracture of the [16]  right mandibular body and [17] right mandibular condyle.

3

injury with acute right pneumocephalus and subarachnoid hemorrhage, respiratory failure,

overgrown gums and poor dentition, impulse control disorder, depression, post-traumatic stress

syndrome, keratitis with photophobia, left rotator cuff syndrome, neuropathy, post concussive

headaches, dysuria, lumbar facet syndrome, left SI sacroilitis, pelvic obliquity, occipital

neuralgia, and post-traumatic seizures.  Due to the complexity of the injuries sustained a result of

the subject motor vehicle accident, the full extent of Mr. Maher's accident related injuries have

yet been determined.

Mr. Maher initiated the present action by filing a Complaint against Railo and Quality

Bus in the United States District Court for the Southern District of New York on May 16, 2014.

Mr. Maher has asserted claims for vicarious liability (Count II), corporate negligence (Count III),

negligent entrustment (Count IV), and punitive damages against Defendant Quality Bus, as well

as claims for negligence (Count I) and punitive damages against Defendant Railo.  Exhibit "7."

## II.     ISSUES PRESENTED

    A.    Whether genuine issues of material fact pertaining to Plaintiff's claim for punitive damages exist when the evidence of record establishes that Quality Bus ignored Railo's criminal history and past employment when she was hired, ignored repeated safety violations by Railo during the course of her employment, had knowledge at least one month prior to the accident that Railo was taking Percocet, and required Railo to operate a school bus to transport elementary school aged children on February 14, 2013 after she reported that she was sick, had not slept, and was in pain.
        **SUGGESTED RESPONSE:  IN THE AFFIRMATIVE**

## III.    STANDARD OF REVIEW

Defendant Quality Bus's motions, supporting documents, and memorandum of law

poorly differentiate between the claims for which it is seeking judgment on the pleadings and the

claims for which it is seeking summary judgment.  Upon careful review, it loosely appears as if

Defendant Quality Bus seeks judgment on the pleadings with respect to Plaintiff's claims for

corporate negligence and negligent entrustment (Counts III & IV) while seeking summary judgment with respect to Plaintiff's claim for punitive damages.  However, based upon the present procedural juncture of this litigation, together with Defendant Quality Bus's offered supporting documents,[2] it remains uncertain whether Defendant's motions will be decided pursuant to Federal Rule of Civil Procure 12(c) or Federal Rule of Civil Procedure 56.[3]  In an abundance of caution, Plaintiff's Memorandum of Law in Opposition will encompass both Rule 12(c) and Rule 56.

### A.     Federal Rule of Civil Procedure 12(c)

As the U.S. Supreme Court explained in <u>Celotex</u>,

> Before the shift to "notice pleading" accomplished by the Federal Rules, motions to dismiss a complaint or to strike a defense were the principal tools by which factually insufficient claims or defenses could be isolated and prevented from going to trial . . . but with the advent of "notice pleading," *the motion to dismiss seldom fulfills this function anymore*, and its place has been taken by the motion for summary judgment.

<u>Celotex Corp.</u> 106 S.Ct. 2548, 2555(U.S. 1986) (emphasis added).  The Southern District of New York has also acknowledged the evolving utility of motions to dismiss, explaining that the "simplified notice pleading standard relies on liberal discovery rules and summary judgment

---

2    "The papers submitted on these motions graphically illustrate the unnecessary work to which attorneys can put themselves and the Court by failing to observe the elementary rules applicable to pleading, and also the specific rules of this Court relating to motions.  In support of the motions to dismiss the attorneys have submitted elaborate affidavits going into factual questions related to the alleged cause of action, as though the Court could determine the case on affidavits on such a motion.  It is elementary that on a motion to dismiss the complaint, the Court may consider nothing except the pleading. . . insofar as the motion to dismiss the complaint is concerned, the Court will consider nothing but the complaint and will disregard the affidavits which have been filed.  Insofar as the motion for summary judgment by the Williamsons is concerned, these defendants apparently have overlooked the fact that under Rule 56(c), 28 U.S.C.A., the issue is whether 'there is no genuine issue as to any material fact'. The affidavits on their face show issues as to material facts. These defendants have not even urged, in their papers, that there is no genuine issue as to any material fact, but rather have sought to argue the facts by the affidavits submitted by them." <u>Holmberg v. Williamson</u>, 135 F.Supp. 493, 494 (S.D.N.Y. 1955).

3    "[A] district court acts properly in converting a motion for judgment on the pleadings into a motion for summary judgment when the motion presents matters outside of the pleadings . . ." <u>Allen v. Antal, et. al.</u>, 2015 WL 5474080, *3 (S.D.N.Y. 2015).

motions to define disputed facts and issues and to dispose of unmeritorious claims." Streit v. Bushnell, 424 F.Supp.2d 633, 640 (S.D.N.Y. 2006).

In light of the foregoing, when "reviewing a complaint for legal sufficiency in the face of motion to dismiss . . . the Court's point of departure is Rule 8(a)(2). Pursuant to the liberal pleading requirements of the Federal Rules of Civil Procedure, a plaintiff need only provide 'a short and plain statement of the claim showing the pleader is entitled to relief.'" Streit v. Bushnell, 424 F.Supp.2d 633, 640 (S.D.N.Y. 2006).

When deciding a Rule 12(c) motion for judgment on the pleadings, courts apply "the same standard as that applicable under a Rule 12(b)(6) [motion to dismiss for failure to state a claim upon which relief can be granted]." Sheppard v. Beerman, 18 F.3d 147, 150 (S.D.N.Y. 1994). "Under that test, a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Sheppard v. Beerman, 18 F.3d 147, 150 (S.D.N.Y. 1994). More specifically, it is well established that "[t]o survive a Rule 12(c) motion, the complaint must contain sufficient factual matter to 'state a claim to relief that is *plausible on its face.*'" Allen v. Antal, et. al., 2015 WL 5474080, *3 (S.D.N.Y. 2015) (emphasis added) (citing Graziano v. Pataki, 689 F.3d 110, 114 (2d Cir. 2012)).

To evaluate a motion to dismiss brought pursuant to Rule 12(c), "a court may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." Allen v. Antal, et. al., 2015 WL 5474080, *3 (S.D.N.Y. 2015) (citing Peter F. Gaito Architecture, LLC v. Simon Dev. Corp., 602 F.3d 57, 62 (2d Cir. 2010)). However, when

additional documents outside of the complaint are included within a motion to dismiss, a "district court must either *exclude the additional material* and decide the motion on the complaint alone or *convert the motion to one for summary judgement* . . . and afford all parties the opportunity to present supporting material." Allen v. Antal, et. al., 2015 WL 5474080, *3 (S.D.N.Y. 2015) (citing Friedl v. City of N.Y., 210 F.3d 79, 83 (2d Cir. 2000)). In fact, Federal Rule of Civil Procedure 12(d) unambiguously provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside of the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." F.R.C.P. 12(d); Allen v. Antal, et. al., 2015 WL 5474080, *3 (S.D.N.Y. 2015).

In this case, Defendant Quality Bus has produced not only Plaintiff's Second Amended Complaint and its Answer, but also a series of affidavits, documents, and deposition transcripts. Defendant Quality Bus has not provided any statement indicating its intention to limit the applicability of such documents, rather those documents have been produced in support of both Defendant Quality Bus's motion for judgment on the pleadings and motion for summary judgment without restriction. Pursuant to Federal Rule of Civil Procedure 12(d), either Defendant Quality Bus's supporting documents should be excluded, or its motions for judgment on the pleadings should be converted to motions for summary judgment.

### B.    Federal Rule of Civil Procedure 56

The key purpose of Federal Rule of Civil Procedure 56(c) is to "isolate and dispose of *factually unsupported* claims or defenses." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2553 (U.S. 1986) (emphasis added). Rule 56 authorizes a court to grant a party's motion for summary judgment when "the movant shows that there is no genuine dispute as to any material fact" and that the undisputed facts establish that the movant "is entitled to judgment as a matter of law."

F.R.C.P. 56(a).  "Contested facts are material to the outcome of particular litigation if the substantive law at issue so renders them."  Townes ex. rel. Estate of Townes v. Cove Haven, Inc., 2004 WL 2403467, *3 (S.D.N.Y. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The U.S. Supreme Court provided an illustration of Rule 56 in Celotex, explaining that

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party *who fails to make a showing sufficient to establish the existence of an element essential to that party's case,* and on which the party will bear the burden of proof at trial.

Celotex Corp. 106 S.Ct. at 2552 (emphasis added). The Court provided further guidance, clarifying that "there can be 'no genuine issue as to any material fact,' [when there is] a *complete failure of proof* concerning an *essential element* of the nonmoving party's case . . ."  Celotex Corp. 106 S.Ct. at 2552.

Moreover, the "mere existence of some *alleged* factual dispute between the parties will not defeat an otherwise *properly supported* motion for summary judgment."  Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505 (U.S. 1985).  However, summary judgment "will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2506 (U.S. 1985).  The U. S. Supreme Court clarified in Celotex, "[i]n essence, *the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury* or whether it is *so one sided* that one party must prevail as a matter of law." Celotex Corp. 106 S.Ct. at 2553 (emphasis added).

At the summary judgment stage, the "trial judge's function is not him[/her]self to weigh the evidence and determine the truth of the matter, but to determine *whether there is a genuine*

*issue for trial*." <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S.Ct. 2505 (U.S. 1985) (emphasis added). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are *jury functions*, not those of a judge. <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S.Ct. 2505, 2513 (U.S. 1985).  To summarize the proper role of a judge in deciding a motion for summary judgment, the U.S. Supreme Court in <u>Anderson</u> explained that

> the judge must ask him[/her]self  not whether he [she] thinks the evidence unmistakably favors one side or the other but whether a fair minded jury could return a verdict for the plaintiff on the evidence presented. . . In terms of the nature of the inquiry, this is no different from the consideration of a motion for acquittal in a criminal case, where the beyond-a-reasonable-doubt standard applies and where the judge asks whether a reasonably jury could find guilt beyond a reasonable doubt.

