IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JUSTIN T. MAHER

                        Plaintiff

                v.

CAITLIN H. RAILO and
QUALITY BUS SERVICE, LLC

                        Defendants

Docket No. **12 CV 3586 (JCM)**

**MEMORANDUM OF LAW IN OPPOSITION TO CAITLIN H. RALO'S MOTIONS FOR SUMMARY JUDGMENT & JUDGMENT ON THE PLEADINGS**

**Jury Trial Demanded**

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CAITLIN H. RAILO'S MOTIONS FOR SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS

        AND NOW comes the Plaintiff, Justin T. Maher, by and through his attorneys,

COGNETTI & CIMINI, and hereby submits the instant Memorandum of Law in Opposition to

Defendant Caitlin H. Railo's Motions for Summary Judgment and Judgment on the Pleadings.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………. ii.

I.    INTRODUCTION……………………………………………………... 1

II.   ISSUES PRESENTED…………………………………………………... 4

III.  STANDARD OF REVIEW……………………………………………… 4

    A.   Federal Rule of Civil Procedure 12(c)…………………………………... 5

    B.   Federal Rule of Civil Procedure 56………………………………………. 7

IV.   ARGUMENT………………………………………………………….. 12

        i.    *The conduct of Railo on February 14, 2013 was intentional and deliberate and "has the character of outrage frequently associated with a crime."*……………………………………………………… 14

        ii.   *Railo's actions and inactions evidence "a history of egregious conduct" which culminated in "serious and permanent injuries to another."*……………………………………………………… 18

        iii.  *Railo's wanton negligence demonstrates a complete disregard for the safety and welfare of the general public*……………………………. 20

V.    CONCLUSION…………………………………………………………… 24

i

# TABLE OF AUTHORITIES

**Procedural Rules**

<u>F.R.C.P.</u> 12(c)…………………………………………………………………………3, 5

<u>F.R.C.P.</u> 12(d) …………………………………………………………………………7

<u>F.R.C.P.</u> 56(a) …………………………………………………………………………8

**United States Courts of Appeals Cases**

<u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ………………..11

<u>Graziano v. Pataki</u>, 689 F.3d 110, 114 (2d Cir. 2012) ……………………………………….6

<u>Friedl v. City of N.Y.</u>, 210 F.3d 79, 83 (2d Cir. 2000) ……………………………………….7

<u>Peter F. Gaito Architecture, LLC v. Simon Dev. Corp.</u>, 602 F.3d 57, 62 (2d Cir. 2010) ……….6

**Southern District of New York Cases**

<u>Allen v. Antal, et. al.</u>, 2015 WL 5474080, *3 (S.D.N.Y. 2015) ……………………………..5, 11

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) ………………………………… 8, 9

<u>Celotex Corp. v. Catrett</u>, 106 S.Ct. 2548, 2553 (U.S. 1986) ……………………………….5, 7, 10

<u>Greenbaum v. Handeksbanken</u>, 979 F.Supp. 973, 988 (1997)……………………………….12

<u>Holmberg v. Williamson</u>, 135 F.Supp. 493, 494 (S.D.N.Y. 1955) ……………………………..5

<u>Junker v. Midterra Assoc., Inc.</u>, 49 F.R.D. 310, 311 (S.D.N.Y. 1970) ……………………..10

<u>Streit v. Bushnell</u>, 424 F.Supp.2d 633, 640 (S.D.N.Y. 2006)…………………………………..6

<u>Sheppard v. Beerman</u>, 18 F.3d 147, 150 (S.D.N.Y. 1994) ……………………………………..6

<u>Townes ex. rel. Estate of Townes v. Cove Haven, Inc.</u>, 2004 WL 2403467, *3

   (S.D.N.Y. 2004) ………………………………………………………………….…. 8, 11

<u>Ventre v. Hilton Hotels Corp., et. al.</u>, 2000 WL 1011050, *2 (S.D.N.Y. 2000) ……………… 11

**New York State Cases**

<u>Bumpus v. New York City Tr. Auth.</u>, 851 N.Y.S.2d 591, 591 (App. Div. 2d Dep't. 2008). . . . .12

<u>Fabiano v. Philip Morris Inc.</u>, 862 N.Y.S.2d 487, 491 (App. Div. 1st Dep't 2008)……………. 14

<u>Falcaro v. Kressman</u>, 627 N.Y.S.2d 562 (App. Div. 2d Dep't. 1995) …………………… ……16

<u>Fordham-Coleman v. Nat'l Fuel Gas Dist. Corp.</u>, 834 N.Y.S.2d 422, 428-9

   (App. Div. 4th Dep't 2007) …………………………………………………………14, 15

Ghaffari v. North Rockland Center School Dist., 804 N.Y.S.2d 752, 752

     (App. Div. 2d Dep't. 2005)……………………………………………………………15

Guzman v. Strab Construction Corp., 228 A.D.2d 645 (App. Div. 2d Dep't. 1996)…………10

Home Ins. Co. v. Am. Home Products Corp., 551 N.Y.S.2d 481, 550

     (App. Div. 3d Dep't 1967) …………………………………………………………………14

In re John D. Baker a/k/a David Baker, Debtor, 18 B.R. 243, 245 (E.D.N.Y. 2012) …………14

James, et. al. v. Eber Bros. Wine & Liquor Corp., 153 A.D.2d 329

(N.Y.S. App. Div. 4th Dep't. 1990). …………………………………………………..…45

Karoon v. New YorkCity Tr. Auth., 659 N.Y.S.2d 27 (App. Div. 1st Dep't. 1997) …..……12

Kennedy v. Vault Leasing, 15 Misc.3d 1139(A) (Sup. Ct., Richmond County 2007). ….……16

Linsalata v. Berry, 39 Misc.3d 1207(A) (Sup. Ct., Westchester County 2013) ……… ….10, 13

Prozeralik v. Capitol Cities Communications, Inc., 82 N.Y.2d 466, 479 (N.Y. 1993) ……….15

Sweeney v. McCormick, 159 A.D.2d 832, 834  (App. Div. 3d Dep't. 1990) …………………15

Talavera v. Arbit, 795 N.Y.S.2d 708, 708 (App. Div. 2d Dep't. 2005)  ………………………12

Watson v. Strack, 773 N.Y.S.2d 676 (App. Div. 4th Dep't. 2004) ……………………………20

## I.      INTRODUCTION

The present litigation arises following a near fatal motor vehicle accident which occurred at the intersection of State Route 209 and Peenpack Trail (hereinafter "intersection") in the Town of Deerpark, Orange County, New York on February 14, 2013.  Exhibit "1;" Exhibit "2."