<u>Anderson v. Liberty Lobby, Inc.</u>, 106 S.Ct. 2505, 2512 (U.S. 1985).   A judge "must view the evidence presented through the prism of the substantive evidentiary burden. . . whether a jury *could reasonably* find *either* that the plaintiff proved his case by the quality and quantity of the evidence required . . . *or* that he did not. . ." <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S.Ct. 2505,2513 (U.S. 1985).  (emphasis added).

Notably, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes *demonstrate the absence of a genuine issue of material fact*." <u>Celotex Corp.</u> 106 S.Ct. at 2553 (emphasis added).

A party supports a motion for summary judgment by:

> Citing to particular parts of materials in the record, including *depositions, documents, electronically stored information, affidavits or declarations . . . admissions, interrogatory answers,*

9

> *or other materials* . . . [or] showing that the materials cited do not
> establish the . . . presence of a genuine dispute.

F.R.C.P. 56(c)(1)(a) (emphasis added).  Although Rule 56 does not require that a party support

its motion for summary judgment with affidavits (Celotex Corp. 106 S.Ct. at 2553), any affidavit

or declaration which is submitted "*must be made on personal knowledge*, set out facts that would

be admissible in evidence, and show that the affiant or declarant is competent to testify on the

matters stated."  F.R.C.P. 56(c)(4) (emphasis added).

Assuming the moving party "fulfills its preliminary burden, the onus shifts to the non-

movant to prove or raise the existence of a genuine issue of material fact."  Allen v. Antal, et. al.,

2015 WL 5474080, *4 (S.D.N.Y. 2015).   In opposing a motion for summary judgment, the

nonmoving party is not required to "produce evidence in a form that would be admissible at trial

in order to avoid summary judgment. . . Rule 56(e) permits a proper summary judgment motion

to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) [depositions,

documents, electronically stored information, affidavits or declarations . . . admissions,

interrogatory answers, or other materials].  Celotex Corp. 106 S.Ct. at 2553. "Courts have

recognized that proof which might be inadmissible at trial may, nevertheless, be considered in

opposition to a motion for summary judgment." Linsalata v. Berry, 39 Misc.3d 1207(A) (Sup.

Ct., Westchester County 2013) (citing Guzman v. Strab Construction Corp., 228 A.D.2d 645

(App. Div. 2d Dep't. 1996).

The evidence presented by the nonmoving party "is to be believed, and all justifiable

inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505,2513

(U.S. 1985); See i.e., Junker v. Midterra Assoc., Inc., 49 F.R.D. 310, 311 (S.D.N.Y. 1970)

(stating "we are bound by the principle that the existence of any genuine issue of material fact

precludes the granting of relief . . . we must view the evidence in the light most favorable to the

party opposing the motion . . . resolving all doubts in their favor."). "Courts must 'construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." <u>Allen v. Antal, et. al.</u>, 2015 WL 5474080, *3 (S.D.N.Y. 2015) (citing <u>Fincher v. Depository Trust & Clearing Corp.</u>, 604 F.3d 712, 720 (2d Cir. 2010). Similarly, a court "must resolve all ambiguities . . . in favor of the party defending against the motion." <u>Ventre v. Hilton Hotels Corp., et. al.</u>, 2000 WL 1011050, *2 (S.D.N.Y. 2000) (citing <u>Eastway Constr. Corp. v. City of New York</u>, 762 F.2d 243, 249 (2d Cir. 1985).

Finally, courts should proceed "with caution in granting summary judgment . . . where there is reason to believe that the better course would be to proceed to a full trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S.Ct. 2505,2513 (U.S. 1985) (citing <u>Kennedy v. Silas Mason Co.</u>, 68 S.Ct. 1031 (U.S. 1948)). Summary judgment is only appropriate "when it is *apparent* that *no trier of fact* 'could find in favor of the nonmoving party because the evidence to support its case is so slight.'" <u>Townes ex. rel. Estate of Townes v. Cove Haven, Inc.</u>, 2004 WL 2403467, *3 (S.D.N.Y. 2004) (quoting <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994)).

In the present case, Defendant Quality Bus has failed to meet its burden as the moving party at summary judgment. More specifically, Defendant Quality Bus has not identified or even argued the absence of a genuine issue of material fact which should be presented for consideration by a jury. Rather, Defendant Quality Bus's motion, memorandum of law, and supporting documents simply present one version of facts without even suggesting that no conflicting evidence exists. Similarly, Quality Bus has not argued or alleged any "complete failure of proof" with respect to any essential element of Plaintiff's claim for punitive damages. In fact, on their face, Defendant Quality Bus's own motion, memorandum of law, and supporting

documents raise numerous issues of material fact for determination by a jury.  Pursuant to Rule

56 and applicable caselaw,[4]  Defendant Quality Bus's motion for summary judgment should

therefore be denied as Defendant Quality Bus has failed to meet its burden at summary judgment

so as to "shift the onus" to Plaintiff.

## IV.   ARGUMENT

Well established New York Law provides that "[g]enerally, where an employee is acting

within the scope of his or her employment, the employer is liable for the employee's negligence

under a theory of respondeat superior and no claim may proceed against the employer for

negligent hiring, retention, supervision, or training."  Talavera v. Arbit, 795 N.Y.S.2d 708, 708

(App. Div. 2d Dep't. 2005) (internal citations omitted).

However, there exists an equally well established exception to the general principle

"where . . . the injured plaintiff seeks punitive damages from the employer *based on alleged*

*gross negligence in the hiring or retention of the employee.*"  Talavera v. Arbit, 795 N.Y.S.2d

708, 708 (App. Div. 2d Dep't. 2005) (emphasis added) (citing Watson v. Strack, 773 N.Y.S.2d

676 (App. Div. 4th Dep't. 2004); Karoon v. New YorkCity Tr. Auth., 659 N.Y.S.2d 27 (App.

Div. 1st Dep't. 1997)).

Fundamental to a cause of action based upon negligent hiring, it must be established that

the "the employer knew or should have known of the employee's propensity for the conduct

which caused the injury."  Ghaffari v. North Rockland Center School Dist., 804 N.Y.S.2d 752,

752 (App. Div. 2d Dep't. 2005); Bumpus v. New York City Tr. Auth., 851 N.Y.S.2d 591, 591

(App. Div. 2d Dep't. 2008).

---

[4] "[T]hese defendants apparently have overlooked the fact that under Rule 56(c), 28 U.S.C.A., the issue is whether 'there is no genuine issue as to any material fact'. The affidavits on their face show issues as to material facts. These defendants have not even urged, in their papers, that there is no genuine issue as to any material fact, but rather have sought to argue the facts by the affidavits submitted by them."  Holmberg v. Williamson, 135 F.Supp. 493, 494 (S.D.N.Y. 1955).

Similarly, "[t]o state a cause of action for negligent entrustment, plaintiff must establish that the defendant had control over the vehicle and was negligent in entrusting it to a third party when the defendant knew, or in the exercise of ordinary care should have known, the third party was incompetent to operate it." Linsalata v. Berry, 39 Misc.3d 1207(A), 6 (Sup. Ct., Westchester County 2013) (citing Bennet v. Geblein, 71 AD2d 96,99 (App. Div. 4th Dep't. 1979)). To successfully establish a claim for negligent entrustment, "[t]he defendant must have some special knowledge concerning a *characteristic or condition peculiar to the person . . . which renders that person's use of the chattel unreasonably dangerous.*" Linsalata v. Berry, 39 Misc.3d 1207(A), 6 (Sup. Ct., Westchester County 2013) (emphasis added) (citing Byrne v. Collins, 77 AD3d 782,784 (App. Div. 2d Dep't. 2010)).

In its motions for judgment on the pleadings and summary judgment, Quality Bus argues that Plaintiff's claims for corporate negligence and negligent entrustment must necessarily be dismissed as a matter of law since Plaintiff has not "alleged" a viable claim for punitive damages. Notably, Defendant Quality Bus has neither argued nor alleged the absence of a genuine issue of material fact, warranting consideration by a jury, in regards to Plaintiff's claim for punitive damages.

    **A.**    **Defendant Quality Bus is not entitled to summary judgment on Plaintiff's claim for punitive damages because numerous genuine issues of material fact exist concerning Quality Bus's hiring process, supervisory procedures, disciplinary procedures, and complicity in causing the February 14, 2013 motor vehicle accident.**

In the State of New York, a Plaintiff is required to establish his claim for punitive damages by a preponderance of the evidence. Greenbaum v. Handeksbanken, 979 F.Supp. 973, 988 (1997). Additionally, "punitive damages are not a separate cause of action. . . They are

13

inextricably linked to the underlying cause of action." <u>Greenbaum v. Handeksbanken</u>, 979

F.Supp. 973, 982 (1997).

> As New York Courts have outlined, punitive damages

> > Are intended as punishment for *gross misbehavior* for the *good of the public* and have been referred to as a sort of hybrid between a display of *ethical indignation* and the imposition of a *criminal fine* . . . The damages may be expressive of the community attitude towards one who willfully and wantonly causes hurt or injury to another.

<u>Fordham-Coleman v. Nat'l Fuel Gas Dist. Corp.</u>, 834 N.Y.S.2d 422, 428-9 (App. Div. 4th Dep't

2007) (quoting <u>Home Ins. Co. v. Am. Home Products Corp.</u>, 551 N.Y.S.2d 481, 550 (App. Div.

3d Dep't 1967)).  In that regard, Courts agree that "[a] jury is particularly well suited to the

expression of community attitudes, and the decision whether to award punitive damages should

'reside in the sound discretion of the original trier of the facts.'" <u>Fordham-Coleman v. Nat'l Fuel</u>

<u>Gas Dist. Corp.</u>, 834 N.Y.S.2d 422, 429 (App. Div. 4th Dep't 2007) (quoting <u>Home Ins. Co. v.</u>

<u>Am. Home Products Corp.</u>, 551 N.Y.S.2d 481, 550 (App. Div. 3d Dep't 1967)).