On the afternoon of February 14, 2013, at approximately 2:36 p.m., Defendant Caitlin Railo (hereinafter "Railo") was operating a yellow 2003 Freightliner School Bus in a northerly direction on State Route 209 approaching the intersection.  Exhibit "1," 1-3; Exhibit "2," 9-14. The 2003 Freightliner school bus was owned by and registered to Defendant Quality Bus Service, LLC (hereinafter "Quality Bus").  Exhibit "2," 9.  At the time, Railo was transporting a student, Kiera, home from school during the course and scope of Railo's employment as a bus driver for Quality Bus.  Exhibit "3," 7.

At the same time, Plaintiff Justin T. Maher (hereinafter "Mr. Maher"), was operating his blue-green 1995 Honda Civic Del Sol in a southerly direction on State Route 209, approaching the intersection.  Exhibit "1," 3.  As Mr. Maher was proceeding straight through the intersection on Route 209 southbound, Railo began negotiating a left turn onto Peenpack Trail without first bringing the approximately 35.3 foot long, 17,680 pound school bus to a stop at the intersection. Exhibit "2," 11, 17 ("it is obvious Caitlin [Railo] does not stop prior to making her turn onto Peenpack Trail as she stated she did during our interview with her at the hospital");  Exhibit "6."

Railo thereafter failed to yield the right of way to oncoming traffic, namely Mr. Maher, and proceeded to navigate the school bus through the oncoming (southbound) traffic lane of State Route 209.  Exhibit "2," 13.  By turning into the oncoming southbound lane of State Route 209, Railo caused the school bus to violently strike the front left (driver's side) of Mr. Maher's vehicle.  Exhibit "1," 1.

Following the accident, Railo was transported to Bon Secours Community Hospital for treatment of neck injuries.  Exhibit "2," 11.  During an interview conducted by Officer Timothy Dymond at Bon Secours Hospital, Officer Dymond noticed that Defendant Railo had "constricted pupils and droopy eye lids."  Exhibit "2," 17.  Officer Dymond then performed Standardized Field Sobriety Testing, which Railo failed.  Exhibit "2," 17.  Defendant Railo was then evaluated by Trooper Jason Vidocavich of the New York State Police Drug Recognition Experts and was found to be positive for "CNS [Central Nervous System] depressants."  Exhibit "2," 17.  With Railo's consent, a blood sample was also obtained by the New York State Police. Exhibit "2," 17.  Toxicology testing by Susan B. Gillies, a forensic scientist with the New York State Police Mid Hudson Regional Crime Laboratory, revealed opiate drugs in Railo's blood; namely, prescription drugs Diazepam and Morphine.  Exhibit "2," 30.  New York State DOT Controlled Substance Testing of Railo's blood was similarly positive for opiate drug concentrations.  Exhibit "2," 29.

In her handwritten statement prepared at 4:15 p.m. on the date of the accident, Railo stated "the medications I took today are: Clonodine .01mg, one tablet at 9:45 am. Valium 5mg 1 tablet at 9:45 am. Yesterday I took Percocet 7.5mg 2 tablets at about 8 pm and a half an Ambien 10 mg ½ tablet at 8 pm.  I also take Suboxone 8mg in the morning and 2 mg before bed but I haven't taken it since last week."  Exhibit "2," 23.  During an April 12, 2013 statement obtained by Officer Dymond following receipt of Defendant Railo's toxicology results, Railo acknowledged that she "had dirty blood" at the time of the subject accident, further explaining:

> I am prescribed Valium by Dr. Galli so that is why Diazepam came up.  I ran out of Suboxone two days before the accident.  I did not go to my doctor and get a refill and I was not allowed to call out of work.  I had to work.  I took a 200 mg Morphine pill.  It is . . . oblong says 200 on one side.  The pill is time released.

Exhibit "2," 24.

In connection with the February 14, 2013 motor vehicle accident, Railo was indicted by the State of New York and charged with Assault in the Second Degree (Class D Felony), three counts of Vehicular Assault in the First Degree (Class D Felonies), two counts of Vehicular Assault in the Second Degree (Class E Felonies), three counts of Operating a Motor Vehicle While Under the Influence of Drugs (Class E Felonies), three counts of Aggravated Operating a Motor Vehicle While Under the Influence of Drugs (Class E Felonies), and Endangering the Welfare of a Child (Class A Misdemeanor). Exhibit "5," 4, 16. Railo ultimately pled guilty to Assault in the Second Degree and Aggravated Operation of a Motor Vehicle While Under the Influence of Drugs, and was sentenced to two years in state prison, and three years post release. Exhibit "5," 3; Exhibit "6," 4-5. Her driver's license was revoked for one year as part of her sentence. Exhibit "5," 2.

As a result of the February 14, 2013 motor vehicle accident, Mr. Maher sustained serious and permanent bodily injuries, including but not limited to, numerous facial fractures[1], left proximal humerous fracture, right mid shaft humerous fracture, left distal radius fracture, bicondylar left tibial plateau fractures, right posterior rib fracture, right-sided pneumothorax, groundglass opacifications in the upper lung, transection of the right and left cranial nerves, right abducens nerve palsy, ventilator associated pneumonia, deep vein thrombosis, traumatic brain

---

[1]    [1] to the anteromedial and posterolateral walls of the right maxillary sinus, [2] minimally displaced fracture of the floor of the right orbit, which was within the extra coronal orbit, displaced fractures of the [3] medial left orbital wall, [4] left orbit floor, and [5] left lateral orbital wall, displaced fractures of the [6] anterior, [7] medial, and [8] posterior lateral walls of the left maxillary sinus, displaced comminuted fractures of the [9] left zygomatic arch, displaced fracture at the [10] base of the bilateral pterygoids, [11] step off of the right nasal bone fractured through [12] bilateral sphenoid sinuses with [13] extension into the right carotid canal with focus of the airways in the right carotid canal, and a displaced fracture of the [14] left mandibular condyle and [15] left mandibular angle, and a comminuted displaced fracture of the [16]  right mandibular body and [17] right mandibular condyle.

injury with acute right pneumocephalus and subarachnoid hemorrhage, respiratory failure, overgrown gums and poor dentition, impulse control disorder, depression, post-traumatic stress syndrome, keratitis with photophobia, left rotator cuff syndrome, neuropathy, post concussive headaches, dysuria, lumbar facet syndrome, left SI sacroilitis, pelvic obliquity, occipital neuralgia, and post-traumatic seizures.  Due to the complexity of the injuries sustained a result of the subject motor vehicle accident, the full extent of Mr. Maher's accident related injuries have yet been determined.