> Thus, "[e]ven if a plaintiff suffers only nominal damage, willful and intentional misdoing

may be the basis for an award of punitive damages." <u>In re John D. Baker a/k/a David Baker,</u>

<u>Debtor</u>, 18 B.R. 243, 245 (E.D.N.Y. 2012) (citing <u>Le Minstrall v. CBS</u>, 402 N.Y.S.2d 815 (App.

Div. 1st Dep't 1978)).  Punitive damages are warranted where the acts of a defendant

"demonstrate a complete disregard . . . [for] the safety and welfare of the general public."

<u>Fabiano v. Philip Morris Inc.</u>, 862 N.Y.S.2d 487, 491 (App. Div. 1st Dep't 2008).

> Conversely, New York Courts have observed that

> > Although . . . punitive damages generally are not available in cases involving ordinary negligence, such damages may nevertheless be awarded in "actions based on negligence if such negligence amounts to flagrant misconduct."

14

Fordham-Coleman v. Nat'l Fuel Gas Dist. Corp., 834 N.Y.S.2d 422, 428 (App. Div. 4th Dep't 2007) (internal citations omitted) (citing Soucy v. Greyhound Corp., 276 N.Y.S.2d 173, 175 (App. Div. 3d Dep't 1967)).  Moreover, "[c]onduct justifying an award of punitive damages 'need not be intentionally harmful but may consist of *actions which constitute willful or wanton negligence or recklessness*.'"  Fordham-Coleman v. Nat'l Fuel Gas Dist. Corp., 834 N.Y.S.2d 422, 428 (App. Div. 4th Dep't 2007) (internal citations omitted) (citing Home Ins. Co. v. Am. Home Products Corp., 551 N.Y.S.2d 481, 550 (App. Div. 3d Dep't 1967)).  An act is "wanton" and/or "reckless" when it is performed "under circumstances showing heedlessness and an utter disregard for the rights and safety of others." Sweeney v. McCormick, 159 A.D.2d 832, 834 (App. Div. 3d Dep't. 1990).

Significantly, the New York Court of Appeals explained that "[p]unitive damages are awarded in tort actions 'where the defendant's wrongdoing has been intentional and deliberate, and has the character of *outrage frequently associated with crime*." Prozeralik v. Capitol Cities Communications, Inc., 82 N.Y.2d 466, 479 (N.Y. 1993) (emphasis added).  The New York Court of Appeals elaborated, pointing out that

> Something more than the mere commission of a tort is always required for punitive damages.  There must be circumstances of *aggravation or outrage*, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or *such a conscious and deliberate disregard of the interests of others that the conduct itself may be called willful or wanton.*"

Prozeralik v. Capitol Cities Communications, Inc., 82 N.Y.2d 466, 479 (N.Y. 1993) (quoting W. Page Keeton, et. al., Prosser & Keaton on the Law of Torts, §2, p. 9-10 (5th ed. 1984)).

Additionally, punitive damages may also be appropriate where there is no "public" harm at issue.  See, e.g., Suffolk Sports Center, Inc. v. Belli Constr. Corp., 628 N.Y.S.2d 952, 954-6 (App. Div. 2d Dep't. 1995).  In such a case, an award of punitive damages is warranted where

the defendant has a "history" of egregious conduct which culminates in "serious and permanent injuries" to another.  See, e.g., <u>Falcaro v. Kressman</u>, 627 N.Y.S.2d 562 (App. Div. 2d Dep't. 1995).

> Nevertheless, the conduct in question must be 'grossly negligent, or wanton, or so reckless as to amount to a conscious disregard of the rights of others. . . Thus, *'needlessness' and an 'utter disregard'* for the rights and safety of others must be demonstrated."

<u>Kennedy v. Vault Leasing</u>, 15 Misc.3d 1139(A) (Sup. Ct., Richmond County 2007).

In this case, Defendant Quality Bus's actions and inactions extend well beyond "flagrant misconduct" and evidence an utter disregard for the "rights and safety of others" and the public at large, especially young school aged children.

> i.     *Defendant Quality Bus's actions and inactions throughout the course of its hiring process evidence a patently desperate, nearly fraudulent, scheme to fill bus driver positions; regardless of the applicant's qualifications, true eligibility, or ability to safely operate a school bus.*

Quality Bus has instituted a hiring and intake manual (hereinafter "manual") which, by owner and manager Michael Martucci's description, "provides some overview and direction on how we [Quality Bus]– the process by which we hire people."  <u>Exhibit "8</u>," 32; <u>Exhibit "13</u>." With respect to an applicant's driving record, the manual provides "An acceptable driving record must also be at the company's disposal through the New York State Department of Motor Vehicles.  A minimum of three years of driving history is obtained for each applicant who wishes to operate a motor vehicle." <u>Exhibit "13</u>."

The Federal Motor Carrier Safety Regulations (hereinafter "FMCSR") require a commercial employer to investigate a "driver's safety performance history with Department of Transportation regulated employers during the preceding three years," and make a record of "the previous employers name . . . the date the previous employer was contacted, or the attempts

made, and the information received about the driver from the previous employer.  *Failures to contact a previous employer . . . must be documented.  The record must be maintained pursuant to §391.53."*  49 F.R. §391.23 (emphasis added).  However, where an applicant has no prior commercial driving experience, the FMCSRs seek "documentation that no investigation was possible must be placed in the driver's history investigation file . . . within the required 30 days of the date the driver's employment begins."  49 F.R. §391.23.  Additionally, the State of New York Vehicle and Traffic Law mandates that "[e]ach motor carrier shall: . . . (2) investigate the driver's employment record during the preceding three years."  15 CRR-NY 6.3.

Notably, on her employment application, Railo provided the identity of two former employers, "Kaltec, Inc." and "Riverside Support Center" which purportedly demonstrated her employment from July of 2009 to March of 2012.  Exhibit "14," 2.  She indicated that she left Riverside Support Center, a drug addiction treatment center, because "facility was shut down."  Exhibit "14," 2.  She also indicated that she stopped working at "Kaltec Inc.," a food packaging entity because "had to have major surgery I had to have a lot of dr. appt.s."  Exhibit "14," 2.  She voluntarily disclosed that she was fired from Kaltec, Inc.  Exhibit "14," 1.

However, there is no evidence of record to establish that any employment verification was conducted by Quality Bus with regard to Caitlin Railo.  Mr. Martucci testified that Quality Bus does not have a policy requiring documentation of an applicant's employment verification.  Exhibit "8," 42.  However, he stated that "one of the managers will make a telephone call [to a previous employer] and, you know, we would make sure that process was taken care of before."  Exhibit "8," 41-42.  Quality Bus has no document reflecting that prior employment verification as required by the FMCSRs was not possible in light of the fact that Railo had not previously operated a commercial motor vehicle.

With respect to an applicant's driving history, the FMCSR require a motor carrier to perform "an inquiry into each State where the driver held or holds a motor vehicle operator's license or permit during the preceding 3 years to obtain that driver's motor vehicle record." 49 F.R. §391.23.  Similarly, the State of New York mandates:

> Each motor carrier shall: . . . (8) Obtain an abstract of a conditional driver's record from the appropriate agency *in every state including New York*, in which the person has resided, worked, or has held a driver's license or learner's permit during the preceding three years.

15 CRR-NY 6.3 (emphasis added).  Accordingly, the FMCSR also require that

> a person shall not drive a commercial motor vehicle unless he/she has completed and furnished the motor carrier that employs him/her with an application for employment that meets the requirements . . . and must contain:
> (3) the addresses at which the applicant has resided during the 3 years preceding the date on which the application is submitted; . . .

49 F.R. 391.21.

Quality Bus's application for employment only requires applicants to disclose their "present" address, rather than all addresses and/or states where they have resided during the preceding three years.  Exhibit "14," 1.  However, the application does inquire "how long" next to the "present address" section.  Exhibit "14," 1.  Notably, Railo did not provide any response in that category of her application.  Exhibit "14," 1.  During her deposition, Railo admitted to having grown up in New Jersey before moving to New York.  Exhibit "10," 27.

Nonetheless, Railo executed a consent form which authorized Quality Bus to review her "driving record at any time" and agreed that "such record can be forwarded and reviewed by New York State Department of Motor Vehicle personnel, school district personnel for the districts for which I drive, and the insurance carrier(s) for Quality Bus Service, LLC."  Exhibit "14," 4.  During his deposition, Mr. Martucci admitted that he has never even attempted to obtain

any applicant's driving record for more than the preceding three (3) years "because vehicle and traffic law tells us that we're required to do research for three years, so that's the State's requirement." Exhibit "8," 34.  In reality, the vehicle and traffic law requires a motor carrier to obtain an applicant's *full* driving history from each *state* where the applicant has "resided, worked, or has held a driver's license or learner's permit" during the preceding three years."  15 CRR-NY 6.3.  Mr. Martucci conceded that he was not in any way prevented from obtaining an applicant's full or 10 year driving history, and acknowledged that the State of New York makes available more than three years driving history.  Exhibit "8," 34.

Under the title of "Criminal Clearance," the manual provides

> In accordance with the rules and regulations established by the New York State Education Department, each prospective employee must complete an employment application that includes prior work history.  The company requires 10 years of employment and/or educational history.  If ten years of employment and/or educational history is unavailable, the company will require the applicant to provide additional personal references.  Furthermore, each applicant will be required to provide written personal references. . . . in addition to the employment history check, a criminal background check is conducted of all employees.  Fingerprints are taken of each employee, prior to service, which are sent to the Federal Bureau of Investigation, the Department of Criminal Justice Services, and the New York State Department of Motor Vehicles for final review and clearance. . .

Exhibit "13."  The manual similarly indicates that an applicant will be ineligible for employment if they have been convicted of any combination of three or more moving violations or accidents within the preceding three years.  Exhibit "13."  Further, the manual warns that Quality Bus will discuss any accidents or convictions which appear on the driving abstract "in detail."  Exhibit "13."

On her employment application, Railo voluntarily disclosed a 2010 rear end motor vehicle accident, a 2012 speeding ticket, and a 2012 citation for "parking on pavement."  Exhibit

"14." However, Quality Bus's employment file doesn't contain any written notes or documentation providing the details of Railo's traffic convictions or motor vehicle accident. On her application, Railo wrote "rearend, person trying to pull into dealership – driving without steering wheel." Exhibit "14," 3. Accordingly, Railo *did* disclose a "combination" of three "moving violations" or "accidents" within the preceding three years. In contravention of its own hiring manual, Quality Bus did not find Railo ineligible for employment as a school bus driver based upon the information provided in her employment application.