Mr. Maher initiated the present action by filing a Complaint against Railo and Quality Bus in the United States District Court for the Southern District of New York on May 16, 2014. Mr. Maher has asserted claims for vicarious liability (Count II), corporate negligence (Count III), negligent entrustment (Count IV), and punitive damages against Defendant Quality Bus, as well as claims for negligence (Count I) and punitive damages against Defendant Railo.  Exhibit "7."

## II.   ISSUES PRESENTED

A.   Whether genuine issues of material fact pertaining to Plaintiff's claim for punitive damages exist when the evidence establishes that Railo knew she was impaired at the time of the accident, attempted to call off work upon recognition of her impaired state, yet deliberately chose to operate a school bus in spite of her impaired condition.
**SUGGESTED RESPONSE:  IN THE AFFIRMATIVE**

## III.   STANDARD OF REVIEW

Defendant Railo's motions, supporting documents, and memorandum of law purport to seek both summary judgment and judgment on the pleadings with respect to Plaintiff's claim for punitive damages.  However, based upon the present procedural juncture of this litigation, together with Defendant Railo's offered supporting documents,[2] it remains wholly unclear

---

[2]   "The papers submitted on these motions graphically illustrate the unnecessary work to which attorneys can put themselves and the Court by failing to observe the elementary rules applicable to pleading, and also the specific

whether Defendant's motions will be decided pursuant to Federal Rule of Civil Procure 12(c) or Federal Rule of Civil Procedure 56.[3]  In an abundance of caution, Plaintiff's Memorandum of Law in Opposition will encompass both Rule 12(c) and Rule 56.

### A.      Federal Rule of Civil Procedure 12(c)

As the U.S. Supreme Court explained in <u>Celotex</u>,

> Before the shift to "notice pleading" accomplished by the Federal Rules, motions to dismiss a complaint or to strike a defense were the principal tools by which factually insufficient claims or defenses could be isolated and prevented from going to trial . . . but with the advent of "notice pleading," *the motion to dismiss seldom fulfills this function anymore*, and its place has been taken by the motion for summary judgment.

<u>Celotex Corp.</u> 106 S.Ct. 2548, 2555(U.S. 1986) (emphasis added).  The Southern District of New York has also acknowledged the evolving utility of motions to dismiss, explaining that the "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." <u>Streit v. Bushnell</u>, 424 F.Supp.2d 633, 640 (S.D.N.Y. 2006).

In light of the foregoing, when "reviewing a complaint for legal sufficiency in the face of motion to dismiss . . . the Court's point of departure is Rule 8(a)(2).  Pursuant to the liberal pleading requirements of the Federal Rules of Civil Procedure, a plaintiff need only provide 'a

---

rules of this Court relating to motions.  In support of the motions to dismiss the attorneys have submitted elaborate affidavits going into factual questions related to the alleged cause of action, as though the Court could determine the case on affidavits on such a motion.  It is elementary that on a motion to dismiss the complaint, the Court may consider nothing except the pleading. . . insofar as the motion to dismiss the complaint is concerned, the Court will consider nothing but the complaint and will disregard the affidavits which have been filed.  Insofar as the motion for summary judgment by the Williamsons is concerned, these defendants apparently have overlooked the fact that under Rule 56(c), 28 U.S.C.A., the issue is whether 'there is no genuine issue as to any material fact'. The affidavits on their face show issues as to material facts. These defendants have not even urged, in their papers, that there is no genuine issue as to any material fact, but rather have sought to argue the facts by the affidavits submitted by them." <u>Holmberg v. Williamson</u>, 135 F.Supp. 493, 494 (S.D.N.Y. 1955).

[3]      "[A] district court acts properly in converting a motion for judgment on the pleadings into a motion for summary judgment when the motion presents matters outside of the pleadings . . ." <u>Allen v. Antal, et. al.</u>, 2015 WL 5474080, *3 (S.D.N.Y. 2015).

short and plain statement of the claim showing the pleader is entitled to relief.'"  Streit v. Bushnell, 424 F.Supp.2d 633, 640 (S.D.N.Y. 2006).

When deciding a Rule 12(c) motion for judgment on the pleadings, courts apply "the same standard as that applicable under a Rule 12(b)(6) [motion to dismiss for failure to state a claim upon which relief can be granted]." Sheppard v. Beerman, 18 F.3d 147, 150 (S.D.N.Y. 1994).  "Under that test, a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Sheppard v. Beerman, 18 F.3d 147, 150  (S.D.N.Y. 1994).  More specifically, it is well established that "[t]o survive a Rule 12(c) motion, the complaint must contain sufficient factual matter to 'state a claim to relief that is *plausible on its face*.'" Allen v. Antal, et. al., 2015 WL 5474080, *3 (S.D.N.Y. 2015) (emphasis added) (citing Graziano v. Pataki, 689 F.3d 110, 114 (2d Cir. 2012)).

To evaluate a motion to dismiss brought pursuant to Rule 12(c), "a court may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." Allen v. Antal, et. al., 2015 WL 5474080, *3 (S.D.N.Y. 2015) (citing Peter F. Gaito Architecture, LLC v. Simon Dev. Corp., 602 F.3d 57, 62 (2d Cir. 2010)).  However, when additional documents outside of the complaint are included within a motion to dismiss, a "district court must either *exclude the additional material* and decide the motion on the complaint alone or *convert the motion to one for summary judgement* . . . and afford all parties the opportunity to present supporting material." Allen v. Antal, et. al., 2015 WL 5474080, *3 (S.D.N.Y. 2015) (citing Friedl v. City of N.Y., 210 F.3d 79, 83 (2d Cir. 2000)).  In fact, Federal Rule of Civil

6

Procedure 12(d) unambiguously provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside of the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." F.R.C.P. 12(d); Allen v. Antal, et. al., 2015 WL 5474080, *3 (S.D.N.Y. 2015).