Notwithstanding the same, regarding convictions and license suspensions, the FMCSR provide:

> a person shall not drive a commercial motor vehicle unless he/she has completed and furnished the motor carrier that employs him/her with an application for employment that meets the requirements . . . and must contain: . . .
> (8) a list of all violations of motor vehicle laws or ordinances (other than violations involving only parking) of which the applicant was convicted or forfeited bond or collateral during the 3 years preceding the date the application is submitted;
> (9) a statement setting forth in detail the facts and circumstances of any denial, revocation, or suspension of any license, permit, or privilege to operate a motor vehicle that has been issued to the applicant, or a statement that no such denial, revocation, or suspension has occurred; . . .

49 F.R. §391.21.

However, even considering the limited three year driving history obtained by Quality Bus, the following concerning entries are listed:

> ******************ACTIVITY*******************
> DOCUMENT SURRENDERED ON: 03/04/2002 TO NY
> RETURNED TO NY ON: 07/08/2002
> DOCUMENT SURRENDERED ON: 12/05/2008 TO NY
> RETURNED TO NY ON: 08/12/2009
> RESTRICTED LICENSE ISSUED 08/12/2009 . . .
> ********SUSPENSIONS/REVOCATIONS**********
> REVOCATION ON: 09/04/2009 OPER W/O INS-INF . . .

CLEARED ON: 09/13/2010 REQUIREMENTS MET . . .
SUSPENSION: 08/22/2008 FLD ANSWER SUMMONS . . .
LOCATION: ORANGE COUNTY, CITY OF MIDDLETOWN
CLEARED ON: 07/30/2009 SCOFFLAW ANSWERED
******CONVICTIONS/BAIL FORFEITURES**********
CONVICTION: DISOBEYED TRAFFIC DEVICE
VIOLATION: 07/10/12   CONVICTED ON: 08/08/12
LOCATION: ORANGE COUNTY, TOWN OD DEERPARK
CONVICTION: OPER W/O INS-INF
VIOLATION: 08/24/2007 CONVICTED ON: 07/30/2009
***************ACCIDENTS**************
ACCIDENT DATE: 03/17/11 INJURY & PROPERTY DAMAGE
COUNTY: ORANGE . . .
POLICE REPORT FILED.

Exhibit "21." In violation of the FMCSR, Quality Bus did not obtain any written statements from Railo explaining the series of suspensions identified on her limited three year driving history.  Even more alarming, during his deposition, Mr. Martucci testified that the repeated entries indicating that Railo had "surrendered" her license and then "returned" to New York "typically means that the driver moved to a different state and surrendered their New York License." Exhibit "8," 144.  Mr. Martucci specifically testified that he did not inquire which other state(s) Railo had driven in between March 4, 2002 and July 8, 2002 or December 5, 2008 and August 12, 2009.

> Q. Then goes to - - documents surrendered on 3/4/02 to New
>    York.  Do you know what that means?
> A. That typically means that the driver moved to a different state
>    and surrendered their New York license.
> Q. So, that she was driving for out of state for a period of time?
> A. That's generally what that means, yes.
> Q. Did you discuss with her what state she was driving out of state
>    in and whether she has obtained any convictions or any driving
>    violations in those states?
> A. No.  It would have been  -- 2002 would have been ten years
>    prior at that point.
> Q. So you didn't care.  Okay.  Now, documents surrendered on
>    12/05/08 to New York, what does that mean?
> A. Again, specifically could have been that she left the state to
>    become licensed somewhere else.

> Q. Did you check her driver - - do you remember discussing this
>    with her?
> A. I don't remember specifically discussing this with her.
> Q. Did this prompt any further investigation on your part?
> A. No.

Exhibit "8," 144-45.  Mr. Martucci did not inquire into which other states Caitlin Railo had

driven, or perform any investigation related to the repeated instances in which Railo surrendered

her license to the State of New York.  Mr. Martucci was equally disinterested in the 2011 motor

vehicle accident which was listed on Railo's driving history, and instead took the position that

the motor vehicle accident was outside of his employment investigation purview since he

mistakenly believed the accident had not occurred within three years of Railo's employment

application.

> Q. And then its an accident.  Did you make any investigation into
>    that accident?
> A. I discussed it with her.
> Q. And again, when you discussed these things with her, you
>    made no notes or anything else?
> A. No.
> Q. It was just your discussion?
> A. And that accident would have been noted on page one if it had
>    fallen within the time frame that it was required to be [3 years
>    prior to date of application].

Exhibit "8," 148.  However, the referenced motor vehicle accident occurred on March 17, 2011.

Exhibit "21."  Based upon the application date of July 31, 2012, it should have been disclosed

upon Quality Bus's employment application.  Exhibit "14."  However, the fact that Railo had

attempted to conceal information on her employment application did not concern Mr. Martucci

enough to deny her employment as a school bus driver.  In fact, she was ultimately hired to

transport elementary students between Port Jervis, New York and Matamoras, Pennsylvania.

Disturbingly, Quality Bus's employment application does not require or even request that

an applicant disclose any criminal history information outside of "traffic convictions and

forfeitures" for the "past 3 years."  Exhibit "14."  However, the New York State Article 19A Bus

Driver Application specifically requires an applicant to disclose all criminal convictions, without

limitation.  Exhibit "19."  The application is a crucial part of the background investigation and

eligibility determination for applicants performed by the State of New York Department of

Motor Vehicles Bus Driver Unit.  Accordingly, New York State regulations provide that

> Each motor carrier shall: . . .
>
> (9) Forward to BDCU a copy of such person's driving record from
> each State, other than New York, within ten days of the date on
> which the carrier received such information;
> (10) the carrier *must provide* BDCU with an acceptable Article 19-
> A Driver Application (DS-870) for the conditional driver within
> ten days of the hiring date of the conditional driver.

15 CRR-NY 6.3.  Additionally, the State of New York also mandates

> (a) . . . any motor carrier which employs a driver who operates a
> school bus. . . must require such driver to be fingerprinted
> according to the following procedure.
> (1) a set of fingerprints must be provided to BDCU for both the
> DCJS and the FBI on cards provided by the Department of Motor
> Vehicles, along with the driver's Article 19A Driver Application. .
> ."

15 CRR-NY 6.4.

    However, Railo's 19A Bus Driver Application contains only some basic typewritten

information, but is otherwise blank, listing no motor vehicle accidents or criminal convictions.

Exhibit "20."  In this respect, Mr. Martucci testified:

> Q.  Do you know who typed this document [19A Application]?
> A.  Not specifically.  But someone in the office [Quality Bus]. . . .
> This is an internal document.  This doesn't go to the DMV. . .

Exhibit "8," 127.  Equally as concerning, Railo's 19A Bus Driver Application, prepared by

Quality Bus, identifies Railo as a "male" rather than a female.  Exhibit "20."  Most concerning,

the Article 19A Bus Driver application does not even include the motor vehicle accidents and

traffic convictions identified by Railo on her employment application or by her driving history

record.  Exhibit "20."  Mr. Martucci executed the 19A Bus Driver Application, certifying "this

application has been reviewed together with the driver abstract and medical examination . . ."

Exhibit "20."  When questioned about the patent inaccuracies contained on the 19A Bus Driver

Application, Mr. Martucci insisted that the inaccuracies were irrelevant because he does not

provide the form to the New York State Bus Driver Certification Unit, in violation of New York

State regulations.

> Q.  Where does the 19A application go?
> A.  It goes in my files.
> Q.  That's it?
> A.  Correct.
> Q.  It doesn't get submitted to the state at all?
> A.  No.  The 19A files used to get submitted to the State many
> years ago, but they no - - none of these forms go to the state. . .
> this is an internal document.  So [the 19A Bus Driver Application]
> is redundant to [Quality Bus's Employment Application].  And
> the driver didn't list it [convictions or accidents] on [the 19A Bus
> Driver Application] but listed it in [Quality Bus's Employment
> Application] . . .

Exhibit "8," 68-69.  It should be noted that both the 19A Bus Driver Application prepared by

Quality Bus for Railo (Exhibit "20") and the Bus Driver Certification Unit's most recently

released version of the form (Exhibit "19") unambiguous provide at the top of the form

"Complete all parts of this form.  Please print or type.  *Send original to Bus Driver Unit,* keep a

copy in your 19-A file.

Notwithstanding the foregoing, Ms. Koselnak explained that the application is maintained

in Quality Bus's employment files because the State of New York has the right to enter Quality

Bus's facility and audit the 19A files.  Exhibit "18," 90.  Yet Mr. Martucci was not concerned

by the fact that the 19A Driver application was incomplete and failed to reflect Railo's criminal

convictions, sex, and motor vehicle accidents; insisting that the form is an "internal document"

which is "redundant" of Quality Bus's employment application - which does not request that an applicant disclose any criminal history.  Exhibit "8," 128.  Unlike the Article 19-A application, Quality Bus's own application does not seek an applicant's criminal history information.

In this regard, Railo testified that she does not recall ever having had a conversation with a Quality Bus representative regarding her criminal convictions.  Exhibit "10," 183-4.  With respect to the blank 19A driver application, Railo added "See, I don't like this, though, because I filled this out [motor vehicle accident and traffic convictions] on [Quality Bus's] application.  I don't like that they didn't put it [the disclosed motor vehicle accident and traffic convictions] on there [the 19A Application]. That's not my fault."  Exhibit "11," 277.