In this case, Defendant Railo has produced not only Plaintiff's Second Amended Complaint and her Answer, but also a series documents and deposition transcripts. Defendant Railo has not provided any statement indicating its intention to limit the applicability of such documents, rather those documents have been produced in support of both Defendant Railo's motion for judgment on the pleadings and motion for summary judgment without restriction. Pursuant to Federal Rule of Civil Procedure 12(d), either Defendant Railo's supporting documents should be excluded, or its motions for judgment on the pleadings should be converted to motions for summary judgment.

**B.     Federal Rule of Civil Procedure 56**

The key purpose of Federal Rule of Civil Procedure 56(c) is to "isolate and dispose of *factually unsupported* claims or defenses." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2553 (U.S. 1986) (emphasis added). Rule 56 authorizes a court to grant a party's motion for summary judgment when "the movant shows that there is no genuine dispute as to any material fact" and that the undisputed facts establish that the movant "is entitled to judgment as a matter of law." F.R.C.P. 56(a). "Contested facts are material to the outcome of particular litigation if the substantive law at issue so renders them." Townes ex. rel. Estate of Townes v. Cove Haven, Inc., 2004 WL 2403467, *3 (S.D.N.Y. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The U.S. Supreme Court provided an illustration of Rule 56 in Celotex, explaining that

> the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion,
> against any party *who fails to make a showing sufficient to*
> *establish the existence of an element essential to that party's case,*
> and on which the party will bear the burden of proof at trial.

Celotex Corp. 106 S.Ct. at 2552 (emphasis added). The Court provided further guidance, clarifying that "there can be 'no genuine issue as to any material fact,' [when there is] a *complete failure of proof* concerning an *essential element* of the nonmoving party's case . . ." Celotex Corp. 106 S.Ct. at 2552.

Moreover, the "mere existence of some *alleged* factual dispute between the parties will not defeat an otherwise *properly supported* motion for summary judgment." Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505 (U.S. 1985). However, summary judgment "will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2506 (U.S. 1985). The U. S. Supreme Court clarified in Celotex, "[i]n essence, *the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury* or whether it is *so one sided* that one party must prevail as a matter of law." Celotex Corp. 106 S.Ct. at 2553 (emphasis added).

At the summary judgment stage, the "trial judge's function is not him[/her]self to weigh the evidence and determine the truth of the matter, but to determine *whether there is a genuine issue for trial*." Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505 (U.S. 1985) (emphasis added). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are *jury functions*, not those of a judge. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2513 (U.S. 1985). To summarize the proper role of a judge in deciding a motion for summary judgment, the U.S. Supreme Court in Anderson explained that

8

> the judge must ask him[/her]self  not whether he [she] thinks the
> evidence unmistakably favors one side or the other but whether a
> fair minded jury could return a verdict for the plaintiff on the
> evidence presented. . . In terms of the nature of the inquiry, this is
> no different from the consideration of a motion for acquittal in a
> criminal case, where the beyond-a-reasonable-doubt standard
> applies and where the judge asks whether a reasonably jury could
> find guilt beyond a reasonable doubt.

Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2512 (U.S. 1985).   A judge "must view the evidence presented through the prism of the substantive evidentiary burden. . . whether a jury *could reasonably* find *either* that the plaintiff proved his case by the quality and quantity of the evidence required . . . *or* that he did not. . ."  Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505,2513 (U.S. 1985).  (emphasis added).

Notably, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes *demonstrate the absence of a genuine issue of material fact*." Celotex Corp. 106 S.Ct. at 2553 (emphasis added).

A party supports a motion for summary judgment by:

> Citing to particular parts of materials in the record, including
> *depositions, documents, electronically stored information,*
> *affidavits or declarations . . . admissions, interrogatory answers,*
> *or other materials* . . . [or] showing that the materials cited do not
> establish the . . . presence of a genuine dispute.

F.R.C.P. 56(c)(1)(a) (emphasis added).  Although Rule 56 does not require that a party support its motion for summary judgment with affidavits (Celotex Corp. 106 S.Ct. at 2553), any affidavit or declaration which is submitted "*must be made on personal knowledge*, set out facts that would

be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." F.R.C.P. 56(c)(4) (emphasis added).

Assuming the moving party "fulfills its preliminary burden, the onus shifts to the non-movant to prove or raise the existence of a genuine issue of material fact." Allen v. Antal, et. al., 2015 WL 5474080, *4 (S.D.N.Y. 2015).   In opposing a motion for summary judgment, the nonmoving party is not required to "produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) [depositions, documents, electronically stored information, affidavits or declarations . . . admissions, interrogatory answers, or other materials]. Celotex Corp. 106 S.Ct. at 2553. "Courts have recognized that proof which might be inadmissible at trial may, nevertheless, be considered in opposition to a motion for summary judgment." Linsalata v. Berry, 39 Misc.3d 1207(A) (Sup. Ct., Westchester County 2013) (citing Guzman v. Strab Construction Corp., 228 A.D.2d 645 (App. Div. 2d Dep't. 1996).

The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505,2513 (U.S. 1985); See i.e., Junker v. Midterra Assoc., Inc., 49 F.R.D. 310, 311 (S.D.N.Y. 1970) (stating "we are bound by the principle that the existence of any genuine issue of material fact precludes the granting of relief . . . we must view the evidence in the light most favorable to the party opposing the motion . . . resolving all doubts in their favor.").  "Courts must 'construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Allen v. Antal, et. al., 2015 WL 5474080, *3 (S.D.N.Y. 2015) (citing Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010).  Similarly, a court "must

resolve all ambiguities . . . in favor of the party defending against the motion." Ventre v. Hilton Hotels Corp., et. al., 2000 WL 1011050, *2 (S.D.N.Y. 2000) (citing Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir. 1985).

Finally, courts should proceed "with caution in granting summary judgment . . . where there is reason to believe that the better course would be to proceed to a full trial." Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505,2513 (U.S. 1985) (citing Kennedy v. Silas Mason Co., 68 S.Ct. 1031 (U.S. 1948)).  Summary judgment is only appropriate "when it is *apparent* that *no trier of fact* 'could find in favor of the nonmoving party because the evidence to support its case is so slight.'" Townes ex. rel. Estate of Townes v. Cove Haven, Inc., 2004 WL 2403467, *3 (S.D.N.Y. 2004) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994).

In the present case, Defendant Railo has disregarded key evidence in order to set forth a purportedly "uncontroverted" set of facts which she argues entitle her to summary judgment on Plaintiff's claim for punitive damages.