However, the failure to discuss or provide any criminal history is perhaps the most concerning intentional failure by Quality Bus.  As Plaintiff's commercial vehicle safety expert concluded, Railo's criminal history alone should have precluded her from being hired as a school bus driver.  However, not only did Quality Bus fail to conduct any independent criminal history investigation, but it also placed the sole responsibility of performing such an investigation entirely on the State of New York, after supplying it with incorrect and misleading information.  Notably, New York State regulations provide:

> Bus driver qualification under Article 19-A of the Vehicle Traffic Law is the responsibility of both the Department of Motor Vehicle and the carrier.  *The carrier may establish qualifications for hiring or continuing the employment of drivers that are more stringent than those contained in this part.*

15 CRR-NY 6.11 (emphasis added).  Pursuant to the New York State regulations, Quality Bus was also responsible for the qualification of Railo pursuant to Article 19-A of the Vehicle Traffic Law.

With respect to her criminal history, Railo testified during her deposition:

> Q. Was there anything about your driving history or criminal
>    history that caused you any kind of concern before you applied
>    for a job as a bus driver for Quality Bus?
> A. Pose a concern with me?
> Q. Yeah.
> A. It always does.  It does anywhere.

Exhibit "10," 34.  Although she was admittedly unable to recall all of the numerous criminal

convictions and arrests throughout her lifetime, during her deposition Railo explained, "I had

petit larceny, possession of a controlled substance, possession in the seventh.  I don't remember

which one, possession in the seventh, driving without a license."  Exhibit "11," 274.  Railo

elaborated that "when you get possession in the seventh, it's something miniscule.  It's not even

worth going to jail for.  I don't even remember what it was.  It was an empty bag of weed.  I

don't remember what it was."  Exhibit "10," 40-41.  She also recalled a conviction for driving

while ability impaired; however "Like I said, it's been over ten years. Twelve years I think."

Exhibit "10," 40.  She later recalled that the conviction arose after she had overdosed on heroin

while in the driver's seat of her vehicle with the key in the ignition.  Exhibit "11," 373.

Regarding the petit larceny offense, Railo explained "I don't know what to say. I was younger.  I

was using drugs.  I haven't gotten arrested in years." Exhibit "10," 39.  With respect to an arrest

and conviction for reckless driving and leaving the scene of a personal injury accident, Railo

added "We were at an intersection.  He hit my driver's side door and flipped over me." Exhibit

"10," 86.

> Q. Do you remember if the reason why you left the scene of the
>    accident was because there was a warrant out for your arrest and
>    that's why you left?
> A. It could have been . . .

Exhibit "10," 86.  Railo also testified that she recalled surrendering her driver's license in 2009.

Exhibit "10," 56.  She elaborated that her driver's license "was suspended for fines, I believe,"

and although she couldn't recall the length of her suspension, she didn't think it was "that long." Exhibit "10," 46.

In reality, however, Railo has an extensive arrest and conviction record featuring driving without insurance, criminal possession of a controlled substance (cocaine), criminal possession of a controlled substance/drug paraphernalia (hypodermic needle and heroin), bail jumping, petit larceny, endangering the welfare of a child, failure to stop at a stop sign, reckless driving, leaving the scene of a personal injury accident, driving while impaired, and disorderly conduct.  Exhibit "15."

However, Railo felt no obligation to disclose a full criminal history since Quality Bus's employment application did not request that she disclose any criminal history, carefully limiting disclosure to "traffic convictions" which had occurred within the preceding three years.  Even in light of the 19-A Bus Driver application which requires an applicant to list "all criminal convictions," Quality Bus did not even discuss the issue of a criminal history with Railo.  The lack of a request for voluntary disclosure of an applicant's criminal history is compounded by the fact that Quality Bus failed to conduct any independent criminal history investigation on Caitlin Railo, consistent with industry standards.  Instead, Quality Bus seeks to absolve itself from any responsibility for hiring Railo, or from failing to perform a criminal history investigation by arguing that it is the State of New York's sole responsibility to qualify school bus drivers, and that it relied upon a limited criminal history performed through the State of New York Department of Motor Vehicles Bus Driver Certification Unit based upon false, inaccurate, and misleading information it provided. Specifically, Mr. Martucci testified:

> A.  Department of Motor Vehicles clears the bus driver.
> Q.  How do they do that?
> A.  I'm not entirely sure their process.
> Q.  They do that based on the 19A application?

27

> A.   The criminally clear the driver based on their fingerprints. . .
> Well, they're the agency that clears the driver, I guess that's
> where the confusion is.   DMV is the agency that clears the
> driver . . .

Exhibit "8," 65.

Criminal history is especially important in this case, where individuals are being screened

to determine their suitability to work with public and private school aged children.   In this

regard, New York State regulations provide:

> (6) . . . The driver of a vehicle for the transportation of children
> shall be of good moral character and thoroughly reliable.   At the
> time of initial application and at such other times as the
> superintendent of schools . . .may determine, each applicant for
> approval for employment as a school bus driver shall furnish . . . at
> least three statements from three different persons who are not
> related either by blood or marriage to the applicant pertaining to
> the moral character and reliability of the applicant.

8 CRR-NY §156.3 (d)(6).

Consistent with New York State regulations and Quality Bus's contract with the Port

Jervis School District, Mr. Martucci testified during his deposition that personal character

references are done in writing.   Exhibit "8," 43.   Mr. Martucci added that the three (3) character

references are "required by the State Education Department," and are verified by Quality Bus via

telephone calls.   Exhibit "8," 43.   However, Mr. Martucci admitted that no written

documentation verifying either employment references or character references existed.   Exhibit

"8," 43.

Of note, like the New York State Regulations, the Port Jervis School District

transportation contract requires that character references be provided from individuals who are

not related to the applicant.   Exhibit "12."   Again, a simple review of the character references

provided on behalf of Railo demonstrate their policy violative nature.   Railo provided character

references from her mother, Sheila Metcalf, her husband, Eric Baisley, and a friend.   Exhibit

28

"17."  While the patent insufficiency of the character references, in and of itself, may not form a

basis for Quality Bus's notice of Railo's ineligibility and unfitness to operate a school bus, they

clearly evidence Defendant Quality Bus's utter disregard for simple mechanisms intended to

ensure only qualified and upstanding individuals transport elementary students within and

without the Port Jervis School District.  Notably, Sheila Metcalf identifies herself as Railo's

mother in the body of her written reference; no telephone verification would even be required to

verify the insufficiency of the reference.  Mr. Martucci indicated that he did not personally verify

the references, and Quality Bus's corporate designee for training purposes indicated that she did

not evaluate or verify Railo's references, she simply checked "to make sure we had them."

Exhibit "18," 112.

       Likewise, Quality Bus failed to maintain any documentation of Railo's personal

employment interview, if any was conducted.  In this regard, New York State Regulations

mandate:

> Unless waived by the commissioner's designee pursuant to section
> 6.14 of this part, a motor carrier must keep the following items in
> the employee's file . . .
> (2) . . . statements of personal interview. . .

15 CRR-NY 6.17.

       During his deposition, Mr. Martucci testified that "[w]e [Quality Bus] always interview

all of our candidates with at least two managers."  Mr. Martucci further explained:

> Q.  Would you write down if they said I will give you three years
> of my employment and leave seven years blank, you would ask
> them where they were for those seven years?
> A.  Yes.
> Q.  And if they told you I was in Mexico, you would write that
> someplace?
> A.  Like on a note.  Whatever notes we would have. . . it would be
> written like on a note pad that I would have during an interview.  I
> typically make little notations.

Q.  Would you put it with the employee file?
A.  No. . . it would probably have a ton of other notes on it, like I
usually do on my tablet.
Q.  But it wouldn't be given in the employee's personnel file?
A.  No. . .
Q.  There is no notes of that interview, we established that ad
naseum this morning?
A.  Not in her personnel file.
Q.  Are there notes someplace else?
A.  Not that I could find, no.

Exhibit "8," 47-48, 113.  With regard to Railo's interview, Mr. Martucci testified:

Q.  Did you interview her [Railo]?
A.  Yes.  I was in the interview. . .
Q.  You have no independent memory of interviewing her; correct?
A.  I can remember being at the table.  I can remember her there.
But I can't - - I don't remember the specific questions that youre
asking me.  Those discussion points.  I remember I was present
during that interview. . . I specifically remember her talking about
her daughter who went to school at one of our schools. . . I also
remember that when she came to us she had no license, no
commercial license.  So, that she would have been required
training . . .
Q.  Do you know what large vehicles she was experienced with?
A.  I do recall discussing that.  She had talked about experience
driving like rental trucks in past like a U-hall [sic] type of vehicle.
I don't recall anything besides that.

Exhibit "8," 106, 114, 116, 118.  So not only did Quality Bus fail to create and maintain a

statement of personal interview, Mr. Martucci does not recall any specific topic of conversation

during Railo's interview which pertains to her ability to safely, reliably, and responsibly

transport school aged children on a daily basis.

As another aspect of hiring, Quality Bus's manual provides that "[e]ach candidate for

employment must not only successfully complete a drug and alcohol screening, but also undergo

a physical exam to determine his or her ability to complete essential functions of the job.  School

Bus Driver Physical Examinations are conducted under guidelines of the New York State

Department of Motor Vehicles." Exhibit "13." New York State Regulations specifically require that

> (c) . . . Except as provided in subdivision (d) of this section, the medical examination shall be performed by a licensed doctor of medicine . . . A physician's assistant or advanced practice nurse may conduct the physical examination *if they are acting under the direction and supervision of a physician*. . . when the medical examination is performed by a physician's assistant or an advance practice nurse, *the supervising or collaborating physician must approve the findings and sign the examination report*. . .

15 CRR-NY 6.10.

Railo's physical examination was not performed or approved by a medical doctor. Instead, the examination was conducted by a certified nurse practitioner. Exhibit "22." Railo testified during her deposition that she questioned the nurse about whether she was required to disclose her history of drug addiction, but was instructed that she only needed to provide medical conditions for the preceding five years. Exhibit "10," 163. She did however, inform the nurse that she was prescribed and actively taking prescription Suboxone, which treats opioid addiction. Exhibit "10," 150-151.

> Q. Did she ever say anything to you about whether or not you might not be fit to drive a bus because of these three drugs that you reported to her that you were on?
> A. That's what I was thinking, but, no, she didn't say anything.
> Q. But then you never told anyone at Quality Bus that you were taking Suboxone?
> A. No. They never asked.