## IV.    ARGUMENT

Defendant Railo argues that the evidence in the present case fails to support a claim for punitive damages because this case involves only "driver distractedness," an "improperly executed left turn," and a "failure to yield;" all of which are "common occurrences" which cannot support a claim for punitive damages.

    **A.**     **Defendant Railo is not entitled to summary judgment on Plaintiff's claim for punitive damages because numerous genuine issues of material fact exist regarding her impairment at the time of the February 14, 2013 motor vehicle accident, the voluntary nature of her decision to operate a school bus while impaired by drugs, and the outrageous nature of Railo's history of misconduct.**

In the State of New York, a Plaintiff is required to establish his claim for punitive damages by a preponderance of the evidence.  Greenbaum v. Handeksbanken, 979 F.Supp. 973, 988 (1997).  Additionally, "punitive damages are not a separate cause of action. . . They are inextricably linked to the underlying cause of action."  Greenbaum v. Handeksbanken, 979 F.Supp. 973, 982 (1997).

As New York Courts have outlined, punitive damages

> Are intended as punishment for the *gross misbehavior* for the *good of the public* and have been referred to as a sort of hybrid between a display of *ethical indignation* and the imposition of a *criminal fine* . . . The damages may be expressive of the community attitude towards one who willfully and wantonly causes hurt or injury to another.

Fordham-Coleman v. Nat'l Fuel Gas Dist. Corp., 834 N.Y.S.2d 422, 428-9 (App. Div. 4th Dep't 2007) (quoting Home Ins. Co. v. Am. Home Products Corp., 551 N.Y.S.2d 481, 550 (App. Div. 3d Dep't 1967)).  In that regard, Courts agree that "[a] jury is particularly well suited to the expression of community attitudes, and the decision whether to award punitive damages should 'reside in the sound discretion of the original trier of the facts.'" Fordham-Coleman v. Nat'l Fuel Gas Dist. Corp., 834 N.Y.S.2d 422, 429 (App. Div. 4th Dep't 2007) (quoting Home Ins. Co. v. Am. Home Products Corp., 551 N.Y.S.2d 481, 550 (App. Div. 3d Dep't 1967)).

Thus, "[e]ven if a plaintiff suffers only nominal damage, willful and intentional misdoing may be the basis for an award of punitive damages."  In re John D. Baker a/k/a David Baker, Debtor, 18 B.R. 243, 245 (E.D.N.Y. 2012) (citing Le Minstrall v. CBS, 402 N.Y.S.2d 815 (App.

Div. 1st Dep't 1978)).  Punitive damages are warranted where the acts of a defendant

"demonstrate a complete disregard . . . [for] the safety and welfare of the general public."

Fabiano v. Philip Morris Inc., 862 N.Y.S.2d 487, 491 (App. Div. 1st Dep't 2008).

 Conversely, New York Courts have observed that

> Although . . . punitive damages generally are not available in cases
> involving ordinary negligence, such damages may nevertheless be
> awarded in "actions based on negligence if such negligence
> amounts to flagrant misconduct."

Fordham-Coleman v. Nat'l Fuel Gas Dist. Corp., 834 N.Y.S.2d 422, 428 (App. Div. 4th Dep't

2007) (internal citations omitted) (citing Soucy v. Greyhound Corp., 276 N.Y.S.2d 173, 175

(App. Div. 3d Dep't 1967)).  Moreover, "[c]onduct justifying an award of punitive damages

'need not be intentionally harmful but may consist of *actions which constitute willful or wanton*

*negligence or recklessness*.'"  Fordham-Coleman v. Nat'l Fuel Gas Dist. Corp., 834 N.Y.S.2d

422, 428 (App. Div. 4th Dep't 2007) (internal citations omitted) (citing Home Ins. Co. v. Am.

Home Products Corp., 551 N.Y.S.2d 481, 550 (App. Div. 3d Dep't 1967)).  An act is "wanton"

and/or "reckless" when it is performed "under circumstances showing heedlessness and an utter

disregard for the rights and safety of others."  Sweeney v. McCormick, 159 A.D.2d 832, 834

(App. Div. 3d Dep't. 1990).

 Significantly, the New York Court of Appeals explained that "[p]unitive damages are

awarded in tort actions 'where the defendant's wrongdoing has been intentional and deliberate,

and has the character of *outrage frequently associated with crime*."  Prozeralik v. Capitol Cities

Communications, Inc., 82 N.Y.2d 466, 479 (N.Y. 1993) (emphasis added).  The New York Court

of Appeals elaborated, pointing out that

> Something more than the mere commission of a tort is always
> required for punitive damages.  There must be circumstances of
> *aggravation or outrage*, such as spite or 'malice,' or a fraudulent

> or evil motive on the part of the defendant, *or such a conscious and
> deliberate disregard of the interests of others that the conduct itself
> may be called willful or wanton.*"

Prozeralik v. Capitol Cities Communications, Inc., 82 N.Y.2d 466, 479 (N.Y. 1993) (quoting W.

Page Keeton, et. al., Prosser & Keaton on the Law of Torts, §2, p. 9-10 (5th ed. 1984)).

Additionally, punitive damages may also be appropriate where there is no "public" harm

at issue.  See, e.g., Suffolk Sports Center, Inc. v. Belli Constr. Corp., 628 N.Y.S.2d 952, 954-6

(App. Div. 2d Dep't. 1995).  In such a case, an award of punitive damages is warranted where

the defendant has a "history" of egregious conduct which culminates in "serious and permanent

injuries" to another.  See, e.g., Falcaro v. Kressman, 627 N.Y.S.2d 562 (App. Div. 2d Dep't.

1995).

> Nevertheless, the conduct in question must be 'grossly negligent,
> or wanton, or so reckless as to amount to a conscious disregard of
> the rights of others. . . Thus, *'needlessness' and an 'utter
> disregard'* for the rights and safety of others must be
> demonstrated."

Kennedy v. Vault Leasing, 15 Misc.3d 1139(A) (Sup. Ct., Richmond County 2007).  .

> i.      *The conduct of Railo on February 14, 2013 was intentional and deliberate
>         and "has the character of outrage frequently associated with a crime."*

Following the accident, Railo was transported to Bon Secours Hospital for treatment of

neck injuries.  Exhibit "1," 11.  During an interview conducted by Officer Timothy Dymond at

Bon Secours Hospital, Railo communicated that

> she was stopped on [State Route 209] in the Town of Deerpark
> getting ready to make a left turn onto Peenpack Road.  She stated
> she checked for oncoming traffic and saw none and proceeded to
> turn left.  As she entered her turn a vehicle traveling at a high rate
> of speed came out of nowhere and struck the front end of her
> schoolbus.