Exhibit "11," 299. With respect to Railo's physical examination, Mr. Martucci testified

> So, I remember this document coming in. Typically more than one of us will look at – when I say one of us, I mean more than one Article 19A examiner will look at these to make sure that they're accurate. Mainly what we look at is the top under box one, make sure all of the areas are filled out. Where the drivers name is. A lot of the time the drivers don't know the work telephone number, so we make sure that information is filled out. We also – if we

31

> notice that anything is missing, which sometimes there is
> information missing, we will talk with the driver and make sure
> that all of the areas are complete and filled in.

Exhibit "8," 120-21.  Mr. Martucci explained that he always "tries" to read the comments by the

medical examiner, but that no one from Quality Bus would ever attempt to contact an applicant's

physician.  Exhibit "8," 120-122.  Despite reviewing Railo's medical examination to ensure that

all information was "filled in," Mr. Martucci did not take issue with the fact that no medical

doctor had approved the physical examination.

Significantly, Railo's pharmacy and medical records demonstrate that she had been

operating a school bus while using Percocet and Suboxone during the entire course of her

employment with Quality Bus.  Exhibit "31;"  Exhibit "32."  Moreover, at least as of January 14,

2013, Quality Bus was aware that Railo was taking additional prescription medications,

including Tylenol (325mg), Ibuprofen (800mg), and Percocet (5mg) by virtue of a January 14,

2013 doctor's note excusing her absence from work on that date.  Exhibit "33."

With respect to Quality Bus's overall hiring practices, Walter A. Guntharp, Jr., a

commercial vehicle safety expert, concluded that

> Had Quality Bus Service, LLC performed a criminal background
> investigation as required by industry practices, they would have
> discovered that Ms. Railo had a significant criminal history,
> including but not limited to arrests and convictions for leaving the
> scene of an accident, drug related offenses, and child
> endangerment.  This history of arrests should have immediately
> disqualified Ms. Railo from any consideration for employment.
> Quality Bus Service, LLC was on notice that Ms. Railo had not
> demonstrated a "good moral character" upon her failed attempt to
> conceal criminal and traffic proceedings, driver's license
> suspensions, and her true medical conditions during the hiring
> process.

Exhibit "16," 7.  Mr. Guntharp found that Railo was unqualified to operate a school bus for

multiple reasons, but was hired as a driver as a direct result of Quality Bus's patently careless

hiring and screening practices.  Exhibit "16," 8.  More specifically, Mr. Guntharp pointed to

Quality Bus's failure to investigate Railo's employment history, driving history, and criminal

history.  Exhibit "16," 8.  Moreover, Mr. Guntharp noted that Quality Bus's employment

application and hiring procedures fail to meet the minimum requirements of both Federal and

New York State Motor Carrier Safety Regulations.  Exhibit "16," 8.

> ii.     *Defendant Quality Bus's procedures, actions, and inactions during the course of training Railo demonstrate a careless and reckless disregard for the safety of the public in general, and school aged children in particular.*

New York State regulations require that "[e]ach school bus driver initially employed by

a board of education or transportation contractor . . . shall have received at least two hours of

instruction on school bus safety practices . . ."  8 CRR-NY §156.  Accordingly, "[t]he *Pre-*

*Service Course* must be completed and the Core Final Exam passed prior to transporting

children." Exhibit "23."  Quality Bus's manual similarly states that employees will undergo a

three hour pre-service course and a two hour employee orientation.  Exhibit "13."  Mr. Martucci

confirmed that an employee would not begin transporting students until the pre-service course is

completed.  Exhibit "8," 77-78.

However, Mr. Martucci elaborated upon Quality Bus's manual by explaining

> . . . the pre-service course meets the State's requirements, that's three hours.  And we also do our orientation, which is in addition to that three hours. . . I would say they typically take about five hours.  It depends how many people are there.

Exhibit "8," 79, 81.  However, Quality Bus's corporate designee on employee training testified

during her deposition:

> Q.  I'm just trying to get a sense as to like it says here, there is a two hour employee orientation.  Is there someone, you know, with a stop watch that, you know, says okay, go into this room, you know here at Quality Bus and youre going to undergo a two hour orientation process.
> A.  No.

Exhibit "18," 46.  Although the pre-service course must be completed before an employee begins transporting children, the evidence of record establishes that Railo began transporting children on October 26, 2012, but did not attend the pre-service course until November 6, 2012. Compare, Exhibit "24;" with Exhibit "25."  Consistently, Railo testified that she began driving a bus by herself on "the exact day I got my [CDL] license." Exhibit "11," 277.

As far as training during the pre-service course on drug and alcohol use and abuse, Ms. Koselnak testified:

> Q.  As part of this three-hour pre-service course, do you discuss the topic of drugs or alcohol use by bus drivers?
> A.  Yes. . . basically I just say that drinking and driving don't mix.
> *. . because of the type of cargo that we handle* . . .
> Q.  And the special cargo you're referring to are the children; correct?
> A.  Yes.

Exhibit "18," 50.  Notably, Quality Bus did not utilize the New York State Department of Education's optional pre-service course chapter devoted to drug and alcohol use and abuse. Exhibit "2."

Relative to the company orientation, Mr. Martucci testified that he provides newly hired employees the company handbook a day prior to orientation, "so that they can read it.  And that that's reviewed in conjunction with another handbook. . ." Exhibit "8," 81.  Ms. Koselnak added that, during the orientation, "we go through this manual [employee handbook], quite literally, page by page, reviewing the items that are in here." Exhibit "18," 82-83.  However, during her deposition, Railo testified that she recognized the pre-service course material and recalled receiving it.  Exhibit "11," 285-286.  She did not recall having ever received a company handbook.  Exhibit "11," 288-290.

34

> Q.  Do you recognize that as something that you had in your locker
> while you were employed at the bus company?
> A.  Locker? I didn't have a locker.
> Q.  You didn't have it on the premises? . . .
> A.  I don't recognize it.  I don't keep stuff there.  There is no
> lockers.
> Q.  Did you get an employee handbook?
> A.  I don't recognize this. . .
> Q.  This is the front page of another employee handbook. . . Do
> you recall receiving that?
> A.  I don't remember that, no.

Exhibit "11," 290, 292-3.  Additionally, Ms. Koselnak testified that she was unable to describe

the employee handbook "that all drivers are presented upon joining the company."

Mr. Martucci also stated that Quality Bus has a special training program whereby

employees are assigned "mentor" school bus drivers.

> . . . typically they will start for the first couple of days as riding on
> the bus, watching a driver who we call a mentor driver, it's a
> veteran driver, someone who knows the ropes, who manages their
> bus well who we send them with so they can get some sense of
> how a strong performer acts in that role. . . so that goes on for a
> period of time.  Usually a couple of days.  We gauge . . . how the
> applicant is progressing.  Sometimes the applicants want more
> time.  Others show us that they're very confident and they're ready
> to start after just a few days. . . then . . .the new driver takes the
> seat such that the mentor driver then  -- they switch roles.  So, the
> new driver is not in the field alone with a group of kids. . . And
> they will do a couple of days driving the bus with the help . . . not
> necessarily someone supervising them or telling them what to do,
> but with the help of somebody who knows the job.

Exhibit "8," 84.  Ms. Koselnak confirmed that the mentor driver training program is mandatory,

but admitted that she could not identify any document which would indicate who Railo's mentor

driver was.  Exhibit "18," 61.  Railo denied having ever been assigned a mentor driver,

testifying:

> Q.  I think you said that you started driving a bus on the first day
> that your commercial driver's license was issued to you on October
> 24, 2012; is that correct?

> A.  Yes.
> Q.  So, that very day you got the keys to a bus?
> A.  Yes.
> Q.  And did you actually do a route that day?
> A.  Yes.
> Q.  You picked up school children?
> A.  Yes.
> Q.  Did anybody from Quality Bus ride with you that first day?
> A.  No.
> Q.  How about any other day that you were driving school students
> for Quality Bus, did Quality Bus employ, supervise or manage
> your – or even another bus driver, ride with you at any point in
> time?
> A.  No.

Exhibit "11," 377.

Clearly applicable to the present February 14, 2014 motor vehicle accident, Railo was not

properly trained to negotiate a left hand turn across a state highway.  New York State regulations

demand that "drivers shall make a full stop at all railroad crossings and at State Highways before

crossing . . . "  8 CRR-NY §156.3.  However, with respect to the left turn onto Peenpack Trail,

Ms. Koselnak testified:

> Q.  Have you ever trained bus drivers to stop their bus prior to
>      making the left-hand turn off of Route 209 onto Peenpack
>      Trail? . . .
> A. . .  not unless oncoming traffic is coming.  They are trained to
>      slow up to check for oncoming traffic and then proceed to
>      make when it's clear to make the left hand turn.

Exhibit "18," 152-155.

> iii.    *Defendant Quality Bus's supervision and retention of Railo further*
>         *establishes that the need for drivers outweighed the rights and safety of*
>         *the general public, school aged children, and Plaintiff Mr. Maher.*

Quality Bus retained Railo as an employee even after she had proven herself to be a

careless driver, who regularly operated her school bus by allowing herself to be distracted by her

environment.

36

On October 26, 2012, Quality Bus completed the Carrier's Annual Review of Employee's Driving Record.  At that time, it was disclosed that Railo had,  just prior to the date of her application for employment, been charged with disobeying a traffic device.  Exhibit "26."  She was later convicted on August 8, 2012.  Exhibit "26."  The violation was not disclosed on her employment application.  Exhibit "14."  The record is devoid of any explanation or statement by Railo explaining the conviction, or how she had disobeyed a traffic device.  Additionally, there is no evidence of record that any additional instructional or supervision measures were taken by Quality Bus as a result of the recent conviction.

On December 3, 2012, Ms. Koselnak conducted and completed the Article 19-A Report on Annual Defensive Driving Performance.  Exhibit "27."  Notably, Ms. Koselnak indicated that Railo's "observation" ability was "unsatisfactory."  Exhibit "27."  Additionally, Railo's "procedures for receiving and discharging passengers" and her "traffic interaction" were also found to be unsatisfactory.  Specifically, Ms. Koselnak added her comments:

> To much unnecessary conversation w/ students. 1.  Be more observant when people getting in & out of cars on side streets 9. Remind students of 4 step unloading procedure & crossing 10. When car is letting pedestrian cross you're at stop sign wait- car has right of way.