Exhibit "1," 17.  During his interview, Officer Dymond noticed that Defendant Railo had

"constricted pupils and droopy eye lids."  Exhibit "1," 17.  Officer Dymond then performed

Standardized Field Sobriety Testing, which Railo failed.  Exhibit "1," 17.  Defendant Railo was

then evaluated by Trooper Jason Vidocavich of the New York State Police Drug Recognition

Experts and was found to be positive for "CNS [Central Nervous System] depressants."  Exhibit

"1," 17.

      With Railo's consent, a blood sample was also obtained by the New York State Police.

Exhibit "1," 17.  Toxicology testing by Susan B. Gillies, a forensic scientist with the New York

State Police Mid Hudson Regional Crime Laboratory, revealed opiate drugs in Railo's blood;

namely, prescription drugs Diazepam and Morphine.  Exhibit "1," 30.  New York State DOT

Controlled Substance Testing of Railo's blood was similarly positive for opiate drug

concentrations.  Exhibit "1," 29.

      In her handwritten statement prepared at 4:15 p.m. on the date of the accident, Railo

stated "the medications I took today are: Clonodine .01mg, one tablet at 9:45 am. Valium 5mg 1

tablet at 9:45 am. Yesterday I took Percocet 7.5mg 2 tablets at about 8 pm and a half an Ambien

10 mg ½ tablet at 8 pm.  I also take Suboxone 8mg in the morning and 2 mg before bed but I

haven't taken it since last week."  Exhibit "1," 23.  During an April 12, 2013 statement obtained

by Officer Dymond following receipt of Defendant Railo's toxicology results, Railo

acknowledged that she "had dirty blood" at the time of the subject accident, further explaining:

> I am prescribed Valium by Dr. Galli so that is why Diazepam came
> up.  I ran out of Suboxone two days before the accident.  I did not
> go to my doctor and get a refill and I was not allowed to call out of
> work.  I had to work.  I took a 200 mg Morphine pill.  It is . . .
> oblong says 200 on one side.  The pill is time released.

Exhibit "1," 24.

In connection with the February 14, 2013 motor vehicle accident, Railo was indicted by the State of New York and charged with Assault in the Second Degree (Class D Felony), three counts of Vehicular Assault in the First Degree (Class D Felonies), two counts of Vehicular Assault in the Second Degree (Class E Felonies), three counts of Operating a Motor Vehicle While Under the Influence of Drugs (Class E Felonies), three counts of Aggravated Operating a Motor Vehicle While Under the Influence of Drugs (Class E Felonies), and Endangering the Welfare of a Child (Class A Misdemeanor).  Exhibit "5," 4, 16.  Railo ultimately pled guilty to Assault in the Second Degree and Aggravated Operation of a Motor Vehicle While Under the Influence of Drugs, and was sentenced to two years in state prison, and three years post release. Exhibit "5," 3; Exhibit "6," 4-5.  Her driver's license was revoked for one year as part of her sentence.  Exhibit "5," 2.

Richard Stripp, Ph.D., performed a forensic toxicology case review on behalf of Plaintiff. Exhibit "35."  Dr. Stripp concluded that "Railo consumed morphine and diazepam in the hours prior to the accident.  Since the parent (active) drugs were present in her blood at the time of collection it is reasonable to opine that she would have experienced some level of impairment by these drugs at the time of the accident."  Exhibit "35," 7.  Dr. Stripp noted that Railo admitted having taken "percocet, clonidine, and Ambien the night before the accident" but concluded that those drugs "were not likely part of the DOT testing panel and thus unlikely to be detected if present in Railo's urine."  Exhibit "35," 2-3.

Dr. Stripp similarly concluded that Suboxone, a drug prescribed to Railo to treat opiate addiction, would not have been detected by DOT illicit drug tests.  Exhibit "35," 3.  Instead, Dr. Stripp opined that Railo's positive "opiate" test result "supports her statement that she had taken morphine in the hours preceding the accident."  Exhibit "35," 2.

16

With respect to the prescription drug Morphine, Dr. Stripp explained that

> The most common side effects are *drowsiness, inability to concentrate, apathy, lessened physical activity,* constipation, urinary retention, nausea, vomiting, tremors, itching, bradycardia, and respiratory depression at higher doses. . . early effects may include *slowed reaction time, depressed consciousness, sleepiness, and poor performance on divided attention and psychomotor tasks.* Late effects may include *inattentiveness, slowed reaction time, greater error rate in tests, poor concentration, distractibility, fatigue, and poor performance on psychomotor tests.*

Exhibit "35," 4-5 (emphasis added).  Dr. Stripp further explained that "[b]oth morphine and heroin have a high physical and psychological dependence. . . Withdrawal can begin within 6-12 hours after the last dose and may last 5-10 days. . .  Exhibit "35," 5.  With respect to the prescription drug Diazepam, Dr. Stripp explained that

> It is suggested that patients treated with Diazepam be cautioned against engaging in hazardous occupations requiring complete mental alertness such as driving a motor vehicle.  Simulator and driving studies have shown that diazepam produces significant driving impairment over multiple doses.  Single doses of diazepam can increase lateral deviation of lane control, reduce reaction times, reduce ability to perform multiple tasks, decrease attention, adversely affect memory and cognition, and increase the effects of fatigue.

Exhibit "35," 7.  Moreover, Dr. Stripp stressed the significance of concurrent use of both Morphine and other CNS depressing drugs, such as Diazepam, in that such concurrent use "increase[s] many of the effects of morphine. . . increases the risk of sedation, drowsiness, and decreased motor skills, respiratory depression, hypotension, and profound sedation or coma." Exhibit "35," 5.

As part of her allocution, Railo admitted having consumed diazepam and morphine prior to the February 14, 2013 motor vehicle accident.  Exhibit "6," 17.  Railo further admitted that she did not have a prescription for the morphine she consumed, but that she had a valid prescription

for diazepam (Valium) and that "they [Quality Bus] knew it."  Exhibit "6," 17-18.  Railo also

conceded that the drugs she had consumed prior to the crash had interfered with her ability to

operate the school bus.  Exhibit "6," 19.  Notably, during her allocution, Railo acknowledged that

she did not at any point see Mr. Maher's approaching vehicle as she negotiated the left turn from

State Route 209 onto Peenpack Trail.  Exhibit "6," 19.