Exhibit "27."  With respect to "unnecessary conversation with students," Mr. Martucci stated that Quality Bus does not train bus driver's to limit their conversation, and that he personally believed that such an instruction would be "unreasonable" and "impossible."  More specifically, Mr. Martucci testified:

> Q.  Let us agree, that would be a distraction if a driver is talking to a student while driving the bus?
> A.  Drivers have to talk to kids when driving a bus.  It's a requirement of the job, interacting with children is part of the job.

37

Q.  So, they are able to carry on conversations with kids while
they're driving?

A.  It would be totally unreasonable for me to tell a bus driver they
couldn't talk - - a school bus driver that they couldn't talk to
their passengers.

Q.  I understand talking to them.  There is a difference.  Let's make
a distinction between talking to them and carrying on a
conversation . . . You say it's unreasonable to prohibit your
drivers from talking to students. . . There is no limitation on the
interaction verbally that a bus driver could have with a student
while he's driving the bus?

A.  You know, I would - - it would be impossible for me to
monitor all of the conversations that bus drivers were having
with the students on all of the buses.

Q.  Is there any limitation, that's all I'm asking?

A.  No specific limitation that I can think of other than that we
would tell drivers not to be distracted.  They should refrain
from things that distract them while they're driving the bus.
For one person any conversation . . . or for another person, they
may be able to manage a bus very well managing multiple
situations and driving.

Q.  Who do you leave that determination up to, the bus driver?

A.  I wouldn't be able to create a rubric or anything that would,
you know, define what is distracting conversation is and what a
not distracting conversation is.

Exhibit "8," 92.  Conversely, Ms. Koselnak testified:

Q. . .is that [conversation while driving a school bus] something
that is not acceptable?

A.  They're advised not to.  Okay.  And when you have little
students and little students want to chit chat with the driver.
Pretty much trying to explain to them that you have to
concentrate more on your driving.

Q.  As part of the training that the driver's received from Quality
Bus, would that be something that you would instruct them on?

A. Yes.

Q.  And is it for safety reasons for the students?

A. Yes.

Q.  Because talking to students while driving can be a distraction?

A.  Yes."

Exhibit "18," 101-2.  However, Railo added:

Q.  Do you know if Quality Bus had any policy that prohibited you
from talking to the students while theyre on the bus?

A.  No.

> Q.  Do you know if you were ever reprimanded for talking too
>     much to the students on the bus by Quality Bus?
> A.  No. . . .
> Q.  In the moments right before the impact, if you were talking to
>     someone, would that have been a violation of Quality Bus
>     policy?
> A. No.

Exhibit "10," 215, 216-217.  The need for limited conversation with students is highlighted by

this case, wherein onboard video of the interior of Railo's school bus demonstrates that she was

engaged in a continuous conversation.  Exhibit "4."

A startling inconsistency in the evidence of this case arises upon consideration of the

Physical Performance Tests provided by Defendant Quality Bus.  The first test was provided by

Defendant Quality Bus in conjunction with its December 30, 2015 First Supplemental Response

to Plaintiff's Request for Production of Documents.  At that time, a Physical Performance Test

dated November 6, 2012 was produced.  Since New York State regulations require that the

Physical Performance Test be provided prior to a driver transporting students, Railo should have

been required to complete the Physical Performance Test by October 26, 2012, when she began

transporting children, and once per year thereafter.

However, on January 6, 2015, in conjunction with its Third Supplemental Response to

Plaintiff's Request for Production of Documents, Quality Bus Produced a second Physical

Performance Test, dated just one day prior to the subject February 14, 2013 motor vehicle

accident.  Significantly, Railo definitively testified that although she could not recall the exact

date she underwent the physical performance test, she only underwent said test on one occasion.

Exhibit "11," 277.  The authenticity of the February 13, 2014 Physical Performance Test is

questionable based upon the convenient timing of its alleged occurrence as well as the timing of

its production to Plaintiff.

On December 18, 2012, Ms. Koselnak also conducted a 19-A Biennial Behind the Wheel Road Test.  Exhibit "28."  During the course of the test, Ms. Koselnak noted multiple pre-trip inspection failures by Railo.  Exhibit "28."  However, even more concerning, she noted that Railo " failed to use proper lane/s."  Exhibit "28."  Nevertheless, Ms. Koselnak testified that she never disciplined Railo with respect to the "unsatisfactory" elements of the Report on Annual Defensive Driving Performance or Biennial Behind the Wheel Road Test.  Exhibit "18," 114-115.  Mr. Martucci confirmed that none of Railo's documented deficiencies would result in her being discharged, disciplined, or reprimanded.  Exhibit "8." 164.

Defendant Quality Bus similarly failed to inspect and/or identify obvious signs of Railo's impairment throughout her employment, and specifically on the date of the accident.  With respect to identification of signs of impairment, Mr. Martucci testified:

> Q.  Who makes the decision that they [school bus driver employed by Quality Bus] appear to be awake, non disheveled . . . what is the criteria you look for when you look through the window to see the driver in this case?
> A.  You would make sure that the driver seemed alert.  You would make sure that the driver – we know all of the people that work for us personally.  So, we know their mannerisms.  We know – we look for somebody who is coherent.  Nobody who displays any obvious outward signs like, for example, smells of alcohol, you know, we look to make eye contact with the person to try to develop some type of - - .

Exhibit "8," 98.  Ms. Koselnak also testified

> Q.  Are you trained to look for certain red flags that might indicate that that particular individual on that particular morning might be unfit to operate a bus?
> A.  I did take many years ago a training class on that.  But if a person checks in and I kind of have an issue with the way they look I might run some questions by them.
> Q.  Do you know if you ever had any issues with Caitlin Railo as far as you know, her condition when she reported in the morning to operate a school bus for any particular day?

40

A.  I don't recall any.

Exhibit "18," 76-77.  During her deposition, Railo confirmed that Quality Bus representatives

had ample opportunity to inspect her demeanor, explaining "I have to go in and get the key for

the bus, so I go in and I say good morning.  I use, you know, the ladies room and then get the key

and then go to the bus." Exhibit "10," 193.

In her statement to the New York State Police, Railo stated that she took a 200 mg time-

released Morphine pill at 12:00 a.m. on February 14, 2013.  Exhibit "1," 25.  Quality Bus

representatives therefore would have had an opportunity to observe Railo's demeanor,

appearance, and speech prior to providing her with the keys for a school bus for her morning

route and her afternoon route.  However, Quality Bus representatives deny that Railo exhibited

any symptoms of impairment.

Significantly, Railo treated with her psychiatrist, Dr. Vivianna Galli, between her

morning and afternoon bus routes.  Exhibit "30," 127-128.  Dr. Galli observed that Railo was

suffering from "mild withdrawal" which included achiness, cramps, and nausea.  Exhibit "30,"

127-128.  She noted Railo's mood to be anxious and irritable.  Exhibit "30," 127-128.  Even

more disturbing, Dr. Galli indicated "remote memory impairment," and that Railo's

attention/concentration was "mildly impaired." Exhibit "30," 127-128.  She generally concluded

that Railo's condition was worsening as a result of an insurance conflict which prevented her

from obtaining Suboxone.  Exhibit "30," 127-128.

Additionally, while she was providing a statement to the New York State Police shortly

after the February 14, 2013 motor vehicle accident, Officer Timothy Dymond noted that he

"noticed Caitlin had constricted pupils and droopy eyelids." Exhibit "1," 18.  His observation

prompted him to perform standardized field sobriety testing, which Railo failed.  Exhibit "1," 18.

41

She was then evaluated by Trooper Jason Vidocavich, who concluded that Railo was positive for CNS depressants.  Exhibit "18."

Accordingly, the observations by Dr. Viviana Galli and Officer Dymond, who would have evaluated Railo in close proximity to the time of the subject motor vehicle accident, are in direct conflict with the testimony and affidavits provided by Ms. Koselnak and Karen Wells.

> iv.    *Defendant Quality Bus's complicity in the February 14, 2014 motor vehicle accident further evidences its needless disregard for the safety and rights of others, including Railo, school aged-children, and the general public as well as Mr. Maher.*

In its supporting memorandum of law, Defendant Quality Bus relies heavily upon the decision rendered by the New York Appellate Division in James.  James, et. al. v. Eber Bros. Wine & Liquor Corp., 153 A.D.2d 329 (N.Y.S. App. Div. 4th Dep't. 1990).  The defendant-employee in James was a liquor salesman who caused a fatal motor vehicle accident after having consumed alcohol at several taverns along his sales route.  James, 153 A.D.2d at 331.  The plaintiff in James had asserted a claim for punitive damages against the defendant-employer based upon the argument that the employer "knew of [employee's] habit of drinking on the job yet did nothing to change his behavior."  James, 153 A.D.2d at 331.

The Court confirmed the general rule that "punitive damages can be imposed on an employer for the intentional wrongdoing of its employees only where management has *authorized, participated in, consented to, or ratified* the conduct giving rise to such damages, *or deliberately retained the unfit servant . . . or the wrong was in pursuance of a recognized business system of the entity.*"  James, 153 A.D.2d at 330-331 (citing Loughry v. Lincoln First Bank, 67 N.Y.2d 369, 378 (1986)).  Ultimately, the court in James concluded that "there was no proof of any complicity in or ratification of the employee's action by the employer" since the employer "did not permit or condone drinking on a regular basis and warned employees against

such practice.  There was no evidence to support the claim that the employee had a drinking 'problem' or, even if he had, that the employer was aware of it."  James, 153 A.D.2d at 330.

However, James is both factually and procedurally distinguishable from the instant case. Procedurally, James was decided *after* a trial on the merits as a result of Defendant's appeal from a jury verdict awarding Plaintiff $2,500,000 in punitive damages.  James, 153 A.D.2d at 330-331.  Plaintiff's claim for punitive damages against employer *was not* dismissed on summary judgment.  Rather, Defendant appealed from the jury's $2,500,000 punitive damages award arguing that the "evidence [*presented at trial*] was insufficient to support the punitive award." James, 153 A.D.2d at 331.