> ii.    *Railo's actions and inactions evidence "a history of egregious conduct"
>        which culminated in "serious and permanent injuries to another."*

The history of Railo's flagrant misconduct began well before her employment with

Quality Bus.  As Railo explained during her deposition, "I had petit larceny, possession of a

controlled substance, possession in the seventh.  I don't remember which one, possession in the

seventh, driving without a license."  Exhibit "11," 274.  With respect to the possession

conviction, Railo elaborated that "when you get possession in the seventh, it's something

miniscule.  It's not even worth going to jail for.  I don't even remember what it was.  It was an

empty bag of weed.  I don't remember what it was."  Exhibit "10," 40-41.  She also recalled a

conviction for driving while ability impaired; however "Like I said, its been over ten years.

Twelve years I think."  Exhibit "10," 40.  She later recalled that the conviction arose after she

had overdosed on heroin while in the driver's seat of her vehicle with the key in the ignition.

Exhibit "11," 373.  Regarding the petit larceny offense, Railo explained "I don't know what to

say. I was younger.  I was using drugs.  I haven't gotten arrested in years."  Exhibit "10," 39.

With respect to an arrest and conviction for reckless driving and leaving the scene of a personal

injury accident, Railo added "We were at an intersection.  He hit my driver's side door and

flipped over me." Exhibit "10," 86.

> Q.  Do you remember if the reason why you left the scene of the
> accident was because there was a warrant out for your arrest and
> that's why you left?
> A.  It could have been . . .

18

Exhibit "10," 86.  Railo also testified that she recalled surrendering her driver's license in 2009.
Exhibit "10," 56.  She elaborated that her driver's license "was suspended for fines, I believe,"
and although she couldn't recall the length of her suspension, she didn't think it was "that long."
Exhibit "10," 46.

In reality, however, Railo has an extensive arrest and conviction record featuring driving
without insurance, criminal possession of a controlled substance (cocaine), criminal possession
of a controlled substance/drug paraphernalia (hypodermic needle and heroin), bail jumping, petit
larceny, endangering the welfare of a child, failure to stop at a stop sign, reckless driving, leaving
the scene of a personal injury accident, driving while impaired, and disorderly conduct.  Exhibit
"15."

Railo's wanton behavior continued during the course of her employment with Quality
Bus.  Just prior to the date of her application for employment, Railo had been charged with
disobeying a traffic device.  Exhibit "26."  She was later convicted on August 8, 2012.  Exhibit
"26."  The record is devoid of any explanation or statement by Railo explaining the conviction,
or how she had disobeyed a traffic device.

On December 3, 2012, Mary Koselnak, Quality Bus Service, LLC's corporate designee
for training purposes, conducted and completed the Article 19-A Report on Annual Defensive
Driving Performance.  Exhibit "27."  Notably, Ms. Koselnak indicated that Railo's "observation"
ability was "unsatisfactory."  Exhibit "27."  Additionally, Railo's "procedures for receiving and
discharging passengers" and her "traffic interaction" were also found to be unsatisfactory.
Specifically, Ms. Koselnak added her comments:

> To much unnecessary conversation w/ students. 1.  Be more
> observant when people getting in & out of cars on side streets 9.
> Remind students of 4 step unloading procedure & crossing 10.

19

> When car is letting pedestrian cross you're at stop sign wait- car
> has right of way.

Exhibit "27."  On December 18, 2012, Ms. Koselnak also conducted a 19-A Biennial Behind the

Wheel Road Test.  Exhibit "28."  During the course of the test, Ms. Koselnak noted multiple pre-

trip inspection failures by Railo.  Exhibit "28."  However, even more concerning, she noted that

Railo " failed to use proper lane/s."  Exhibit "28."

　　　Most disturbing, Railo operated a school bus under the influence of Percocet and

Suboxone throughout the entire course of her employment with Quality Bus.  Exhibit "30;"

Exhibit "31;" and Exhibit "32."  Railo's extensive history of egregious conduct warrants an

award of punitive damages, as her conduct culminated in serious and permanent bodily injury to

Mr. Maher.

> iii.　　Railo's wanton negligence demonstrates a complete disregard for the
>      safety and welfare of the general public.

　　　In Rinaldo, the Appellate Division of the Supreme Court of New York evaluated a claim

for punitive damages arising from a rear end motor vehicle accident.  The Court provided the

following rationale for its decision to deny defendant's motion for summary judgment on

punitive damages:

> From the *damage to plaintiff's vehicle* and plaintiff's testimony as
> to her *observation of defendant's vehicle* through her rearview
> mirror . . .*defendant drove directly into the rear of plaintiff's
> vehicle without taking any action whatsoever to avoid the collision*
> . . . the jury could reasonably have concluded that the defendant
> was highly intoxicated, that he was driving at an excessive rate of
> speed on a heavily congested public street and the he *completely
> disregarded the obvious presence of the plaintiff* and other users of
> the highway where the accident occurred.  *This sufficiently
> established wanton negligence and recklessness on defendant's
> part so as to warrant an award of punitive damages.*

Rinaldo v. Mashayekhi, 185 A.D.2d 435, 436 (App. Div. 3d Dep't. 1992).  Plaintiff submits that

the facts giving rise to the present action are even more compelling than those in Rinaldo.

20

Plaintiff's expert accident reconstructionist, William J. Martin, observed that "there are no tiremarks from the rear wheels of the school bus, which remained on dry ground, revealing that panic braking was not applied [by Railo]."  Exhibit "36," 9.  During the initial impact, Mr. Maher's vehicle was "compressed downward and then scraped the ground for a short distance as the Honda moved less than one foot to maximum engagement [by the bus]."  Exhibit "36," 8.  As the bus drove over Mr. Maher's vehicle, "it was compressed into the asphalt."  Exhibit "36," 7.  Upon initial impact, Mr. Maher's vehicle sustained significant damage.  Specifically:

> [t]he front of the front fender is jammed into the edge of the right front wheel of the school bus, ripping the fender from the Honda. . . The front of the vehicle is *crushed* and the components are pushed rearward on an angle, including the engine which is pushed rearward into the firewall.  The hood is crumpled rearward at an angle, deeper at the left [driver's side] end than at the right end, into the windshield, crushing the windshield rearward . . . The removable top is displaced and bent.  The entire left portion of the firewall, floorboards, dashboards and components are damaged and pushed rearward, *intruding into the driver's compartment*."