Factually, the evidence of employer's "complicity," "ratification," or "consent" consisted of "[t]he fact that the employee had had an "alcohol-related arrest" 12 years before the accident . . . and the fact that the employee was involved in an altercation at a bar three months before the accident."  James, 153 A.D.2d at 330.  The court reasoned that a single 12 year old accident related arrest "was not probative of a present drinking problem" and a single, isolated "altercation at a bar" was not sufficient to put the employer on notice of any "drinking problem." James, 153 A.D.2d at 330.  In this case, Quality Bus's complicity in the February 14, 2013 motor vehicle accident is undeniable and incites a reaction of outrage.

During his deposition, Michael Martucci testified that in approximately "2009 we began a contract with the Port Jervis School District under which we were the primary bus contractor where we provided all bus service to the district."  Exhibit "8," 29.  Mr. Martucci explained that the Port Jervis school district alone requires 70 busses.  Exhibit "8," 29.  However, despite Quality Bus's growing need for drivers, Mr. Martucci explained that "we are always able to cover the routes we have," although he admittedly continues to place advertisements for school

bus drivers in the newspaper "a couple of times a year."  Exhibit "8," 58.  Quality Bus's contract with the Port Jervis School District also requires a certain number of available substitute drivers. Exhibit "12."

Despite Mr. Martucci's admitted need for reliable bus driver, Mr. Martucci testified that Quality Bus's only policy on absenteeism is "just that they have to report that they're not going to come to work when they don't come to work."  Exhibit "8," 87.  He elaborated by explaining that Quality Bus has no policy related to tardiness or absenteeism "other than we - -  you have to be on time.  We want you to be on time.  If you call out you call out.  So there is no policy per say [sic]."  Exhibit "8," 88.  Mr. Martucci added that Quality Bus has no disciplinary procedure for being late multiple times.  Exhibit "8," 89.  Ms. Koselnak also stated that no employee would be subject to disciplinary action for missing work, but stressed that

> They [drivers] become almost the center of the student's life.  They are a lot of times the first person that the student sees in the morning and the last person the student sees at night.  So, attendance is critical. . .

Exhibit "18," 73.

Conversely, Quality Bus's own employment manual indicates "[i]t is frequently difficult to get substitute drivers, so the more notice that can be given [before calling off of work] the better the chances to get a substitute driver."  Exhibit "9."  Quality Bus's corporate designee confirmed the fact that it is frequently difficult to get substitute drivers.  Exhibit "18," 80. Quality Bus's employment manual also addresses frequent tardiness and absenteeism.  Exhibit "9."

Railo was able to accurately describe Quality Bus's substitute driver arrangements.

Q.  Were you aware of other backup drivers at Quality Bus?

A. No.  I know they would take another route in addition to their route.  That's what I had to do that day.  That's what the other driver's do. . . they already had a route.

Exhibit "10," 310.

Q. So, on all occasions where you didn't go to work, someone drove your route; is that correct?
A. Yes.  I think the lady in the office drove it one time.  That's why I got in trouble . . .

Exhibit "11," 309.

Q. So, you had ladies in the office that could drive buses; correct?
A. One of them could go out on the run, because there had to be somebody in the office, yes. . .
Q.  And the drivers that drove routes could take additional routes; right?
A.  Yes.

Exhibit "11," 310-11.

Mr. Martucci testified that he was unaware of any problems with Caitlin Railo between October of 2012 (when she was hired) through February of 2013.  Exhibit "8," 152.  He also testified that he was unaware that she was frequently tardy for work.  Exhibit "8," 153.

Similarly, Mr. Martucci testified that he had no recollection of Railo ever being disciplined.

Exhibit "8," 168.  Additionally, Ms. Koselnak was unable to recall if she was ever required to do a route for Railo because she had called off from work or arrived late, although Quality Bus's daily workboard records reflect that she had done so on several occasions.  Exhibit "18," 118.

With respect to disciplinary action prior to the February 14, 2013 motor vehicle accident, Railo testified

Q.  Were you ever told that day [02/14/12] that you would be fired if you didn't come in?
A.  I was told prior to that day.
Q.  The day of the accident, were you told you would be fired if you didn't come in?
A.  No. I hung up and went in.

45

> Q. Before that, were you ever told that you would be fired if you
>     didn't come into work?
> A. Yes, I would lose my job.
> Q. And who told you that?
> A. I had to sign a paper, and then the boss told me.  They both told
>     me.
> Q. What paper did you have to sign?
> A. One of their papers saying that I wouldn't be late or call out
>     again.
> Q. What happened on that occasion . . . that caused you to have to
>     sign something?
> A. Either I was late or called out.  I don't remember the day. . .
> Q. What did he say?
> A. That I cannot be late or call out again.
>  Q.  And what did you say?
> A. I signed the paper.
> Q. Well, did he present the paper or did the female?
> A. They both did.

Exhibit "11," 349-51.  Although no documentation with respect to repeated call offs or tardiness

was produced by Defendant Quality Bus during the course of the present litigation, Quality

Bus's dispatch records demonstrate that Railo had been a "no show" on several occasions, was

late on other occasions, and was ultimately suspended for an unspecified reason(s).  Exhibit

"34;"  Exhibit "18," 123-126.

Regarding her actions on the morning of the subject motor vehicle accident, February 14,

2013, Railo testified:

> Q. Did you attempt to call off work on the morning of February
>     14, 2013, the day of the accident?
> A. I believe I did.
> Q. Tell me what happened as far as that goes, as far as you can
>     remember.
> A. If I don't come in, I was fired.
> Q. Do you recall generally what you said about not coming in?
> A. I didn't feel good. . . Just said my body was sore and I was in
>     pain and I had trouble sleeping the night before.
> Q. And what did that person [at Quality Bus] tell you when you
>     made the request to stay home that day?
> A. There was no other drivers. . . There was nobody else to do the
>     route.

Exhibit "10," 208-9.

> Q. At some point somebody from Quality Bus told you that if you
> miss work, youre going to be fired; is that fair?
> A. Yes.
> Q. When was that statement made to you?
> A. The last time I was late.
> Q. Okay.  Who made that statement to you?
> A. The secretary.
> Q. Was that the same secretary that you called and spoke to on the
> morning of February 14, 2013?
> A. Yes.
> Q. And so when you called off and told her that you didn't feel
> well and that you didn't want to come in, and her response
> generally was, well, there is no one else to take the route?
> A. Yes. . . I just said 'There is nobody else that can do it?' and she
> said 'No, there is not.'

Exhibit "10," 211-12.

> Q. . . . "I was tired and I wished they would have let me call out.
> My boss told me I could not call out under any circumstances."
> Did you say those statements to Investigator Diamond on April
> 12th, 2013?
> A. Yes.

Exhibit "10," 250.

> Q. So both your boss or your supervisor, Mr. Martucci, and the
> secretary, told you that you could not call out under any
> circumstances; is that accurate?
> A. Yes.  I could not be late.

Exhibit "10," 252.

> Q. Okay.  And did you tell anyone that you didn't want to drive
> the afternoon route?
> A. I told two of the workers. . . The two that also do the PA run
> with me.  I complained to them about it, having to work. . . I
> told them that I told Quality in the morning and tried to call out
> and they wouldn't let me, that I was in pain, and they say
> 'Well, why are you working?' . . . 'I had to come in.'

<u>Exhibit "11,"</u> 302-3.  Ms. Koselnak testified during her deposition that she has no recollection of whether Railo attempted to call off of work on the morning of February 14, 2013.  <u>Exhibit "18,"</u> 129-30.

Notably, both the FMCSR and New York State Regulations provide:

> No driver shall operate a bus and a motor carrier shall not permit a driver to operate a bus while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness or any other cause, as to make it unsafe for him to begin or continue to operate the bus. *At the request of the driver or the motor carrier* such illness, fatigue, or other cause shall be certified by a qualified physician. . .

<u>15 CRR-NY 6.23</u>.

With respect to the corporate responsibilities of Quality Bus, Mr. Guntharp concluded that Quality Bus was "on notice that Ms. Railo was operating her school bus while under the influence of controlled substances based upon her disclosures during a medical evaluation which, by industry standard, should have prompted further investigation." <u>Exhibit "16."</u>

Mr. Guntharp applied a root cause analysis (RCA) to the subject motor vehicle accident, and determined that "the need for Ms. Railo's services caused Quality to require her to drive that day [February 14, 2013] despite the fact that she had notified them that she was sick and did not want to drive.  Quality knew or should have known that a driver's ability to operate safely can be affected by physical distress associated with being sick." <u>Exhibit "16,"</u> 12.

Mr. Guntharp ultimately concludes that "[h]ad Quality Bus Service, LLC or Caitlin Railo acted in a safe, responsible manner and following industry expectations for safe operation, this collision would not have occurred." <u>Exhibit "16,"</u> 12.

**V.      CONCLUSION**

Defendant Quality Bus's Rule 12(c) motions for judgment on the pleadings must be converted to Rule 56 motions for summary judgment.  Quality Bus, as the moving party at summary judgment, has failed to meet its burden of establishing the absence of any genuine issues of material fact.  Alternatively, if this Honorable Court finds that Defendant Quality Bus has met its initial burden, Plaintiff has established the existence of numerous genuine issues of material fact which should be presented for consideration by a jury.

WHEREFORE, Defendant Quality Bus's Motions for Summary Judgment and Judgment on the Pleadings relative to Plaintiff's claims for corporate negligence, negligent entrustment, and punitive damages should be denied and dismissed.

**Respectfully submitted,**
**COGNETTI & CIMINI**

**VINCENT S. CIMINI, ESQUIRE**
**Atty. ID No. 60463**

**SAL COGNETTI, JR. ESQUIRE**
**Atty. ID No. 17269**

**Counsel for Plaintiff, Justin T. Maher**
**Scranton Electric Bldg., 7th Floor**
**507 Linden Street**
**Scranton, Pa 18503**
**(570) 346-0745**