Exhibit "36," 8-9 (emphasis added).  Scrape marks present on Route 209 indicate that Mr. Maher's vehicle abruptly changed direction as the school bus operated by Railo proceeded to drive on top of and over Mr. Maher's vehicle.  Exhibit "36," 7.

Since Railo had driven the bus on top of Mr. Maher's vehicle, it became pinned beneath the front of the bus.  Exhibit "36," 9.  The mechanical wiring in the area of the firewall and dashboard of Mr. Maher's vehicle was severely damaged.  Mr. Martin observed that "there is severe damage to the area of the firewall and dashboard where there are many wires damaged."  Exhibit "4," 9.  As a result, the steering column was "compromised and the steering wheel [was] displaced rearward [into the driver's compartment] and bent forward at the top."  Exhibit "4," 9.

Nonetheless, the school bus operated by Railo continued traveling through the southbound travel lane of Route 209 and onto Peenpack Trail following the impact, further

crushing and forcibly pushing Mr. Maher's vehicle in a northwesterly direction for approximately 21.3 feet before the school bus finally came to a stop on Peenpack Trail.  Exhibit "1," 3;  Exhibit "36," 8.  Scrape marks present on Route 209 indicate that Mr. Maher's vehicle abruptly changed direction as the school bus operated by Railo continued traveling through the southbound lane of State Route 209 onto Peenpack Trail.  Exhibit "36," 7.

> At that point, its [Mr. Maher's vehicle's] forward movement was
> abruptly stopped and it was then pushed westward on Peenpack
> Trail, where the front wheels left scrapes to the west.  The Honda
> was pushed to its final rest location by the right front wheel of the
> school bus, which is against the left [driver's] side of the Honda . . .
> with the front end of the left front fender of the Honda stuck in the
> rim [of the school bus].

Exhibit "36," 7.  By applying Videolan technology to the on-board video captured from the interior of the school bus at the time of the accident, Mr. Martin was able to conclude that the school bus took approximately 1.9 to 2.0 seconds "to reach the point of impact from the start of the left turn."  Exhibit "36," 12;  Exhibit "4."  Mr. Martin was similarly able to calculate a .28 second skid to impact time for Mr. Maher's Honda.  Exhibit "36," 12.  Based upon this information, Mr. Martin concluded that Mr. Maher's perception/reaction time was within the normal range of 1.6 to 2.0 seconds at the time of the accident.  Exhibit "36," 12.

Similarly, based upon the available sightline of more than 500 feet from the intersection, Mr. Martin was able to conclude that Mr. Maher's vehicle would have been clearly visible to Railo "for at least 4 to 5 seconds before she started to make the left turn.  And at the time she started her left turn, the Honda would have clearly been too close for any northbound turning vehicle, including the shortest car. . ."  Exhibit "36," 12.  Based upon the foregoing, and in response to Railo's unsupported assertion that Mr. Maher was speeding at the time of the accident, Mr. Martin was able to conclude that

22

> Justin Maher would have to have been traveling at a speed of
> approximately 150 Mph at the time Ms. Railo began her left turn at
> 2.0 seconds before impact to have not been visible to Ms. Railo
> when she began her left turn.  The physical evidence establishes
> that the Honda was traveling at approximately 46 to 50 Mph as it
> approached this intersection. . . this demonstrates that Ms. Railo's
> statements and testimony support a conclusion that her perception,
> recognition, decision and reactional faculties were degraded at the
> time of this accident.

Exhibit "36," 14.  He further explained

> At what should have been Ms. Railo's point of perception of the
> southbound vehicle, using a normal perception/reaction time of
> 0.75 to 1.0 seconds for making a left turn, which gives a total
> timeframe of 2.65 to 3.0 seconds before impact, the Honda was
> approximately 180 to 220 feet away the point of impact. . .
> Even at 5 seconds before impact, which is allowing an improperly
> lengthy perception/reaction time of approximately 3 seconds for
> Caitlin Railo to just perceive the presence of oncoming traffic-
> which is not an unexpected hazard, the southbound Honda, if
> traveling at a speed of 50 Mph would have been approximately
> 367 feet away, well within the available sightline, and
> still too close on this highway for Ms. Railo to perceive that the
> 35-foot long school bus should have begun a left turn since the
> analysis shows that it could not have cleared the intersection before
> the Honda reached it.

Exhibit "36," 16.

Moreover, Walter A. Guntharp, Jr., a commercial vehicle safety expert, evaluated both

the actions of Railo and the corporate policies and conduct Quality Bus on behalf of Plaintiff.

Regarding the actions of Railo, Mr. Guntharp concluded that

> Ms. Caitlin Railo knowingly and intentionally concealed her
> medical, criminal, and unsafe driving history in order to obtain a
> driving position with Quality.  Once hired, she routinely drove a
> large school bus while under the influence of drugs that affected
> her ability to operate safely.  Finally, on the date of the collision,
> Ms. Railo, despite knowing that she was unfit to operate a bus, ran
> her routes at the expense of public safety.  The actions of Ms.
> Railo, both prior to driving that day and at the time of the collision
> were direct causes of the injuries to Mr. Maher.

23

Exhibit "16," 12.  He specifically observed that

> Caitlin Railo, with reckless disregard for the safety of the public,
> attempted to conceal her history of drug dependency and history of
> seizures from Quality Bus Service, LLC. . . The decision of Caitlin
> Railo to jeopardize the safety of her passengers and the motoring
> public by [repeatedly] driving under the influence of drugs
> represented a reckless disregard for the safety of the public.

Exhibit "16."

## V.   CONCLUSION

Defendant Railo's Rule 12(c) motion for judgment on the pleadings must be converted to a Rule 56 motion for summary judgment.  With respect to Railo's motion for summary judgment, Plaintiff has established the existence of numerous genuine issues of material fact which should be presented for consideration by a jury.

WHEREFORE, Defendant Railo's Motions for Summary Judgment and Judgment on the Pleadings relative to Plaintiff's claim for punitive damages should be denied and dismissed.

Respectfully submitted,
**COGNETTI & CIMINI**

**VINCENT S. CIMINI, ESQUIRE**
**Atty. ID No. 60463**

**SAL COGNETTI, JR. ESQUIRE**
**Atty. ID No. 17269**

**Counsel for Plaintiff, Justin T. Maher**
**Scranton Electric Bldg., 7th Floor**
**507 Linden Street**
**Scranton, Pa 18503**
**(570) 346-0745**